1                UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3

4

5  SILVESTRE ESTRADA,                CASE NO:

6              Plaintiff,      22-CV-1373-DMS-BGS
   vs.
7
   UNITED STATES OF AMERICA,
8
              Defendant.
9  _____/

10

11

12

13

14

15              VIDEOTAPED DEPOSITION OF

16               OFFICER BRIAN MORENO

17              SAN DIEGO, CALIFORNIA

18                 DECEMBER 12, 2022

19

20

21

22

23

24  Job No. 943156

25  REPORTED BY:  JACQUELINE STEARMAN, CSR NO. 9373

OFFICER BRIAN MORENO - 12/12/2022

Page 13

1:21   1 BY MR. MCDONALD:

**2      Q.   Understood.   Thank you.   How far did you go in**

1:21   **3 school?**

4      A.   I did two years of college.

1:21   **5      Q.   Okay.   Was that an Associate's Degree?**

6      A.   No, it was not.   It was -- it was -- everything

1:21   7 was too miscellaneous to qualify -- quantify a degree.

**8      Q.   Where do you currently live?**

1:21   9      A.   I live in Campo, California.

**10      Q.   How long have you lived in Campo?**

1:21   11      A.   Going on two-and-a-half years.

**12      Q.   Okay.   So when did you move there, approximately?**

1:21   13      A.   I want to say it was May, but I don't remember

14 the actual year.   It was close to when this all happened.

1:21   **15      Q.   Okay.**

16      A.   Just because I was still on the end of the

1:21   17 academy.   And then when this happened, was right when I

18 got into phase.

1:21   **19      Q.   Okay.**

20      A.   So whatever the year, so maybe it's two years.

1:21   **21      Q.   Okay.   You mentioned the word "phase."   What does**

**22 "phase" mean?**

1:21   23      A.   So phase training is what happens when we get out

24 of the academy.   We basically are taught by a field

1:21   25 training officer and they -- they basically kind of guide

MSJ_002

OFFICER BRIAN MORENO - 12/12/2022

Page 14

1:22   1 us through the initial steps of learning how to police.

2       Q.   Okay.   And you're referring to your employment

1:22   3 with the San Diego Police Department?

4       A.   Yes.

1:22   5       Q.   Okay.   Who -- do you live with anyone currently?

6       A.   I do, with my fiance.   And we've got four kids.

1:22   7       Q.   And you're fiance and your kids, were they in

8 Circle K parking lot with you that night or not?

1:22   9       A.   No, I was on my way home from work.

10      Q.   So they have no involvement in this case?

1:22   11      A.   Correct.

12      Q.   You mentioned working for the San Diego Police

1:22   13 Department.   How long have you worked there?

14      A.   Since -- I think I -- the actual hire date was --

1:22   15 it was September 9th of 2019.   Something like that.

16      Q.   Okay.   And what did you do before joining SDPD?

1:22   17      A.   I waited tables for 20 years.

18      Q.   Okay.   Where were you waiting tables most

1:22   19 recently before joining the police department?

20      A.   Vintana in Escondido.   It's a good restaurant.

1:23   21           MR. RUTMAN:   It is.   You should try it.

22           MR. MCDONALD:   Okay.

1:23   23           MR. RUTMAN:   It's right above the car dealership.

24           MR. MCDONALD:   Good to know.

1:23   25 / / /

MSJ_003

OFFICER BRIAN MORENO - 12/12/2022

Page 26

1:42    1      Q.   Where is Campo?

        2      A.   Campo is very, very east.   It's basically -- it's

1:42    3  by the border.   Couple miles from where -- 12 miles, I

        4  think, from the border.

1:42    5      Q.   Okay.

        6      A.   The Mexican border.

1:42    7      Q.   How -- how far is Campo from where we are here

        8  today?

1:42    9      A.   It's exactly an hour, almost on the nose.

        10     Q.   And you've lived in Campo area for about

1:42   11  two-and-a-half years?

        12     A.   Correct.

1:42   13     Q.   What are the -- the major roadways that -- that

        14  run to the Campo area?

1:42   15     A.   94 and Buckman.

        16     Q.   Okay.   And you mentioned Buckman.   Is that

1:43   17  accessed off the Interstate 8 freeway?

        18     A.   Yes.

1:43   19     Q.   Okay.   So if you -- from Downtown San Diego, if

        20  you took the 8 Freeway East, you would drive for how many

1:43   21  miles approximately before you reach the Buckman Springs

        22  exit?

1:43   23     A.   40 or 50, I believe.

        24     Q.   Okay.   And then you would take the Buckman

1:43   25  Springs exit and head south?

MSJ_004

OFFICER BRIAN MORENO - 12/12/2022

Page 27

1:43  1    A.  Correct.

2    Q.  Okay.  And how -- how far, approximately, do you

1:43  3  have to drive on Buckman Springs Road before hitting the

4  main Campo area?

1:43  5    A.  12 to 15 miles-ish.

6    Q.  Okay.  And you mentioned the -- the 94.

1:43  7    A.  Uh-huh.

8    Q.  What's the 94?

1:43  9    A.  94 is an interstate.  It comes from, basically,

10  El Cajon and it comes all the way -- it's basically the

1:43  11  back way in through mountains to get to Campo.

12    Q.  Okay.  Have you driven that road, the 94, before?

1:43  13    A.  One time.

14    Q.  One time?

1:43  15    A.  And it was recently, yes.

16    Q.  Do you ordinarily take the 8?

1:43  17    A.  I do.

18    Q.  Is your home closer to the 8?

1:44  19    A.  It's just -- it's safer.  The 94 is pretty windy

20  and it's a lot of accidents that happen on the 94.

1:44  21    Q.  How do you know a lot of accidents happen on the

22  94?

1:44  23    A.  I'm on our -- we have a Facebook page that we go

24  onto.  And then there's also news articles go straight to

1:44  25  us as well.  I've got Campo on my news thing, and we get

OFFICER BRIAN MORENO - 12/12/2022

Page 28

1:44   1 accidents over there all the time.  Usually motorcycle

2 riders on the weekends when they're running it.

1:44   **3     Q.  So do you -- do you make a conscious effort to**

**4 avoid the 94?**

1:44   5     A.  I do, yes.  Like I said, I'll -- I'll be taking

6 it today just because of the one lane of the snow, but

1:44   7 other than that, I -- I usually do not take it.

**8     Q.  And that's -- that's because of the dangerousness**

1:44   **9 of the road?**

10     A.  Right now of the 8, yes.  Or the 94, yes,

1:44   11 correct, is the reason why I don't normally take the 94

12 just because it's a very windy road.

1:44   13          MR. MCDONALD:  Showing you what I've marked as

14 Exhibit 67.

1:44   15          (Defendant's Exhibit 67 was marked for

16          identification)

1:44   17 BY MR. MCDONALD:

**18     Q.  Take a look at that exhibit, and then let me know**

1:44   **19 if you recognize the area.**

20     A.  I do.

1:45   **21     Q.  So what is Exhibit 67?**

22     A.  It looks like it's mostly the 94, Campo Road.

1:45   23 And then you've got Buckman up over here and you've got

24 Campo over here on the right-hand side.

1:45   **25     Q.  Okay.  So you recognize this as a fair and**

OFFICER BRIAN MORENO - 12/12/2022

Page 37

1:53   1          MR. MCDONALD:  Okay. Let the record reflect the

2 witness has placed to arrows, one in and one out of the

1:53   3 parking lot as requested.

4 BY MR. MCDONALD:

1:53   **5     Q.  Are there any additional entrances or exits to**

**6 the Circle K parking lot?**

1:54   7     A.  Not that I'm aware of, no.  I've never seen one.

**8     Q.  How would you describe, generally, the stores and**

1:54   **9 the general parking lot of this Circle K area?**

10    A.  Depends on the day.  Saturdays it's super busy, a

1:54  11 lot of motorcycles come, but otherwise it's pretty mellow.

12 There's not a lot of traffic.

1:54  13          MR. MCDONALD: Showing you what's marked as

14 Exhibit 73.

1:54  15          (Defendant's Exhibit 73 was marked for

16          identification)

1:54  17 BY MR. MCDONALD:

**18     Q.  Do you recognize Exhibit 73?**

1:54  19    A.  I do.

**20     Q.  What is it?**

1:54  21    A.  That's an aerial view of the Circle K.

**22     Q.  And where is the -- where is the entrance and**

1:54  **23 exit?**

24    A.  It's over here on the left-hand side.

1:54  **25     Q.  Could you use that blue Sharpie that you have to**

OFFICER BRIAN MORENO - 12/12/2022

Page 38

1:54   1 place an "X" just right on the approximate location of the

2 entrance and exit.

1:55   3   A.  (Witness complies).

4       MR. MCDONALD: Okay.  The record should reflect

1:55   5 the witness has done so with an "X" near the bottom

6 right-hand corner -- bottom left-hand side of the exhibit.

1:55   7 BY MR. MCDONALD:

8    Q.  How frequently are you in this particular parking

1:55   9 lot?

10   A.  Used to be all the time.  It's very rare now.

1:55   11   Q.  Why is it rare now?

12   A.  Gas is so expensive.  I go a little bit out of my

1:55   13 way and go to Costco instead of going up to Circle K.

14 It's usually about 50 cents cheaper.

1:55   15   Q.  Around the time of May 2021, how regularly were

16 you in this parking lot?

1:55   17   A.  Every other day.  That's about every -- about how

18 often I filled up.

1:55   19   Q.  Would you also -- would you buy stuff in the

20 Circle K?

1:55   21   A.  Sometimes, yeah.

22   Q.  Okay.

1:55   23   A.  It depends.  I'd buy energy drinks or chips

24 something like that sometimes.

1:55   25   Q.  And remind me again when -- when you moved to

Page 42

| | | |
|---|---|---|
| 2:00 | 1 | MR. MCDONALD:  Showing you what I've marked as |
| | 2 | Exhibit 76. |
| 2:00 | 3 | (Defendant's Exhibit 76 was marked for |
| | 4 | identification) |
| 2:00 | 5 | BY MR. MCDONALD: |
| 2:00 | 6 | Q.  Is this a Google Earth overhead image of this |
| | 7 | Circle K parking lot that we've been talking about? |
| | 8 | A.  It is. |
| 2:00 | 9 | Q.  And you mentioned before that there's been some |
| | 10 | concrete pave -- poured into this parking lot; is that |
| 2:00 | 11 | right? |
| | 12 | A.  Correct, yes. |
| 2:00 | 13 | Q.  And was this concrete poured after the events |
| | 14 | that occurred in this case? |
| 2:00 | 15 | A.  It was. |
| | 16 | Q.  In May -- |
| 2:00 | 17 | A.  Yes. |
| | 18 | Q.  -- of 2021? |
| 2:00 | 19 | A.  Yes. |
| | 20 | Q.  Do you know what the newly-poured patch of |
| 2:01 | 21 | concrete is in this parking lot? |
| | 22 | A.  Yes. |
| 2:01 | 23 | Q.  If you could use the blue pen and just draw a -- |
| | 24 | a line on the newly-poured patch of concrete? |
| 2:01 | 25 | MR. RUTMAN:  Oh, okay.  You made -- do you |

OFFICER BRIAN MORENO - 12/12/2022

Page 43

2:01 | 1 know -- does he know where it is on that picture?  Okay.

2 I thought you meant why it was there.  Sorry.

2:01 | 3        THE WITNESS: Yeah, because -- I'm glad they did

4 it because it was a pain in the butt.  It always came to a

2:01 | 5 buckle head right here whenever -- when you had trailers

6 coming in and out.

2:01 | 7        MR. RUTMAN:  Oh.

8        MR. MCDONALD:  The record should reflect that the

2:01 | 9 witness has placed a -- a series of blue lines marking the

10 newly-poured concrete patch.

2:01 | 11       And, Counsel, would you stipulate that that is

12 where the newly-poured concrete patch is?

2:01 | 13       MR. RUTMAN:  Yeah.

14 BY MR. MCDONALD:

2:01 | **15    Q.  So when I ask you questions about the event, do**

**16 you understand you should keep in mind that the -- this**

2:01 | **17 area that you've now marked previously was not concrete?**

18    A.  Correct.

2:02 | **19    Q.  Okay.  Directing your attention to May 14th of**

**20 2021, what did you do that day?**

2:02 | 21    A.  I worked.

**22    Q.  As an officer for the San Diego Police**

2:02 | **23 Department?**

24    A.  Yes.

2:02 | **25    Q.  When was your shift that day?**

MSJ_010

Page 44

2:02    1    A.  I was on second watch.  We were just about to go

2      to first.

2:02    3    Q.  And what is the time for second watch?

4    A.  Second watch is 2:00 to midnight.  But just,

2:02    5 like, normally we usually end up getting out of there

6 about 30 minutes early because we come in 30 minutes early

2:02    7 to load up and get our gear on.  So it's kind of one of

8 those things.

2:02    9    Q.  Do you remember your workday that day?

10    A.  I actually don't because it was phase.  The whole

2:02   11 thing was a blur.

12    Q.  And, again, by "phase," so you were -- that was a

2:03   13 secondary part of your training for the police department?

14    A.  Correct, yes.

2:03   15    Q.  So you spent that day with -- with a training

16 officer in the beat car with you?

2:03   17    A.  Correct.

18    Q.  Do you remember when exactly you -- you checked

2:03   19 out that night?

20    A.  I don't.  Not at all.

2:03   21    Q.  What did you do after concluding your work for

22 the day?

2:03   23    A.  Change out.  And I drove -- I knew I needed to

24 get gas.  I usually got gas on my way in going home, so I

2:03   25 went to go get gas.

OFFICER BRIAN MORENO - 12/12/2022

Page 45

2:03    1    Q.   Okay.  And so you finished your shift with the

        2 police department in Downtown San Diego?

2:03    3    A.   Yes.  Oh, no, I was in Western at that point.

        4    Q.   Okay.  Where is that at?

2:03    5    A.   Western is over, like, Sports Arena area and Old

        6 Town.

2:03    7    Q.   Okay.  And -- and then you took the 8 Freeway out

        8 to Campo?

2:03    9    A.   Yes.

       10    Q.   Okay.  You took the Buckman Springs exit?

2:03   11    A.   I did.

       12    Q.   And you headed down 12 or so miles to the

2:04   13 intersection of Buckman Springs Road and the 94?

       14    A.   I did.

2:04   15    Q.   Okay.  What did you do after that?

       16    A.   I got gas.  I pulled in the Circle K and filled

2:04   17 up my tank.

       18    Q.   Okay.  And did you fill your tank all the way up?

2:04   19    A.   Always, yes.

       20    Q.   What did you do after that?

2:04   21    A.   That's when I went to go leave and go back.  Go

       22 home.

2:04   23    Q.   Okay.

       24    A.   Or tried to.

2:04   25    Q.   Did something happen that prevented you from

OFFICER BRIAN MORENO - 12/12/2022

Page 46

2:04    1 going home that evening?

2       A.   Yes.   I saw sirens, and I saw a car being chased

2:04    3 by a bunch of Border Patrol.

4       Q.   Where were you when you first saw those things?

2:04    5    A.   I want to say I was right about here when I first

6 saw it because that's when I tucked over into this pump

2:04    7 right here, just to get out of the way.   Because I figured

8 just because of this turn, I thought whoever it was, was

2:04    9 going to go behind me.

10      Q.   Okay.   If you please could with the black Sharpie

2:05    11 mark BM-1.

12      A.   Okay.

2:05    13      Q.   BM-1 in the location you were approximately when

14 you first became aware of this scene.

2:05    15   A.   (Witness complies).

16      Q.   And were you in a vehicle at that point?

2:05    17   A.   I was.

18      Q.   What's your vehicle?

2:05    19   A.   At that point, it was a 2018 Tacoma.

20      MR. MCDONALD:   Okay.   The record should reflect

2:05    21 that the witness has placed "BM-1" as requested on Exhibit

22 76.

2:05    23 BY MR. MCDONALD:

24      Q.   Which direction at -- at the time you first

2:05    25 became aware of this event --

OFFICER BRIAN MORENO - 12/12/2022

Page 47

2:05 | 1    A.   Uh-huh.

**2    Q.   -- what direction was your Tacoma facing?**

2:05 | 3    A.   It was probably about there.

**4    Q.   Okay.**

2:05 | 5    A.   Because, like I said, I just saw the lights out

6 of the corner of my eyes, and I saw the car as I was

2:05 | 7 coming around the corner.

**8    Q.   Okay.  And could you please --**

2:06 | 9         THE REPORTER:  Just one moment, please.

10        MR. MCDONALD:  Yes.  We're pausing for just one

2:06 | 11 minute.  Off the record.

12        THE VIDEOGRAPHER:  Off the record.  Time is now

2:06 | 13 2:06 p.m.

14        (Recess taken)

2:06 | 15        THE VIDEOGRAPHER:  Back on the record.  Time now

16 2:13 p.m.  Counsel?

2:06 | 17 BY MR. MCDONALD:

**18    Q.   Sir, you've placed "BM-1" on Exhibit 76**

2:06 | **19 representing the location you were when you first became**

**20 aware of a scene unfolding around you with Border Patrol**

2:06 | **21 and a vehicle that the Border Patrol was following; is**

**22 that right?**

2:06 | 23    A.   Yes, correct.

**24    Q.   Okay.  And what were you -- were you on foot or**

2:06 | **25 in a vehicle at the time at which you first became aware**

**MSJ_014**

OFFICER BRIAN MORENO - 12/12/2022

Page 48

2:06    1 of this event?

2       A.   I was in a vehicle.

2:07    3     Q.   And what is your vehicle?

4       A.   It was a 2018 Tacoma.

2:07    5     Q.   If you could, with the black pen in front of you,

6 mark at the location of BM-1 the approximate positioning

2:07    7 of your Tacoma at that moment in time.

8       A.   (Witness complies).

2:07    9          MR. MCDONALD:   The record should reflect the

10 witness has placed a black rectangle just next to BM-1

2:07    11 representing the approximate positioning of the witness'

12 Tacoma at the moment he first became aware of this

2:07    13 unfolding scene.

14          THE WITNESS:   Yes.

2:07    15 BY MR. MCDONALD:

16     Q.   What -- and what did you see?

2:07    17     A.   I was first drawn to lights, but then I saw a

18 silver vehicle driving, I guess, what is it gonna be,

2:08    19 north, northeast, on Campo Road.

20     Q.   And how would you describe the speed of that

2:08    21 silver vehicle?

22     A.   In Campo, I couldn't really say he was going

2:08    23 fast.  And the reason being is everybody speeds out there

24 just because we all know the back roads.

2:08    25          So it would probably be a normal speed for me,

OFFICER BRIAN MORENO - 12/12/2022

Page 49

2:08  1 just what I would see everyday drivers doing.  But like I

2 said, it would be speeding.  It wouldn't be the 55 he was

2:08  3 supposed to be going.

**4      Q.   Referring you to Exhibit 76, so the direction of**

2:08  **5 travel that you saw this silver vehicle was from the**

**6 bottom of the exhibit towards the top of the exhibit; is**

2:08  **7 that right?**

8      A.   Correct.

2:08  **9      Q.   Okay.  Driving on State Route 94/Campo Road?**

10      A.   Correct.

2:08  **11      Q.   And what did you see the vehicle do next?**

12      A.   He pulled into the gas station parking lot.

2:08  **13      Q.   Into the Circle K parking lot?**

14      A.   Yes.

2:09  **15      Q.   Okay.  And what did he do -- what did the silver**

**16 vehicle do after pulling into the Circle K parking lot?**

2:09  17      A.   I'm not 100 percent sure, but I'm 90 percent sure

18 that he came in front of me and then drove back over here

2:09  19 to this part of the parking lot.

20         But at this point, it was obstructed, so I don't

2:09  21 know what he did at this point of the parking lot.  I just

22 remember him coming, and he went this direction.

2:09  **23      Q.   Okay.**

24      A.   So he was going west, I believe.

2:09  **25      Q.   If you could please use the red pen that I'm**

OFFICER BRIAN MORENO - 12/12/2022

Page 50

2:09  1 **handing you to mark the path of travel of this silver car.**

2 A. Just from up the road over here?

2:09  **3 Q. From the 94 into the parking lot as far as you**

**4 remember.**

2:09  5 A. And then probably about there is where I lost

6 him.

2:09  7 MR. MCDONALD:  The record should reflect that the

8 witness has drawn three separate red arrows showing the

2:09  9 path of travel of this -- of this silver car.

10 Counsel, are you willing to stipulate that the

2:10  11 car, the silver car, was a Nissan?

12 MR. RUTMAN: Yes.  Can I ask for clarification,

2:10  13 Colin?

14 MR. MCDONALD:  Yes.

2:10  15 MR. RUTMAN:  Would it be appropriate for him to

16 maybe put a dotted line there to indicate that that's

2:10  17 where he lost sight of the -- of the vehicle?

18 BY MR. MCDONALD:

2:10  **19 Q. Yes, sir.  If you could, at the end of your arrow**

**20 just place maybe three dash marks to show --**

2:10  21 MR. RUTMAN:  Perfect.

22 MR. MCDONALD:  The witness has placed three dash

2:10  23 marks at the end of the third red arrow.

24 BY MR. MCDONALD:

2:10  **25 Q. And that represents the place where you initially**

OFFICER BRIAN MORENO - 12/12/2022

Page 51

2:10  1 lost sight of this vehicle; is that right?

2  A.  Yes.

2:10  3      MR. MCDONALD:  Okay.  And Counsel, stipulate that

4 the silver car that we're talking about is the Nissan?

2:10  5      MR. RUTMAN:  Yes.

6      MR. MCDONALD:  Okay.

2:10  7      MR. RUTMAN:  Yeah.

8 BY MR. MCDONALD:

2:10  9      Q.  So the parties stipulate that this silver car

10 is -- is a Nissan.

2:10  11     So when I refer to "the Nissan," do you

12 understand that that's the car that I'm talking about?

2:11  13     A.  Yes.

14     Q.  Okay.  During -- as the Nissan pulled to the

2:11  15 Circle K parking lot and made the turn as you've indicated

16 with that red arrow, how would you describe how the driver

2:11  17 was driving that Nissan?

18     A.  That -- at that point, it was fast.  And it

2:11  19 definitely looked like he was just trying to get out of

20 there.

2:11  21     Q.  Okay.  What did -- how did that make you feel in

22 that moment?

2:11  23     A.  At that point, I just wanted to get out of the

24 way.  I didn't want to get hit, and I didn't want to get

2:11  25 involved in any of it.

OFFICER BRIAN MORENO - 12/12/2022

Page 52

2:11     1    **Q. Did you think that you might get hit?**

       2    A. When he came in as quickly as he did, yes. And I

2:11     3   figured if I did not get out of the way, then I would have

       4   been hit.

2:11     5    **Q. How many miles an hour, approximately, would you**

       **6 say he was moving?**

2:11     7    A. Maybe -- when he came through, probably about 25

       8   to 30.

2:11     9    **Q. And how -- how quickly would you say a car**

     **10 ordinarily moves within a gas station parking lot?**

2:12    11    A. Under -- here, especially in Campo, under five

     12   miles an hour. We go pretty slow in.

2:12    **13    Q. Were you scared when you saw this driver pull**

     **14 into the Circle K parking lot?**

2:12    15    A. It difficultly made me think twice about going

     16   anywhere.

2:12    **17    Q. Were you scared?**

     18    A. No, I don't really get scared that easy. So, no,

2:12    19   not really. I just -- especially with training.

     **20    Q. Let me ask it this way: did it concern you?**

2:12    21    A. Oh, absolutely.

     **22    Q. Why?**

2:12    23    A. I didn't want to deal with any sort of insurance

     24   stuff, I didn't want to get hurt by getting the truck hit,

2:12    25   I didn't want it slammed into anything.

OFFICER BRIAN MORENO - 12/12/2022

Page 53

2:12    1    Q.  And -- and who was it that was causing you to
        2 have these concerns?

2:12    3    A.  The driver of the Nissan.

        4    Q.  It wasn't Border Patrol?

2:12    5    A.  At that point, no.

        6    Q.  What happened next?

2:12    7    A.  The next time I saw the vehicle, I saw him going
        8 up this way, and it looked like he was trying to get out.

2:12    9    Q.  And by "this way," what do you mean?

        10   A.  He was going back towards the entrance and the
2:13    11 exit.

        12   Q.  If you could please use the blue pen that I'm
2:13    13 handing you, and if you could mark with three dashes, like
        14 you've done, the position where you regained eyesight on
2:13    15 the Nissan.

        16   A.  Probably right about here, I would say.

2:13    17       MR. MCDONALD:  Okay.  And which direction -- the
        18 witness has placed three dash marks to represent where he
2:13    19 next saw the Nissan.

        20 BY MR. MCDONALD:

2:13    21   Q.  And -- and which direction was the Nissan facing
        22 at the time -- at that time?

2:13    23   A.  Towards the entrance and the exit, so about
        24 there.

2:13    25       MR. MCDONALD:  And the witness, for the record,

MSJ_020

OFFICER BRIAN MORENO - 12/12/2022

Page 54

2:13   1 has indicated back towards -- in the direction of the

2 entrance to the Circle K parking lot.

2:14   3 BY MR. MCDONALD:

**4      Q.  From those three dash marks, could you please**

2:14   **5 draw with the blue pen a line showing the path of travel**

**6 of the Nissan for -- for what came next.**

2:14   7      A.  He basically went kind of right here and he hit

8 somewhere over here.  So it was -- it was about that

2:14   9 general area is when he hit.  Like I was saying in the

10 video, the curb was about -- about two feet.  So it's --

2:14   11 it was a pretty decent curb.

12          MR. MCDONALD:  Okay.  The -- the record should

2:14   13 reflect the witness has drawn in blue line with an arrow

14 that proceeds close to the edge of the newly-poured patch

2:14   15 of concrete.

16 BY MR. MCDONALD:

2:14   **17      Q.  And, again, sir, at this time, that patch of**

**18 concrete was not there?**

2:14   19      A.  Correct, yes, it was not.

**20      Q.  And so for this period that -- that you've drawn**

2:14   **21 in a blue pen, was the driver driving on concrete or**

**22 driving on dirt?**

2:15   23      A.  Driving on dirt.

**24      Q.  Okay.  Had you -- before that moment in time, had**

2:15   **25 you ever seen anyone driving on that portion of the Circle**

OFFICER BRIAN MORENO - 12/12/2022

Page 59

2:22    1    A.  I do.

        2        Q.  And where is the Nissan?

2:22    3    A.  It's just off to my left-hand side, and I'm in

        4 the truck.

2:22    5        Q.  And in relation to the exhibit in the video, is

        6 it just near the top of the video approximately center of

2:22    7 the frame?

        8    A.  It is, yes.

2:22    9        Q.  And is the vehicle, the Nissan, on concrete or on

       10 dirt at this point?

2:22   11    A.  It's on dirt.

       12        MR. RUTMAN:  So what's the time stamp there then,

2:22   13 Colin?

       14        MR. MCDONALD:  52 seconds.

2:22   15 BY MR. MCDONALD:

       16    Q.  I'm pushing play.  I've paused it at 58.

2:23   17        Sir, during the period between 50 seconds and 58

       18 seconds or so, what did it appear to you that day that the

2:23   19 driver was trying to do in this moment in time?

       20    A.  Get back out of the -- the parking lot and get

2:23   21 back onto the 94.  Get onto Campo Road.

       22    Q.  Did it appear as though he was trying to evade

2:23   23 the Border Patrol?

       24    A.  Yes.

2:23   25    Q.  Was it clear that Border Patrol was trying to

MSJ_022

OFFICER BRIAN MORENO - 12/12/2022

Page 60

2:23   1 stop this Nissan?

2    A.  Yes.

2:23   3    Q.  Why was that clear?

4    A.  Lights and siren.

2:23   5    Q.  What were you hearing during this time?

6    A.  I don't even remember, to be honest.  I don't.  I

2:23   7 remember hearing sirens when they were on the road, but I

8 don't remember if sirens were on when they came in -- into

2:23   9 the gas station.

10    Q.  Would you describe this as a chaotic scene?

2:23   11    A.  Very much so.

12    Q.  What was chaotic about it?

2:24   13    A.  The Nissan driver not being able to get out where

14 he's trying to go.  I heard a loud pop when he hit the --

2:24   15 the curb.  And then when he backed up, at that point it

16 just seemed like he didn't know where to go.

2:24   17    Q.  Did you know at any point whether the driver was

18 gonna stop and get out of his car and turn himself in?

2:24   19    A.  No.

20    Q.  Did you know what the driver was gonna do next at

2:24   21 any given point?

22    A.  I did not.

2:24   23    Q.  You mentioned hearing a loud pop.  When was that

24 loud pop?

2:24   25    A.  It was when he hit the curb trying to get back

MSJ_023

Page 61

2:24   1 out.

**2**      **Q.   Okay.  I've brought the video back to 49 seconds.**
2:24   **3 I'm going to push play.  I've paused at 56 seconds in the**
       **4 video.  Is that when you heard the loud pop?**
2:25   5      A.   Yes.

**6**      **Q.   And what made the loud pop?**
2:25   7      A.   My guess is the bumper hit -- hitting the cement.

**8**      **Q.   Is there a curb there separating the dirt patch**
2:25   **9 from the concrete driveway?**
10      A.   Yes.

2:25   **11**      **Q.   And how would you describe the curb that's there?**
12      A.   It's a big curb.  It's -- like I said, it's
2:25   13 probably about a foot-and-a-half to two feet.

**14**      **Q.   A larger-than-usual curb?**
2:25   15      A.   Absolutely.
16           MR. RUTMAN:   78.
2:26   17           MR. MCDONALD:   Showing you what I've marked as
18 Exhibit 78.
2:26   19           (Defendant's Exhibit 78 was marked for
20           identification)
2:26   21 BY MR. MCDONALD:
**22**      **Q.   Is this the silver Nissan?**
2:26   23      A.   Yes.
**24**      **Q.   And is it resting in the Circle K parking lot on**
2:26   **25 the dirt -- dirt patch?**

Page 62

| | | |
|---|---|---|
| 2:26 | 1 | A.  Yes. |
| | **2** | **Q.  Do you see the front right side of this Nissan?** |
| 2:26 | 3 | A.  I do. |
| | **4** | **Q.  Okay.  When do you see there?** |
| 2:26 | 5 | A.  Bumper falling off. |
| | **6** | **Q.  Okay.  Do you know how that happened?** |
| 2:26 | 7 | A.  My guess is after hitting the curb. |
| | **8** | **Q.  And is that guess based on what you saw happen in** |
| 2:26 | **9** | **front of you?** |
| | 10 | A.  Correct.  And there's also white residue on the |
| 2:26 | 11 | front bumper. |
| | **12** | **Q.  And when the Nissan hit the curb, did you think** |
| 2:27 | **13** | **that the chase was over at that point?** |
| | 14 | A.  Oh, absolutely.  I thought it was done. |
| 2:27 | **15** | **Q.  Why did you think it was done?** |
| | 16 | A.  Because usually at that point people give up. |
| 2:27 | 17 | Once they realize they can't go forward anymore, they |
| | 18 | stop. |
| 2:27 | **19** | **Q.  Did it appear as though there was anywhere for** |
| | **20** | **this Nissan to go at that point?** |
| 2:27 | 21 | A.  No, not at that point. |
| | **22** | **Q.  Why not?** |
| 2:27 | 23 | A.  Because you had cars all around him at that |
| | 24 | point. |
| 2:27 | **25** | **Q.  Did the driver stop at that point?** |

MSJ_025

OFFICER BRIAN MORENO - 12/12/2022

Page 63

2:27    1    A.  No.

        2    Q.  What happened next?

2:27    3    A.  They backed up.

        4    Q.  Showing you, again, Exhibit 77, starting at the

2:27    5  56 second mark.  I've paused it at the 1:02 mark.

        6        And at 1:02, sir, do you see Border Patrol

2:27    7  vehicles moving in closer towards the Nissan?

        8    A.  I do.

2:27    9    Q.  And was it at this point that you thought that

       10  this chase was over?

2:28   11    A.  It was, yes.

       12    Q.  Pushing play at 1:02.  Stopped it at 1:10.

2:28   13        Did that video show the -- the Nissan moving in

       14  reverse?

2:28   15    A.  Yes.

       16    Q.  Did you have a clear line of vision to the Nissan

2:28   17  as it was reversing?

       18    A.  Yes.

2:28   19    Q.  And how would you describe how the driver was

       20  reversing?

2:28   21    A.  Erratically.  He was just trying to get out of

       22  there as fast as he could.

2:28   23    Q.  Did you say, "Erratically"?

       24    A.  Yes.

2:28   25    Q.  What makes you choose that word?

OFFICER BRIAN MORENO - 12/12/2022

Page 67

2:32  1 walking towards the car.

2  **Q.  Okay.  Looking straight onto Exhibit 76, did they**
2:33  3 **come -- I believe you motioned to the top of this exhibit**
4 **from the direction that they traveled?**

2:33  5  A.  Yes, down to the bottom.

6  **Q.  Okay.  And did they come from a vehicle that was**
2:33  7 **parked up in that location?**

8  A.  I believe so, yes.

2:33  9  **Q.  Okay.  Do you know where that vehicle was?**

10  A.  Somewhere over here.

2:33  11  **Q.  Could you mark with the black pen the approximate**
12 **location of -- of that Border Patrol vehicle?**

2:33  13  A.  (Witness complies).

14  **Q.  Could you put "BP" in the middle of that**
2:33  15 **rectangle?**

16  A.  (Witness complies).

2:33  17  MR. MCDONALD:  The record reflect -- should
18 reflect that the witness has placed a black rectangle with
2:33  19 the letters "BP" inside to show the Border Patrol vehicle.
20 BY MR. MCDONALD:

2:33  21  **Q.  Now, sir, is there any relationship between where**
22 **you put that Border Patrol vehicle on this exhibit and the**
2:34  23 **place where the Nissan hit into the curb?**

24  A.  Yeah, the -- the vehicle is almost right where it
2:34  25 hit the curb.

OFFICER BRIAN MORENO - 12/12/2022

Page 68

2:34   1   Q.   A Border Patrol vehicle came up to that point?

  2   A.   Correct.

2:34   3   Q.   Okay.  Going back to the numbers for the three

  4 agents that you placed, those numbers represent the place

2:34   5 in time when the Nissan came to a stop at the red

  6 rectangle; is that right?

2:34   7   A.   Correct.

  8   Q.   And what were the Agents 1, 2 and 3 doing at that

2:34   9 time?

  10   A.   Shouting commands.

2:34   11   Q.   What commands?

  12   A.   To get out of the car.

2:34   13   Q.   Were they saying, "Stop"?  What were they saying?

  14   A.   I believe they were saying, "Stop."  But the -- I

2:34   15 remember them saying, "Get out of the car."

  16   Q.   And were you able to clearly hear them?

2:34   17   A.   Yes.

  18   Q.   Did you have your windows down or windows up?

2:34   19   A.   They were up.

  20   Q.   Okay.

2:35   21   A.   That car does not have good sound insulation at

  22 all.

2:35   23   Q.   Your windows being up didn't keep you from

  24 hearing what the Border Patrol agents were saying?

2:35   25   A.   No, no.

MSJ_028

OFFICER BRIAN MORENO - 12/12/2022

Page 69

2:35    1      Q.  Were you closer to the Border Patrol agents than

2 the Nissan?

2:35    3      A.  Yes.

4      Q.  You were closer or the Nissan was closer?

2:35    5      A.  To the -- oh, to the Border Patrol agents, the

6 Nissan was.

2:35    7      Q.  The Nissan was closer?

8      A.  Correct.

2:35    9      Q.  Okay.  All right.  After you heard the agents

10 telling driver to get out of the car, did the driver get

2:35   11 out of the car?

12      A.  No.

2:35   13      Q.  When the -- the Nissan reversed to the location

14 of the red rectangle, did you again think the chase was

2:35   15 over at that point?

16      A.  I did.

2:35   17      Q.  So is that the second time you thought this chase

18 was over?

2:35   19      A.  Correct, yes.

20      Q.  Okay.  Were you right?

2:35   21      A.  No.

22      Q.  What happened next?

2:36   23      A.  The Nissan started pulling forward again.

24      Q.  Okay.

2:36   25          MR. RUTMAN:  79.

MSJ_029

OFFICER BRIAN MORENO - 12/12/2022

Page 70

2:36    1          MR. MCDONALD:  Thanks.

        2          (Defendant's Exhibit 79 was marked for

2:36    3          identification)

        4  BY MR. MCDONALD:

2:37    5      Q.  Sir, directing your attention to the screen, I'm

        6  going to play what's been marked as Exhibit 79, video from

2:37    7  a Subway employee.  I'm pushing play now.  I've paused the

        8  video at 15 seconds, and I'm going to replay that once.

2:37    9  I've paused it at 16 seconds.

        10         Sir, do you recognize what's depicted in Exhibit

2:37    11 79?

        12     A.  Yes.

2:37    13     Q.  What is it?

        14     A.  It's the -- it's the shooting from outside -- or

2:38    15 from inside the Subway store that was there.

        16     Q.  Okay.  And you recognize the events that are

2:38    17 unfolding on this video as the events that you saw while

        18 parked at the gas pump?

2:38    19     A.  Yes.

        20     Q.  Okay.  And does this appear to be a true and

2:38    21 accurate depiction of what happened in the Circle K

        22 parking lot that night?

2:38    23     A.  Yes.

        24     Q.  What do you see when the video first starts?

2:38    25     A.  Looks like the silver car is at a stop.

MSJ_030

OFFICER BRIAN MORENO - 12/12/2022

Page 71

2:38   1      Q.  Okay.  And then what happened -- I'll push play,

2 and then I'll ask you some questions.

2:38   3      A.  Okay.

4      Q.  Pushing play from the beginning.  I've paused at

2:38   5 about the eight-second mark.

6           What's happening between the first or second,

2:38   7 second and the eight-second mark or so?

8      A.  He's backing up.

2:38   9      Q.  "He" being the driver of the Nissan?

10     A.  Yes.

2:38  11      Q.  And is that the backing up that you have

12 reflected in black pen on Exhibit 76?

2:39  13     A.  Yes.

14      Q.  So does this appear -- Exhibit 79, does this

2:39  15 appear to be immediately after the Nissan has run into the

16 curb?

2:39  17     A.  Yes.

18      Q.  Pushing play from the beginning.

2:39  19           When shots were first fired, was the vehicle

20 standing still or moving?

2:39  21     A.  Moving.

22      Q.  What direction was it moving?

2:39  23     A.  It was moving -- once again, looks like it was

24 trying to get back up onto the -- to Campo Road.  So it

2:40  25 was towards the -- it was going in the direction of the

Page 72

2:40   1 Border Patrol.

2          **Q.  Were you surprised to see the driver start moving**
2:40   3 **forward again?**

4          A.  When I thought it was over, yes, I was.

2:40   5          **Q.  Why were you surprised?**

6          A.  Once again, he was surrounded.  Just it seems
2:40   7 kind of like a -- a moot point to try to get away at that

8 point.

2:40   9          **Q.  Did it appear to you that he was fully surrounded**
10 **by Border Patrol?**

2:40  11          A.  Yes.

12          **Q.  Did he have anywhere to go?**

2:40  13          A.  No.

14          **Q.  What had happen -- what would have happened if he**
2:40  15 **had continued backing up?**

16          A.  He would have probably hit another Border Patrol
2:40  17 car.

18          **Q.  What would have happened if he had drawn --**
2:40  19 **driven straight forward?**

20          A.  He would have either hit a curb or he would hit
2:40  21 that hill and not be a able to go up that hill.

22          **Q.  What about Border Patrol agents?**

2:40  23          A.  He would have probably hit one of those as well.

24          **Q.  Okay.  What did it appear to you that the driver**
2:41  25 **was attempting to accomplish?**

MSJ_032

OFFICER BRIAN MORENO - 12/12/2022

Page 73

2:41  1    A.   Once again, just trying to get out of that

2 parking lot.

2:41  **3    Q.   When the -- when the Nissan reversed and came to**

**4 a stop and then started up again, did you hear any sounds**

2:41  **5 coming from the Nissan when it started going forward?**

6    A.   Just the engine -- the rpm's going higher on the

2:41  7 engine like he was just trying to get out of there.

**8    Q.   Describe what that sound sounds like.**

2:41  9    A.   Just like a high-pitched whine.

**10    Q.   The whine of the engine?**

2:41  11    A.   Yes.

**12    Q.   Is it a sound that you associate with someone**

2:41  **13 trying to rapidly pick up speed?**

14    A.   Yes.

2:42  **15    Q.   How does that sound compare to the normal sound**

**16 that a car makes when a normal drive forward is made?**

2:42  17    A.   Usually, it's a lot -- it's a higher sound,

18 whereas like a normal acceleration is a lot lower.

2:42  **19    Q.   Okay.  And so the acceleration of the Nissan**

**20 going forward stood out to you based on the noise that the**

2:42  **21 engine was making?**

22    A.   Yes.

2:42  **23    Q.   Okay.  And could you hear the noise clearly from**

**24 your position at the gas pump?**

2:42  25    A.   Yes.

OFFICER BRIAN MORENO - 12/12/2022

Page 74

2:42   1    Q.  Tell me about what you were seeing from an
2 acceleration standpoint of the Nissan at that moment in
2:42   3 time.

4    A.  Not very much acceleration.  It seemed like the
2:43   5 wheels were spinning more than they were taking the car
6 anywhere.

2:43   7    Q.  Okay.  The car was on a dirt patch at that point
8 in time?

2:43   9    A.  Yes.

10    Q.  Did the way that the driver was driving at that
2:43   11 moment in time, did it appear to present a danger to the
12 Border Patrol agents?

2:43   13    A.  Yes and no.  I'm -- I guess we're taught to be --
14 like, think differently.  So from where I was sitting, was
2:43   15 it in -- in the same direction?  Yes.  Was it going to hit
16 them?  I don't know.

2:43   17      I don't know what they were seeing in that -- in
18 that situation, so I can't say if it was a danger to them.
2:43   19 Because things are very, very different when you're in
20 that scene.

2:43   21      Was it heading the same general direction as
22 them?  Yes, it was.

2:44   23    Q.  The agents you've marked one, two and three on
24 Exhibit 76, at the moment the Nissan starts moving
2:44   25 forward, had Agents 1, 2 and 3 moved even closer to the

MSJ_034

Page 75

2:44    1 Nissan at that point?

        2    A.  Yes.

2:44    3    Q.  Okay.  If you could please in green mark again

        4 one, two and three the approximate location of those three

2:44    5 agents at the moment the vehicle starts moving forward.

        6    A.  (Witness complies).

2:44    7         MR. MCDONALD:  The record should reflect the

        8 witness has placed in green the numbers one, two and three

2:44    9 to represent the agents' location at the moment the Nissan

        10 started moving forward.

2:44    11 BY MR. MCDONALD:

        12    Q.  And, sir, how many feet approximately would you

2:45    13 say from the Nissan were Agents 1, 2 and 3 in green?

        14    A.  One and two were probably about 10-ish feet, and

2:45    15 I would say three was a little bit further, probably about

        16 maybe 15.  He was definitely further out than these two.

2:45    17 These two were coming in a lot hotter.

        18    Q.  And when the vehicle started moving forward, were

2:45    19 Agents 1 and 2 at that point moving towards the vehicle?

        20    A.  Yes.

        21    Q.  It appears, based on the red rectangle that you

2:45    22 drew, that Agents 1 and 2 are forward of the Nissan at the

2:45    23 point in time it started moving forward?

        24    A.  Yes.

2:46    25    Q.  Okay.  Using the clock method, 12:00, 1:00,

Page 76

2:46  1 11:00, 10:00, from the vantage point of the Nissan, where

2 did it appear that Agent No. 1 was in -- in relation to

2:46  3 the front of the Nissan?

4    A.  To the front of the Nissan, he was probably about

2:46  5 at 2:30 or 3:00.  He was definitely off to the side.

6    Q.  And that's Agent 1?

2:46  7    A.  Yes.

8    Q.  When about Agent 2?

2:46  9    A.  Probably about 1:00.

10    Q.  Looking at your diagram, just to clarify, if I'm

2:47 11 looking at that, it would almost appear that Agent 2 is --

12 is more like an 11:00 looking straight on that rectangle.

2:47 13 Can you explain that?

14    A.  So what I -- what I remember is basically when he

2:47 15 came to a stop --

16    Q.  Yeah.

2:47 17    A.  -- when he started going forward he was like this

18 and started turning that way.  And then the agents were

2:47 19 coming in like this enclosing the front window.

20    Q.  Okay.

2:47 21    A.  So he was off to the -- like, the 1:00 side and

22 came around the front like this.  Because when he was

2:47 23 firing, he was firing across the car.

24      MR. RUTMAN:  You have to describe what he just

2:47 25 did, Colin.

MSJ_036

Page 77

2:47    1 BY MR. MCDONALD:

**2      Q.  Could you describe the direction of travel of the**

2:47    **3 Nissan -- after it came to a stop, describe the direction**

**4 of travel that the Nissan then next took.**

2:47    5           MR. RUTMAN:  Hold -- hold on.  I want -- I'd

6 like -- I think it's appropriate for him to de -- for you

2:47    7 or him to describe what he did with his hands as he was

8 indicating on the map just before you asked that

2:48    9 questions.

10           THE WITNESS:  So the -- the Nissan started going

2:48    11 forward and he -- he looked like he was trying to veer up

12 towards Campo Road.

2:48    13           Well, we're trained -- because of cross-fire,

14 we -- we basically make an L.  It's not even necessarily

2:48    15 a -- a straight L, but we're going to come in at different

16 angles so that we don't have to worry about any sort of

2:48    17 friendly fire.

18           So what they were doing is one was coming in

2:48    19 at -- at possibly a 1:00 off the nose, and the other one

20 was coming in at 2:30 or 3:00 off the nose.  So they were

2:48    21 creating that L pattern to make sure that there was no

22 cross-fire between the two.

2:48    23           THE REPORTER:  Hold on.

24 BY MR. MCDONALD:

2:48    **25      Q.  Okay.  Describe for the record the direction of**

MSJ_037

OFFICER BRIAN MORENO - 12/12/2022

Page 78

2:48   1 travel that the Nissan took after it came to a stop after

       2 it reversed.

2:48   3     A.  I would say it was -- it was veering up towards

       4 Campo Road, or trying to.  But because it was sliding, it

2:49   5 probably was going more straight than it was turning.

       6     Q.  Okay.  And did you know whether the driver was

2:49   7 gonna to turn to the right at any point?

       8     A.  No.

2:49   9     Q.  Did you know whether he was gonna take a hard

      10 left at any point?

2:49  11     A.  No.

      12     Q.  Did you know whether he was gonna drive straight

2:49  13 forward?

      14     A.  No.

2:49  15     Q.  Did you think that the driver was gonna do no

      16 more driving at all after he had reversed and come to a

2:49  17 stop?

      18     A.  After he had reversed and come to a stop, yeah.

2:50  19 Once again, I thought it was done.

      20          MR. RUTMAN:  80.

2:50  21          MR. MCDONALD:  Showing on the screen a video that

      22 I've marked Exhibit 80.

2:50  23          (Defendant's Exhibit 80 was marked for

      24          identification)

2:50  25 / / /

MSJ_038

OFFICER BRIAN MORENO - 12/12/2022

Page 79

2:50    1 BY MR. MCDONALD:

    2      Q.  I've paused it at the beginning of the video.

2:50    3          Sir, do you see five different screens or feeds

    4 depicted in this video?

2:50    5      A.  Yes, I do.

    6      Q.  And do you see the top middle screen?

2:51    7      A.  Yes.

    8      Q.  Does that appear to be the feed that we watched

2:51    9 in the earlier exhibit?

    10     A.  Yes.

2:51    11     Q.  Do you see your -- is that your Tacoma there at

    12 the gas pump?

2:51    13     A.  Yes, it is.

    14         MR. RUTMAN:  That's Exhibit 77.

2:52    15         MR. MCDONALD:  Thank you.

    16         MR. RUTMAN:  The record should reflect the video

2:52    17 has audio that's not being recorded.  Reported, sorry.

    18         MR. MCDONALD:  That's correct.

2:52    19 BY MR. MCDONALD:

    20     Q.  I paused it at the 1:08 mark.

2:52    21         Sir, did you have a chance to watch that video up

    22 until now?

2:52    23     A.  No.

    24     Q.  And have you been keeping close attention to the

2:52    25 video as it unfolded up until the 1:08 marker?

OFFICER BRIAN MORENO - 12/12/2022

Page 80

2:52    1    A.  Yes.

        2    Q.  Did you hear gunshots just before I stopped the

2:53    3  video?

        4    A.  Yeah.

2:53    5    Q.  And the timing of those gunshots, are they

        6  consistent with what happened in the time frame of events

2:53    7  that evening?

        8    A.  Yes.

2:53    9    Q.  Referring back to Exhibit 76, so when the driver

       10  of the Nissan started going forward, was he going in the

2:53   11  direction of the Border Patrol?

       12    A.  Yes.

2:53   13    Q.  And were those Border Patrol agents on foot?

       14    A.  Yes.

2:53   15    Q.  And was he traveling in the direction of Border

       16  Patrol agents on foot before shots were fired?

2:53   17    A.  Yes.

       18    Q.  How quickly would you estimate the Nissan was --

2:54   19  moved forward before the shots were fired?

       20    A.  Miles per hour?

2:54   21    Q.  Yes.

       22    A.  Not fast.  Like I said, it was sliding.  Maybe a

2:54   23  couple.  Two or three.

       24    Q.  Okay.  Was that because it was coming from dead

2:54   25  stop?

MSJ_040

OFFICER BRIAN MORENO - 12/12/2022

Page 81

2:54    1     A.   Yes.

2:54    2     Q.   Okay.   Can any car go from 0 to 60 in a matter of
        3  seconds?

2:54    4     A.   No.

2:54    5     Q.   Based on the sound that you heard of the
        6  acceleration of the engine, did it appear to you that the
2:54    7  driver was trying to accelerate to a high rate of speed?

        8     A.   Yes.

2:55    9          MR. MCDONALD:  Direct your attention to the
        10 screen, I'm showing you a video that I am marking as
2:55    11 Exhibit 81.

        12          (Defendant's Exhibit 81 was marked for
2:55    13          identification)

        14 BY MR. MCDONALD:

2:55    15    Q.   I've paused the exhibit at the beginning.

        16          Sir, do you recognize this as the Cameron Corners
2:56    17 gas station across the street from the Circle K?

        18    A.   Yeah.  That looks like Bash's store, yes.

2:56    19    Q.   Pushing play.  What are you seeing?

        20    A.   I'm seeing a car fleeing a bunch of patrol --
2:56    21 Border Patrol agents.

        22    Q.   I've paused at 39 seconds.

2:57    23          Do you see a vehicle traveling right to left on
        24 the video near the -- near the top of the frame?

2:57    25    A.   Yes.

MSJ_041

OFFICER BRIAN MORENO - 12/12/2022

Page 82

2:57   1      Q.   Where does it appear the vehicle is traveling?

2          A.   It's in the dirt path on the side of the gas

2:57   3  pumps, so on the -- in front of the gas pumps of the

4  Circle K.

2:57   5      Q.   Pushing play again.  I've paused at 48 seconds.

6          What did you just see happen in the video?

2:57   7      A.   The vehicle stopped and started backing up.

8      Q.   Does that appear to be the moment in time where

2:57   9  you described the Nissan hit into the curb in this parking

10 lot?

2:57  11      A.   Yes.

12      Q.   Pushing play at 48 seconds.  I've paused at 58

2:58  13 seconds.

14          What, if anything, happened right before I pushed

2:58  15 pause in this video?

16      A.   Looked like the vehicle was starting to turn left

2:58  17 after it started accelerating.

18      Q.   Accelerating forward?

2:58  19      A.   Yes.

20      Q.   And do you see Border Patrol agents on foot

2:58  21 around the vehicle at this point in time?

22      A.   I can't see it, but that's because of all the

2:58  23 lights.

24      Q.   Pushing play at 58 seconds.  And I've stopped the

2:58  25 video at 1:12.

MSJ_042

OFFICER BRIAN MORENO - 12/12/2022

Page 83

2:58    1        Do you see an individual on the left side of the

        2 screen?

2:58    3    A.  I do.

        4    Q.  Is that Bash?

2:58    5    A.  Kind of looks like him.

        6    Q.  The events that you just watched in Exhibit 81,

2:59    7 are they a fair and accurate depiction of the events that

        8 you saw in front of you the evening of May 14th of 2021?

2:59    9    A.  Yes.

        10       MR. MCDONALD:  I propose a five-minute break at

2:59    11 this point for me to collect my notes.

        12       MR. RUTMAN:  Okay.  You almost done?

2:59    13       MR. MCDONALD:  Yeah.

        14       THE VIDEOGRAPHER:  Off the record.  Time now

2:59    15 3:06 p.m.

        16       (Recess taken)

3:14    17       THE VIDEOGRAPHER:  Back on the record.  Time now

        18 3:14 p.m.  This begins audio number two in the deposition

3:14    19 of Officer Brian Moreno.  Counsel?

        20 BY MR. MCDONALD:

3:14    21    Q.  Sir, you mentioned earlier that one of your

        22 practices as part of your training is to attempt to

3:14    23 memorialize events that happen in -- in report form; is

        24 that right?

3:14    25   A.  Yes.

OFFICER BRIAN MORENO - 12/12/2022

Page 97

3:27  1 segregated from one another so they won't collaborate

2 on -- they their -- so their statements to police will --

3:27  3 will only be based upon what they independently remember?

4    A.  Yes.

3:27  5    Q.  Okay.  Did you see Border Patrol agents who were

6 on the scene talking to one another while you were waiting

3:28  7 to leave?

8        MR. MCDONALD:  Objection.  Vague.

3:28  9        THE WITNESS: I mean, I'm sure they were.  At --

10 but at that point, I would probably talk, too, just to go

3:28  11 over what -- what the situation was.  You -- I mean, you

12 wouldn't do, like, a full debrief.

3:28  13 BY MR. RUTMAN:

14    Q.  Right.

3:28  15    A.  But you would still talk, make sure everybody's

16 okay, find out what they saw, find out what -- what --

3:28  17 what was going on.

18    Q.  Okay.  All right.  How many feet would you say

3:28  19 your front bumper was from the Nissan at the time the

20 shots were fired, approximately?

3:28  21    A.  My recollection would be lot closer than it was.

22 Based off the pictures, it looks like it was probably 75

3:28  23 to 100 feet.

24    Q.  Okay.  Okay.  Do you remember the cell phone

3:29  25 video that we saw that showed the car backing up and then

Page 115

3:46   1 STATE OF CALIFORNIA)SS:

       2 COUNTY OF SAN DIEGO)

3:46   3

       4        I do hereby certify:

3:46   5        That the foregoing deposition was taken before me

       6 at the time and place therein set forth at which time the

3:46   7 witness was put under oath by me;

       8        That the testimony of the witness and all

3:46   9 objections made at the time of the examination were

       10 recorded stenographically by me were thereafter

3:46   11 transcribed under my direction and supervision and that

       12 the foregoing is a true record of the same.

3:46   13        I further certify that I am neither counsel for nor

       14 related to any party to said action, nor anywise

3:46   15 interested in the outcome thereof.

       16        IN WITNESS WHEREOF, I have subscribed my name this

3:46   17 27th day of January, 2023.

       18

3:46   19

       20

3:46   21 _____

       22 JACQUELINE STEARMAN, CSR NO. 9373

3:46   23

       24

3:46   25



EXHIBIT __67__
REPORTER _J. STEPHAN_
WITNESS _MORENO_
DATE _12,12,22_

MSJ_046

EXHIBIT 73
REPORTER J. STEPHENS
WITNESS MORENO
DATE 12.12.22

MSJ_047



MSJ 048



MSJ_049

```
 1            UNITED STATES DISTRICT COURT

 2          SOUTHERN DISTRICT OF CALIFORNIA

 3

 4

 5   SILVESTRE ESTRADA,

 6                  Plaintiff,

 7        vs.                    Case No.

 8   UNITED STATES OF AMERICA,      21-cv-1390-DMS-BGS

 9                  Defendant.

10   _____/

11

12

13

14

15     VIDEOTAPED DEPOSITION OF TRENT HEIMERDINGER

16

17          Taken at San Diego, California

18            Monday, December 5, 2022

19

20

21

22

23   Job No. 940498

24   Reported by Kathleen Shelburne, CSR

25   Certificate No. 7227
```

MSJ_050

TRENT HEIMERDINGER – 12/05/2022

Page 13

```
     1     A.    Campo.

     2     Q.    And where is Campo located?

     3     A.    It is far East County San Diego, south on

     4  Buckman Springs Road, north of -- go ahead.

12:19:12     5     Q.    How far, approximately, is that from where

     6  we are today in downtown?

     7     A.    About an hour.

     8     Q.    How long did you live in Campo?

     9     A.    Two-and-a-half years.

12:19:22    10     Q.    When did you move there?

    11     A.    Shoot.

    12     Q.    Approximately?

    13     A.    Approximately, 2018.

    14     Q.    So you were there in Campo from about 2018

12:19:37    15  until late 2020?

    16     A.    2021, somewhere in there, yes.

    17     Q.    Okay.

    18     A.    And then I moved to Japatul.

    19     Q.    Okay.  And where did you live before living

12:19:47    20  in Campo?

    21     A.    Pine Valley.

    22     Q.    Is that also in East San Diego County?

    23     A.    Correct.

    24     Q.    Have you spent much of your life in the

12:20:01    25  Pine Valley, Campo, Japatul area?
```

TRENT HEIMERDINGER – 12/05/2022

Page 21

1    Q.    Okay.  You mentioned the 94.  What's the
2    94?
3    A.    The Highway 94.  The main road that goes
4    from here to downtown if you keep going out there
12:27:47   5    past Campo all the way.
6    Q.    Is that primarily an east-west road?
7    A.    Generally, yes.
8    Q.    On Exhibit 24, are there portions of it
9    where it may run, you know, north-south, for certain
12:28:04   10    stretches of time?
11    A.    Yes.
12    Q.    In the region that's depicted in
13    Exhibit 24, how would you describe the 94 in this
14    section of road?
12:28:15   15    A.    Windy.  Definitely cut out through some
16    canyons and stuff, two lane, not much of a shoulder
17    on either side, pretty narrow turns.
18    Q.    Can this be a dangerous stretch of road?
19    A.    Absolutely.  I've seen multiple wrecks on
12:28:37   20    that road in my life growing up out there.
21    Q.    Do you take personal care to drive with
22    care in this stretch of road?
23    A.    Usually, yes, unless I'm in a hurry
24    sometimes, yeah, but...
12:28:48   25    Q.    And why -- why is that?

TRENT HEIMERDINGER – 12/05/2022

Page 22

1    A.   Just behind, getting somewhere, late for

2  work, going faster certain areas, but, um, usually,

3  yes, it is a more dangerous road.

4    Q.   Okay.  And so you take -- do you take care

12:29:00    5  to drive with caution in this stretch of road; is

6  that accurate?

7    A.   Yes.

8    Q.   How many wrecks have you seen

9  approximately, would you say, in this area?

12:29:08   10    A.   Um, seven or eight.  A good friend of mine

11  owns a tow company out there, so I hear about a lot

12  of them.  He is very busy in the section of, you

13  know, Campo, between the Interstate 8 and 94.  It's

14  a -- there's a lot of traffic accidents out there.

12:29:24   15    Q.   What would you -- are you familiar with the

16  speed limit generally in this area?

17    A.   Yes.

18    Q.   All right.  In the stretch of road,

19  specifically the 94 road, in what's depicted in

12:29:39   20  Exhibit 24, what generally is the speed limit in

21  that area?

22    A.   Usually, 55.

23    Q.   And you said "usually."  Are there some

24  portions that are different than 55?

12:29:50   25    A.   Just caution corners.

TRENT HEIMERDINGER - 12/05/2022

Page 23

```
           1     Q.   And what's a caution corner?

           2     A.   Where, you know, sharp turn coming up,

           3  speed or recommended speed gets reduced to, you

           4  know, 25 or 35 or 45 miles an hour.

12:30:00   5     Q.   On the stretch of the 94, depicted in

           6  Exhibit 24, are there blind curves or blind turns in

           7  this area?

           8     A.   Yes.

           9     Q.   How many?

12:30:14  10     A.   Uh, five or six, mainly blind because of

          11  the height of the brush.  Just can't see around

          12  corners or what's behind them.

          13          (Exhibit 25 was marked for

          14           identification by the

12:30:24  15          Certified Court Reporter.)

          16  BY MR. MC DONALD:

          17     Q.   Showing you what I've marked as Exhibit 25.

          18           Do you recognize Exhibit 25?

          19     A.   Yes.

12:30:35  20     Q.   What is it?

          21     A.   The stretch before you get to the Green

          22  Store in Campo by the Vineyard.

          23     Q.   So this depicts State Route 94?

          24     A.   Yes.

12:30:46  25     Q.   And is this facing eastward or westward?
```

TRENT HEIMERDINGER - 12/05/2022

Page 26

1    A.    It is there, yes.

2          (Exhibit 27 was marked for

3           identification by the

4          Certified Court Reporter.)

12:32:51   5  BY MR. MC DONALD:

6     Q.    Showing you what's marked as Exhibit 27, do

7    you recognize Exhibit 27?

8     A.    I do.

9     Q.    What is Exhibit 27?

12:33:28   10   A.    That is, if you stay on the road from

11   Exhibit 26 and take a left, keep going about one

12   mile past the old elementary school, um, getting to

13   the intersection of Cameron Corners right there.

14    Q.    Okay.  You mentioned turning a left.  Is

12:33:43   15  that just the natural bend in the State Route 94 as

16   opposed to turning onto a different street?

17    A.    Yes.  There is an intersection by the Green

18   Store to go right towards the railroads and the

19   old -- the border patrol station and all that up

12:33:56   20  there and Camp Lockett.  Left would take you towards

21   this spot.

22    Q.    Okay.

23   A.    Back towards Buckman Springs Road.

24    Q.    And so this is -- Exhibit 27 is again

12:34:07   25  depicting the State Route 94 further east of

TRENT HEIMERDINGER – 12/05/2022

Page 27

1    Exhibit 26; is that correct?

2        A.    Yes, northeast, yes.

3        Q.    Okay.  And I see on the photograph it says,

4    "Campo Road" embedded into this image.  Is that

12:34:20    5    another name for the State Route 94 in this area?

6        A.    To the best of my knowledge, yes.

7        Q.    Okay.  And are you familiar with the -- a

8    Circle K parking lot in this general area?

9        A.    Yes.

12:34:38    10        Q.    Referring to Exhibit 27, where is the

11    Circle K in relation to what Exhibit 27 shows?

12        A.    If you would keep continuing northeast on

13    Exhibit 27's picture, the Circle K parking lot is on

14    the right, behind the oak tree, on the top, right of

12:34:58    15    the photo.

16        Q.    Okay.  So how far away, would you say, in

17    this picture are you from that Circle K parking lot?

18        A.    150, 200 yards.

19        Q.    Just around the bend?

12:35:08    20        A.    Around the bend, to right, yes.

21            MR. RUTMAN:  Colin, do you mind if I just

22    jump in to clarify something right now?

23            MR. MC DONALD:  Go ahead.

24            MR. RUTMAN:  Is the Circle K the red, white

12:35:24    25    and green striped thing in the upper, right-hand

TRENT HEIMERDINGER – 12/05/2022

Page 28

1   corner?

2           THE WITNESS:  No, that is the Cameron

3   Corners gas station.

4           The Circle K is directly across the street

12:35:32   5   from that.

6           MR. RUTMAN:  Gotcha.  So it's obscured by

7   the tree?

8           THE WITNESS:  Yes.

9           MR. RUTMAN:  Okay.  Rival gas station

12:35:42   10   across the street in this picture.

11           THE WITNESS:  Yes.

12           MR. RUTMAN:  Thank you.

13           Thank you, Collin.

14            MR. MC DONALD:  Yes, no problem.

12:35:49   15           (Exhibit 28 was marked for

16            identification by the

17            Certified Court Reporter.)

18   BY MR. MC DONALD:

19       Q.   Showing you what I've marked as Exhibit 28.

12:35:54   20       Do you recognize Exhibit 28?

21       A.   Yes.

22       Q.   What is Exhibit 28?

23       A.   That is the entrance to the Circle K and

24   Sinclair gas station.

12:36:01   25       Q.   That's the Circle K that we were just

Page 58

1  fence, not barbed wire, you know, four-inch squares

2  of grid running vertically and horizontally, um,

3  yeah, just, you know, posts probably every ten feet,

4  kind of a wiry, just metal fence.

01:35:04   5      Q.   Okay.  Were the agents 1 and 2 that you've

6  **marked on Exhibit 31, were they on the Circle K side**

7  **of the fence, or were they on the 94 side of the**

8  **fence?**

9      A.   I do not remember that part.  Could not

01:35:18  10  tell from where I was.

11      **Q.   When you first saw them, how close were**

12  **they in feet, approximately, to the Nissan?**

13      A.   25, 30.

14      **Q.   And were they proceeding toward the Nissan**

01:35:36  15  **when you saw them?**

16      A.   Yes, they were just out of their vehicles,

17  vehicle doors still open, walking toward the Nissan

18  pretty slowly, yes.

19      **Q.   Now, when the Nissan reversed, did it then**

01:35:52  20  **come to a stop after reversing?**

21      A.   I believe so, briefly.

22      **Q.   Okay.  And what happened after that?**

23      A.   Um, from what I remember, I saw the Nissan

24  start moving forward towards those two agents, and

01:36:08  25  then shortly after that they opened fire on the

MSJ_058

TRENT HEIMERDINGER – 12/05/2022

Page 59

1  vehicle.

2  **Q.   Okay.  How long, approximately, was the**

3  **vehicle stopped before moving forward?**

4  A.   A few seconds, maybe, maybe.

01:36:26  5  **Q.   Did it appear from your vantage point after**

6  **the vehicle had stopped reversing that the vehicle**

7  **was going to park and proceed no further?**

8  A.   It's what I expected, but I saw it move a

9  little bit, and then, um, they -- they started

01:36:48  10  shooting pretty quick after that, yeah.

11  **Q.   Why did you expect that the car was going**

12  **to stop and proceed no further after the reversing**

13  **had stopped?**

14  A.   Pretty much surrounded by countless number

01:37:00  15  of border patrol vehicles in the area.  Um, just

16  didn't expect it to keep going after that, and the

17  car started moving again, and then that's when they

18  started shooting.

19  **Q.   Did it appear from your vantage point that**

01:37:14  20  **the driver of the Nissan was trying to evade the**

21  **boarder patrol agents?**

22  A.   Yeah, that's what I assumed the only reason

23  he would keep moving at that point.

24  **Q.   How many shots approximately did you hear**

01:37:32  25  **fired?**

MSJ_059

TRENT HEIMERDINGER - 12/05/2022

Page 60

```
             1    A.   Five, six, seven, eight, somewhere in
             2    there.  A couple of them were, you know, really,
             3    really close splits on the -- between rounds, but
             4    um, yeah, I would say, five -- five to seven, ten,
01:37:49     5    somewhere in there.
             6    Q.   And at the moment you heard the first shot
             7    fired, was the vehicle moving forward?
             8    A.   It was still rolling forward, yes.
             9    Q.   And how would you describe the vehicle's
01:38:02    10    movement in moving forward in terms of its speed?
            11    A.   Couldn't tell perfectly.  Um, it definitely
            12    wasn't just in gear without your foot on the brake
            13    idling.  It was accelerating.  I do know that.  But,
            14    um, couldn't tell how fast he was accelerating
01:38:21    15    because the angle he was kind of coming straight
            16    towards me, so just, uh, they were facing towards me
            17    at the stop sign, the angle he was at, so I couldn't
            18    tell how fast he was really coming.
            19    Q.   You said you know that he was accelerating.
01:38:32    20    How do you know the driver of the Nissan was
            21    accelerating?
            22    A.   I could just see the movement of the
            23    vehicle going forward.  It wasn't stationary.
            24    Q.   Did it appear to you that it was a sudden
01:38:46    25    acceleration forward, or was it a slow, start moving
```

**MSJ_060**

Page 98

1   STATE OF CALIFORNIA

2   COUNTY OF SAN DIEGO

3           I, Kathleen Shelburne, Certified

4   Shorthand Reporter, No. 7227, in and for the State

5   of California, do hereby certify that the deponent

6   was by me first duly sworn to testify to the truth,

7   and that the foregoing testimony was reported by me

8   in shorthand, and was thereafter transcribed with

9   computer-aided transcription; that the foregoing is

10  a true, correct and complete record of said

11  proceedings.

12          I further certify that I am not in any way

13  interested in the outcome of the cause in said

14  caption.

15          The dismantling, unsealing, or unbinding of

16  the original transcript will render the reporter's

17  certificate null and void.

18  _____X_____ Reading and Signing was requested.

19  _____ Reading and Signing was waived.

20  _____ Reading and Signing was not requested.

21          In witness whereof, I have hereunto set my

22  hand this 16th day of January 2023.

23

24  _____

25          Kathleen Shelburne, CSR NO. 7227

























MSJ_068



MSJ_069



MSJ_070

1                    UNITED STATES DISTRICT COURT

2                  SOUTHERN DISTRICT OF CALIFORNIA

3

    SILVESTRE ESTRADA, et al.,
4
                          Plaintiff,
5                                        Case No.:   21-CV-1390-DMS-BGS
              vs.
6
    UNITED STATES OF AMERICA, et
7   al.,

8                          Defendants.
    _____
9

10

11                  VIDEOTAPED DEPOSITION OF

12                     ROBERT GODREAU

13                  SAN DIEGO, CALIFORNIA

14                   DECEMBER 19, 2022

15

16

17

18

19

20

21

22

23

24
    REPORTED BY:
25  A. DESIREE TIPPER, CSR NO. 13806

ROBERT GODREAU                                          21

```
 1            MR. WALLACE:  Objection.  Vague.  Incomplete
 2    hypothetical.
 3            THE WITNESS:  It depends on the circumstances.
 4    BY MR. GRUENBERG:
 5        Q    Do you have a recollection of the night of the
 6    incident?
 7        A    Somewhat, sir.
 8        Q    If I indicated that the date of the incident was
 9    May 14th of 2021, would that sound right to you?
10        A    I believe so, yes.
11        Q    All right.  And do you remember when you first
12    found out that there was an incident involving
13    Mr. Estrada?
14        A    Yes, sir.
15        Q    How did you first find that out?
16        A    An agent from a sister station the Brown Field
17    station put over our frequency, the El Cajon station,
18    that there was a vehicle that had loaded two possible
19    illegal aliens into the vehicle, and he was heading
20    towards our area of operation.
21        Q    And where would that area of operation be?
22        A    So I believe the vehicle loaded the two
23    individuals in the 52 cuts and he was going -- heads
24    eastbound on 94 towards -- you know, passing towards the
25    188 and the 94 in Tecate, California.
```

MSJ_072

ROBERT GODREAU                                    22

```
 1        Q    So was the loading done in Tecate?
 2        A    I believe it's part Tecate, but I'm not a
 3   hundred percent sure.
 4        Q    All right.  And he was heading towards Campo?
 5        A    Yes, sir.
 6        Q    All right.  And is Campo within your
 7   jurisdiction?
 8        A    Yes, sir.
 9        Q    All right.  And when did you first -- withdraw.
10             Were you driving a border patrol vehicle that
11   night?
12        A    Yes.
13        Q    All right.  When did you first have any
14   involvement with Mr. Estrada or his vehicle?
15        A    I was posted facing south on Vollmer Lane Road
16   and Highway 94.  So I was on the north side facing south
17   onto the highway, and -- when I saw the vehicle that
18   matches the vehicle that was put up over the radio,
19   coming towards our location.
20        Q    Okay.  And what did you do when you saw the
21   vehicle?
22        A    I looked inside of -- like, I could see inside
23   the vehicle as it passed me.  And I don't remember
24   exactly my observations at that point because it's been
25   so long.  And I ended up getting behind the vehicle
```

MSJ_073

ROBERT GODREAU                                             23

1    looking --

2        Q    As the vehicle passed you, how fast do you think

3    it was going?

4        A    I believe it was a lower speed than most people

5    and the locals from Campo.

6        Q    So 40 miles an hour?

7        A    I do not remember.

8        Q    Is that a fair estimate?

9        A    I just do not remember.

10       Q    What would be your best estimate?

11            MR. WALLACE:  Of the speed of the vehicle when

12   you first saw it?

13            MR. GRUENBERG:  As it passed him.

14            THE WITNESS:  I believe he was going 30,

15   35 miles per hour.

16   BY MR. GRUENBERG:

17       Q    Okay.  And did you pull in behind it?

18       A    Yes, sir.

19       Q    And what happened next?

20       A    I ran the vehicle's license plate through our --

21   the San Diego border patrol dispatch and also did it on

22   my ATAK phone.

23       Q    All right.  What happened next?

24       A    The vehicle -- I don't -- the vehicle has -- I

25   just don't want to -- I don't remember exactly.

```
 1            MR. WALLACE:  Give me that pen, Robert.
 2            (Speaking simultaneously.)
 3   BY MR. GRUENBERG:
 4       Q    Mr. Godreau, just tell us what you do recall.
 5       A    I --
 6       Q    You ran the plate?
 7       A    So I ran the plate, and there was something on
 8   the plate that maybe -- I believe it didn't have enough
 9   crossings or any crossings through the local border
10   patrol checkpoints or port of entry, Tecate port of
11   entry, which would raise my suspicions because local
12   Campo citizens, to go in and out through those checkpoint
13   frequently to get groceries or go to work and different
14   things like that.
15            So a vehicle that came out of the area from LA
16   or other places, come pick up illegal aliens or drugs
17   would have any crossings through those checkpoints or
18   port of entries.
19       Q    Okay.  And that aroused your suspicion?
20       A    Yes, sir.
21       Q    All right.  What did you do next?
22       A    At one point I performed a vehicle stop on that
23   vehicle.
24       Q    I'm sorry?
25       A    At one point I performed a vehicle stop.
```

MSJ_075

ROBERT GODREAU                                                           25

1        Q    And how did you do that?

2        A    I did it by turning on my lights.

3        Q    Your flashing red lights?

4        A    My flashing emergency lights, correct.

5        Q    All right.  What happened next?

6        A    I believe the vehicle put on his hazard lights

7   and continued eastbound on Highway 94.  It was a little

8   odd because where I attempted to pull -- do a vehicle

9   stop, he would have enough, you know, time to pull over

10  to the side of the road, to the shoulder of the road, in

11  a safe place, but he continued.  But because he put his

12  flashers on, I believe he was trying to look for a place

13  to pull over.

14       Q    Okay.  And then what happened after that?

15       A    He continued to -- eastbound on Highway 94

16  through S-curves, and he ended up pulling over to an area

17  known to us patrol agents as the Horse Gate.

18       Q    Horse Gate?

19       A    Horse Gate.  Yeah, there's barely any shoulder

20  there for the vehicle to pull over safely.

21       Q    And did he pull over there?

22       A    He pulled over there.

23       Q    And what happened next?

24       A    I remember I was looking at the vehicle

25  waiting -- I had my hand on the shifting -- gear

MSJ_076

ROBERT GODREAU                                                    26

1    shifting, but I was waiting to put it in park because I

2    usually do it after I see the vehicle pulling over.

3    Putting his vehicle in park will show me his parking

4    lights come up briefly.  And I didn't see that.  And so

5    my partner, Agent Baker, passing -- or coming to my

6    window and I told him, like, Go back to your vehicle

7    because he might FTY.  He might just go.

8        Q    And what was that called?  FT- --

9        A    FTY, failure to yield.

10       Q    Okay.  So you thought he would take off again?

11       A    Correct.  Because I hadn't seen his parking

12   lights come up yet.

13       Q    Okay.  And was Agent Baker, your partner -- was

14   he in your vehicle or was he in another vehicle?

15       A    He was in a vehicle.

16       Q    Behind you?

17       A    Came to back me up.

18       Q    And he was behind you as you were following

19   Mr. Estrada?

20       A    Yes.

21       Q    All right.  What happened next?

22       A    He went towards his vehicle.  At that point, I

23   believe I might have realized maybe I missed his brake --

24   parking lights.  So I shift into parking.  I got out of

25   the vehicle.  As I'm approaching the vehicle, the driver

MSJ_077

ROBERT GODREAU                                          27

1   yells out something out of the window and takes off at a

2   fast rate.

3       Q    He yelled something?

4       A    Correct.

5       Q    Do you know what he yelled?

6       A    No, sir.

7       Q    Okay.  And then he took off?

8       A    Yes, sir.

9       Q    What happened next?

10      A    I started running towards my vehicle, and I told

11  Agent Baker -- I yelled at him "FTY, FTY."  I got in my

12  vehicle and we both started to follow him -- or tried to

13  catch up to the vehicle.  At that point, he was going on

14  Highway 94.

15      Q    When you parked behind Mr. Estrada, how many

16  feet were you parked behind him?

17      A    To estimate, I would say from bumper to bumper,

18  about 5 feet.

19      Q    Okay.

20      A    10 feet.

21      Q    Okay.  So Mr. Estrada fails to yield, right?

22      A    Correct.

23      Q    And he takes off?

24      A    Yes, sir.

25      Q    And you follow him?

MSJ_078

ROBERT GODREAU                                    28

1       A    Yes, sir.

2       Q    And at that point how fast is he going?

3       A    He fluctuated.  Especially at first, he was

4    going really fast, and I was having a hard time catching

5    up to him.  And I've working this area for 19 years or

6    so.  So I'm very comfortable driving that, and it was

7    still kind of hard to catch up to him.

8            So during the whole, you know, chase, it

9    fluctuated from 30 miles an hour to a hundred miles per

10   hour, so --

11      Q    Are you certain that your speed reached a

12   hundred miles an hour?

13      A    No.  My speed, no.

14      Q    Do you believe Mr. Estrada's speed reached a

15   hundred?

16      A    I believe it was probably close to it, correct.

17      Q    Okay.  What was your max speed, do you think?

18      A    I'll be guessing but I would say around 85 or

19   so.

20      Q    Okay.  You're familiar with the terrain out

21   there?

22      A    Yes, sir.

23      Q    Is it hilly?

24      A    In some areas, yes.

25      Q    In the area where you were that night as you

MSJ_079

1     A    Yes, sir.

2     Q    And he was driving fast the whole time?

3     A    No, sir.

4     Q    Were there times when he was driving slow?

5     A    Yeah.  I recollect one time he was approaching

6    Forest Gate Road off of Highway 94.  And sometimes when

7    we get in vehicle pursuits, they go south on that road,

8    and they drive all the way to the border, and they try to

9    jump to border -- international border -- south --

10         So he came to that road.  He slowed down.  Like,

11   he was probably going to go south on that Forest Gate

12   Road, but an agent was coming north on that same road

13   towards Highway 94, and maybe because he saw that agent,

14   he continued eastbound on Highway 94.  Another reason he

15   was -- I think he was brake checking me at certain times,

16   or I was getting close to him and he would step really

17   hard on the brake to slow me down, and then he would take

18   off again.

19    Q    All right.  So you entered the gas station area.

20   Do you recall that?

21    A    Yes, sir.

22    Q    And were you the first car behind Mr. Estrada?

23    A    Yes, sir.

24    Q    And I think you indicated that Mr. Baker was

25   behind you?

MSJ_080

ROBERT GODREAU                                          45

1    others because of the terrain and then -- yeah.

2    BY MR. GRUENBERG:

3        Q    And are you saying that he was in the grass and

4    there's a curb; so he hit the curb when he was on the

5    grass?

6        A    What I'm saying is like when he got on the grass

7    and continued eastbound on the grass --

8        Q    Yeah.

9        A    On the 94 --

10       Q    Right.

11       A    -- he went all the way to the east to the

12   driveway.  And that curb there is pretty high.  And he

13   ran into that curb and -- or I believe he got stuck.

14       Q    Okay.  And what happened next?

15       A    So at that point, I believe he got stuck.  I --

16   I went in front of the vehicle and positioned my vehicle

17   in front of his vehicle so I can get out and perform an

18   arrest before anybody started running out of the vehicle,

19   which is normal for alien smuggling cases.

20       Q    Okay.  What happened next?

21       A    That wasn't the case.  He was not done yet.  He

22   put the vehicle in reverse and traveled at a fast rate of

23   speed in reverse, westbound along 94.  But at that point

24   there was another vehicle, a border patrol vehicle unit

25   that followed pretty much followed him to that location.

MSJ_081

ROBERT GODREAU                                                  46

 1        Q    All right.

 2        A    The agent came to a stop as this all took place.

 3   And when the subject vehicle was going in reverse

 4   westbound, he came to a stop.

 5             At the same time this is all happening, as I

 6   park my vehicle in front of his vehicle, I step out of my

 7   vehicle because I'm trying to perform -- do an arrest,

 8   and I see the vehicle going south -- or in reverse

 9   westbound.  And then I unholster my weapon, and I

10   continue to travel towards the vehicle.  And it's just

11   rapidly evolving; everything is changing at the same

12   time.  And the vehicle came to a stop.  We're giving

13   commands to the driver to put his hands up, and -- I

14   mean, we continue to issue commands.  Everything is

15   happening really fast.  And then at that point, I hear

16   the engine rev up and then he -- the vehicle came at a

17   fast rate towards me where I open fire because I thought

18   he was going to kill me.

19        Q    And where were you standing when you opened

20   fire?

21        A    I was standing to the front of the vehicle and

22   to the -- towards -- on the driver's side more, like if

23   the -- if the vehicle -- the front of the vehicle, the

24   middle of the front of the vehicle is 12:00 like on a

25   clock, I was standing at the 10:30 hour or 11:00 hour.

MSJ_082

ROBERT GODREAU                                           53

1       A     I do not recollect.

2       Q     Do you know whose vehicle that was?

3       A     No, sir.

4       Q     Do you know the names of the officers who were

5    there that night?

6       A     Some of them.

7       Q     Was that Mr. Alba?

8       A     I know that Mr. Alba was on scene, but I don't

9    know if that was his vehicle.

10      Q     You're not sure if that was Mr. Alba?

11      A     I do not know.

12      Q     So as Mr. Estrada backs his car up, how close to

13   that border patrol vehicle does he get?

14      A     I do not know, sir.

15      Q     What's your best estimate?

16      A     A foot or 2, maybe.

17      Q     Okay.  And then he realizes -- in your mind,

18   he's realizing he can't back up any further?

19      A     In my mind, he realized, I'm surrounded.  I'm

20   done.

21      Q     At that point, did you continue to approach

22   Mr. Estrada?

23      A     At that point, I stop, and I'm issuing commands.

24   Show me your hands; put your hands up, along -- and other

25   agents are doing the same.

MSJ_083

ROBERT GODREAU                                              54

1      Q    And how many times did you tell him to put his

2   hands up?

3      A    I do not recollect, sir.

4      Q    Do you recall shouting, Don't move?

5      A    I do not remember, sir.

6      Q    Do you recall anyone shouting, Don't move?

7      A    No, sir, I don't remember.

8      Q    Would that be something in the border stops that

9   you effect?  Would that be something that you yell?

10     A    Yes.  In training we yell, "Show me your hands,"

11  "Stop moving," things like that.

12     Q    Okay.  So you're yelling either "Don't move" or

13  "Show me your hands"?

14     A    Yes, sir.  Possible.

15     Q    And is Mr. Estrada showing you his hands?

16     A    No, sir.

17     Q    Where were his hands?

18     A    I do not remember, sir.

19     Q    Do you believe them to be on the steering wheel?

20          MR. WALLACE:  Objection.  Foundation.

21          Go ahead and answer.

22  BY MR. GRUENBERG:

23     Q    If you don't know --

24     A    So I cannot see his hands because of the

25  dashboard.  I was in front of him.

MSJ_084

ROBERT GODREAU                                              55

```
 1        Q    All right.

 2        A    Could be.

 3        Q    All right.  What happened next?

 4        A    At that point I figure that he's done, that he's

 5   stopped, that he's ready to give himself up.  But, again,

 6   he wasn't.  He then revved up the engine, and the vehicle

 7   started moving rapidly towards me, and that's when I

 8   opened fire.

 9        Q    All right.  Do you know if you hit Mr. Estrada?

10        A    I know now.  I didn't know then.

11        Q    All right.  And your testimony, I think, was

12   that you were at 1:00 or 2:00?

13        A    I'm sorry.  I know now that I didn't hit

14   Mr. Estrada, but I didn't know when it happened.

15        Q    I understand.  I heard you say that.

16             So your testimony is that you were at 1:00 or

17   2:00 when you opened fire?

18        A    No, sir.  I was at a -- in regards to

19   Mr. Estrada's vehicle, I was at his 10:30, 11:00 before

20   he revved up the vehicle and lunged it towards me.  Then

21   at that time, the vehicle came at me -- it kept turning

22   to the north, left -- to his left.

23        Q    So he backed up.  Mr. Estrada backed up within a

24   foot of the border patrol agent car, right?

25        A    Possibly, yeah.
```

MSJ_085

ROBERT GODREAU                                                93

```
1        A     Yeah, the goal is to arrest.

2        Q     And that's why you're approaching from the

3    right-hand side, correct?

4        A     So to me, sir, the right-hand side of the

5    vehicle would be the 3:00.

6        Q     Sir, let's use my diagram, please?

7        A     From using your diagram, sir, the 3:00 will be

8    my right-hand side -- or the driver's side, the

9    right-hand side.

10       Q     You're approaching from 3:00?

11       A     I'm not.

12       Q     What side are you approaching from?

13       A     I'm approaching from the front of the vehicle

14   and I was offset a little bit to the -- my right as I

15   approached the vehicle.  But I was at no point passing

16   the threshold of front bumper and becoming -- approaching

17   the vehicle on the driver's side.

18       Q     All right.  So you never get past the bumper?

19       A     Correct.

20       Q     How far from the bumper do you get?

21       A     I'm not sure, sir.  I think approximately

22   10 feet.

23       Q     Okay.  And then you approach the vehicle until

24   you hear it rev, correct?

25       A     I think at that point I stopped issuing voice
```

MSJ_086

ROBERT GODREAU                                          94

1   commands --

2      Q    Okay.

3      A    -- and then I hear the vehicle rev.

4      Q    And you're still at 4:00 or 5:00, correct?

5      A    Correct.  4:30, 5:00 in front of the vehicle.

6      Q    And what happens next?

7           MR. WALLACE:  Asked and answered.  Cumulative.

8           Go ahead.

9           THE WITNESS:  I don't know where you want me to

10  start, but at a certain point, the vehicle revved up and

11  then lunged -- the vehicle started heading rapidly

12  towards me, and then I opened fire.

13  BY MR. GRUENBERG:

14     Q    And was the vehicle turning?

15     A    When I --

16          MR. WALLACE:  Objection.  Vague as to time.

17          Go ahead.

18          THE WITNESS:  When I opened fire, the vehicle

19  was coming directly at me.

20

21

22

23

24

25

REPORTER'S CERTIFICATE

1

2

3          I, A. Desiree Tipper, a Certified Shorthand

4    Reporter No. 13806 in the State of California, do hereby

5    certify:

6              That the foregoing proceedings were taken

7    before me at the time and place herein set forth; that

8    any witnesses in the foregoing proceedings, prior to

9    testifying, were placed under oath; that a verbatim

10   record of the proceedings was made by me using machine

11   shorthand which was thereafter transcribed under my

12   direction; further, that the foregoing is an accurate

13   transcription thereof.

14             I further certify that I am neither

15   financially interested in the action nor a relative or

16   employee of any attorney of any of the parties.

17             IN WITNESS WHEREOF, I have hereunto

18   subscribed my name this 2nd day of January, 2023.

19

20

21

22
     _____
23                    A. Desiree Tipper
                      CSR No. 13806
24

25

MSJ_088

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   SILVESTRE ESTRADA, et al.,      )
                                     )
 5              Plaintiff,           )
                                     )
 6      vs.                          )No. 21-CV-1390-DMS-BGS
                                     )
 7   UNITED STATES OF AMERICA, et    )
     al.,                            )
 8                                   )
                Defendants.          )
 9   _____)

10

11

12

13              DEPOSITION OF JASON ALBA

14               San Diego, California

15

16                   10:14 A.M.

17             Friday, January 13, 2023

18

19          880 Front Street, Fourth Floor

20               San Diego, California

21

22

23

24   Reported by:
     ALEXSANDRIA J. LINCOLN
25   CSR No. 13670
```

JASON ALBA                                      24

```
 1    Just tell me.  That's what I was getting at before
 2    when I said don't guess at something even though you
 3    think it's something I should remember this, but I
 4    don't.
 5          Just tell me you don't remember.  That's fine.
 6          Did he have his weapon out of its holster at
 7    the time, if you knew?
 8      A.  I don't remember.
 9      Q.  Okay.  When you saw Agent Godreau approaching
10    the vehicle, where was the vehicle?  Was it still up
11    against the curb where it attempted to exit?  Or had
12    it already backed up?  Or was it in motion at the
13    time?
14      A.  Could you repeat that?
15      Q.  Sure.
16          When you first saw Agent Godreau, as you've
17    just described, was the vehicle at the curb where it
18    had hit?  In motion in reverse?  Or had it come to a
19    stop at the far end of the grassy area?
20      A.  At a stop.
21      Q.  Okay.  And how far away from the front end of
22    the Nissan Altima would you estimate Agent Godreau
23    was standing, if you know?
24      A.  Approximately six feet.
25      Q.  And if -- to use to crib from the Government's
```

MSJ_090

1  way of describing it.  If you're thinking of a clock

2  and the front of the car straight ahead is 12:00

3  o'clock, at what time on the clock would Agent

4  Godreau had been standing when you first saw him with

5  respect to the car?

6      A.  Between 11:00 and 12:00.

7      Q.  Okay.  What did you see Agent Godreau do?

8  What movements did you see him undertake once you saw

9  him?

10      Let me ask you this first:  Did Agent Godreau

11  remain in your field of vision the entire time?

12      A.  Yes.

13      Q.  Okay.  What did you see him doing?

14      MR. WALLACE:  I'm going to object.  As vague

15  as to time.

16      But you can answer, if you understand.

17  BY MR. RUTMAN:

18      Q.  Yeah, from the moment you first saw him until

19  the time the shots rang out, tell me what movements

20  you saw Agent Godreau make?

21      A.  He was yelling commands.

22      Q.  Okay.  Do you remember what he was yelling?

23      A.  No.

24      Q.  Were other agents yelling commands as well, to

25  your knowledge?

JASON ALBA                                     26

1      A.  No.

2      Q.  Were you?

3      A.  Yes.

4      Q.  Okay.  What were you yelling?

5      A.  Stop.

6      Q.  Okay.  Anything else?  Get out of the car?

7   Show me your hands?  Anything like that?

8      A.  No.

9      Q.  At some point, did you see Agent Godreau

10  holding his weapon?

11     A.  Yes.

12     Q.  Okay.  And were you holding your weapon when

13  you got out of your vehicle as well?

14     A.  Yes.

15     Q.  Okay.  And did you see Agent Godreau continue

16  to approach the vehicle?

17     A.  I don't understand.

18     Q.  Sure.

19         Once you saw Agent Godreau out of his vehicle

20  you said he was at 11:00 or 12:00 or clock, six feet

21  away, did he continue to move or was he stationary

22  from that point forward?

23     A.  Stationary.

24     Q.  Could you describe the terrain you were

25  standing on?  It's a glassy area.  Was it hard pack?

MSJ_092

JASON ALBA                                          36

 1       A.   Approximately four feet.

 2       Q.   Is this the first time you actually fired your

 3   weapon in the field?

 4       A.   Yes.

 5       Q.   And is it your understanding that aside from

 6   any knowledge you may have learned from your

 7   attorney, that the bullet you fired was actually the

 8   one that hit the driver of the vehicle?

 9            MR. WALLACE:  Do you know that independent of

10   me?

11            THE WITNESS:  No.

12   BY MR. RUTMAN:

13       Q.   Okay.  When you fired your weapon, did you

14   fire your weapon because you believed that if the

15   vehicle was allowed to continue to move forward, it

16   could strike Agent Godreau or some other agent?

17       A.   Could you repeat that?

18       Q.   Sure.

19            At the time you fired your weapon at the

20   driver of the vehicle, did you believe that, had you

21   not fired, that vehicle might continue forward in

22   such a way that it might injure Agent Godreau?

23       A.   Yes.

24       Q.   Was there any other agent that you could see

25   in your field of vision who you thought might have

MSJ_093

1   been injured by the vehicle, by the Altima, if it

2   continued to move forward in the direction it was

3   headed?

4        A.   No.

5        Q.   Could you estimate the speed of the vehicle at

6   the time you fired your weapon?

7        A.   I can't.

8        Q.   Okay.  At the time the vehicle started to move

9   forward, do you recall hearing anything type of high

10  pitch wine or noise that would indicate that the

11  engine was revving or accelerating in some fashion?

12       A.   Could you repeat that?

13       Q.   Sure.

14            At the time the vehicle --

15            At or just before the time the vehicle started

16  to move forward, do you recall hearing any type of

17  engine revving or high pitched wine that would

18  indicate that maybe someone was stepping on the

19  accelerator to gain speed or something?

20       A.   Yes.

21       Q.   Okay.  How long would you say, if you can say

22  at all, that you heard that noise before the car

23  actually started to move forward?

24       A.   I can't say.

25       Q.   Would it be less than ten seconds in your

```
 1   STATE OF CALIFORNIA        )
                                )
 2   COUNTY OF RIVERSIDE        )

 3

 4        I, Alexsandria J. Lincoln, a Certified Shorthand

 5   Reporter of the State of California, do hereby certify:

 6        That the foregoing proceedings were taken before

 7   me at the time and place herein set forth; that any

 8   witnesses in the foregoing proceedings, prior to

 9   testifying, were placed under oath.

10        That a verbatim record of the proceedings was

11   made by me using machine shorthand which was thereafter

12   transcribed under my direction; further, that the

13   foregoing is a true and accurate transcription thereof.

14        I further certify that I am neither

15   financially interested in the action nor a relative

16   or employee of any attorney of any of the parties.

17        In witness whereof, I have hereunto subscribed

18   my name.

19

20   Dated:  February 6, 2023

21

22

23   *Alexsandria J. Lincoln*
     _____
24   Alexsandria J. Lincoln
     CSR No. 13670

25
```

1                    UNITED STATES DISTRICT COURT

2                  SOUTHERN DISTRICT OF CALIFORNIA

3

   SILVESTRE ESTRADA, et al.,
4
                         Plaintiff,
5                                    Case No.:  21-CV-1390-DMS-BGS
             vs.
6
   UNITED STATES OF AMERICA, et
7  al.,

8                        Defendants.
   _____
9

10

11                       DEPOSITION OF

12                      CHRISTOPHER BAKER

13                    SAN DIEGO, CALIFORNIA

14                     DECEMBER 23, 2022

15

16

17

18

19

20

21

22

23

24
      REPORTED BY:
25    A. DESIREE TIPPER, CSR NO. 13806

1      A      Yes.

2      Q      All right.  And is it your testimony, then, when

3  Mr. Estrada pulled into the parking lot, you parked near

4  that gap?

5      A      Yes.

6      Q      And is there a gap in the fence there?

7      A      Yes.

8      Q      Or is it just a road that goes under the fence?

9      A      It is a gap.  It looks like it may have been a

10  gate before, but it's a barbwire fence with just a gap, a

11  gap in the middle of it.

12     Q      Okay.

13     A      There's barbwire on each side of the gap, and

14  that's just --

15     Q      So you can walk through it?

16     A      Yes.

17     Q      Okay.  And did you park covering the gap right

18  in front of the gap or to the left or right of it?

19     A      It would have been to the left of it or a little

20  bit further east --

21     Q      As you're looking at the photo --

22     A      Yes.

23     Q      -- you would have parked to the left of it?

24     A      To the left.

25     Q      All right.  Why did you park to the left of it?

1        A     I -- I don't recall.

2        Q     Okay.  At some point, did you get out of your

3    vehicle?

4        A     Yes.

5        Q     What caused you to get out of your vehicle?

6        A     I knew that the parking lot only had that one

7    entry, and I believe that it was going to result in a

8    bailout.  That's the term we use in border patrol where

9    all the occupants flee out, so --

10       Q     Did you anticipate that Mr. Estrada would drive

11   through that opening?

12       A     No.  There's a curb -- there's a large sign for

13   the gas prices.  There's a flagpole and several trees and

14   concrete barriers.

15       Q     So you didn't believe that Mr. Estrada could

16   drive out of there?

17       A     I did not believe he was going to.

18       Q     All right.  So did you get out of your vehicle

19   immediately upon parking there?

20       A     Yes.

21       Q     Did you see Mr. Estrada drive around the parking

22   lot of the gas station?

23       A     I saw him drive towards that -- it appears to be

24   a green strip of turf right here (indicating).

25       Q     And was he --

1      A    There was a large sign there.  He was facing

2  westbound in the parking lot.

3      Q    And was he on the grass or field section as he

4  was driving or was he in the parking lot?

5      A    In the parking lot on the concrete facing

6  westbound, which would be to the right of the page.

7      Q    Okay.  And what did you see him do next?

8      A    The vehicle slowed and momentarily stopped while

9  I was running towards the vehicle, and while I was

10 approaching in this grassy area, the subject vehicle ran

11 over the curb and ended up driving right towards me.

12     Q    Okay.  And how fast was the vehicle going at

13 that time?

14     A    I -- it was accelerating.  It was rapidly

15 accelerating.  I can't give you an exact speed.  I'd say

16 15 to 20 miles per hour while -- as it passed me.

17     Q    Okay.  Can you mark the section where you were

18 standing when it passed you?

19     A    Yes.

20     Q    You can do that with a circle.

21     A    Okay.  Somewhere -- somewhere within this area

22 (indicating).  I don't know the exact, but somewhere

23 right in this area.

24     Q    Okay.  And did the car pass you on the -- on the

25 fence side of you or the concrete parking lot side of

MSJ_099

CHRISTOPHER BAKER                                          18

1   you?

2        A    It was on this grassy area, so between the fence

3   and the parking lot, and it was heading right towards me,

4   and I had to jump -- run and jump out of the way of the

5   vehicle.  It was heading right towards me.  I was

6   pointing my flashlight at it and I had to kind of do an

7   evasive maneuver to get out of the front of the vehicle.

8        Q    And how did you do that?  Did you dive?

9        A    I run -- I ran and I -- I knew there was some

10  concrete and signs over here, so I just got towards the

11  edge of the parking lot where there are some covered --

12       Q    And I think the signs are bordering the turf and

13  the field?

14       A    Yes.

15       Q    And so you knew that that would be a barrier?

16       A    I know I was still east of the sign and his

17  vehicle would have been right around here somewhere when

18  he was coming towards my direction.

19       Q    Okay.  So when he was coming for you, was he

20  driving towards the fence or along the fence?

21       A    Along the -- paralleling the fence and the

22  parking lot, right in the middle of that small strip.

23       Q    How many feet off the fence was he?

24       A    It's -- that's a small strip there and he was

25  between that -- where there's a gas sign.  He ended up

MSJ_100

1    breaking trees right around that area, between the fence

2    and the strip because his vehicle wouldn't fully fit, so

3    he was right off the fence.

4        Q    Uh-huh.  So maybe a couple feet off the fence?

5        A    I would say it was somewhere in the middle of

6    there.  So I don't know the exact measurement.

7        Q    Maybe 5 feet?

8        A    I would say 5 to 10 at that point --

9        Q    Okay.

10        A    -- and then he ended up driving right along the

11    fence after.  But when he passed me, 5 to 10 feet off the

12    fence.

13        Q    Okay.  You were able to get out of his way and

14    essentially stand in front of the turf?

15        A    I don't recall if it was that sign or one of

16    these light posts.  It was one of the two.  I got behind

17    the concrete barrier.

18        Q    What concrete barrier?

19        A    Well, there's a concrete post.  They're

20    pretty --

21            (Speaking simultaneously.)

22            THE WITNESS:  -- they're able to give me some

23    cover for my vehicle.

24    BY MR. GRUENBERG:

25        Q    Okay.

MSJ_101

CHRISTOPHER BAKER                                      20

1       A    I can't recall if it was the sign or the post,
2  but I did run southbound towards the edge of the parking
3  lot.
4       Q    All right.  Did you have your whole -- your
5  weapon drawn at that point?
6       A    No.
7       Q    Why not?
8       A    I -- while I was approaching, I was running at a
9  rapid speed with my flashlight in hand, pointing it at
10 the vehicle, and I was expecting a bailout prior to the
11 vehicle driving towards me.
12      Q    Okay.  And as the vehicle passed you, heading
13 east, what did you do?
14      A    I initially ran -- continued -- I shined my
15 light towards the agents that were following the subject
16 vehicle.  I shined my light toward them so that they
17 wouldn't hit me as they drove through the vehicle.
18           And then I started running towards my vehicle to
19 get back -- get back in my vehicle.  However, I saw that
20 the subject vehicle was getting stuck, hitting the trees,
21 and it kind of went back and forward, and there was kind
22 of a ditch here, so I saw a vehicle going back and forth
23 and I was running westbound, kind of paralleling the
24 highway.
25      Q    All right.  And so you're running towards the

MSJ_102

CHRISTOPHER BAKER                                    21

1    driveway, right?

2        A    Yes, sir.

3        Q    And did you see at some point Mr. Estrada's

4    vehicle back up to a border patrol vehicle?

5        A    I can't recall.  There were several vehicles on

6    scene.

7        Q    Well, you see I'm pointing to the vehicle that

8    was being driven by Mr. -- Officer Ruiz?

9        A    Okay.

10       Q    Do you have an understanding that that's true?

11       A    There were many vehicles and I was running, sir.

12   I don't recall exactly what placement vehicles were at

13   that time.

14       Q    All right.  If I represented to you that this

15   vehicle was Mr. Ruiz's border patrol vehicle, would that

16   make sense to you?

17            MR. RUTMAN:  Perez.

18   BY MR. GRUENBERG:

19       Q    Excuse me.  Perez?

20            MR. CORDERO:  I object.  Vague and ambiguous.

21            THE WITNESS:  I don't know exactly where each

22   individual was parked.

23   BY MR. GRUENBERG:

24       Q    Okay.  Fair enough.  Do you recall, however,

25   Mr. Estrada backing up right to a place right in front of

MSJ_103

CHRISTOPHER BAKER                                    22

1    this border patrol pickup truck?

2              Do you remember that?

3        A    I don't recall specifically that.  I remember

4    the vehicle going forward and backwards, and it appeared

5    to be getting stuck several times.

6        Q    Okay?

7        A    And that's when I -- I was initially planning on

8    getting back in my vehicle, but I saw the vehicle was

9    getting stuck, and I saw agents approaching the vehicle,

10   also.

11       Q    Okay.  And so what did you do?

12       A    When I saw the agents approaching the vehicle on

13   foot, I kept running, paralleling the highway.

14       Q    Along the fence?

15       A    Yes.

16       Q    Okay.  How many feet off the fence were you?

17       A    Ten feet.

18       Q    All right.  Do you remember hearing gunshots?

19       A    Yes.

20       Q    Where were you standing when you first heard the

21   gunshots?

22       A    So there was a K-9 vehicle that was right around

23   here.  It's not shown on this, but I was on the other

24   side of the K-9 vehicle, just towards the highway, I

25   guess you could say.

MSJ_104

1      Q     Okay.  How did you get across the fence?  Did

2  you use the gap?

3      A     Yes.

4      Q     Okay.  So as you're seeing what's unfolding, you

5  entered the gap and ran along the highway?

6      A     Correct.

7      Q     All right.  And do you see the vehicle that's

8  circled?

9      A     Yes.

10     Q     Were you -- where were you standing when you

11  heard the gunshots relative to that?

12     A     It would have been towards the front of the

13  vehicle but on the outside towards the highway.

14     Q     All right.

15     A     Or maybe right around the hood.  Right in this

16  general area, the hood or the drivers.

17     Q     All right.  And is there a reason that you were

18  standing there?

19     A     I was just running to get ahead because I -- I

20  could see agents approaching the vehicle as I was by my

21  vehicle here, so I kept running this way.  And while I

22  was in this general area, I did not see the shots, but I

23  did -- I -- I heard it.  I heard a couple pops, audible

24  pops when I was around here, so I gained cover behind the

25  vehicle.

MSJ_105

CHRISTOPHER BAKER                                    24

1       Q    As you were running, did you see officers

2   standing around Mr. Estrada's white Nissan Sentra?

3       A    I did see -- I saw at least three agents kind of

4   triangulated around the vehicle.

5       Q    Do you know Officer Godreau?

6       A    Yes.

7       Q    Do you consider him to be a friend?

8       A    I would say a coworker.  We get along, but I

9   never talk to him outside of work.

10      Q    Okay.  Would you recognize him, though?

11      A    Yes.

12      Q    And did you recognize him to be somewhere in

13  front of the vehicle?

14      A    At the time, I did see an agent in front, but I

15  don't recall who it was.

16      Q    All right.

17      A    While I was running, I could see the -- at least

18  the three agents on foot approaching the vehicle, and I

19  could not tell who was who because I was running.

20      Q    Did you ever perceive yourself to be in imminent

21  harm?

22      A    Yes.

23      Q    In danger of imminent?

24      A    Yes, sir.

25      Q    And when was that?

CHRISTOPHER BAKER                                        25

1        A     After I had initially stopped and ran towards

2     the open grassy area that I have circled here as the

3     subject vehicle did the U-turn towards me and was driving

4     right -- it would have -- if I wouldn't have moved, I

5     would have been hit pretty much.

6        Q     You had time to move?

7        A     It was very close.  I don't know.  I was able

8     to.  I've always been fast.  That's was my reaction, was

9     just to run and get cover, and I was able to get out of

10    the way.

11       Q     But you didn't have to dive, right?

12       A     I don't believe I dove.  I --

13       Q     You didn't have to jump?

14       A     I may have jumped.  I know I ran.  I made an

15    evasive maneuver to get out of there and get behind

16    cover.

17       Q     All right.  You thought you had time to do that?

18       A     I was not thinking about if I felt it or not at

19    the time.  I just did it to get out of the way.

20       Q     All right.  Do you know how many feet were --

21    when you got out of the way, do you know how many feet

22    was between you and the vehicle as it passed you?

23       A     I would say 10 feet or less.

24       Q     Thank you.

25       A     If I wouldn't have moved, it would have hit me

MSJ_107

CHRISTOPHER BAKER                                        26

1   head on, but it was within 10 feet as I ran away.

2        Q    All right.  Thank you.

3             Did you ever see the vehicle head for Officer

4   Godreau?

5             MR. CORDERO:  Just for clarification, I believe

6   everybody is an agent, not an officer.

7             THE WITNESS:  Correct.

8             MR. GRUENBERG:  Excuse me.  Okay.

9             MR. CORDERO:  Yeah.  It gets confusing.

10  There's --

11            MR. GRUENBERG:  I'll try to remember.

12            MR. CORDERO:   -- CBP officers and border patrol

13  agents.

14  BY MR. GRUENBERG:

15       Q    Okay.  Did you ever see the vehicle head for

16  Agent Godreau?

17       A    I saw the vehicle driving towards an agent

18  because I saw an agent in front of it while I was running

19  behind my vehicle towards this direction, but I -- I

20  didn't know it was him at the time.

21       Q    All right.  And this agent that you saw in front

22  of the vehicle, how many feet in front of the vehicle was

23  he when you saw him -- when you first saw him?

24       A    It'd be hard to -- I would say 10 to 20 --

25       Q    All right.

MSJ_108

CHRISTOPHER BAKER                                                    55

```
 1                    REPORTER'S CERTIFICATE

 2

 3             I, A. Desiree Tipper, a Certified Shorthand

 4     Reporter No. 13806 in the State of California, do hereby

 5     certify:

 6                   That the foregoing proceedings were taken

 7     before me at the time and place herein set forth; that

 8     any witnesses in the foregoing proceedings, prior to

 9     testifying, were placed under oath; that a verbatim

10     record of the proceedings was made by me using machine

11     shorthand which was thereafter transcribed under my

12     direction; further, that the foregoing is an accurate

13     transcription thereof.

14                   I further certify that I am neither

15     financially interested in the action nor a relative or

16     employee of any attorney of any of the parties.

17                   IN WITNESS WHEREOF, I have hereunto

18     subscribed my name this 7th day of January, 2023.

19

20

21

22

23     _____

                         A. Desiree Tipper
24                       CSR No. 13806

25
```

MSJ_109

1               UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF CALIFORNIA

3

    SILVESTRE ESTRADA, et al.,
4
                        Plaintiff,
5                                    Case No.:  21-CV-1390-DMS-BGS
            vs.
6
    UNITED STATES OF AMERICA, et
7   al.,

8                       Defendants.
    _____
9

10

11                    DEPOSITION OF

12                   JOSE L. PATCH

13                SAN DIEGO, CALIFORNIA

14                 DECEMBER 28, 2022

15

16

17

18

19

20

21

22

23

24
    REPORTED BY:
25  A. DESIREE TIPPER, CSR NO. 13806

JOSE L. PATCH                                                      14

```
 1      A    Yes.

 2      Q    And where were you at the time Mr. Estrada

 3   backed up to the pickup truck?

 4           MR. WALLACE:  I'm just going to object as vague.

 5   You mean as he was stopped?

 6           MR. GRUENBERG:  Yes, as he was stopped.  As he

 7   came to a stop.

 8           THE WITNESS:  In that approximate area, the same

 9   area.

10   BY MR. GRUENBERG:

11      Q    All right.  So somewhere near the tree or near

12   the flag?

13           MR. WALLACE:  I'm going to object as to

14   "somewhere near" as vague.

15           But you can answer.

16           THE WITNESS:  I believe closer to the tree than

17   the flag, but -- best -- my best estimate is in between

18   the two, off to the front of the vehicle.

19   BY MR. GRUENBERG:

20      Q    All right.  And how far away from the vehicle

21   were you when it came to a stop?

22      A    My best estimate is 10 to 15 feet away.

23      Q    All right.  And what did you do next?

24      A    Continued to give commands.

25      Q    And what happened next?
```

1      A      The -- I heard an engine rev loudly and then the

2  vehicle moved, lunged from that position forward and I

3  believe started -- became -- it was too close -- coming

4  too close to Agent Godreau and I, at that point, feared

5  for his life.

6      Q      At that point, did you fire your weapon?

7      A      I did not.

8      Q      Why is that?

9      A      When the vehicle edged forward towards Agent

10 Godreau, the passenger on the -- in the front seat was

11 directly in my line of sight.

12     Q      Do you recall there being a delay from the time

13 you first heard the rev to when the vehicle moved?

14     A      I do.

15     Q      And would your explanation be that the vehicle

16 was in neutral and then the driver realized it and then

17 put it in drive?

18            MR. WALLACE:  Objection.  Foundation.

19            You can answer.

20 BY MR. GRUENBERG:

21     Q      Was that your impression?

22     A      I didn't know.  I don't have an impression of

23 that, other than I know there was a pause when he backed

24 up for a second.

25     Q      And then there was a rev?

1                  REPORTER'S CERTIFICATE

2

3           I, A. Desiree Tipper, a Certified Shorthand

4    Reporter No. 13806 in the State of California, do hereby

5    certify:

6                That the foregoing proceedings were taken

7    before me at the time and place herein set forth; that

8    any witnesses in the foregoing proceedings, prior to

9    testifying, were placed under oath; that a verbatim

10   record of the proceedings was made by me using machine

11   shorthand which was thereafter transcribed under my

12   direction; further, that the foregoing is an accurate

13   transcription thereof.

14                I further certify that I am neither

15   financially interested in the action nor a relative or

16   employee of any attorney of any of the parties.

17                IN WITNESS WHEREOF, I have hereunto

18   subscribed my name this 7th day of January, 2023.

19

20

21

22   _____

23                    A. Desiree Tipper
                       CSR No. 13806
24

25

MSJ_113

1              UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3

   SILVESTRE ESTRADA, et al.,
4
                     Plaintiff,
5                              Case No.:  21-CV-1390-DMS-BGS
          vs.
6
   UNITED STATES OF AMERICA, et
7  al.,

8                     Defendants.
   _____
9

10

11              DEPOSITION OF

12                LUIS PEREZ

13            SAN DIEGO, CALIFORNIA

14            December 22, 2022

15

16

17

18

19

20

21

22

23

24
   REPORTED BY:
25 A. DESIREE TIPPER, CSR NO. 13806

MSJ_114

1      A    Are you referring to before or after I got

2   behind him?

3      Q    Thank you for the clarification.

4           So Mr. Estrada heads east?

5      A    Yes, sir.

6      Q    You follow him, correct?

7      A    Kind of, yeah.  Not immediately behind him, but

8   yeah, I was turning around to follow him.

9      Q    And what happened next?

10     A    I noticed he was trying to reverse his vehicle.

11     Q    All right.  Because he realized he couldn't get

12   out?

13     A    Correct.

14     Q    At least that was your understanding?

15     A    Yes, sir.

16     Q    Right?

17          And what do you then do?

18     A    I jumped the curb onto the grassy area where he

19   was and positioned my vehicle right behind him.

20     Q    And that's a technique referred to as boxing in?

21     A    No, sir.

22     Q    What do you refer to that as?

23     A    Usually, boxing in is more than one vehicle

24   trying to stop the vehicle from going anywhere.

25     Q    All right.  Fair enough.

MSJ_115

LUIS PEREZ                                              17

```
 1          So you pull in behind Mr. Estrada as he's
 2   backing up?
 3      A    Correct.
 4      Q    And do you stop your vehicle?
 5      A    I do.
 6      Q    And is he backing up towards your vehicle at
 7   some point?
 8      A    Yes, sir.
 9      Q    And does he stop in front of your vehicle?
10      A    Yes.
11      Q    How many feet in front of your vehicle does he
12   stop?
13      A    Estimate --
14      Q    Yes.
15      A    -- maybe 1 or 2 feet before my vehicle.
16      Q    Okay.  So right up to your vehicle?
17      A    Yes, sir.
18      Q    And my understanding is he's stopped there for a
19   period of time before moving forward.
20      A    Correct.
21      Q    How many seconds is he stopped there?  Or
22   minutes?
23      A    Honestly, it was so rapid, I couldn't tell you.
24   Maybe -- it was under a minute for sure.  Are you talking
25   about just from when he stopped?
```

MSJ_116

LUIS PEREZ                                                          18

```
 1        Q    Yes.
 2        A    Just initially stopped from hitting my
 3   vehicle --
 4        Q    Yes.
 5        A    -- before he started to go forward?
 6        Q    Yes.
 7        A    Such a tough -- estimate wise, probably about
 8   anywhere between 20 and 40 seconds.
 9        Q    Okay.  So it was in the -- the way things are
10   unfolding --
11        A    Right.
12        Q    -- it was actually an extended period of time?
13        A    From when he stopped to when he tried to go
14   forward, yes.
15        Q    All right.  And my understanding is that there
16   was a high-pitched whining sound coming from his car at
17   some point.
18        A    Whining?  Clarify, sir.
19        Q    Yes.  Did you hear Mr. Estrada -- did you hear
20   Mr. Estrada's vehicle make a sound?
21        A    Yes.
22        Q    What kind of sound would you describe that as?
23        A    Typical revving of an engine.
24        Q    A revving.  Okay.  And did you hear the revving
25   before the car moved?
```

MSJ_117

1      A    I did.

2      Q    And did the car move right after the revving?

3      A    No, sir.

4      Q    All right.  Did the car not moving while you

5   heard the revving -- did that indicate to you that

6   possibly the car was in neutral?

7      A    Possibly.

8      Q    All right.

9      A    I'm not sure.  I didn't see the gears, but --

10     Q    But you heard the revving without it moving?

11     A    Correct.

12     Q    All right.  And what happened next after you

13  heard the revving?

14     A    We were approaching the vehicle.

15     Q    Who is "we"?

16     A    Me and the fellow agents around the vehicle.

17     Q    All right.  Were you out of your car?

18     A    When he went from reverse to not -- to stopped,

19  that's when I exited my vehicle and approached from the

20  driver's side towards the suspect vehicle.

21     Q    Okay.  And how far were you from the vehicle

22  when the vehicle actually went forward?

23     A    So from me from point where I can touch the

24  vehicle, I would say probably anywhere between 5 and

25  10 feet.

MSJ_118

```
 1                    REPORTER'S CERTIFICATE

 2

 3            I, A. Desiree Tipper, a Certified Shorthand

 4    Reporter No. 13806 in the State of California, do hereby

 5    certify:

 6                 That the foregoing proceedings were taken

 7    before me at the time and place herein set forth; that

 8    any witnesses in the foregoing proceedings, prior to

 9    testifying, were placed under oath; that a verbatim

10    record of the proceedings was made by me using machine

11    shorthand which was thereafter transcribed under my

12    direction; further, that the foregoing is an accurate

13    transcription thereof.

14                 I further certify that I am neither

15    financially interested in the action nor a relative or

16    employee of any attorney of any of the parties.

17                 IN WITNESS WHEREOF, I have hereunto

18    subscribed my name this 7th day of January, 2023.

19

20

21

22

23    _____

                        A. Desiree Tipper
24                      CSR No. 13806

25
```

MSJ_119

1                UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3

4

5  SILVESTRE ESTRADA,                 CASE NO:

6              Plaintiff,        22-CV-1373-DMS-BGS
   vs.
7
   UNITED STATES OF AMERICA,
8
              Defendant.
9  _____/

10

11

12

13

14

15             VIDEOTAPED DEPOSITION OF

16                MATTHEW DELGADO

17             SAN DIEGO, CALIFORNIA

18                DECEMBER 7, 2022

19

20

21

22

23

24  JOB NUMBER. 940533A

25  REPORTED BY:  JACQUELINE STEARMAN, CSR NO. 9373

Page 28

12:43   1    A.  Yes, it was.

     **2    Q.  And how many days a week on average did you work**

12:43 **3 for Subway during your almost two years working there?**

     4    A.  I would say that probably around the later half

12:43 5 of my first year is whenever I got put into the closing

     6 position.  So I was working about -- I was getting about,

12:43 7 probably, 30 to 40 hours on average.

     **8    Q.  Each week?**

12:43 9    A.  Yes.

     **10   Q.  So you would spend around that amount of time in**

12:43 **11 this Circle K parking lot every week?**

     12   A.  Yes, inside the store looking out for customers.

12:43 13        MR. MCDONALD: Showing you what I've marked as

     14 Exhibit 38.

12:43 15        (Defendant's Exhibit 38 was marked for

     16        identification)

12:43 17        THE WITNESS: Okay.

     18 BY MR. MCDONALD:

12:43 **19   Q.  Do you recognize Exhibit 38?**

     20   A.  Yes, I do.

12:44 **21   Q.  And what is Exhibit 38?**

     22   A.  Exhibit 38 whenever you're coming from the --

12:44 23 from the freeway, whenever you -- from Kumeeyay Highway

     24 and instead of going down -- I'm getting sidetracked.

12:44 25        But, yes, I do recognize it.  It's from the

Page 29

12:44    1  freeway.  It's to the -- if you're coming from the angle

         2  that the picture is taken, you are to the left of Cameron

12:44    3  Corners.

         4       Q.  The Cameron Corners gas station --

12:44    5       A.  Yes, sir.

         6       Q.  -- you previously talked about?

12:44    7       A.  Yes, sir.

         8       Q.  Okay.

12:44    9       A.  Apologize about that.

        10       Q.  And are we look -- in Exhibit 38, are we looking

12:44   11  straight on to the Circle K parking lot entrance?

        12       A.  Yes.

12:44   13       Q.  Okay.

        14       A.  You are looking at a good majority of it.

12:44   15       Q.  I'm handing you a blue pen.  If you could with

        16  the blue pen mark with an arrow "in" the entrance lane to

12:45   17  the Circle K parking lot and then mark with an arrow "out"

        18  the exit lane to the Circle K parking lot.

12:45   19       A.  Okay.  So -- so it would be like this where --

        20  because there is a -- kind of a curve right there.  So the

12:45   21  divide is a little scuffed, so a lot of people tend to end

        22  up in the middle.

12:45   23          But what happens is it's mostly -- you follow

        24  this curve that is on the -- whenever you're exiting and

12:45   25  the curve inwards is more --

Page 30

12:45   1     Q.   Okay.

        2     A.   I cannot find the words to describe right now.

12:45   3 I'm sorry.

        4          MR. MCDONALD:   So let the record reflect that the

12:45   5 witness has placed two arrows.   One entering the parking

        6 lot and one that shows the direction of travel exiting the

12:45   7 parking lot.

        8 BY MR. MCDONALD:

12:46   9     Q.   And, sir, is there a -- is there a rightward bend

       10 to the road as you enter into the parking lot?

12:46  11     A.   Yes.

       12     Q.   Okay.

12:46  13     A.   There would be a bend that goes right ward.

       14     Q.   So as -- if you're -- as you're exiting the

12:46  15 parking lot, there's a leftward bend that cars would have

       16 to follow to exit the parking lot?

12:46  17     A.   That is correct.

       18     Q.   Okay.   Is the Subway that you worked at for

12:46  19 approximately two years, is that visible in Exhibit 38?

       20     A.   It is, but it looks like it's a newer photo.   So

12:46  21 it has the -- it has the paint that's there and the Subway

       22 taken down.

12:46  23     Q.   Okay.   Could you circle the structure that the

       24 Subway building used to be?

12:46  25     A.   Okay.   It was -- it was part of three buildings,

MSJ_123

MATTHEW DELGADO - 12/07/2022

Page 31

12:46    1 if I recall, all next to each other.

**2      Q.   Okay.**

12:46    3    A.   One of them that used to be right next to it was

4 called Parlor 94.  And then the third one, the owners of

12:46    5 the Circle K use as storage, for the most part.

6         MR. MCDONALD:  Okay.  So the record should

12:47    7 reflect that the witness has placed a oval-shaped marking

8 representing the three buildings that the Subway was

12:47    9 connected to.

10        THE WITNESS: That is correct.

12:47   11 BY MR. MCDONALD:

**12      Q.   Okay.  And where specifically within that bigger**

12:47   **13 oval -- if you could please use the black pen to mark the**

**14 specific location of where the Subway was.**

12:47   15    A.   It might have a little bit of the Parlor

16 connected to it because the doors are right next to each

12:47   17 other, but it would be kind of like this square right --

18 within the -- let's see.

12:47   19        MR. MCDONALD:  Let the record reflect the witness

20 has placed a black square within blue oval he had

12:47   21 previously drawn to represent more specifically the

22 location of the Subway.

12:47   23 BY MR. MCDONALD:

**24      Q.   Sir, do you see the Circle K reflected in Exhibit**

12:48   **25 38?**

**MSJ_124**

MATTHEW DELGADO - 12/07/2022

Page 32

| | |
|---|---|
| 12:48 | 1   A.   Yes, I do. |
| | **2      Q.   Could you please place a black rectangle around** |
| 12:48 | **3 the approximate location of the Circle K?** |
| | 4   A.   Okay.  The main building or -- |
| 12:48 | **5      Q.   The main building.** |
| | 6   A.   Okay. |
| 12:48 | **7      Q.   Yes, please.** |
| | 8   A.   I just wanted to make sure.  Okay. |
| 12:48 | 9        MR. MCDONALD:  Let the record reflect the witness |
| | 10 has placed a three-sided rectangle to show the location of |
| 12:48 | 11 the Circle K. |
| | 12 BY MR. MCDONALD: |
| 12:48 | **13      Q.   And did you not close off that rectangle because** |
| | **14 it continues to proceed to the right side of this exhibit?** |
| 12:48 | 15   A.   Yes, it proceeds a little more. |
| | **16      Q.   Okay.** |
| 12:49 | 17        MR. RUTMAN:  Sorry, got something stuck in my |
| | 18 throat.  Yeah, I tried the water already and it's not |
| 12:49 | 19 working. |
| | 20        MR. MCDONALD:  Showing you Exhibit 39. |
| 12:49 | 21        (Defendant's Exhibit 39 was marked for |
| | 22        identification) |
| 12:49 | 23 BY MR. MCDONALD: |
| | **24      Q.   Do you recognize 39?** |
| 12:49 | 25   A.   Yes, I do. |

MSJ_125

Page 33

12:49     1     Q.   What is that?

          2     A.   That is the Subway whenever it was still open.

12:49     3 And it looks like it's whenever -- it looks like it's of

          4 the night of where the incident occurred.

12:49     5     Q.   And is this a fair and accurate depiction of what

          6 the Subway looked like --

12:49     7     A.   Yes.

          8     Q.   -- in May of 2021?

12:49     9     A.   Yes.  Yes, sir.

         10     Q.   Okay.  What direction in the Circle K parking lot

12:50    11 is the Subway facing?

         12     A.   So it's facing -- let me just go to the map on

12:50    13 Exhibit 36.  It would be facing the westward face.  It

         14 would be facing a little more westward out towards the

12:50    15 road that 37, Exhibit 37, is.

         16     Q.   Towards the State Route 94?

12:50    17     A.   Yes, sir.

         18          MR. MCDONALD: Showing you what I've marked as

12:50    19 Exhibit 40.

         20          (Defendant's Exhibit 40 was marked for

12:50    21          identification)

         22 BY MR. MCDONALD:

12:50    23     Q.   Do you recognize Exhibit 40?

         24     A.   It looks like it is a top-down view of the whole

12:51    25 parking lot and the buildings.

Page 34

12:51   1      Q.  Of the Circle K parking lot?

       2      A.  Yes, sir.

12:51   3      Q.  And does this appear to be a fair and accurate

       4 depiction of the top-down view of the -- of the Circle K

12:51   5 parking lot?

       6      A.  Yes.

12:51   7      Q.  Do you see the Subway depicted in this

       8 photograph?

12:51   9      A.  Yes, sir.

       10      Q.  Could you please use the black pen and draw a

12:51   11 rectangle around the Subway.

       12      A.  Okay.

12:51   13      MR. MCDONALD: Okay.  Let the record reflect that

       14 the witness has placed a black rectangle representing the

12:51   15 location of the Subway in Exhibit 40 just to the left of

       16 center of the exhibit.

12:51   17 BY MR. MCDONALD:

       18      Q.  And, sir, there's a structure of sorts right in

12:52   19 the center of Exhibit 40, approximately.  Is that the gas

       20 station pumps?

12:52   21      A.  Yes, sir.

       22      Q.  That's the Sinclair gas station pumps?

12:52   23      A.  Yes, sir.

       24      Q.  Have you gotten gas there before?

12:52   25      A.  Yes, I have.

MATTHEW DELGADO - 12/07/2022

Page 35

12:52   1     Q.  Okay.  And then the structure on the right side

        2 of the Sinclair gas pumps, is that the Circle K?

12:52   3     A.  Yes, it would be.

        4     Q.  Could you please draw a rectangle around -- in

12:52   5 blue around the Circle K?

        6     A.  All right.

12:52   7         MR. MCDONALD:  Okay.  Let the record reflect the

        8 witness has placed in blue a rectangle around the Circle K

12:52   9 building just to the -- just above and to the right of the

        10 gas station pumps.

12:52   11 BY MR. MCDONALD:

        12    Q.  And, sir, this -- this exhibit also shows the

12:52   13 entrance and exit to the Circle K parking lot; is that

        14 right?

12:52   15    A.  This is correct.

        16    Q.  Could you place an "X" on that approximate

12:53   17 location?

        18    A.  Yes.  On the exit outwards to the main street

12:53   19 or --

        20    Q.  Correct.

12:53   21    A.  Okay.

        22        MR. MCDONALD:  Okay.  Let the record reflect the

12:53   23 witness has placed an "X" representing the entrance and

        24 exit to the Circle K parking lot.  And that "X" appears to

12:53   25 have been drawn directly over a -- what appears to be a

Page 36

12:53    1 white -- large white vehicle in Exhibit 40.

2 BY MR. MCDONALD:

12:53    **3      Q.  Sir, are there any other entrances or exits to**

**4 the Circle K parking lot beyond the place that you've just**

12:53    **5 marked?**

6      A.  There is one at the gate on the outside fence.

12:53    7 There is a gate, but it's mostly for people just coming in

8 and out.  Usually from whenever I was working at the

12:53    9 Subway, it was the truck drivers stopping on the shoulder.

**10      Q.  Okay.  Could you please mark with a circle the**

12:54    **11 location of that gate?**

12      A.  (Witness complies).

12:54    13      MR. MCDONALD: Okay.  Let the record reflect the

14 witness has placed a blue circle just to the right of

12:54    15 center and just beneath about an inch below center as well

16 of the photo representing the place where there's a gate

12:54    17 into this parking lot.

18 BY MR. MCDONALD:

12:54    **19      Q.  And, sir, what is that gate used for?**

20      A.  Mostly people just walking in and out of it.

12:54    21 Usually for people to get their fueling from Cameron

22 Corners Gas Station, crossing the street to go into the

12:54    23 Circle K to buy some goods.

24      Or when some truckers are taking a quick stop

12:54    25 parking on the shoulder.  I know the public transport bus

MATTHEW DELGADO - 12/07/2022

Page 37

12:54  1 also does it, too.  They park on the shoulder, they'll go

2 through the gate to get to the Circle K.

12:55  **3    Q.   Okay.  Do cars drive through that gate?**

4    A.   No.

12:55  **5    Q.   Is it wide enough for a car to drive through it?**

6    A.   I don't believe so.

12:55  **7    Q.   Have you ever seen a car drive through it?**

8    A.   I do not.

12:55  **9    Q.   Besides the events we're going to talk about,**

**10 have you ever seen a car driving on the grass/dirt portion**

12:55  **11 of this Circle K parking lot?**

12    A.   I have personally not ever seen someone before

12:56  13 the incident.

14         MR. RUTMAN:  41?  Since you've got two videos,

12:57  15 can you maybe have a file name or something like that so

16 we can distinguish between the two?

12:57  17         MR. MCDONALD: I think I can do that.

18         MR. RUTMAN:  Do you need some more water?

12:57  19         THE WITNESS: I have some still.

20         MR. RUTMAN:  Okay.

12:57  21         THE WITNESS: Thank you, though.

22         MR. RUTMAN:  Sure.

12:57  23         (Defendant's Exhibit 41 was marked for

24         identification)

12:57  25 / / /

Page 38

12:57  1 BY MR. MCDONALD:

**2     Q.  Sir, I'm placing a computer in front of you.**

12:57  3     A.  Okay.

**4     Q.  And I'm going to -- when you're ready, you can**

**5 push play on the video.  It is a video contained on a disk**

**6 marked Exhibit 41.**

12:58  7          MR. MCDONALD:  Counsel, I have downloaded this

8 video to the desktop to have it played for streaming

12:58  9 purposes from the desktop.

10          MR. RUTMAN:  Right.  So stipulated.

12:58 11 BY MR. MCDONALD:

**12     Q.  And this is scope video of the Circle K parking**

12:58 **13 lot.**

**14          Sir, if you could push play and then just watch**

12:58 **15 the video, and then I will ask you some questions about it**

**16 as it goes.**

12:58 17     A.  Okay.

**18     Q.  Sir, if you could generally describe what it is**

12:58 **19 that you're seeing in the video marked Exhibit 41.**

20     A.  So it started off a little bit on the left side

12:58 21 of the build -- when you're facing it, the right side, but

22 it would be stage left.  And it started off a little over

12:58 23 there and it's going over -- it went straight and then

24 it's over the grassy area right now.

12:58 **25     Q.  Okay.  And are you referring to the Circle K**

MATTHEW DELGADO – 12/07/2022

Page 39

12:59    1 parking lot area?

     2    A. Yes, sir.

12:59    3    Q. And is this video depicting that parking lot?

     4    A. Yes, sir.

12:59    5    Q. And is it a fair and accurate depiction -- as

     6 you're watching it, is it a fair and accurate depiction of

12:59    7 what the parking lot looked like in May of 2021?

     8    A. Yes.

12:59    9    Q. Okay. Keep watching. What are you seeing now on

    10 the video?

12:59   11    A. On the video, it stayed at a certain area for a

    12 moment. It's right in front of the -- whenever you're

12:59   13 coming from Campo Road, from the west going eastward, it's

    14 stopped in front of a tree for a little bit. You can see

1:00    15 what appears to be some tracks. And then just now they

    16 went around and they're proceeding to go forward.

1:00    17    Q. And is the video showing the grass/dirt segment

    18 of the Circle K parking lot?

1:00    19    A. Yes, sir.

    20    Q. And you mentioned some tracks. Are those tracks

1:00    21 from a car?

    22    A. I believe so. They are from vehicles.

1:00    23    Q. Okay. And is the video heading in the direction

    24 of the entrance and exit of the Circle K parking lot?

1:00    25    A. Yes, sir.

MSJ_132

MATTHEW DELGADO - 12/07/2022

Page 40

1:00    1           MR. RUTMAN:  It's ended.

        2  BY MR. MCDONALD:

1:00    3      Q.  Has the video ended?

        4      A.  Yes, sir.

1:00    5      Q.  Okay.  So that video is a fair and accurate

        6  representation of what the Circle K parking lot looked

1:00    7  like on -- in May of 2021?

        8      A.  Yes.

1:01    9      Q.  Do you have Exhibit 40 in front of you?

        10     A.  Yes, sir.

1:01    11     Q.  With the blue pen, could you mark the approximate

        12 area that that video in Exhibit 41 showed?

1:01    13     A.  So --

        14     Q.  And you could just draw a line, however

1:01    15 necessary, to show the path of travel of that video.

        16     A.  (Witness complies).

1:02    17          MR. MCDONALD:  Okay.  The record should reflect

        18 that the witness has placed a -- a line showing the path

1:02    19 of travel of this drone video from Exhibit 41.

        20          It starts on the concreted portion of the parking

1:02    21 lot with a -- a ball representing the beginning of the

        22 video, proceeding downwards to another ball and then

1:02    23 proceeding leftwards to another further ball representing

        24 the ending location of the video.

1:02    25 / / /

MSJ_133

MATTHEW DELGADO - 12/07/2022

Page 68

1:45    1 sense.  There was room for it, a little room behind, a

2 little room forward, but they had it generally kind of

1:45    3 contained at this spot.

**4      Q.  Okay.  And what did they have it contained with,**

1:45    **5 vehicles?**

6      A.  Vehicles.

1:45    **7      Q.  Okay.  How many vehicles, approximately, would**

**8 you say there were at the time that the Nissan arrived at**

1:45    **9 the location of the red rectangle?**

10      A.  I can only guarantee two from what I -- from what

1:45    11 I can kind of recall.  But as far as I'm aware, I believe

12 there might have been more.

1:46    **13      Q.  Okay.  If you could use this black pen and mark,**

**14 using rectangles, the locations of the two Border Patrol**

1:46    **15 vehicles that you can recall at the moment that the Nissan**

**16 arrived at the red rectangle.**

1:46    17      A.  (Witness complies).

18          MR. MCDONALD:  Okay.  The witness -- or the

1:46    19 record should reflect the witness has placed two

20 rectangles just behind and in front of the red rectangle.

1:46    21 BY MR. MCDONALD:

**22      Q.  So you mentioned that you took a video of the**

1:46    **23 scene that was unfolding in front of you; is that right?**

24      A.  During a bit of the period of time, yes.

1:46    **25      Q.  Okay.  And what kind of a phone did you have at**

**MSJ_134**

Page 69

1:46    1 the time?

2      A.  I want to say it might have been a Moto One.

1:46    3      Q.  Okay.

4      A.  But I know I've dropped most of my phones a lot

1:47    5 of times where the cameras aren't so great.  So I -- the

6 only one that I have right now that has a decent camera

1:47    7 that hasn't been messed up by me dropping it so much is my

8 current phone.

1:47    9      Q.  Okay.  Do you still have the phone that you used

10 to record the event we've been talking about?

1:47   11      A.  I do still own it, but I've wiped it several

12 times and used it for other purposes.

1:47   13      Q.  Okay.  Did you provide the video of the event

14 that you recorded to the San Diego Sheriff's Department?

1:47   15      A.  Yes, I did.

16      Q.  Okay.  Placing a computer in front of you.  If

1:48   17 you could push play when I ask you to push play.  This --

18 I'm showing you a video that I've marked on disk as

1:48   19 Exhibit 46.

20          MR. MCDONALD:  Counsel, the video has been placed

1:48   21 on the desktop of this laptop for quick viewing

22 accessibility

1:48   23          MR. RUTMAN:  Yes, that's -- that's stipulated.

24          MR. MCDONALD:  And I stand corrected.  I should,

1:48   25 in fact, be marking this as Exhibit 47.

MSJ_135

MATTHEW DELGADO - 12/07/2022

Page 70

1:48    1          (Defendant's Exhibit 47 was marked for

        2          identification)

1:48    3 BY MR. MCDONALD:

        4      Q.   Sir, go ahead and push play on that video.

1:49    5      A.   (Witness complies)

        6      Q.   Okay.  Has the video concluded?

1:49    7      A.   Yes, sir.

        8      Q.   Did you recognize the video in Exhibit 47?

1:49    9      A.   Yes, sir, that was the one that I took.

        10     Q.   Okay.  Did you hear a voice in that video?

1:49    11     A.   That was my voice and I -- I don't know.  I just

        12 find myself a little embarrassing in the video.  I don't

1:49    13 know why.  To me, it's just, like, I -- it's -- I don't

        14 know.

1:49    15         MR. RUTMAN:  Because you hit the deck?

        16         THE WITNESS: No, just because, like, I -- I --

1:50    17 I've voiced my thoughts too often and to me it's --

        18 BY MR. MCDONALD:

1:50    19     Q.   That's okay, sir.  Let me ask some questions.

        20         The Exhibit 47, that's a -- that's -- that is a

1:50    21 true and accurate copy of -- of the video that you took?

        22     A.   Yes, sir.

1:50    23     Q.   Okay.  I'm going to position the video at the two

        24 second mark.

1:50    25         And, sir, where was the -- can you see the Nissan

MSJ_136

MATTHEW DELGADO - 12/07/2022

Page 81

2:04   1    A.  There were others, but I do not recall their

2 positions.

2:04   3    Q.  How many others, approximately, would you say?

4    A.  Probably -- I would probably say probably around

2:04   5 three to four more maybe from --

6    Q.  And -- and --

2:04   7    A.  Personal --

8    Q.  -- generally, where were they located?

2:04   9    A.  Behind it on the -- probably on the sides,

10 probably.  They would be probably on this -- like, on the

2:04   11 map probably -- I can't really describe it to well, but

12 probably in this general location.

2:05   13   Q.  Okay.  Start -- were they -- were they

14 surrounding the Nissan?

2:05   15   A.  I believe so.

16   Q.  You believe so or they were?

2:05   17   A.  Like, position-wise or, like, how they were or

18 where they --

2:05   19   Q.  At this moment in time when the -- when the

20 Nissan has come to a stop after reversing, did it appear

2:05   21 as though Border Patrol was surrounding the Nissan?

22   A.  Yes, I believe so.

2:05   23   Q.  Did it --

24       MR. RUTMAN:  Can I just clarify that question?

2:05   25 Do you mean Border Patrol vehicles, agents or both?

MATTHEW DELGADO - 12/07/2022

Page 82

2:05  1        MR. MCDONALD: I mean both the agents on foot and

      2  vehicles.

2:05  3  BY MR. MCDONALD:

      4     Q.  Did it appear as a -- as an entire unit that the

2:05  5  Border Patrol was -- was surrounding the driver?

      6     A.  Yes, sir, the vehicle, not the -- just the

2:05  7  driver.

      8     Q.  And when the vehicle came to a stop after

2:05  9  reversing, did you know if the driver was gonna get out of

     10  his vehicle at that point?

2:05 11     A.  No, did not know.

     12     Q.  Did you know if the driver was gonna drive

2:05 13  forward at that point?

     14     A.  No, I did not know.

2:06 15     Q.  Did you know if he was gonna drive and turn to

     16  the right at that point in time?

2:06 17     A.  No, sir.

     18     Q.  Did you know what the driver was gonna do?

2:06 19     A.  No, sir.

     20     Q.  Was a chaotic scene?

2:06 21     A.  Yes.

     22     Q.  In what way was it chaotic?

2:06 23     A.  It was -- well, it was definitely out of the norm

     24  for certain just for how things normally are.  I didn't --

2:06 25  but just from how, like, the vehicles just were all just

Page 83

2:06    1 coming around and kind of, like, the positioning.

        2      Q.   Focusing your attention on the Nissan itself.

2:06    3      A.   Okay.

        4      Q.   Did the driver of the Nissan appear to be driving

2:06    5 erratically?

        6      A.   Yes.

2:06    7      Q.   Did you know what he was gonna do next at any

        8 given point in time?

2:06    9      A.   No, sir.

        10     Q.   When he came to a stop after reversing, did you

2:06    11 think that the event was over at that point?

        12     A.   Yes, sir.

2:07    13     Q.   Why did you think it was over at that point?

        14     A.   Because he's -- he stopped, I -- I guess.

2:07    15     Q.   And was he boxed in?

        16     A.   He had some leeway in front, but for the most

2:07    17 part, yeah.

        18     Q.   Okay.

2:07    19     A.   I'd say so.

        20     Q.   For him to get back off of grass and onto the

2:07    21 concrete, would he have needed to jump a curb?

        22     A.   Yes, sir.

2:07    23     Q.   Going backwards, correct?  If he had continued

        24 going backwards, would he have come to a curb?

2:07    25     A.   Yes, sir.

MATTHEW DELGADO - 12/07/2022

Page 84

2:07     1    Q.   And he would have to have jumped that curb to get

2 back onto concrete?

2:07     3    A.   Yes, sir.

    4    Q.   And what if he had gone forwards from his

2:07     5 location as you've reflected in Exhibit 48?

    6    A.   There would be a -- from where he stopped, there

2:07     7 would be either more -- like, another agent car or an

8 agent in the way.

2:08     9    Q.   You mentioned the driver after reversing stopped

10 momentarily, but didn't get out of the car; is that right?

2:08   11    A.   Yes, sir.

  12    Q.   What did the driver do instead?

2:08   13    A.   They proceeded to drive forward after stopping.

  14    Q.   Okay.   In the direction of agents?

2:08   15    A.   Yes, sir.

  16    Q.   Did you see agents in the front of the vehicle as

2:08   17 it started going forward?

  18    A.   Diagonally to the vehicle, yes.

2:08   19    Q.   Okay.   By "diagonally," what do you mean?

  20    A.   Like -- like, where the headlights would probably

2:08   21 be associated.   Like, right in that range, I would say.

  22    Q.   Okay.   So not directly center, center of the

2:08   23 vehicle, but around the headlight locations?

  24    A.   Yes, sir.

2:08   25    Q.   Okay.   So in front of the car?

**MSJ_140**

Page 85

2:08    1    A.  Yes, sir.

        2    Q.  How many agents did you see in the headlight

2:08    3 positions, approximately?

        4    A.  Approximately two.

2:09    5    Q.  And at that moment in time, how far away in feet

        6 approximately would you say those agents were from the

2:09    7 Nissan?

        8    A.  I would probably say three to six feet maybe.

2:09    9    Q.  Okay.

        10   A.  That range.

2:09    11   Q.  Okay.  How far away are we seated from each other

        12 now would you approximate?

2:09    13   A.  Probably three feet.  Probably.

        14   Q.  Okay.  So these agents were between three and six

2:09    15 feet away from the Nissan?

        16   A.  From where I was positioned, that's where I would

2:09    17 assume they would be, yes.

        18   Q.  Okay.  Based on your perception of the event

2:09    19 unfolding in front of you?

        20   A.  Yes.

2:09    21   Q.  Did it appear as though the Nissan posed a

        22 danger to the agents at that moment in time?

2:09    23   A.  Yes, sir.

        24   Q.  Why?

2:09    25   A.  Because it is a vehicle that is made of metal and

Page 86

2:10    1 has a lot of weight behind it that carries a lot of

        2 momentum.  If it -- if you get hit by something like that,

2:10    3 it generally will cause damage if it's going even decent

        4 amount of speed.

2:10    5     Q.  And it was traveling in the direction of these

        6 two agents?

2:10    7     A.  I believe so.

        8     Q.  How would you describe the way this the vehicle

2:10    9 started moving forward, was it slowly, was it a surge, was

       10 it quickly?  How would you describe the way that it moved

2:10   11 forward?

       12     A.  I would probably describe it quickly on with a

2:10   13 bit of a surge.

       14     Q.  Okay.  And what do you mean by a surge?

2:10   15     A.  Kind of like it went from -- like, they tried to

       16 get more speed in the very beginning.  Like, they just hit

2:10   17 the pedal a little bit too hard, in a sense.

       18     Q.  Okay.

2:10   19     A.  Like it -- it kind of jerked forward and they

       20 just went with it.

2:10   21     Q.  Okay.  Do you drive?

       22     A.  I do.

2:11   23     Q.  Okay.  And are you familiar with the common act

       24 of starting to move a car forward?

2:11   25     A.  Yes, sir.

Page 87

2:11  1    Q.  Okay.  Was what you saw the driver of the Nissan

      2 do, was it like that common act of moving car forward, or

2:11  3 was it an uncommon act of moving a car forward?

      4    A.  It would be uncommon.

2:11  5    Q.  How was it uncommon?

      6    A.  Instead of slowly easing into the pace that you

2:11  7 want to go from -- like, to move somewhere.  Like, to move

      8 from -- from the side of a parking -- like, a side of

2:11  9 street.  Instead of easing outwards and then into a --

      10 like, a slower acceleration to the pace you want to get

2:11  11 for city streets, it was more like you're on the side and

      12 there's no one directly in front of you and just want to

2:11  13 go.

      14    Q.  Did you hear -- or does the video that you took,

2:12  15 Exhibit 47, does it have audio?

      16    A.  It did.

2:12  17    Q.  Is that a yes?

      18    A.  It does have audio.

2:12  19    Q.  And can you hear gunshots in that video?

      20    A.  Yes, sir.

2:12  21    Q.  Do the gunshots first occur after the vehicle is

      22 already moving forward?

2:12  23    A.  Yes.  It occurs while the vehicle is in motion.

      24    Q.  Moving forward?

2:12  25    A.  Yes, sir.

MATTHEW DELGADO - 12/07/2022

Page 93

2:22    1 on a disk as Exhibit 50.

        2          (Defendant's Exhibit 50 was marked for

2:22    3          identification)

        4 BY MR. MCDONALD:

2:22    5      Q.  Sir, if you could push play on that video.

        6      A.  Okay.

2:23    7          MR. RUTMAN:  It's ended.

        8          THE WITNESS:  Yeah.

2:23    9 BY MR. MCDONALD:

        10     Q.  The video's ended, sir?

2:23    11     A.  Yes, sir.

        12     Q.  Have you seen that video before?

2:23    13     A.  I have not.

        14     Q.  What does that video show?

2:23    15     A.  It shows a different angle from about around the

        16 same time whenever I took mine.  It's from -- it looks to

2:23    17 be like from the front -- front view lot from the Circle K

        18 security.

2:23    19     Q.  And does -- does that video in Exhibit 50 appear

        20 to show the same event that we've been talking about?

2:23    21     A.  Yes, sir.

        22     Q.  Do you recognize the location depicted in the

2:23    23 video?

        24     A.  Yes, sir.

2:23    25     Q.  What location is that?

MATTHEW DELGADO - 12/07/2022

Page 94

2:23    1    A.  It's the Circle K parking lot.  And from where

2 the -- where the video's main focus is, it looks like it's

2:24    3 at the grassy area.

**4    Q.  Okay.  In Exhibit 50, do you see the Nissan that**

2:24   **5 we've been talking about?**

6    A.  I believe I did.

2:24   **7    Q.  Would you like to play the video again?**

8    A.  Yes, please.

2:24   **9    Q.  Go for it.**

10    A.  Yes, you can -- you can see the vehicle.

2:24   **11    Q.  Describe what you see the Nissan vehicle doing**

**12 during video in Exhibit 50.**

2:24   13    A.  From the angle that the video is, it seems like

14 it tried to go to the curb and tried to go over it, but it

2:24   15 seems like it might be a little too short for the curb.

**16    Q.  Okay.  And what curb are you talking about?**

2:25   17    A.  I'm referring to the curb for the -- at the time

18 that kind of separated the dirt area from the entrance.

2:25   **19    Q.  And is there an exhibit that shows that portion**

**20 of the curb there that you have?**

2:25   21    A.  Yes.  46 has a portion of the curb there, and so

22 does 44.  It has a much clearer curb.

2:25   **23    Q.  Directing your attention to Exhibit 44, does that**

**24 appear to show the curb where the Nissan drove up to as**

2:25   **25 depicted in the video in Exhibit 50?**

MATTHEW DELGADO - 12/07/2022

Page 95

2:25  1     A.  I believe so.  It's probably the area that it did

2 contact with.  Probably.

2:25  3     Q.  Okay.  And based on the video and your review of

4 that, what happened when the Nissan reached the curb?

2:26  5     A.  It looked like it came to a halt.

6     Q.  Did you see the Nissan after this event?

2:26  7     A.  The --

8         MR. RUTMAN:  Objection.  Vague.  "After this

2:26  9 event" meaning after the shooting, after this video we're

10 looking at?  What time frame?

2:26  11 BY MR. MCDONALD:

12     Q.  Sir, you were there present in the Circle K

2:26  13 parking lot or at the Subway for some period of time that

14 evening after the event we've been talking about, right?

2:26  15     A.  Yes, sir.

16     Q.  And did you get a chance to see the Nissan

2:26  17 sitting there in the -- in the grassy section of the

18 parking lot?

2:26  19     A.  Yes, when I left the -- when I was able to leave

20 the area, I did.

2:27  21         MR. MCDONALD:  Showing you what I've marked as

22 Exhibit 51.

2:27  23         (Defendant's Exhibit 51 was marked for

24         identification)

2:27  25 / / /

Page 96

1 BY MR. MCDONALD:

**2    Q.  Sir, is this the Nissan as it rested the evening**

**3 of May 14th of 2021 in the Circle K parking lot?**

4    A.  Yes.

**5    Q.  Okay.  And do you see the front right side of the**

**6 Nissan?**

7    A.  Yes, sir.

**8    Q.  Okay.  What do you see there?**

9    A.  It looks like the front has been disconnected

10 where it's flung outwards where you can see some of the

11 interior for the front.

**12    Q.  Okay.  So it's been damaged on the front side of**

**13 the vehicle?**

14    A.  Yes, sir.

**15    Q.  Do you know how that damage occurred?**

16    A.  No, sir.

**17    Q.  Okay.**

18    A.  I could only assume it's from whenever in the

19 video the vehicle made contact with the curb.

MATTHEW DELGADO - 12/07/2022

Page 118

2:53   1 STATE OF CALIFORNIA)SS:

       2 COUNTY OF SAN DIEGO)

2:53   3

       4       I do hereby certify:

2:53   5       That the foregoing deposition was taken before me

       6 at the time and place therein set forth at which time the

2:53   7 witness was put under oath by me;

       8       That the testimony of the witness and all

2:53   9 objections made at the time of the examination were

       10 recorded stenographically by me were thereafter

2:53   11 transcribed under my direction and supervision and that

       12 the foregoing is a true record of the same.

2:53   13       I further certify that I am neither counsel for nor

       14 related to any party to said action, nor anywise

2:53   15 interested in the outcome thereof.

       16       IN WITNESS WHEREOF, I have subscribed my name this

2:53   17 25th day of January, 2023.

       18

2:53   19

       20

2:53   21       _____

       22       JACQUELINE STEARMAN, CSR NO. 9373

2:53   23

       24

2:53   25



EXHIBIT __37__
REPORTER _J. STEARMAN_
WITNESS _DELGADO_
DATE _12.7.22_



EXHIBIT 38
REPORTER J. STEARMAN
WITNESS DELGADO
DATE 12 7 22

MSJ_150



EXHIBIT 39
REPORTER J STECKMAN
WITNESS DELGADO
DATE 12.3.22

MSJ_151



MSJ_152



MSJ_153



EXHIBIT 51
REPORTER J. STEARMAN
WITNESS DELGADO
DATE 12.7.22

1                  UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF CALIFORNIA

3

4

5  SILVESTRE ESTRADA,                 CASE NO:

6              Plaintiff,        21-CV-1390-DMS-BGS
   vs.
7
   UNITED STATES OF AMERICAN,
8
              Defendant.
9  _____/

10

11

12

13

14

15            VIDEOTAPED DEPOSITION OF

16       FRANCISCO JAVIER MADARIAGA-GONZALEZ

17          TAKEN AT U.S PORT OF ENTRY

18             SAN DIEGO, CALIFORNIA

19              DECEMBER 1, 2022

20

21

22

23

24 JOB NO. 940488

25 REPORTED BY:  JACQUELINE STEARMAN, CSR NO. 9373

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 35

1:05    1     Q.  And is that the "X" that you placed on Exhibit 2

        2 near the left side of the page?

1:05    3     A.  Yes.

        4     Q.  What time on May the 12th did you arrive at the

1:05    5 "X," approximately?

        6     A.  At 11::00 in the morning.

1:05    7     Q.  Okay.  You crossed over the mesh fence?

        8     A.  No, we stayed there at the border.

1:06    9     Q.  Okay.  How long did you stay there?

        10    A.  Until the next morning on the 13th, again at that

1:06   11 time same time.  4:00 or 5:00 in the morning.

       12    Q.  Okay.  Why were you waiting until the morning?

1:06   13    A.  Well, because he told us that we could -- we

       14 could cross in the morning because during day we -- we --

1:06   15 they could see us.  And they could see us.

       16    Q.  What time the next morning May 13th did you

1:06   17 cross?

       18    A.  We crossed around 5:00 in the morning and we

1:06   19 arrived around 8 a.m. to the 94.

       20    Q.  And did you take, approximately, the same route

1:07   21 that you had taken on May the 10th?

       22    A.  To get to the 94, we went a little farther.

1:07   23    Q.  Did you ultimately arrive at the same place on

       24 the 94 as you had been on May 10th, or did you arrive at a

1:07   25 different place along the 94?

Page 36

1:07   1    A.  It was farther down.

2    Q.  Okay.  If you could please use the red pen to

1:07   3 mark your approximate route of travel from the border to

4 where you met the 94 on May the 13th.

1:08   5    A.  (Witness complies).

6    Q.  So it appears as though you took the same route

1:08   7 for some amount of time and then you veered to the right

8 on your second crossing; is that right?

1:08   9    A.  Yes.

10    Q.  If you could please use the -- this pen because

1:08   11 it comes out a little better than the pen you used to --

12 to mark that.

1:08   13    A.  (Witness complies).

14    Q.  Thank you.

1:09   15         MR. MCDONALD:  Let the record reflect that the

16 witness has placed a -- a line extending from the squiggly

1:09   17 line that he placed earlier along the left side of the

18 page extending to the right off of that line connecting to

1:09   19 State Route 94 on Exhibit 2.

20 BY MR. MCDONALD:

1:09   21    Q.  What was -- what is the terrain like between the

22 border fence and the 94?

1:09   23    A.  A lot of rocks and bushes.

24    Q.  Were you walking on a path?

1:09   25    A.  No, right in the middle of nowhere in the

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 37

1:10    1 mountains.  There's no path.

    **2**    **Q.  Is it flat?  Is it downhill?  Is it uphill?**

1:10    3    A.  Uphill and downhill.

    **4**    **Q.  Was it hard for you?  Easy for you?**

1:10    5    A.  Well, it is hard.  Because we don't usually walk

    6 in those areas.

1:10    **7**    **Q.  Were you pretty tired?**

    8    A.  Yes.

1:10    **9**    **Q.  The second time that you crossed on -- this time**

**10 on May 13th, what food or water did you have with you**

1:10   **11 then?**

    12    A.  We didn't have any food, just -- just one liter

1:10   13 bottle.  Or two bottles of water of one liter each.

    **14**    **Q.  And did you share those two liters between the**

1:11   **15 three of you, or did you each have your own liters?**

    16    A.  It was for the three of us.

1:11   **17**    **Q.  Okay.  How long did it take you to get to the 94**

**18 the second time on May 13th?**

1:11   19    A.  Two-and-a-half hours to three hours.

    **20**    **Q.  Okay.  What happened when you arrived there?**

1:11   21    A.  We arrived to the 94 and the -- the person who

22 was guiding us, we got there to the 94, and he said that

1:11   23 he didn't have any signal.

    24        And, like, at 10 a.m. he said that he was gonna

1:12   25 surrender to Immigration and that he was -- and to stay

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 38

1:12   1 there, that we should stay there, because a car was going

2 to come pick us up.

1:12   3   Q.  Your guide said that he was going to surrender to

4 Immigration?

1:12   5   A.  Well, yes, the person that we were with.

6   Q.  Okay.  So then he -- he left you?

1:12   7   A.  Yes.

8   Q.  And you were there waiting for a car to come?

1:12   9   A.  Yes.

10   Q.  Were you waiting under a bush or in the open?

1:12   11   A.  Under some bush there.

12   Q.  How long did you wait there?

1:12   13   A.  We waited two days.

14   Q.  When the guide left you, did he take water with

1:13   15 him?

16   A.  No.

1:13   17   Q.  He left the water with you?

18   A.  Yes.

1:13   19   Q.  How long did your water last?

20   A.  Just one day because it was very little.  And we

1:13   21 were just drinking just to, you know, refresh our -- our

22 mouth.

1:13   23   Q.  So you ran out of water while you were on the

24 side of the 94?

1:13   25   A.  Yes.

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 39

1:13    1    Q.  Were you nervous about that?

        2    A.  Yes.

1:13    3    Q.  Why?

        4    A.  Because we hadn't eaten.  We didn't have any

1:13    5  water.  We didn't know what was going to happen to us.

        6    Q.  Were you concerned for your safety at that point?

1:13    7    A.  Yes.

        8    Q.  Was it a hot day or a cold day?

1:14    9    A.  Yes, very hot.

        10   Q.  This was in May?

1:14    11   A.  Yes.

        12   Q.  So you waited all of May 13th?

1:14    13   A.  Yes.

        14   Q.  Did you have any phone conversations with anybody

1:14    15  on that day?

        16   A.   Well, someone called us and told us that

1:14    17  somebody would come pick us up in the evening of the 13th,

        18  but nobody showed up.

1:14    19   Q.  Okay.  As the evening was progressing and no one

        20  was coming, were you getting even more worried?

1:15    21   A.  Yes.

        22   Q.  Had you ever been in a circumstance like that in

1:15    23  your life?

        24   A.  No.

1:15    25   Q.  Were you more worried at that point than during

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 40

1:15  1 any other part of your life?

2    A.  Yes, because my cell phone battery was dead, and

1:15  3 I didn't know how to contact anybody.  And we didn't know

4 what was going to happen to us.

1:15  5    Q.  How was your cousin during this time period

6 without water, with your cell phone battery dying?  What

1:15  7 was he like?

8    A.  Well, yeah, he was worried, too, because the one

1:16  9 phone didn't work and the other one didn't have any

10 battery anymore.  So, just worried.

1:16  11    Q.  What were you saying to each other?

12    A.  Well -- well, that we were gonna, well, wait

1:16  13 until the -- you know, the sunlight and then to go down to

14 the -- to the road because we really didn't know the road,

1:16  15 and it was kind of ugly, the area.

16    Q.  Were you waiting right on the road, or did you go

1:16  17 away from the road some distance?

18    A.  It was somewhat at a distance where we could see

1:16  19 the road.  Ten minutes away from the road.

20    Q.  Okay.  You slept there the night of May 13th?

1:17  21    A.  Yes.

22    Q.  And you -- you woke up May 14th in the same

1:17  23 place?

24    A.  Yes.

1:17  25    Q.  How did you sleep that night?

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 41

1:17   1   A.  Well, not very well because it was very cold.  We

2 didn't have any place to stay, just on top of a rock or

1:17   3 under a tree.

**4      Q.  So at night it was very cold and in the day it**

1:17   **5 was very hot?**

6      A.  Yes.

1:17   **7      Q.  Did you have a jacket?**

8      A.  Yes.

1:17   **9      Q.  Were you wearing pants?**

10     A.  Yes.

1:17   **11     Q.  Did you have a blanket?**

12     A.  No.

1:17   **13     Q.  What did you do after you woke up on May the**

**14 14th?**

1:18   15     A.  We turned on the phone to see what time it was.

**16     Q.  What time was it?**

1:18   17     A.  It was about 7:40 in the morning.

**18     Q.  Okay.  What did you do after that?**

1:18   19     A.  Well, we got a call telling us that they hadn't

20 been able to pick us up the day before, but that they were

1:18   21 going to send us food and somebody would pick us up at

22 around 11:00 or 12:00 and to get closer to the side of the

1:18   23 road when they got there.

**24     Q.  Okay.  Did someone come at that time?**

1:19   25     A.  No, nobody.

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 42

1:19    1    Q.  Okay.  What did you think about that?

2    A.  Well, we stayed there because we wanted to work.

1:19    3 That's the purpose of coming.

4        THE INTERPRETER:  And then interpreter asked,

1:19    5 "But what did you think?  The attorney's asking you what

6 you thought."

1:19    7        And he's like, "Oh, well, what I thought is that

8 maybe the person who was going to pick us up had had some

1:19    9 type of problem."

10 BY MR. MCDONALD:

1:19   11    Q.  Okay.  Did -- did someone come at some point to

12 pick you up?

1:20   13    A.  No.  The person said that they were going to try

14 to pick us up at 1 p.m., but then he said they couldn't

1:20   15 because there was a lot Immigration people in the area and

16 to wait until 6:00 or 7:00 in the evening.

1:20   17    Q.  Okay.  At what point in time did you run out of

18 water?

1:20   19    A.  We ran out of water on the 13th.

20    Q.  Oh, on the 13th.  Okay.

1:20   21    A.  Since the 13th.

22    Q.  So you went the whole night without water?

1:20   23    A.  Yes.

24    Q.  And then many hours into the 14th also without

1:20   25 water?

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 43

1:20 | 1   A.  Yes.

**2     Q.  How were you feeling in the -- in the midday of**

1:21 | **3 May the 14th when you're alongside the 94?  What were you**

**4 feeling?**

1:21 | 5   A.  Well, fear because we didn't have any more water.

6 We didn't know what -- what to do, whether to surrender to

1:21 | 7 Immigration or wait for someone to pick us up.  Because

8 they had told us that they were going to send us food and

1:21 | 9 water.

**10    Q.  Had you ever been that fearful before in your**

1:21 | **11 life?**

12   A.  No.

1:22 | **13    Q.  Were you worried about your health at that point?**

14   A.  Yes, because it was two days.  Actually, pretty

1:22 | 15 much three days since the day we arrived to the border

16 without eating.

1:22 | **17    Q.  Did you ultimately decide you needed to do**

**18 something about your situation?**

1:22 | 19   A.  Yes.  At 7 p.m. we called the person, one of the

20 people, because they would call us from different numbers.

1:23 | 21      And then so this person said, "Oh, yeah, we

22 wouldn't -- we weren't able to pick you up, but we're

1:23 | 23 going to pick you up at night."

**24    Q.  That night?**

1:23 | 25   A.  He just said later on tonight.

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 44

1:23  1    Q.  Okay.  What did you do after that?

      2    A.  We waited until around 10 p.m.  And, you know, we

1:23  3  were desperate because we had no food, no water.  And so

      4  we decided, like, around 9:52, we went to the road, to the

1:23  5  94.

      6    Q.  What happened when you got to the side of the 94?

1:24  7    A.  Well, about 25 cars went by and none of them were

      8  Immigration cars.

1:24  9        And then we saw somebody stopped before from

     10  where we were and -- and then it stayed there.  Then it

1:24 11  started driving and -- and then he passed us and stopped

     12  again.

1:24 13    Q.  Okay.  You mentioned 25 -- 25 cars went by.

     14    A.  Yes.

1:24 15    Q.  Did you try to flag them down to have you pick --

     16  have them pick you up?

1:25 17    A.  No, we were simply standing by the road.

     18    Q.  Okay.  This car that went by you, am I right in

1:25 19  understanding that he passed by you and then did a U-turn

     20  and went back the other direction?

1:25 21    A.  No.  He -- he was driving on the side of the road

     22  where we were.  He stopped before where we were standing.

1:25 23  Then he kept on driving.  He saw us by the road, and then

     24  he stops a little farther down past us, and we were just

1:25 25  standing there.  We didn't know if it was Immigration or

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 45

1:26   1 anything.  We didn't see anybody or any signals.

2        Then he backs up.  It was a gray car.  And then

1:26   3 he told us, "Get in.  I'll take you."

4        We didn't know who he was.  We just got in

1:26   5 because we didn't have any water, any food.  And we really

6 didn't even know if he was going to take us to Immigration

1:26   7 or -- or where.

**8     Q.  Okay.  Was he speaking to you in English or in**

1:26   **9 Spanish?**

10    A.  In Spanish, but we couldn't really understand him

1:26   11 because he had an American accent.

**12    Q.  Okay.  And what side of the car were you on when**

1:27   **13 he was talking to you?**

14    A.  On the side of the road on the passenger side.

1:27   **15    Q.  Okay.  And did you have to walk a distance to**

**16 where the car was stopped?**

1:27   17    A.  No, the car backed up.

**18    Q.  So you decided to get into this car?**

1:27   19    A.  Yes, because he told us he was gonna take us to

20 someplace.

1:27   **21    Q.  Where was he gonna take you?**

22    A.  We don't know.  He didn't tell us.  He just said,

1:27   23 "Get in.  I'll -- I'll take you.  You'll see where you

24 stay," or something like that.

1:27   **25    Q.  At that time, did you think that he was the**

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 46

1:28  1 person that was sent to pick you up?

2    A.  No, because we didn't have any more contact with

1:28  3 the person.  I told you.  Like, at 7 p.m. was the last

4 time we had any contact with this person.

1:28  5    Q.  So it might have been someone coming to pick you

6 up?

1:28  7    A.  Well, maybe.  Or some people who sometimes go by

8 and pick up people there who are waiting.

1:28  9    Q.  Okay.  Where did you ask him to take you?

10    A.  I didn't.  We didn't talk to him.  We just got

1:29  11 in, and we didn't move.

12       MR. MCDONALD: Okay.  Would this be a good time to

1:29  13 take a break?  Let's go off the record at this point.

14       THE VIDEOGRAPHER:  Off the record.  Time now

1:29  15 1:29 p.m.

16       (Recess taken)

1:39  17       THE VIDEOGRAPHER:  Back on the record.  Time now

18 1:39 p.m.  This marks the beginning of media number two in

1:39  19 the deposition of Francisco Madariaga.  Counsel?

20 BY MR. MCDONALD:

1:39  21    Q.  Sir, I've ask you a lot of questions up until

22 this point.

1:39  23       Is there anything that you would want to change

24 or add about any of the answers that you've given so far

1:39  25 in the deposition?

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 47

1:39    1    A.  No.

2    Q.  **Okay.  We left off with you describing that you**

1:40    3 **had decided to get into a car on side of the 94.**

4    A.  Yes.

1:40    5         MR. MCDONALD:  Showing you what I have oh marked

6 as Exhibit 3.

1:40    7         (Defendant's Exhibit 3 was marked for

8         identification)

1:40    9 BY MR. MCDONALD:

10    Q.  **Is this the car that you got into, sir, the**

1:40   11 **evening of May 14th, 2021?**

12    A.  Yes, it was a gray car.

1:40   13    Q.  **And is this the car in Exhibit 3?**

14    A.  Yes.

1:41   15    Q.  **Okay.  Where did you sit in the car?**

16    A.  Right here (indicating).

1:41   17    Q.  **And are you referring to the front passenger**

18 **seat?**

1:41   19    A.  Yes.

20    Q.  **And did Jaime also get into the car?**

1:41   21    A.  Yes.

22    Q.  **Where did he sit?**

1:41   23    A.  On this side.

24    Q.  **On the driver's side?**

1:41   25    A.  No, on the other side behind me.

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 48

1:41  1    Q.  Okay.  So he sat in the back seat directly behind

2 you on the passenger side or on the driver's side?

1:41  3    A.  On the passenger side.

4        MR. MCDONALD:  Okay.  I'm going to direct your

1:41  5 attention to the laptop that I will place in front of you

6 to review and watch a video that I will mark as Exhibit 4.

1:42  7        And for the record, this exhibit is contained on

8 a disk that is present here.  That video has been copied

1:42  9 to the desktop of this computer to make it run more

10 smoothly.  And I have passed that by Plaintiffs' counsel

1:42 11 to ensure that that is appropriate and that there are no

12 objections.

1:42 13        MR. RUTMAN:  Right, we discussed that.  That's

14 perfectly fine.

1:42 15        (Defendant's Exhibit 4 was marked for

16        identification)

1:42 17        MR. MCDONALD:  I have positioned the video to

18 start at the 1:59 mark.  Counsel, would you be able to

1:42 19 push play on video?

20        MR. RUTMAN:  Find my glasses.

1:42 21 BY MR. MCDONALD:

22    Q.  And, sir, I'd like you to watch this video from

1:43 23 1:59 until about 3:30.  Until about the 3:30 mark.

24        MR. RUTMAN:  Let me just write that down.  Okay.

1:43 25 Press play.

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 49

1:43   1        (Video is shown)

2 BY MR. MCDONALD:

1:43   3     Q.  Now, sir, in this video that you're watching, do

4 you see a date and time stamp in the upper left corner

1:43   5 of -- of the video screen?

6     A.  Five, yes.

1:43   7     Q.  And what is the date?  What is the date that you

8 see there?

1:44   9     A.  It's the month 5/14/21.

10     Q.  Okay.  Is that May 14th of '21?

1:44   11     A.  Yes.

12        MR. RUTMAN:  We're at 3:06.

1:44   13 BY MR. MCDONALD:

14     Q.  Okay.  And what are you seeing in this video,

1:44   15 sir?

16     A.  Two people running to get in the car.

1:44   17     Q.  Okay.  And do you recognize who those people are?

18     A.  Well, no.  I don't know if it's us or some other

1:44   19 people.

20     Q.  Okay.  Keep watching.

1:44   21        MR. RUTMAN:  The car started moving, so I stopped

22 it at 3:27.  The car has begun moving already.

1:44   23        MR. MCDONALD:  Thank you, Counsel.

24 BY MR. MCDONALD:

1:44   25     Q.  Sir, is this video consistent with the actions

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 50

1:45    1 that you took with Jaime on May 14th of 2021?

2    A.  Yes, it looks like it is.

1:45    3    Q.  So this looks like it could be the two of you

4 arriving at that vehicle?

1:45    5    A.  It could be.

6    Q.  Okay.  It looks as if the individuals in this

1:45    7 video are having to walk or sometimes jog or run up a

8 hill; is that right?

1:45    9    A.  No, because the -- the road was flat where we

10 were at.

1:45   11    Q.  Okay.  All right.  Who is the person driving this

12 car?

1:46   13    A.  I don't know who it was.

14    Q.  And when we refer to the car, is it okay if I

1:46   15 refer to it as the Nissan?

16    A.  I didn't look at the make of the car.

1:46   17       MR. RUTMAN:  I'll stipulate that it was a Nissan,

18 if that makes this faster.

1:46   19       So if he refers to the Nissan, he's referring to

20 that car in the picture.

1:46   21       THE WITNESS: Oh.

22 BY MR. MCDONALD:

1:46   23    Q.  Just for purposes of our conversation, when I

24 refer to the Nissan, the car that's depicted in Exhibit 3

1:46   25 is what I'm referring to.  Do you understand that?

MSJ_171

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 51

1:46    1    A.  Yes.

        2    Q.  Okay.  So you did not know the driver of this

1:46    3 car?

        4    A.  No.

1:46    5    Q.  Do you know his name?

        6    A.  No, I don't.  I don't know any names.

1:46    7    Q.  Okay.  What gave you the confidence to enter into

        8 the car of someone you did not know?

1:47    9    A.  Well, the desperation that we didn't have any

        10 water.  We were in the middle -- middle of nowhere without

1:47    11 knowing where we were.

        12    Q.  At the time that you entered the car, how long

1:47    13 had it been since you had eaten?

        14    A.  Since Wednesday, May -- May -- May 11 -- no.  May

1:47    15 12 on the -- at 11 a.m.

        16    Q.  So it had been over two days since you had had

1:48    17 food?

        18    A.  Yes, almost three days.

1:48    19    Q.  Okay.  And when was the last time you had had

        20 water at the time you got picked up in this car?  When was

1:48    21 the last time you had water?

        22    A.  On the 13th almost at night.

1:48    23    Q.  Okay.  After you entered into the car, what

        24 happened next?

1:48    25    A.  The driver drove for a while and -- and then he

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 52

1:48    1 took the -- I think the 180.  He -- they -- he went to a

2 place called, I think, Tecatito, and he talked to somebody

1:48    3 on the phone for about 10 minutes there.

      **4**    **Q.  What was he saying on the phone?**

1:49    5    A.  What I was able to understand, he was saying it

6 in English, but the person said, "I got two people. I'm

1:49    7 gonna take them to a hotel, and we'll see what we do

8 there," but I don't know who he was talking to.

1:49    **9**    **Q.  Okay.  Did he say anything about receiving**

**10 payment for --**

1:49    11    A.  No, he didn't tell us anything.  We didn't know.

      **12**    **Q.  On the phone, during his conversation, did he say**

1:49    **13 anything about money or payment?**

14    A.  No, he didn't say anything.

1:49    **15**    **Q.  Did you understand everything that he was saying?**

16    A.  No.  I understood what I told you, that he had

1:49    17 gotten these two people, that he was gonna take them to a

18 hotel and that he will see what he was gonna do with them,

1:49    19 with the people.

      **20**    **Q.  Okay.**

1:50    21    A.  That's what I was able to understand.

      **22**    **Q.  What did you think about what you understood him**

1:50    **23 to be saying?**

24    A.  Well, that he was gonna take us to a hotel and

1:50    25 then maybe there he was gonna ask for -- ask us for some

**MSJ_173**

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 61

2:26    1 he had been going for about two or three miles and there

2 were two police cars next to the road.

2:26    3        Then there was one, like, outside the road and

4 one on the road, and then one of them -- one of them, one

2:26    5 of the police cars, was driving behind the car.

**6    Q.   Behind the Nissan?**

2:27    7    A.   Behind the Nissan.  So he was just driving,

8 driving like normally, just driving behind the car.

2:27    9        And then after that, he turned on his overhead

10 lights.  The driver was listening to music, like loud

2:27   11 music.  He kept on driving.

12        And then farther down he said, "Oh, are the

2:27   13 lights for me?"

14        After that, he said he was going to stop, but it

2:27   15 was very narrow.  The road was very narrow.  There was

16 not, like, a shoulder there.

2:27   17        The officer told him to stop, like a little

18 farther down where there was some room.  There was, like,

2:28   19 a place where he could, you know, pull over, and so he

20 did.

2:28   21        So he stopped.  He lowered his window.  The agent

22 arrived.  The agent arrived.  So he saw that he was an

2:28   23 Immigration agent, and that's when he sped away.  He

24 started, you know, trying to escape.

2:28   **25    Q.   Okay.   Okay.   Let's take that one step at a time.**

MSJ_174

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 62

2:28    1        The driver, after he hung up the phone, drove on

2 a dirt road for five minutes?

2:28    3    A.  Yes, for about five minutes.

4    Q.  What was the reason for doing that?

2:28    5    A.  I don't know.  That's where I told you he stopped

6 at the Tecatito.  He was -- and, well, that's what I saw.

2:29    7 There was a sign that said that, and there were some

8 houses there.

2:29    9    Q.  Okay.  And then he came back to the 94?

10    A.  Yes.

2:29   11    Q.  Did he say anything to you during this time?

12    A.  No, nothing.

2:29   13    Q.  So then you're back on the 94 and after two or

14 three miles, then the Nissan, the driver, passes by some

2:29   15 law enforcement vehicles?

16    A.  Yes.

2:29   17    Q.  Okay.  And then one of the law enforcement

18 vehicles gets behind him, behind the Nissan?

2:29   19    A.  Yes.

20    Q.  And puts the lights on?

2:29   21    A.  After a while.

22    Q.  Okay.  How long were the lights on before driver

2:30   23 of the Nissan pulled over to the side of the road?

24    A.  About 8 to 10 miles down.

2:30   25    Q.  How many kilometers?

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 63

2:30   1    A.  I don't know.

2           Q.  Okay.  So you're saying 8 to 10 miles the lights

2:30   3 were on before he turned off to the side of the road?

4           A.  Yes.

2:30   5    Q.  Was there also a siren blaring?

6           A.  No, just the lights.

2:30   7    Q.  Okay.  And did you think to yourself, we need to

8 pull over?

2:30   9    A.  Well, I saw that he turned on his lights, but I

10 didn't understand him very well because he didn't speak

2:30  11 Spanish well.

12          Q.  Who?

2:30  13    A.  The driver.

14          Q.  And were you trying to communicate with him?

2:31  15    A.  No, no.  At no time I tried to communicate with

16 him.

2:31  17    Q.  Okay.  So you didn't -- you didn't try to tell

18 him, "Hey, the lights are on.  We need to pull over"?

2:31  19    A.  No.

20          Q.  Were you worried about getting caught?

2:31  21    A.  Well, we -- when they turned on the lights, we

22 knew that it was an Immigration police car.  So, for us,

2:31  23 it would have been better that he would have stopped and

24 turned us over to Immigration.

2:31  25    Q.  How did you know it was an Immigration car?

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 64

2:31    1    A.  Because I am telling you, we passed the two

2    Immigration patrol police cars on the side of the road,

2:31    3    and we saw them when they got out of the car.

4    Q.  Okay.  So when you're referring to police cars,

2:32    5    you're referring to Border Patrol vehicles?

6    A.  Yes, two Immigration cars.

2:32    7    Q.  Okay.  After the 8 or 10 miles or so, the driver

8    was listening to music, and then it sounded like you said

2:32    9    he said, "Oh, are those lights for me?"

10    A.  Yes.

2:32    11    Q.  And what did you say in response?

12    A.  No, he -- he was, like, talking to himself.

2:32    13    Q.  Okay.  What else did he say?

14    A.  That's it.  And then he wanted to stop right

2:32    15    there, but there was no room.  So he went a little farther

16    to stop.

2:33    17    Q.  What happened then?

18    A.  I'm telling you, he stopped.  The Immigration

2:33    19    agent arrived.  He lowered his window.  And when he saw

20    that he was an Immigration agent, he just sped away.

2:33    21    Q.  Okay.  What did you hear the Immigration agent

22    say to the driver?

2:33    23    A.  No, he arrived there.  He arrived.  He was

24    lowering his window, and he looked at the agent.  He saw

2:33    25    he was an Immigration agent, so the agent did not -- he

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 65

2:33    1 just sped away.  He didn't wait for him to say anything.

     **2**    **Q.  How far away approximately was the agent to the**

2:33    **3 driver's window?**

     4    A.  Like, this much.  I don't know.  A meter.

2:33    5 Three -- three feet.

     **6**    **Q.  About three feet, approximately?  So very close?**

2:34    7    A.  Yes, already.

     **8**    **Q.  And was the agent --**

2:34    9      MR. WALLACE:  Let the record reflect the

   10 witness -- because you can't tell.

2:34   11      MR. MCDONALD: So let the record reflect that the

   12 witness has positioned his hands to approximate the

2:34   13 distance.

   14 BY MR. MCDONALD:

2:34   **15**    **Q.  And that distance was approximately one meter?**

   16    A.  Yes.

2:34   17      MR. RUTMAN:  Colin, can you -- can we go off the

   18 record for one minute?  My chain got all tangled --

2:34   19      MR. MCDONALD:  Yes, sure.

   20      MR. RUTMAN:  -- around my chair.

2:34   21      MR. MCDONALD:  Let's go off the record.

   22      THE VIDEOGRAPHER:  Off the record.  Time is now

2:34   23 2:34 p.m.

   24      (Recess taken)

2:36   25      THE VIDEOGRAPHER:  On the record.  Time now

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 66

2:36  1 2:36 p.m.  Counsel?

2 BY MR. MCDONALD:

2:36  **3     Q.  Sir, you mentioned that the Border Patrol agent**

**4 got within about one meter of the driver's window.  Is**

2:37  **5 that right?**

6     A.  Yes.

2:37  **7     Q.  And what happened at that point?**

8     A.  Well, the driver noticed that it was an

2:37  9 Immigration agent, and he sped away.  He didn't even wait

10 to -- for him to ask him for a license or anything.

2:37  **11    Q.  What was the agent wearing?**

12    A.  Green clothes.

2:37  **13    Q.  So it was clear that he was a Border Patrol**

**14 agent?**

2:37  15    A.  Yes.

16         MR. RUTMAN:  I'm sorry.  I don't mean to

2:37  17 interrupt you.

18         You're answering -- Francisco, you appear to be

2:37  19 answering before the question has been translated

20 completely.  And I know you speak some English, but it's

2:37  21 important for an accurate record that you wait until

22 Mr. McDonald finishes asking his question and the

2:38  23 translator finishes translating that question for you

24 before you answer, okay?

2:38  25         THE WITNESS:  Okay.

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 67

2:38    1          MR. MCDONALD: Thank you.

        2          MR. RUTMAN:  You're welcome.  Yeah, it drives me

2:38    3 nuts when that happens.

        4 BY MR. MCDONALD:

2:38    **5     Q.  Did you tell the driver to drive away?**

        6     A.  No.

2:38    **7     Q.  Why not?**

        8     A.  Because I didn't have to tell him to leave.  On

2:38    9 the contrary, I knew that if the agent was stopping him,

        10 we were gonna get out and we were gonna go to Immigration.

2:38    **11     Q.  Were you concerned about getting caught?**

        12    A.  Immigration, no.  Because we know that we are

2:38    13 illegal.

        **14     Q.  When the driver of the Nissan took off, did you**

2:39    **15 hear the tires screeching of the car or did it -- what did**

        **16 you feel right as the car was taking off?**

2:39    17    A.  Yes, you could hear.  Like, he -- like, how he

        18 sped away.

2:39    **19     Q.  And how would you describe what you heard?**

        20    A.  Like a noise like this.

2:39    21          MR. RUTMAN:  Describe that.

        22          THE WITNESS: Like, when you speed away, when

2:39    23 the -- the tires -- you know, the tires make a noise on

        24 the road when you speed away.

2:39    25 / / /

MSJ_180

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 68

2:39    1 BY MR. MCDONALD:

     2    Q.  Okay.  Is it like the sound that a race car would

2:39    3 make when they're starting off?

     4    A.  Yes, something like that.

2:40    5    Q.  Okay.  And that's what the driver of the Nissan

     6 did with the Border Patrol agent one meter away from the

2:40    7 driver's window?

     8    A.  Yes.

2:40    9    Q.  What did you think at that moment?

    10    A.  Well, why he was trying to run away if they had

2:40   11 already stopped us.  And if it's a police car, whether

    12 it's an Immigration car or a police car, you shouldn't be

2:40   13 running away from them.

    14    Q.  What, if anything, did the driver say as he

2:40   15 exited in the vehicle?

    16    A.  He didn't say anything.

2:40   17    Q.  What happened after that?

    18    A.  Well, that's when the police car started

2:41   19 following him, and that's when he turned on his siren.

    20    Q.  Okay.  So at that point, the lights and the

2:41   21 sirens came on?

    22    A.  Yes, the lights and the siren were on.

2:41   23    Q.  And for how long from beginning to end was the

    24 Border Patrol pursuing the driver of this Nissan?

2:41   25    A.  Oh, the -- how long from when they started

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 69

2:41   1 pursuing him to the incident, right?

    2      Q.   Correct.

2:42   3      A.   Well, it must have been 15 to 20 minutes.

    4      Q.   Okay.  And what was the road like that you were

2:42   5 riding on?

    6      A.   A lot of curves.

2:42   7      Q.   Okay.  Was it a mountainous road?

    8      A.   In some areas, yes.

2:42   9      Q.   Okay.  Were there other cars on the road?

    10     A.   No, not at all.  Almost when we were getting to

2:42   11 the gas station, or that town there, two other Immigration

    12 cars went by that were -- that they were both driving on

2:42   13 the -- on the road.  And they were one behind the other

    14 when he passed them.

2:42   15     Q.   Who's "he"?

    16     A.   The driver in the car where we were.

2:42   17     Q.   And he -- they were driving in the same

    18 direction, and he passed around them?

2:43   19     A.   Yes, yes.

    20     Q.   Okay.  Did he cross the -- the line in the middle

2:43   21 of the road to get around them?

    22     A.   Yes.

2:43   23     Q.   Okay.  Was it a two-lane road, one lane coming

    24 one direction, the other lane going the other direction?

2:43   25 Or was it a larger road than that?

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 70

2:43   1    A.   Okay.  It was a, you know, two -- two lanes.  One

2 coming this way and one going that way.  And then we got

2:43   3 into the town.

**4    Q.   So the driver turned onto the wrong side of the**

2:44  **5 road to pass two cars?**

6    A.   To pass the -- the patrol.  Or, the police cars.

2:44  **7    Q.   Okay.  From where the driver took off like a race**

**8 car to -- to the -- to the -- when the shooting happened**

2:44  **9 in the gas station, if I understand right, that was about**

**10 15 to 20 minutes?**

2:44  11    A.   Yes.

**12    Q.   Okay.  How would you describe the driver's**

2:44  **13 driving of the Nissan during those 15 to 20 minutes?**

14    A.   Well, high speed.  Because on the curves, he

2:45  15 would get out of the road, yes.

**16    Q.   Okay.  By "high speed," how fast approximately**

2:45  **17 would you say he was going?**

18    A.   What -- what's longer, a kilometer or a mile?

2:45  **19    Q.   Well, do you understand kilometers better than**

**20 miles?**

2:45  21    A.   Yes.

**22    Q.   Okay.  Tell me in kilometers how fast you**

2:45  **23 estimate he was going?**

24    A.   At 100 or 120 kilometers.

2:45  **25    Q.   Okay.  And was that on the curves?**

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 71

2:45   1   A.  Well, yes.  He would slow down a little bit on

2 the curves, but still.

2:45   3   Q.  Okay.  What about on the -- were there any

4 straight-aways?

2:46   5   A.  Yes, some parts.

6   Q.  And what would he do on the straight-aways?

2:46   7   A.  He would speed up.

8   Q.  Okay.  And you mentioned -- and to -- to more

2:46   9 than 120 kilometers on the straight-aways?

10       THE INTERPRETER:  I'm sorry, Counsel. What was

2:46   11 the question?

12 BY MR. MCDONALD:

2:46   13   Q.  On the straight-aways, would he exceed 120

14 kilometers?

2:46   15   A.  No.  From 100 to 120 kilometers, more or less.

16   Q.  You mentioned on curves he would go outside of

2:46   17 the lines?

18   A.  Yes, sometimes he would actually go to the wrong

2:46   19 direction, wrong side of the road, or he would go on the

20 side of the road.

2:46   21   Q.  Okay.  So he would cross over both lines on the

22 left and the right?

2:47   23   A.  Yes, both sides when he was on the curves.

24   Q.  Are you familiar with what's known as a blind

2:47   25 turn or a blind curve?

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 72

2:47    1    A.  No, no.

**2       Q.  When you're -- are you familiar with when you're**

2:47  **3  driving on a road and there's a turn ahead of you, you**

**4  cannot see what's on the other side of the turn?**

2:47    5    A.  Oh, yes, I've seen that.

**6       Q.  Were there some curves like that in this road**

2:47  **7  during the 15- to 20-minute pursuit?**

8    A.  Yes, some -- some areas, yes.

2:48    **9       Q.  Okay.  Did you feel that the driver was driving**

**10  dangerously?**

2:48   11    A.  Yes.

**12       Q.  Were you scared?**

2:48   13    A.  Of course I was scared.  Because at the speed

14  that he was driving, I knew that at any time we could be

2:48   15  in an accident and we could die.  And I didn't know what

16  was going to happen to us at the speed that he was

2:48   17  driving.

**18       Q.  Did you ask the driver to stop?**

2:48   19    A.  No.

**20       Q.  Why not?**

2:48   21    A.  Because I was scared.  I -- because --

**22       Q.  Were you stunned silent?**

2:49   23    A.  Yes, because he was driving at this high speed.

24  And then with the loud music, I don't think he could even

2:49   25  hear me.

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 73

2:49   1   Q.  How loud was the music?

2   A.  Well, I don't know how to explain it to you, what

2:49   3  the volume was, but -- but you couldn't hear anything.  If

4  somebody talked, you couldn't even hear.

2:49   5   Q.  Did you try to talk to Jaime in the back seat?

6   A.  Yes, but he didn't hear me.

2:49   7   Q.  Okay.  Was there anyone screaming in the car?

8   A.  No.

2:49   9   Q.  Okay.  Did you have your seatbelt on?

10   A.  Yes.

2:49   11   Q.  When did you put your seatbelt on?

12   A.  When I got on -- got in the car.

2:50   13   Q.  Okay.  And what were you doing with your hands

14  and your body as he was driving, as the driver was

2:50   15  driving, down the road at a high rate of speed?

16   A.  Just holding on to the seat so as not to -- I

2:50   17  mean, yes.

18   Q.  Were you holding on tightly?

2:50   19   A.  Yes.  Like, not to feel any fear or --

20   Q.  Did you still feel fear, though?

2:50   21   A.  Yes.

22   Q.  How did your fear in that moment compare to the

2:50   23  fear that you had earlier when you ran out of water?

24   A.  Right there, there was more fear at that time.

2:50   25   Q.  Because of the driver's driving?

MSJ_186

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 74

2:50   1    A.   Yes, because of the way the driver was driving.

       2    Q.   It was a tense situation for you?

2:51   3    A.   Yes.

       4    Q.   The driver was putting you at risk?

2:51   5    A.   Yes.

       6    Q.   You thought you might die?

2:51   7    A.   Yes, I had that thought, that the car could turn

       8 over and have an accident.

2:51   9    Q.   Okay.  Did you know what the driver was gonna do

      10 at any given moment?

2:51  11    A.   No.

      12    Q.   Was he sporadic in his driving?

2:51  13    A.   What do you mean "sporadic"?

      14    Q.   Let me ask it a different way.  Was he -- he was

2:52  15 erratic in his driving?

      16    A    What do you mean, like weird or -- or that --

2:52  17    Q.   Let me approach it a different way.

      18         Did you know how fast he was going to go on

2:52  19 any -- on any given turn?

      20    A.   No.  What I was thinking, I thought, well, if

2:52  21 there's -- if there's a police car in the middle of the

      22 road, he's gonna have to stop because there's no way of,

2:53  23 you know, keep on going.  That's what I was thinking.

      24    Q.   Did you know when he was gonna stop?

2:53  25    A.   No.

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 75

2:53   1     Q.  Did you know what he was gonna do?

       2     A.  No, I didn't.

2:53   3     Q.  Were there any cliffs on the side of the road

       4 during this portion of the road?

2:53   5     A.  In two areas that we went through, there were.

       6     Q.  And was the cliff on your side of the street or

2:53   7 on the other side of the street?

       8     A.  On the other side.

2:53   9     Q.  Okay.  Were you concerned about the cliff because

       10 of the driver's driving?

2:53   11    A.  Yes, that.  I was scared.

       12    Q.  Why were you concerned about the cliff?

2:54   13    A.  Because even if it was on the other side, I -- I

       14 knew that at the speed that he was driving, he could lose

2:54   15 control and just -- and, well, just die there.

       16    Q.  At that moment in the car during those 15 to 20

2:54   17 minutes with the driver driving at a high rate of speed,

       18 had you ever been more scared in your life?

2:54   19    A.  No.

       20    Q.  Were there Border Patrol agents in vehicles

2:55   21 following the driver throughout this 15- to 20-minute time

       22 period?

2:55   23    A.  Well, the -- the patrol car that stopped him, you

       24 know, that -- that Border Patrol agent that stop him.  And

2:55   25 then the other two that he passed when we were about to

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 76

2:55   1 arrive.

**2      Q.   Okay.  And where were those vehicles during those**

2:55   **3 15 to 20 minutes on the road?**

4      A.   Behind him with their lights on and their sirens

2:55   5 on.

**6      Q.   Would it have been possible for the driver to not**

2:56   **7 know that the Border Patrol vehicles were following him?**

8      A.   No, it was not -- I mean -- well, he -- he should

2:56   9 have known it was him because there was no other cars

10 around him.

2:56   **11     Q.   It was obvious that the Border Patrol was trying**

**12 to stop him?**

2:56   13     A.   To stop him, yes.

**14     Q.   Okay.  At any point during this 15 to 20 minutes,**

2:57   **15 did you see any Border Patrol in front of the Nissan?**

16     A.   Not with the lights on.  We saw them when he

2:57   17 passed them.

**18     Q.   Okay.  And when was that?**

2:57   19     A.   Once we were almost at the gas station.

**20     Q.   Okay.  And was there -- was there an agent on**

2:57   **21 foot that he passed by?**

22     A.   No.

2:57   **23     Q.   Okay.  Tell me what you saw.**

24     A.   Right before arriving to the gas station, I saw

2:57   25 this intersection.  And then I saw on three of the sides

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 77

2:57   1 some police cars waiting for him to go through there.

**2      Q.  And by the time you got to the gas station area,**

2:58   **3 how many Border Patrol cars, approximately, were in the**

**4 area that you could see?**

2:58   5      A.  Once we arrived to the gas station, there were

6 about 15 to 20 police cars.

2:58   **7      Q.  Okay.  And was -- was he stopping his car to turn**

**8 himself in to Border Patrol?**

2:58   9      A.  No, because he got into the gas station on this

10 corner.  He wanted to -- to go through this corner.  There

2:58   11 were houses.

12          Then he went to another side.  There were three

2:58   13 patrol cars.  He kept on going.  There were two other

14 patrol cars in -- and there was, like, a fence right there

2:59   15 between the property of the gas station and -- and the

16 road.  There was a fence right there.

2:59   **17      Q.  Okay.  We'll get to that in a minute.  I want to**

**18 go back to one thing.**

2:59   **19          You mentioned that the driver drove on the wrong**

**20 side of the road and passed two cars at one point.**

2:59   21      A.  Yes.

**22      Q.  Did he pass them on a straight-away or around a**

2:59   **23 turn?**

24      A.  On a straight-away.

2:59   **25      Q.  Okay.  And in that 15- to 20-minute time period,**

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 78

3:00  1 approximately where in that time period did that happen?

2    A.  Once he had been driving for about 15 minutes.

3:00  3 Almost getting there to the -- to that place.

**4    Q.  Okay.  And after about 15 or 20 minutes is when**

3:00  **5 he drove into a gas station parking lot; is that right?**

6    A.  Yes.

3:00  7        MR. MCDONALD: Showing you what I've marked as

8 Exhibit 6.

3:00  9        (Defendant's Exhibit 6 was marked for

10        identification)

3:00  11 BY MR. MCDONALD:

**12    Q.  Take a look at that.  Is this the gas station**

3:01  **13 parking lot that the driver of the Nissan pulled into?**

14        MR. MCDONALD:  Sir, let me pass you what I've

3:01  15 marked as Exhibit 7.

16        (Defendant's Exhibit 7 was marked for

3:01  17        identification)

18 BY MR. MCDONALD:

3:02  **19    Q.  That is a closer-up photograph of the gas station**

**20 parking lot.  Take a look at that and see if you recognize**

3:02  **21 that.**

22    A.  Yes.

3:02  **23    Q.  And does Exhibit 7 depict the gas station parking**

**24 lot that the driver drove into after the 15- to 20-minute**

3:02  **25 pursuit?**

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 79

3:02    1    A.   Yes.

2    Q.   **Now, go ahead and take a look at Exhibit 6 and**

3:02    3 **you can compare Exhibit 6 to Exhibit 7.  And can you**

4 **confirm that that depicts same location?**

3:03    5         MR. MCDONALD: Seven?

6         MR. RUTMAN:  Yeah.

3:03    7 BY MR. MCDONALD:

8    Q.   **Do you see, sir, that Exhibit 6 and 7 depict the**

3:03    9 **same location, just from different vantage points?**

10    A.   Yes, it's the same.

3:04   11    Q.   **Okay.**

12    A.   It's just that over here -- well, the picture

3:04   13 depicts or shows --

14         MR. RUTMAN:  Picture number.  Sorry.

3:04   15 BY MR. MCDONALD:

16    Q.   **You're referring to Exhibit 7; is that right?**

3:04   17    A.   It's just that it's day -- daylight.

18    Q.   **Correct.  And does this in the daylight show the**

3:04   19 **parking lot that the driver drove into with you in the**

20 **passenger seat on May 14th of 2021?**

3:04   21    A.   Yes, but -- it does show that, but in this

22 picture is daylight, and we got there at 10:45 at night.

3:05   23    Q.   **Thank you.  It was dark when you arrived in this**

24 **parking lot?**

3:05   25    A.   Yes, because I told you they picked us up almost

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 80

3:05    1 at 10 p.m.

**2      Q.  Yes.**

3:05    3      A.  And -- and all of this is daylight, all of these.

4           MR. MCDONALD: Okay.  Is I'm going to show you

5 what I'm marking as Exhibit 8.  This is a Google Earth

6 image of the same location.

7           (Defendant's Exhibit 8 was marked for

8           identification)

3:05    9 BY MR. MCDONALD:

**10      Q.  Take a look at Exhibit 8.  And can you see that**

3:05    **11 it's the same location as in Exhibit 6 and 7?**

12          MR. MCDONALD:  And, Counsel, would you be willing

3:06    13 to stipulate on Exhibit 8 that a layer of concrete has

14 been poured on a portion of this parking lot?

3:06    15          MR. RUTMAN:  Yes.

16 BY MR. MCDONALD:

3:06    **17      Q.  Sir, do you see that Exhibit 8 depicts the same**

**18 location as the parking lot that you drove into with -- in**

3:06    **19 the passenger seat of the Nissan?**

20      A.  Yes.

3:06    **21      Q.  Okay.  And do you see that a patch of concrete**

**22 has been poured?**

3:07    23      A.  Yes, where the curve is.

**24      Q.  Do you see that in Exhibit 8?**

3:07    25      A.  Yes, right there.  Right there.

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 81

3:07    1    Q.  Could you draw the outline of the new concrete on

       2 Exhibit 8?

3:07   3    A.  (Witness complies).

       4        MR. MCDONALD:  Okay.  The record should reflect

3:07   5 that the witness has placed two lines demonstrating a new

       6 patch of concrete poured in this gas station parking lot

3:07   7 depicted on Exhibit 8.

       8 BY MR. MCDONALD:

3:07   9    Q.  Before the concrete was poured there, was that

      10 grass and dirt?

3:08  11    A.  Yes.

      12    Q.  Please take Exhibit 8, and what I want you to do

3:08  13 is to draw the route of travel of the car from where it

      14 entered the parking lot to where it first stopped.

3:08  15        So where -- I direct you to the entrance.  Where

      16 is the entrance of the parking lot?

3:08  17    A.  Here.

      18    Q.  Okay.  Put an "X" at the entrance of the parking

3:08  19 lot.

      20    A.  (Witness complies).

3:08  21        MR. MCDONALD: Okay.  The record should reflect

      22 that the witness has placed an "X" right at the entrance

3:08  23 of the parking lot of this gas station.

      24 BY MR. MCDONALD:

3:08  25    Q.  Sir, are there more than one entrances to this

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 82

3:09    1 parking lot?

        2    A.  No.

3:09    3    Q.  Please now draw a line from the "X" that you've

        4 placed to show where the driver went in this parking lot.

3:09    5    A.  (Witness complies).

        6        MR. MCDONALD:  The record should reflect that the

3:10    7 witness has drawn a continuous line encircling this

        8 parking lot.

3:10    9 BY MR. MCDONALD:

        10    Q.  Now, sir, towards the bottom right of Exhibit 8,

3:10    11 it appears as though the concrete turns into dirt; is that

        12 right?

3:10    13    A.  Yes.

        14    Q.  And the -- the route of travel that you show the

3:10    15 driver driving goes from the concrete to the dirt?

        16    A.  Yes.

3:10    17    Q.  Tell me what the driver did to get onto that

        18 dirt.

3:10    19    A.  The driver, he wanted to take off through here

        20 between two patrol cars that were here.

3:11    21    Q.  Okay.  Pause -- pause for a second, sir.  Let me

        22 take this exhibit because I want you to just tell me

3:11    23 without looking at the exhibits, okay?

        24        Tell me what happened once the driver turned into

3:11    25 the gas station parking lot.

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 83

3:11   1     A.   Okay.  The driver came into the gas station and

2 he went up to the front next to the store.  From there, he

3:11   3 jumped over to the grass on the corner, but there were two

4 patrol cars there, so he went back to look for the exit.

3:11   5 Driving -- he was driving on the grass.

6          Then he arrived to where the exit was, but there

3:12   7 were two other police cars.  And he wanted to drive

8 through in between them, but he couldn't.  But he couldn't

3:12   9 because the curb was about two feet high, like this much,

10 so the car couldn't go through there.  The driver, you

3:12  11 know, drove backwards or -- you know, and he stopped a

12 little to look around and see where he could go through.

3:12  **13     Q.   Okay.  Let me pause you there.  Referring your**

**14 attention to Exhibit 8, did the driver first drive to the**

3:13  **15 corner of the parking lot?**

16     A.   Yes.

3:13  **17     Q.   Okay.  And is that depicted near the bottom right**

**18 of Exhibit 8?**

3:13  19     A.   Uh-huh.

**20     Q.   Is that a yes?**

3:13  21     A.   Yes, right here on this corner.

**22     Q.   Okay.  And did he stop there in the corner of the**

3:13  **23 parking lot?**

24     A.   No, he jump on the grass then.

3:13  **25     Q.   Okay. And how fast was he driving his car at that**

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 84

3:13     1 point?

2     A.  He was going a little slower there because it was

3:13     3 a gas station.  There were cars in there, so not that

4 fast.

3:13     **5     Q.  And was there anywhere for the driver to exit on**

**6 that corner of the parking lot?**

3:14     7     A.  No, because there was the fence, you know, next

8 to the road.

3:14     **9     Q.  So what did the driver do after he reached the**

**10 corner of the parking lot?**

3:14     11    A   He saw -- he went on the grass, and he realized

12 that he couldn't get out because of the fence.  And all

3:14     13 the police cars were there on the parking lot.  He tried

14 to, you know, get out, but already on the grass.

3:14     **15    Q.  How did he get on the grass?**

16    A.  Because he got out on the corner of the parking

3:14     17 lot.

**18    Q.  Is there a curb there that he had to get the car**

3:15     **19 over?**

20    A.  But that was, like, 20 centimeters and -- and he

3:15     21 drove over it.

22         MR. MCDONALD: Showing you what's marked as --

3:15     23 excuse me -- Exhibit 9.

24         (Defendant's Exhibit 9 was marked for

3:15     25         identification)

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 85

3:15    1 BY MR. MCDONALD:

        2    Q.  Is this the corner of the parking lot that we've

3:15    3 been talking about?  And, sir, you can also compare this

        4 to Exhibit 6.

3:16    5        Sir, can you confirm that Exhibit 9 is the corner

        6 of the parking lot that we've been discussing?

3:16    7    A.  Yes.

        8    Q.  Okay.  If you could please mark with an "X", a

3:16    9 large "X", the approximate location where the driver drove

       10 over the curb to get onto the grass.

3:16   11    A.  (Witness complies).

       12        MR. MCDONALD:  The record should reflect that the

3:17   13 witness has placed an "X" on Exhibit 9 just left of center

       14 of the photograph right in the turn of the curb.

3:17   15 BY MR. MCDONALD:

       16    Q.  Okay.  And referring to Exhibit 9, after the car

3:17   17 got onto the grass, which direction did the driver turn?

       18    A.  Do you want me to draw the line all the way down?

3:17   19    Q.  Yes, please.  Please draw a line showing the

       20 direction of travel of the vehicle.

3:18   21    A.  (Witness complies).

       22    Q.  Okay.  Have you run out of room there?

3:18   23    A.  Yes.

       24        MR. MCDONALD:  The record should reflect that the

3:18   25 witness has placed a line proceeding from the "X" just to

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 86

3:18    1 the left of the sign showing Circle K.

        2 BY MR. MCDONALD:

3:18    **3     Q.  And, sir, this line shows the direction the car**

        **4 traveled?**

3:18    5     A.  Yes.

        **6     Q.  Were there any Border Patrol vehicles that the**

3:18    **7 car had to avoid during this stretch of the grass?**

        8     A.  On the grass?

3:18    **9     Q.  Yes.**

        10    A.  No.

3:19    **11    Q.  Okay.  Referring your attention back to Exhibit**

        **12 8, your line appears to proceed all the way back near the**

3:19    **13 entrance of the gas station parking lot; is that right?**

        14    A.  Yes.

3:19    **15    Q.  Where was the driver trying to go?**

        16    A.  The driver wanted to get out of there again

3:19    17 because that was the entrance.

        **18    Q.  There was only one entrance?**

3:19    19    A.  Yes.

        **20    Q.  There was only one exit?**

3:19    21    A.  Yes.

        **22    Q.  How would you describe his driving while he was**

3:20    **23 in the gas station parking lot?**

        24    A.  He was driving a little more slowly because there

3:20    25 were parked cars.  There were cars actually filling --

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 87

3:20   1 well, getting some gas.

**2      Q.   Did you know what he was gonna do next?**

3:20   3      A.   No.

**4      Q.   Did he tell you, "Okay, I'm going to stop now and**

**5 turn myself in to Immigration"?**

6      A.   I didn't tell him anything.

**7      Q.   Did he say anything to you?**

8      A.   No, he didn't say anything.  He just wanted to

3:20   9 look for a way out.

**10      Q.   Okay.  Was the music still playing in the car?**

3:21   11      A.   Once we got into the gas station, he turned it

12 down a little bit.  Because -- because once we got into

3:21   13 the gas station, he started calling somebody.  I don't

14 know who he called.

**15      Q.   How do you know he tried to call somebody?**

16      A.   Because that phone was connected to the

3:21   17 Bluetooth, and we could hear it ringing.

**18      Q.   Okay.  And did he have his phone up to his ear?**

3:21   19      A.   Yes.

**20      Q.   Was it his left hand or his right hand?**

3:21   21      A.   Right hand.  Right hand.

**22      Q.   So it was the hand that was closest to you?**

3:21   23      A.   Yes.

**24      Q.   Okay.  And how long did he have the phone up to**

3:22   **25 his ear?**

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 88

3:22   1    A.  Well, after he got on the grass.  When he got on

2 the grass, that's when he started dialing.

3:22   **3       Q.  Did you hear him say anything on the phone?**

4    A.  No, because nobody answered.

3:22   **5       Q.  The line that you've drawn on Exhibit 8 proceeds**

**6 all the way to the curb near the exit and entrance to the**

3:22   **7 gas station; is that right?**

8    A.  Yes.

3:22   **9       Q.  And in Exhibit 8, right at that spot now appears**

**10 to be concrete; is that right?**

3:23   11   A.  Correct.

**12      Q.  Was it -- it was dirt and grass at the time of**

3:23   **13 the incident, though; is that right?**

14   A.  Yes.

3:23   **15      Q.  What happened when the car got to the curb?**

16   A.  He ran into the curb because it was high.  He

3:23   17 couldn't get out, so he backed up.

**18      Q.  What did it feel like when he ran into the curb?**

3:23   19   A.  Once he hit the curb, he was gonna stop because

20 the car had already hit it.  And all the, you know, police

3:23   21 cars were all around us.

**22      Q.  Okay.  I'm asking you, what did it feel like to**

3:24   **23 you when the vehicle hit into the curb?**

24   A.  Well, I felt fear.  I felt that he -- you know,

3:24   25 he was gonna stop because he had already crashed into it.

**MSJ_201**

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 89

3:24   1     Q.   So you thought he was gonna come to a stop at

       2 that point?

3:24   3     A.   Yes.

       4     Q.   And that he would turn himself in to Immigration?

3:24   5     A.   Yes.

       6     Q.   Is that what happened?

3:24   7     A.   No.

       8     Q.   Okay.

3:24   9     A.   He backed up.

      10     Q.   Okay.  Before we get to that, at the time that he

3:25  11 came to a stop at the curb, did you see Border Patrol

      12 agents around you?

3:25  13     A.   No.

      14     Q.   You saw none?

3:25  15     A.   I didn't see anyone.

      16     Q.   Did you -- did you hear any light -- any -- did

3:25  17 you see any lights of the vehicles?

      18     A.   Yes.  The vehicles were already there, all of

3:25  19 them, but the agents hadn't gotten out of their trucks.

      20     Q.   Okay.  When did you first see an agent outside of

3:25  21 a car or a truck?

      22     A.   When the car backed up and stopped.

3:25  23     Q.   Okay.  Did it take you by surprise that the

      24 driver started backing up?

3:26  25     A.   Yes, because he was already surrounded.  He

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 90

3:26    1 didn't have any way out.

**2      Q.   Surrounded by what?**

3:26    3      A.   The police cars.

**4      Q.   But he kept going?**

3:26    5      A.   He kept going.

**6      Q.   Did that make you even more scared at that point?**

3:26    7      A.   Yes.

**8      Q.   He had just banged into the curb and now he's**

3:26    **9 reversing; is that right?**

10      A.   Yes.

3:26    **11     Q.   Did you feel like that was putting you in even**

**12 more danger?**

3:26    13      A.   Yes.

**14     Q.   Did you know what he was gonna do next?**

3:26    15      A.   No.

**16     Q.   How fast approximately would you say the driver**

3:27    **17 reversed?**

18      A.   That was very slow because the car -- one -- the

3:27    19 car -- one of the tires in the car, you know, was not

20 running well, and so the -- he couldn't back up really,

3:27    21 really fast.

**22     Q.   When did the -- when did the tire start not**

3:27    **23 working well?**

24      A.   When he hit the curb.

3:27    **25     Q.   Okay.   How do you know the tire wasn't working**

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 91

3:27    1 well?

2    A.   Because the car was going like this, like

3:27    3 sideways.

**4    Q.   Was it, like, lopsided?**

3:27    5    A.   Yes.  Or, like, it was not balanced anymore.

6 Like, one of the tires was down and --

3:28    **7    Q.   That's what you felt?**

8    A.   Yes.

3:28    **9    Q.   It was obvious to you?**

10    A.   Yes, you could feel it.

3:28    **11    Q.   Okay.  How far back did the driver reverse?**

12    A.   From 7 to 10 meters.

3:28    **13    Q.   Okay.  And while he -- while the driver was**

**14 reversing, did you see agents on their feet starting to**

3:28    **15 come towards the vehicle?**

16    A.   Yes.  That's when the agents started walking

3:28    17 toward the vehicle, and he stopped.

3:28    **18    Q.   Okay.  So I want to get this, make sure I**

3:28    **19 understand.**

**20         As he's backing up is when you first saw agents**

3:29    **21 on their feet starting to come towards the vehicle?**

22    A.   Yes.

3:29    **23    Q.   Before the car stopped?**

24    A.   Yes.

3:29    **25    Q.   How many agents did you see?**

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 92

3:29    1    A.  Well, I saw about three on one side, and there

2 were two, but outside the fence.  Or on the other side of

3:29    3 the fence.

**4    Q.  Okay.  So you saw approximately five agents?**

3:29    5    A.  Yes.

**6    Q.  And the fence that you're referring to is what**

3:29    **7 fence?**

8    A.  Right here on the side.

**9    Q.  Is that on the -- the edge of the parking lot?**

10    A.  On the side of the road.

3:30    **11    Q.  And was that a big, steel sturdy fence or a small**

**12 fence?**

3:30    13    A.  No, just -- just like a screen fence with a --

14 those pipes holding it.

3:30    **15    Q.  So you saw two agents outside of that fence?**

16          MR. MCDONALD:  Would this be a good time to take

3:30    17 a break?

18          THE REPORTER:  Answer?

3:30    19          THE WITNESS: Yes.

20          MR. MCDONALD: Five-minute break at this point? Go

3:30    21 off the record.

22          THE VIDEOGRAPHER:  Off the record.  Time is now

3:31    23 3:31.

24          (Recess taken)

3:42    25          THE VIDEOGRAPHER:  Back on the record.  Time is

MSJ_205

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 93

3:42  1 now 3:42 p.m.  This marks the beginning of media number

2 three in deposition of Francisco Madariaga.  Counsel?

3:42  3 BY MR. MCDONALD:

**4     Q.  Sir, previously you testified that as the**

3:42  **5 vehicle, after it hit the curb, was backing up, that that**

**6 was the first time that you saw agents out of their**

3:42  **7 vehicles on foot; is that right?**

8     A.  Yes

3:42  9         MR. MCDONALD:  I am handing you what I've marked

10 as Exhibit 10.  This is a fresh photograph of the same

3:43  11 photograph depicted in Exhibit 8 that you have previously

12 marked.

3:43  13         (Defendant's Exhibit 10 was marked for

14         identification)

3:43  15 BY MR. MCDONALD:

**16     Q.  Do you see that, sir?**

3:43  17     A.  Yes.

**18     Q.  And do you see on Exhibit 10 the same outline**

3:43  **19 around the newly-poured concrete has been placed on the**

**20 page?**

3:43  21     A.  Yes.

**22     Q.  What I would like for you to do is to mark on**

3:43  **23 Exhibit 10 the place where the car ran into the curb near**

**24 the entrance and exit to the gas station.  If you could**

3:43  **25 please mark that with an "X."**

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 94

3:43    1    A.   (Witness complies).

        2         MR. MCDONALD:   The record should reflect that the

3:44    3    witness has placed an "X" near the entrance and exit to

        4    the parking lot.

3:44    5    BY MR. MCDONALD:

        6    Q.   Now, sir, if you could draw a line showing where

3:44    7    the driver reversed the vehicle approximately 7 to 10

        8    meters, as I understand your earlier testimony.

3:44    9    A.   (Witness complies).

        10        MR. MCDONALD:   Record should reflect that the

3:44    11   witness has drawn a line proceeding down from the "X."

        12   BY MR. MCDONALD:

3:44    13   Q.   And that line represents approximately 7 to 10

        14   meters; is that -- is that right, sir?

3:44    15   A.   Yes.

        16   Q.   Now, if you could please place a circle on the

3:44    17   line that you have just drawn representing where you first

        18   saw agents on foot.

3:45    19   A.   (Witness complies).

        20   Q.   And you're marking where you were in the vehicle.

3:45    21   Not where the agents were, but where you were on the line

        22   that you've drawn.

3:45    23   A.   Right here.

        24   Q.   And that was -- was that before the car came to a

3:45    25   stop reversing?

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 95

3:45　1　A.　Yes.

2　Q.　**Okay.  If you could please place a big circle in**

3:46　3 **the location you were when you first saw agents.**

4　A.　A circle right there, right?

3:46　5　Q.　**Yes.**

6　A.　(Witness complies).

3:46　7　　　MR. MCDONALD:　Okay.  The witness has placed a

8 circle close to the end of the 7 to 10 meter line that he

3:46　9 drew previously.

10 BY MR. MCDONALD:

3:46　11　Q.　**Is that right, sir?**

12　A.　Yes.

3:46　13　Q.　**Now, sir, if you could please mark using numbers**

14 **1, 2, 3, 4, 5 where the agents were at the time when you**

3:46　15 **were at the circle.**

16　A.　(Witness complies).

3:47　17　　　MR. MCDONALD:　The witness has placed the numbers

18 1, 2, 3, 4 and 5 on the page representing where the agents

3:47　19 were when the car was at the circle before it had finished

20 reversing.

3:47　21　　　MR. RUTMAN: On Exhibit No. 10.

22　　　MR. MCDONALD:　On Exhibit No. 10.

3:47　23 BY MR. MCDONALD:

24　Q.　**Where were you -- as the car was reversing, sir,**

3:47　25 **where were you looking?**

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 96

3:47    1    A.  I was looking to the sides because there were

2 many patrol cars, and I was very scared at the time.

3:47    **3    Q.  So is it fair to say you were kind of scanning**

**4 the scene left and right?**

3:48    5    A.  Yes.

**6    Q.  Okay.  Which of these five agents was closest to**

3:48    **7 the vehicle?**

8    A.  When he was backing up, the agents were still

3:48    9 far.  They were closer once the car stopped, and then he

10 was looking around where to exit.

3:48    **11    Q.  Were the agents moving away from the car or were**

**12 they moving towards the car?**

3:48    13    A.  Approaching the car.

**14    Q.  Okay.  Were they saying anything?**

3:48    15    A.  They were saying, "Stop.  Don't move."

**16    Q.  How do you know that's what they were saying?**

3:49    17    A.  Because like the translator said, I understand

18 English a little bit.

3:49    **19    Q.  So you could understand a Border Patrol agent**

**20 saying, "Stop"?**

3:49    21    A.  Yes, I understood that they were telling him

22 that.

3:49    **23    Q.  Were they saying that in a soft voice or in a**

**24 loud voice?**

3:49    25    A.  Loud.

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 97

3:49    1    Q.  How many -- excuse me.  How many of them were

2 saying, "Stop"?

3:49    3    A.  Several were saying it.  I don't know how many

4 because some were by the -- by the patrol cars, and I

3:50    5 don't know how many.

6    Q.  Did the driver obey them?

3:50    7    A.  He stepped on the brakes when he was backing up.

8    Q.  Was there something behind him?

3:50    9    A.  I couldn't tell because I couldn't see behind us.

10    Q.  Okay.  Was there a rearview mirror in the Nissan?

3:50   11    A.  Yes.

12    Q.  Okay.  Sir, I'm showing you what's been

3:51   13 previously marked as Exhibit 10 again.  I would like for

14 you now to please draw in a red circle where the car

3:51   15 stopped.  After all the -- all -- reversing all the way,

16 put a red circle where it stopped.

3:51   17    A.  (Witness complies).

18    Q.  Could you -- could you try to make that a little

3:51   19 more legible?

20    A.  It doesn't work.  No, it's not working.

3:52   21    Q.  Try this.

22        MR. MCDONALD:  The witness has placed a red

3:52   23 circle further below the prior blue circle that he placed

24 on Exhibit 10.

3:52   25 / / /

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 98

3:52   1 BY MR. MCDONALD:

2      Q.  And that's where the vehicle approximately came

3:52   3 to a stop?

4      A.  Yes.

3:52   5      Q.  Did the driver get out of the car and turn

6 himself in to the Border Patrol at that point?

3:52   7      A.  No.  He stayed holding on to the steering wheel,

8 and with the -- with the other hand, he was holding onto

3:52   9 his phone.

10      Q.  He was -- was he still talking on his phone?

3:53   11      A.  Trying to call because nobody was answering.

12      Q.  Was there music playing in the car at this point

3:53   13 still?

14      A.  No, because the Bluetooth was connected to the

3:53   15 car and it was -- you know, I could hear the sound.

16      Q.  Okay.  When the car came to a stop, did the

3:53   17 agents continue to come closer to the car?

18      A.  Yes.  They came as close as possible, but already

3:53   19 in a position of shooting.

20      Q.  Okay.  What do you mean by that?

3:53   21      A.  Because when the car stopped, the agents were

22 already holding their guns in their hands.

3:54   23      Q.  Did you think the driver was gonna stop at that

24 point?

3:54   25      A.  Well, yes, because when he saw the agents going

MSJ_211

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 99

3:54    1 like that, that's when he stopped and he just stayed like

        2 that to see -- to see if there was a -- a way out

3:54    3 anywhere.

        **4    Q.  How long was he stopped after he reversed?**

3:54    5    A.  Before he reversed?

        **6    Q.  After he reversed, came to a stop, approximately**

3:54    **7 how long in seconds was he stopped in one place?**

        8    A.  5 to 10 seconds.

3:55    **9    Q.  Okay.  And did you know that he was gonna go**

        **10 forward again at that point?**

3:55    11   A.  No.

        **12   Q.  What did you see the agents do while the car was**

3:55    **13 stopped?**

        14   A.  They were yelling, "Stop," not to keep on running

3:55    15 anymore.

        **16   Q.  Okay.  And how close were the agents to the car?**

3:55    17   A.  The ones on the sides, not in front, like on the

        18 corners, like three meters away.  Three, four meters.

3:55    **19   Q.  So that's pretty close?**

        20   A.  Yes.

3:56    **21   Q.  Okay.  And how many agents were on the side?**

        22   A.  I just saw the two agents on this side on the

3:56    23 left and one on the right.  Two -- no, two on the driver's

        24 side and one on the passenger side.

3:56    **25   Q.  The two on the driver's side, were they on the**

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 100

3:56   1 other side of the fence or on this side of the fence?

2      A.  On the other side.

3:56   3      Q.  Okay.  Where were the other two agents?

4      A.  Let me give you an example.  This is the car.

3:56   5 One was on this side, one was on the other side.

6      Q.  Okay.  Let -- let me do it this way: as the car

3:57   7 came to a stop, explain to me what you saw with the agents

8 approaching the car.

3:57   9      A.  That they were already pointing their weapons.

10      Q.  Okay.  And you mentioned two on the left; is that

3:57   11 right?

12      A.  Yes.

3:57   13      Q.  One on the right side of the car?

14      A.  Yes.

3:57   15      Q.  How many other agents did you see?

16      A.  The two -- not in front, but like this.

3:57   17      Q.  What do you mean by "like this"?

18      A.  I mean in front would be here, like on these

3:57   19 sides.

20      Q.  Okay.

3:57   21      A.  I mean --

22      Q.  So were they -- were they on the side of the car

3:57   23 or more towards the front of the car?

24      A.  Like, to the sides.  Like, on the corners of

3:58   25 the --

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 101

3:58   1     Q.  Did you have to turn your head this way to see

2 those other two agents, or could you see them when you

3:58   3 were looking straightforward through the windshield?

4     A.  When I turned my head and looked like this, I --

3:58   5 I was able to see the agents.

6     Q.  Okay.  When you turned your head like what?

3:58   7     A.  When the car stopped, I looked to the right.  I

8 looked to the right, to the left and in front when all

3:58   9 the -- and all the agents were already pointing their

10 weapons.

3:59  11     Q.  On Exhibit 10, if you could please mark in red

12 the locations of the five agents that you previously

3:59  13 marked in blue.

14     A.  (Witness complies).

3:59  15     Q.  Now, I want you to mark each of the five where

16 they were when the car came to a stop at the end of its

3:59  17 reverse.

18         MR. RUTMAN:  So this is Exhibit 10 still?

3:59  19         THE WITNESS: With an "X" or with a number?

20 BY MR. MCDONALD:

3:59  21     Q.  With the same numbers.  Keep one as one, two as

22 two, et cetera.

4:00  23     A.  (Witness complies).

24     Q.  Could you make clearer, the five.  I think I know

4:00  25 where the five is, but could you make the five a little

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 102

4:00   1 clearer?

2      A.   Right here.

4:00   3           MR. MCDONALD:   Okay.   So the witness has placed

4 the numerals one, two , three, four, five in red on

4:00   5 Exhibit 10.

6 BY MR. MCDONALD:

4:00   7      Q.   And four and five, sir, are they on the other

8 side of the fence?

4:00   9      A.   Number four and five, yes.

10      Q.   Okay.   And does this represent right when the car

4:00   11 came to a stop?   Is this where the agents were?

12      A.   Yes.

4:00   13      Q.   Okay.   And then you say that the car was stopped

14 for, did you say, 5 to 10 seconds?

4:01   15      A.   Yes.

16      Q.   What happened or what did the agents do during

4:01   17 those 5 to 10 seconds?

18      A.   They were just yelling at him to stop.   And then

4:01   19 I don't know if they thought that the guy a gun or

20 something because he was -- he had his hand on the right

4:01   21 side of him or -- or what was happening.

22      Q.   Okay.   Did it appear to you that the driver could

4:01   23 have had a gun near his right hand?

24           MR. RUTMAN:   Objection.   Vague.

4:01   25           THE WITNESS:   No.

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 103

4:01    1 BY MR. MCDONALD:

2      Q.  Why not?

4:01    3      A.  Because he had his phone.

4      Q.  Okay.  During the 5 to 10 seconds that the car

4:02    5 was stopped, were the agents continuing to come closer to

6 the car?

4:02    7      A.  No, they were -- they stayed at the position

8 where they were at.

4:02    9      Q.  Starting with the red number one, how far away

10 approximately from the car was Agent 1?  And I'm referring

4:02   11 to Exhibit 10.

12      A.  About three meters away.

4:02   13      Q.  Okay.  And -- and I'm referring to the markings

14 that you've placed in red which is the time that the

4:02   15 vehicle came to a stop; is that right?

16      A.  Yes.

4:02   17          MR. RUTMAN:  After reversing?

18          MR. MCDONALD: After reversing.

4:03   19 BY MR. MCDONALD:

20      Q.  Are we -- are we in agreement on that timing?

4:03   21      A.  Yes.  Yes, after.

22      Q.  In Exhibit 10, how far away from the car was the

4:03   23 Agent No. 2 marked in red?

24      A.  Let's say four meters.

4:03   25      Q.  Okay.  What about, same exhibit, red Agent No. 3?

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 104

4:03   1 At the time that the car stopped, how far away from the
       2 car was Agent 3?

4:03   3    A.  Same distance, three meters, because they were
       4 just --

4:03   5    Q.  How many feet is three meters?

       6    A.  Let's say it's three, six  -- about 10 feet.

4:04   7    Q.  Okay.  What happened after those 5 to 10 seconds
       8 of sitting still?

4:04   9    A.  That's when I heard the shots.  I mean, the
      10 driver stayed.  And he, like, with his foot tried to, you

4:04  11 know, speed away, but the car didn't move.  And then the
      12 agents shot -- you know, shot their guns.

4:04  13    Q.  Was the car moving when the agents fired shots?

      14    A.  No.  He put his foot on the pedal, the

4:05  15 accelerator.  The accelerator, as though he wanted to
      16 start driving.

4:05  17    Q.  How do you know that?

      18    A.  Because you could hear it.

4:05  19    Q.  What did it sound like?

      20    A.  Like -- I couldn't -- I couldn't tell you.  I

4:05  21 know the sound when the cars are driving or just driving
      22 normally or when you -- you know, you accelerate.

4:05  23    Q.  And was this accelerating?

      24    A.  Yes.  Like, when you -- like when you turn it on

4:05  25 and then you start letting the car warm up.

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 105

4:05     1     Q.  Okay.  Are you familiar with what's called

         2 flooring the gas pedal?

4:06     3     A.  No, but I've heard -- I've been with friends in

         4 Mexico that once they're drunk and they want to speed

4:06     5 away, or like that.

         6     Q.  And is -- is that the sound that the driver made?

4:06     7     A.  Yes.

         8     Q.  Okay.  How did that sound compare to the race car

4:06     9 sound that you testified to earlier?  How did those two

        10 sounds compare?

4:07    11     A.  How did they compare?  Well, for example, the --

        12 a car that accelerates, like you can tell that the -- the

4:07    13 tires screeching and -- or when you just, you know,

        14 accelerate, like that, you -- you burn more gas when you

4:07    15 accelerate like that.

        16     Q.  Okay.  What -- what I want to know is, we talked

4:07    17 earlier about when the driver was stopped by Border Patrol

        18 and then he saw the agent coming and he saw that he was

4:07    19 Border Patrol, and then he took off really fast in the

        20 car.  And you testified that it was --

4:07    21     A.  Yes.

        22     Q.  -- like the sound of, like, a race car taking

4:07    23 off?

        24     A.  Yes.

4:08    25     Q.  How did that sound compare to the sound that the

MSJ_218

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 106

4:08   1 car made in the gas station parking lot when the driver

2 accelerated after he had stopped?

4:08   3    A.  Well, the sound -- the comparison is that when he

4 accelerated, when the immigration agent stopped him, the

4:08   5 tires, you know, they -- they made a screeching sound.

6 And when he stopped and -- and he tried to -- to -- to

4:08   7 speed away, the sound was not as loud.

8    Q.  Okay.  Did you hear the engine revving?

4:09   9    A.  Yes.

10    Q.  Okay.  What happened -- one minute.  How long was

4:09   11 the engine revving?

12    A.  No, it was just like one -- like, one second, two

4:09   13 seconds.

14    Q.  Okay.  And your testimony is that car didn't move

4:09   15 at all?

16    A.  No.

4:09   17       MR. RUTMAN:  Ask that again because his answer

18 wasn't responsive.  It's a double negative.

4:09   19 BY MR. MCDONALD:

20    Q.  Was the car moving or not moving when shots were

4:10   21 fired?

22    A.  The car didn't move.

4:10   23    Q.  Are you certain of that?

24    A.  I'm sure.

4:10   25    Q.  Okay.  But you did hear the acceleration of the

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 107

4:10    1 engine?

2     A.  It could be heard.

4:10    3     Q.  Okay.  Did the shots happen after the

4 acceleration sound or before the acceleration sound?

4:10    5     A.  When -- when you -- when you -- when we were able

6 to hear the driver accelerating, that's -- after that, the

4:10    7 shots were fired.

8     Q.  After the acceleration, then the agents shot?

4:11    9     A.  Yes.

10     Q.  Where did the bullets come from?

4:11    11     A.  The bullets came from -- let's see where.  From

12 agents one, two.  I don't know about three and four.

4:11    13 Because when you see the -- the impacts on the windshield

14 from the first two, I just covered myself, and I just felt

4:11    15 the glass, you know, flying by my face.

16     Q.  Okay.  You mentioned agents one and two being the

4:12    17 ones who fired.  Are you referring to the red one and two

18 in Exhibit 10?

4:12    19     A.  Yes.

20     Q.  How do you know that they were the ones who

4:12    21 fired?

22     A.  Because they're the ones that were on the --

4:12    23 like, on the corners of the car.  In front of the car,

24 but, like, on the corners of the car.

4:12    25     Q.  How -- how do you know that they were the ones

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 108

4:12   1 who fired, though?

2    A.   Because I was looking at -- in front of me, and I

4:12   3 saw the fire.  When you fire a weapon, you can see the

4 fire.

4:12   5    Q.   And were you looking -- were you looking straight

6 out the windshield at that time?

4:12   7    A.   Yes.

8    Q.   Okay.  Looking straight out the windshield, where

4:13   9 was Agent 1?

10    A.   He was on the side.

4:13   11    MR. MCDONALD:   And the witness motioned slightly

12 to the left.

4:13   13 BY MR. MCDONALD:

14    Q.   Is that right?

4:13   15    MR. RUTMAN:   Well, I'm going to object to the

16 word "slightly."  That's your characterization of it.

4:13   17 It's up to him to indicate clearly how far to the side he

18 was or not.

4:13   19 BY MR. MCDONALD:

20    Q.   Sir, you motioned to the left to identify where

4:13   21 you could see Agent 1 as marked in red on Exhibit 10 at

22 the moment the shots were fired; is that right?

4:13   23    A.   Yes.

24    Q.   And what did you -- how did you see Agent 1

4:14   25 standing?

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 109

4:14    1    A.  I saw him holding his weapon like this.

        2         MR. MCDONALD:  And -- and, for the record, the

4:14    3    witness was holding his hands up as if he was holing a

        4    firearm.

4:14    5    BY MR. MCDONALD:

        6    Q.  Sir, are you familiar with the clock method of

4:14    7    identifying where objects are?

        8         Sir, like, if you're looking straight forward is

4:15    9    12:00, slightly left is 11:00, then 10:00.

        10   A.  Yes.

4:15    11   Q.  Then 9:00.  Do you understand that method?

        12   A.  Yes.

4:15    13   Q.  Where -- using the clock method, where was Agent

        14   1 as marked in Exhibit 10 in red?

4:15    15   A.  On 11:00.

        16   Q.  Turning your attention to Agent 2 in red, you

4:15    17   said Agent 2 was the other one who fired.

        18        Using the clock method looking straight out the

4:15    19   windshield, where was Agent No. 2?

        20   A.  On 1:00.

4:16    21   Q.  On 1:00.  Okay.  Were you injured by any of the

        22   shots that were fired?

4:16    23   A.  No.

        24        MR. RUTMAN:  I guess -- I guess I should have

4:16    25   objected as vague.  Do you mean physically injured or

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 110

4:16  1 emotionally?

2 BY MR. MCDONALD:

4:16  **3    Q.  Were you physically injured by any of the bullets**

**4 that were fired at the scene?**

4:16  5    A.  Well, yes, because I was traumatized.  Oh, well,

6 physically?

4:17  **7    Q.  Did any bullets hit you, sir?**

8        MR. RUTMAN:  There you go.

4:17  9        THE WITNESS: No.

10 BY MR. MCDONALD:

4:17  **11    Q.  How tall are you?**

12    A.  160.

4:17  **13    Q.  And as the shots --**

14        MR. RUTMAN:  Is that centimeters?

4:17  15        THE WITNESS: In meters.  One meter, 60

16 centimeters.

4:17  17        MR. RUTMAN:  Okay.

18 BY MR. MCDONALD:

4:17  **19    Q.  Thank you.  How were you sitting in -- in the**

**20 front passenger seat while you were in the gas station**

4:17  **21 parking lot?  Were you sitting upright, were you**

**22 slouching?  How were you seated?**

4:17  23    A.  I was sitting like this.

**24    Q.  Okay.  In a -- in a straight posture?**

4:17  25    A.  Yes.

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 121

4:39  1     Q.  You heard the engine revving, I guess.  You used

2 the word "accelerating."

4:39  3     A.  Yes.

4     Q.  Now, in your experience, when a car is at a

4:39  5 complete stop and begins to move forward, you're gonna

6 hear that type of noise, correct?

4:40  7         MR. MCDONALD: Objection.  Vague.

8         THE WITNESS: Yes.

4:40  9 BY MR. RUTMAN:

10     Q.  How loud was it when he -- compare what you heard

4:40  11 when he picked you up and started to drive away on the

12 road with what you heard when he had backed up, come to a

4:40  13 stop and then tried to move forward.  Were they the same

14 sound?  Was one louder than the other?

4:40  15     A.  Well, when he stopped and picked us up, the sound

16 of the car was like when you're driving a car normally.

4:40  17     Q.  Okay.

18     A.  The sound when he backed up was less because he

4:40  19 was driving more slowly because the tire was not working

20 very well and the noise was different from that of when he

4:41  21 stepped his foot on the -- on the -- on the accelerator.

22     Q.  Okay.  Now, you said that Agent No. 1 was at

4:41  23 11:00, and he was approximately three meters from the car,

24 right?

4:41  25     A.  Yes.

FRANCISCO JAVIER MADARIAGA-GONZALEZ - 12/01/2022

Page 122

4:41    1    Q.  Agent No. 2 was at 1:00 and was about four meters

        2 from the car, right?

4:41    3    A.  Yes.

        4    Q.  Okay.  Let's freeze that moment in time.

4:41    5        If the car had continued to move in a straight

        6 line, would the car have been able to go between No. 1 and

4:42    7 No. 2 without hitting them?

        8        MR. MCDONALD: Objection.  Speculation.

4:42    9 BY MR. RUTMAN:

        10    Q.  Based upon what you could see.

4:42    11    A.  Yes.

        12    Q.  Did it appear to you that the driver -- I'm sorry

4:42    13 let me rephrase it.

        14        Did it appear to you that any of the Agents 1 or

4:42    15 2 in front of the car were in danger of being hit by the

        16 car based upon the way the car was being driven?

4:42    17    A.  No.

        18    Q.  Did you see No. 1 or No. 2 have to jump out of

4:42    19 the way at any time when the car was accelerating or

        20 revving?

4:43    21    A.  No, no.

        22    Q.  And just one last question.  When you were

4:43    23 talking to the sheriff's department -- deputy, sorry, we

        24 went through the transcript there and you read it, were

4:43    25 you doing your best to answer their questions as best as

Page 131

4:53   1 STATE OF CALIFORNIA)SS:

       2 COUNTY OF SAN DIEGO)

4:53   3

       4      I do hereby certify:

4:53   5      That the foregoing deposition was taken before me

       6 at the time and place therein set forth at which time the

4:53   7 witness was put under oath by me;

       8      That the testimony of the witness and all

4:53   9 objections made at the time of the examination were

       10 recorded stenographically by me were thereafter

4:53   11 transcribed under my direction and supervision and that

       12 the foregoing is a true record of the same.

4:53   13      I further certify that I am neither counsel for nor

       14 related to any party to said action, nor anywise

4:53   15 interested in the outcome thereof.

       16      IN WITNESS WHEREOF, I have subscribed my name this

4:53   17 4th day of January, 2023.

       18

4:53   19

       20

4:53   21 _____

       22 JACQUELINE STEARMAN, CSR NO. 9373

4:53   23

       24

4:53   25

EXHIBIT _8_
REPORTER _J. STEARMAN_
WITNESS _F. MADARIAGA_
DATE _12.1.22_



MSJ 229

1                   UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF CALIFORNIA

3

4

5 SILVESTRE ESTRADA, et al.,          CASE NO:

6              Plaintiffs,      22-CV-1373-DMS-BGS

  vs.
7
  UNITED STATES OF AMERICA,
8
              Defendant.
9 _____/

10

11

12

13

14

15              VIDEOTAPED DEPOSITION OF

16              JAIME MADARIAGA-GONZALEZ

17            TAKEN AT U.S PORT OF ENTRY

18              SAN DIEGO, CALIFORNIA

19                DECEMBER 2, 2022

20

21

22

23

24 JOB NUMBER 940492

25 REPORTED BY:  JACQUELINE STEARMAN, CSR NO. 9373

MSJ_230

JAIME MADARIAGA-GONZALEZ - 12/02/2022

Page 58

1:55   1      A.  He just told me that.  And we sat there, and I

2  just sat and laid back on the seat, and that was it.

1:55   3      **Q.  Okay.  Were you relieved?**

4      A.  Yes.

1:55   5      **Q.  Why were you relieved?**

6      A.  Because I was sitting in the car.  No more cold.

1:55   7          MR. MCDONALD:  Sir, I'm going to show you what I

8  will mark as Exhibit 14.  This is a video of scope

1:55   9  footage.

10         (Defendant's Exhibit 14 was marked for

1:55   11         identification)

12         MR. RUTMAN:  Do you want me to do what we did

1:56   13  yesterday?  It was, like, two minutes to 3:00 or

14  something?

1:56   15         MR. MCDONALD:  I'm positioning the video to begin

16  at the 1:30 mark.

1:56   17         And, Counsel, just for the record, I am again

18  playing this off of a video that was downloaded to my

1:56   19  desktop.  The DVD contains the same video.

20         MR. RUTMAN:  So stipulated, yeah.

1:56   21         MR. MCDONALD:  Counsel, if you would be so kind

22  as to push play on this video starting at the 1:30 mark.

1:56   23         And, sir, if you would watch this video until

24  about the 3:30 mark.  And then I will ask you some

1:56   25  questions about it.

MSJ_231

JAIME MADARIAGA-GONZALEZ - 12/02/2022

Page 59

1:56  1          MR. RUTMAN  I think we should put on the record

2 that the time stamp on this is 5/14/21, 21:40:47.

1:57  3          MR. MCDONALD:  Thank you, Counsel.

4          MR. RUTMAN:  In the upper left-hand corner.  I'm

1:57  5 Pressing play now.

6          We're at three minutes and it blacks out.  Here's

1:58  7 the two men who have gotten into the vehicle at this

8 moment.

1:58  9          MR. MCDONALD: Okay.  Thank you, Counsel.  If you

10 could just stop the video there.

1:59  11         MR. RUTMAN:  Sure.  3:14.

12         MR. MCDONALD: 3:14.

1:59  13 BY MR. MCDONALD:

14     Q.  Sir, did you have a chance to see that video?

1:59  15     A.  Yes.

16     Q.  Okay.  And what was happening in the video?

1:59  17     A.  Two people running.

18     Q.  Okay.  And did you see the time, the -- the date

1:59  19 stamp in the far left corner of the screen that said

20 "May 14th, '21"?

1:59  21     A.  I didn't see that.  I was just focusing on the

22 video.

1:59  23     Q.  Let me show you.

24         MR. MCDONALD:  And, Counsel, if you could assist.

1:59  25         MR. RUTMAN:  Sure.  I'm pointing to that date --

JAIME MADARIAGA-GONZALEZ - 12/02/2022

Page 60

1:59  1 date and time stamp that I referenced earlier.

2 BY MR. MCDONALD:

1:59  **3     Q.  Do you see that 5/14/21 stamp, sir?**

4     A.  Yes.

1:59  **5     Q.  And was that the day that you were picked up on**

**6 the 94 road?**

1:59  7     A.  Yes.

**8     Q.  Does this appear to be you and Francisco moving**

2:00  **9 to the car that picked you up?**

10     A.  Yes, that look -- it looks like that.

2:00  **11     Q.  You mentioned that you -- you ran some to get to**

**12 the car?**

2:00  13     A.  Yes.

**14     Q.  How did you have enough energy to run to the car?**

2:00  15     A.  Well, because we saw that he stopped.  Let's run

16 to get in, and let's go.

2:00  **17     Q.  Did you get dizzy as you were running?**

18     A.  Yes.  When I got in the car, I just sat there and

2:00  19 closed my eyes.

**20     Q.  And were you feeling dizzy in the car as you sat**

2:00  **21 down?**

22     A.  When I sat there, a little, but then later I

2:00  23 didn't anymore.

**24     Q.  After you had a chance to catch your breath?**

2:01  25     A.  Yes.

JAIME MADARIAGA-GONZALEZ - 12/02/2022

Page 74

2:36   1     Q.   Okay.   Before we get into that, at the moment

2 that the driver stopped alongside the 94, took off, what

2:36   3 did -- the agent who had knocked on the car, what did the

4 agent do?

2:36   5     A.   He went back to his car.   I would imagine he got

6 in, and then they started following him.

2:37   7     Q.   Could you see the agent at the moment the car

8 started going forward?

2:37   9     A.   No, no.

10     Q.   How would you describe the way in which the

2:37   11 driver was driving the car after he took off from the side

12 of the 94?

2:37   13     A.   He was going fast, yes.

14     Q.   How fast?

2:37   15     A.   I honestly don't know how fast, how many

16 kilometers or how fast, but he was going fast.

2:38   17     Q.   Was it the fastest that you had ever been driving

18 in a car in your life?

2:38   19     A.   Yes.

20     Q.   How often do you ride in a car?

2:38   21     A.   Not that often, just when we came here and I'm

22 riding in a car.   Well, there in Mexico City, but not

2:38   23 where we live.   Where we live, there's not even a taxi

24 service or Uber service or any of that.   You know, some

2:38   25 people there have a private car, but barely anybody.

JAIME MADARIAGA-GONZALEZ - 12/02/2022

Page 75

2:38  1     Q.  In the course of a year, let's say, how many

2 times do you take rides or drive a car?

2:39  3     A.  Several times, but not in the road like -- like

4 you would see here or in a city, just from one town to the

2:39  5 other.

6         And sometimes we go to Mexico City.  It takes

2:39  7 about four hours to get there.  But barely ever.  Only

8 ride in a car, like, for 30 minutes, 40 minutes, at the

2:39  9 most one hour.

10     Q.  So in your life, the fastest you had ever been

2:39  11 going in a car was in the minutes after the driver of the

12 Nissan took off from the side of the 94 with you in the

2:39  13 back seat; is that right?

14     A.  Yes.

2:40  15     Q.  Describe the 94 road for me.  What is that road

16 like?

2:40  17     A.  What do you mean what it was like?  In what way?

18     Q.  How many lanes are on that road?

2:40  19     A.  It was only two or three.  I don't remember how

20 many.

2:40  21     Q.  Okay.  In the direction that you were traveling,

22 was there one lane going the direction you were going?

2:40  23     A.  Yes, one.

24     Q.  And was there one lane going the opposite

2:40  25 direction?

MSJ_235

JAIME MADARIAGA-GONZALEZ - 12/02/2022

Page 76

2:40    1    A.   Yes.

        2        Q.   Okay.  Was the road straight or was it windy?

2:41    3    A.   There were curves and some straight stretches,

        4 but basically windy.

2:41    5        Q.   The combination of the windy roads and the high

        6 speeds, did that make you worried?

2:41    7    A.   Yes.  Because at the speed that he was going, I

        8 had never ridden in a car at that speed.  And I thought

2:41    9 he's gonna, you know, get out of the road or something.

        10       Q.   What did you think would happen if he did get out

2:41    11 of the road?

        12   A.   The car was gonna overturn or something or crash

2:42    13 or I don't know.

        14       Q.   Did you think you might die?

2:42    15   A.   Yes, if we got out of the road, maybe.

        16       Q.   Was the driver during this time period after he's

2:42    17 left the side of the 94, was he driving inside the lines

        18 of his lane on the road?

2:42    19   A.   Yes, but in the curves at the -- he would take

        20 some of the other side and like that in the curves, but --

2:43    21 but since we basically didn't have any other cars on the

        22 road, nothing happened.

2:43    23       Q.   So he, the driver, would cross over into the

        24 other lane?

2:43    25   A.   Yes, in the curves.  Since he was going fast, he

JAIME MADARIAGA-GONZALEZ - 12/02/2022

Page 77

2:43  1 would cross over on the other side, I guess, to take the

2 curve better, I guess.

2:43  **3    Q.  Were you wearing your seatbelt?**

4    A.  Yes.

2:43  **5    Q.  When did you put the seatbelt on?**

6    A.  As soon as we got in because Francisco told me,

2:43  7 "Put on your seatbelt."

**8    Q.  Was it good that you put your seatbelt on?**

2:43  9    A.  Yes.

**10   Q.  Why is that?**

2:43  11   A.  Because in the curves with my seatbelt on, I

12 didn't move to the sides.

2:44  **13   Q.  What were you doing with your hands?**

14   A.  I was just -- just crossed my arms like this, and

2:44  15 I just laid back.  And since I had the seatbelt, I was

16 just going like this, this movement.

2:44  17        MR. MCDONALD:  Okay.  The record should reflect

18 the witness has crossed his arms across his chest and

2:44  19 rocked slowly back and forth.

20 BY MR. MCDONALD:

2:44  **21   Q.  And why were you -- why were you rocking back and**

**22 forth?**

2:44  23   A.  Because of the curves.  I was moving this way and

24 that way, the way the car was moving.

2:44  **25   Q.  Did you ever bang into the side of the car?**

MSJ_237

JAIME MADARIAGA-GONZALEZ - 12/02/2022

Page 78

2:44  1    A.  No.

      2    Q.  Did you tell the driver at any point, "Hey, you

2:45  3 need to stop"?

      4    A.  No, I didn't say anything.

2:45  5    Q.  Why not?

      6    A.  Well, like I told you, I don't speak English.  I

2:45  7 couldn't say anything.

      8    Q.  Did you tell Francisco in Spanish to please ask

2:45  9 the driver in English to stop?

      10   A.  No, I didn't.

2:45  11   Q.  Why not?

      12   A.  We just got in, sat there, nobody said anything.

2:45  13 Nobody said anything.

      14   Q.  You mentioned at one point the car got to a gas

2:45  15 station; is that right?

      16   A.  Yes.

2:45  17   Q.  How many minutes, approximately, was it between

      18 when the driver took off on the side of the 94 all the way

2:46  19 to the gas station?

      20   A.  I have -- I don't have the exact time.  About 15,

2:46  21 20 minutes, I would say.

      22   Q.  Okay.

2:46  23   A.  Or maybe less because he was going fast.  I don't

      24 know exactly how long.

2:46  25   Q.  Okay.  So approximately 15 to 20 minutes?

JAIME MADARIAGA-GONZALEZ - 12/02/2022

Page 79

2:46   1    A.  Yes, more or less.

       2    Q.  **Were there any Border Patrol vehicles that you**

2:46   3 **could see during those 15 to 20 minutes?**

       4    A.  No.  We saw them when they were -- when we

2:46   5 arrived to the gas station, they were right on the road.

       6 It was all blocked, I mean.

2:47   7    Q.  **What about right after the driver took off at the**

       8 **beginning of the 15 to 20 minutes, did you see Border**

2:47   9 **Patrol agent vehicles then?**

       10   A.  No, just the ones that were behind us.  Two, two

2:47   11 police cars.

       12   Q.  **Okay.  And did those cars follow the Nissan all**

2:47   13 **the way to the gas station?**

       14   A.  Yes, yes.

2:47   15   Q.  **Did they have their lights on?**

       16   A.  Yes.

2:47   17   Q.  **Those were the flashing lights on top?**

       18   A.  Uh-huh.  Actually, with the sound that they have,

2:47   19 too.

       20   Q.  **The -- the siren?**

2:47   21   A.  Yes, the sound that they make.

       22   Q.  **Okay.  And so the -- the flashing lights and the**

2:47   23 **sirens were on for that entire 15- to 20-minute period or**

       24 **so?**

2:48   25   A.  Yes.

MSJ_239

JAIME MADARIAGA-GONZALEZ - 12/02/2022

Page 82

2:52    1    A.  Both things because we were being pursued.  And

        2 then the other thought was what if he, you know, gets out

2:52    3 of the road.

        4    Q.  Okay.  So were you more scared by the way that

2:52    5 the driver was driving, or were you more scared because

        6 you might get caught by Immigration?

2:52    7    A.  Because of the way he was driving.

        8    Q.  Were you really scared?

2:52    9    A.  Yes.

       10    Q.  Was it a really tense situation?

2:52   11    A.  Yes.

       12    Q.  Did you feel like the driver was putting you at

2:52   13 risk?

       14    A.  Yes.

2:52   15    Q.  In what way?

       16    A.  Well, like I told you, that if he were to crash

2:53   17 or -- or overturn.

       18    Q.  You might get seriously hurt?

2:53   19    A.  Yes.

       20    Q.  Or you might be die?

2:53   21    A.  Yes.

       22    Q.  Around any of the curves or at any point during

2:53   23 the 15- to 20-minute pursuit, did you ever hear the tires

       24 screeching?

2:53   25    A.  No, I couldn't hear that, but -- well, because he

MSJ_240

JAIME MADARIAGA-GONZALEZ - 12/02/2022

Page 85

2:57   1      Q.  Have you ever had a chance in your life to see
       2 someone under the influence of drugs?

2:58   3      A.  No.  Well, like here staying here in Tijuana, I
       4 could see people that are in the street, and I would

2:58   5 imagine it's -- and I see them and it's probably because
       6 of that.

2:58   7      Q.  Did it appear to you that the driver was acting
       8 erratically?

2:58   9      A.  What do you mean?

      10      Q.  Are you familiar with the word "erratic"?

2:59  11      A.  No.

      12      Q.  Okay.  Did the driver end up driving into a gas
2:59  13 station parking lot?

      14      A.  Well, I just saw the gas station.  He got in.  He
2:59  15 made a turn like trying to go back or return and but
      16 everything was blocked.

2:59  17      Q.  Okay.  I'll ask you about that.  I want to go
      18 back for one second.

2:59  19          During the 15- to 20-minute pursuit to the gas
      20 station, had you ever been more scared in your life than
2:59  21 in those 15 to 20 minutes?

      22      A.  No.

3:00  23      Q.  You were more scared during that drive than you
      24 had been in your life before?

3:00  25      A.  Yes.

MSJ_241

JAIME MADARIAGA-GONZALEZ - 12/02/2022

Page 105

3:41   1 said you thought that they were gonna get you out of the

2 car now; is that right?

3:41   3    A.   Yes.

4    Q.   And you're referring to the Border Patrol agents

3:41   5 getting you out of the car?

6    A.   Yes.

3:41   7    Q.   Were you relieved at that point that that was

8 gonna happen?

3:41   9    A.   Yes, I thought they're gonna grab us and get us

10 out of the car.

3:41   11    Q.   And did you think that this pursuit that you had

12 just been on for over 20 minutes or so at that point was

3:42   13 over?

14    A.   Yes.

3:42   15    Q.   Were you glad about that?

16    A.   Yes because it -- we were in the car already.  It

3:42   17 stopped.  And I said, they're gonna get us out right here.

18    Q.   But my question was were you glad that you

3:42   19 thought the pursuit was over?

20    A.   Yes.  I was calm at that point.

3:42   21    Q.   Were you happy that the pursuit was over?

22    A.   Yes.

3:42   23    Q.   Why?

24    A.   Because the car was not gonna continue getting us

3:42   25 in danger on the road.

JAIME MADARIAGA-GONZALEZ - 12/02/2022

Page 115

4:03   1        MR. RUTMAN:  Objection.  Asked and answered.

2        THE WITNESS: Maybe he would have hurt them, but

4:03   3 since the car just stopped and it stayed there.

4 BY MR. MCDONALD:

4:03   **5    Q.  Well, so your testimony was that if he drove**

**6 forward, he could have gone through two cars on the other**

4:03   **7 side of the fence and not hurt anybody; is that your**

**8 testimony?**

4:03   9    A.  Yes, that's what I was able to see, that there

10 was room.  But that's what I thought after because the car

4:03   11 where I marked the square, that's where he stopped.  But

12 he didn't try to get out or anything, he just stopped.

4:04   **13    Q.  So in thinking that he could have gotten through**

**14 those two vehicles, were you also thinking that the driver**

4:04   **15 could have just driven right through that fence?**

16    A.  Yes, that's what I thought, but not -- but I was

4:04   17 thinking oh, he should have escaped, and then we would

18 have made it to the U.S.

4:04   19        What I thought was like if he had tried, if he

20 would have tried to go across that fence, then probably we

4:04   21 would have overturned.  I don't know.

22        But I thought of that not to say, oh, he should

4:05   23 have -- he should have escaped and then we would have made

24 it to the U.S.  No, I didn't think of that.

4:05   **25    Q.  So you thought that if he went through that**

JAIME MADARIAGA-GONZALEZ - 12/02/2022

Page 133

1 STATE OF CALIFORNIA)SS:

2 COUNTY OF SAN DIEGO)

3

4        I do hereby certify:

5        That the foregoing deposition was taken before me

6 at the time and place therein set forth at which time the

7 witness was put under oath by me;

8        That the testimony of the witness and all

9 objections made at the time of the examination were

10 recorded stenographically by me were thereafter

11 transcribed under my direction and supervision and that

12 the foregoing is a true record of the same.

13        I further certify that I am neither counsel for nor

14 related to any party to said action, nor anywise

15 interested in the outcome thereof.

16        IN WITNESS WHEREOF, I have subscribed my name this

17 6th day of January, 2023.

18

19

20

21        _____

22        JACQUELINE STEARMAN, CSR NO. 9373

23

24

25

DAVID MATTHEWS                                    1

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF CALIFORNIA

 3
    SILVESTRE ESTRADA, et al.,
 4
                      Plaintiff,
 5                                Case No.:  21-CV-1390-DMS-BGS
           vs.
 6
    UNITED STATES OF AMERICA, et
 7  al.,

 8                    Defendants.
    _____

 9

10

11                   DEPOSITION OF

12                   DAVID MATTHEWS

13               SAN DIEGO, CALIFORNIA

14                 DECEMBER 21, 2022

15

16

17

18

19

20

21

22

23

24
    REPORTED BY:
25  A. DESIREE TIPPER, CSR NO. 13806
```

DAVID MATTHEWS                                    23

1    heard other weapons fire?

2         A    No.

3         Q    Well, isn't it true that you fired almost

4    instantaneously as the other officers?

5         A    Yes.

6         Q    Do you believe hearing the other gunshots played

7    a role in your decision to fire your weapon?

8         A    No.

9         Q    Did you hear the engine rev that night?

10        A    Yes, I did.

11        Q    Is that when you fired your weapon?

12        A    When the vehicle faced towards me, I did, yes.

13        Q    All right.  And do you have an estimate as to

14   the vehicle's speed when you fired at it?

15        A    No.  The area was very short, so I can't tell

16   the exact speed, but the engine revved like it was very

17   high-pitched.  So that would normally mean that the

18   individual pressed the gas pedal all the way down.

19        Q    When it was in neutral?

20        A    I don't think it was in neutral.  The vehicle

21   started moving afterwards.

22        Q    Okay.  When you fired your weapon at the

23   vehicle, how fast do you think the vehicle was going?

24             MR. WALLACE:  Objection.  Asked and answered.

25   Cumulative.

MSJ_246

DAVID MATTHEWS                                    24

```
 1            You can answer again.

 2            THE WITNESS:  Can you say that again?

 3   BY MR. GRUENBERG:

 4      Q    Surely.  At the time you fired your weapon at

 5   the vehicle, how fast do you think the vehicle was going?

 6            MR. WALLACE:  Same objection.

 7            Go ahead; you can answer again.

 8            THE WITNESS:  The vehicle -- like it's just a

 9   short distance.  It's really hard to say exactly how fast

10   he was going.

11   BY MR. GRUENBERG:

12      Q    I know.  I just need your best estimate on that.

13      A    I can't really estimate.

14            (Speaking simultaneously.)

15   BY MR. GRUENBERG:

16      Q    Well, do you think it was going 20 miles an

17   hour?

18      A    I think it was going fast enough to hurt

19   someone, for sure, yes.

20      Q    Okay.  Do you think it was going 20 miles an

21   hour?

22      A    I really don't know.

23      Q    I am -- if you recall, during the admonitions, I

24   indicated I was entitled to your best estimate.

25            MR. WALLACE:  Let me just indicate, he's
```

DAVID MATTHEWS                                        25

1   entitled to your best estimate if you can give one.  And

2   I think he's answered the question, I think, fairly.  I

3   think you're -- you're -- it's argumentative at this

4   point.

5   BY MR. GRUENBERG:

6       Q    Well, all right.  Officer, is it your testimony

7   that you are completely unable to give us any estimate as

8   to the speed of the vehicle when you shot at it?

9       A    Other than it just going fast?  Yes.

10      Q    Well, fast is somewhat of an estimate, but if

11  you are able to testify it was going fast, then I think

12  I'm entitled to know how fast, and then we get back to an

13  actual number and --

14      A    Well --

15      Q    In this country, we typically use miles per hour

16  as our standard for estimating the speed of things,

17  especially with cars.  So what I would like to know is

18  your best estimate as to the miles per hour it was going

19  when you shot at it.

20          MR. WALLACE:  Same objection.

21          You can answer if you understand the question.

22          THE WITNESS:  I mean, the vehicle was just

23  moving really fast and the time frame was really, really

24  quick.  The distance is very short.  We don't exactly

25  come with speedometers.  It's not like I can read the

MSJ_248

1

2

3

4

5

6

7

8

9

10    BY MR. GRUENBERG:

11         Q    Where was he?

12         A    He was a lot closer to the tree in this picture

13    here.  So the vehicle is facing eastbound first, and then

14    I heard the engine rev, and it headed towards Godreau.

15    So he was in that area.  And then the vehicle turned

16    towards me, and that's when I fired.

17         Q    You understand that at some point before you

18    fired your weapon, the vehicle had backed up to the

19    border patrol truck that we show -- that is shown on the

20    exhibit.  I think it's -- did I mark that as the

21    ninety --

22              MR. WALLACE:  92.

23    BY MR. GRUENBERG:

24         Q    92.  Correct?

25         A    In some videos that I reviewed with sheriffs and

MSJ_249

1                    REPORTER'S CERTIFICATE

2

3            I, A. Desiree Tipper, a Certified Shorthand

4    Reporter No. 13806 in the State of California, do hereby

5    certify:

6                 That the foregoing proceedings were taken

7    before me at the time and place herein set forth; that

8    any witnesses in the foregoing proceedings, prior to

9    testifying, were placed under oath; that a verbatim

10   record of the proceedings was made by me using machine

11   shorthand which was thereafter transcribed under my

12   direction; further, that the foregoing is an accurate

13   transcription thereof.

14                 I further certify that I am neither

15   financially interested in the action nor a relative or

16   employee of any attorney of any of the parties.

17                 IN WITNESS WHEREOF, I have hereunto

18   subscribed my name this 6th day of January, 2023.

19

20

21

22

23   _____
                      A. Desiree Tipper
24                    CSR No. 13806

25

MSJ_250

ANDREW R. HADEN
Acting United States Attorney
DAVID B. WALLACE (Cal. Bar No. 172193)
ERNEST CORDERO, JR. (Cal. Bar No. 131865)
COLIN MCDONALD (Cal. Bar No. 286561)
Assistant U.S. Attorneys
United States Attorney's Office
880 Front Street, Room 6293
San Diego, California 92101-8893
Tel: (619) 546-7669/7478/9144
Facsimile: (619) 546-7751
E-Mail: Dave.Wallace@usdoj.gov
ernest.cordero@usdoj.gov
colin.mcdonald@usdoj.gov

Attorneys for Defendant
United States of America

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Silvestre ESTRADA, et al. | Case No.: 22-cv-00373-AJB-BGS |
| Plaintiff, | **DECLARATION OF JASON ALBA** |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

I, Jason Alba, declare and state as follows:

1.     I am a United States Border Patrol agent and so have been employed since April 30, 2007.

2.     In May of 2021, I typically worked Thursday through Monday from 2:00 p.m. to midnight and was assigned to the El Cajon Border Patrol Station.

3.     On the day of the incident, May 14, 2021, I was driving a marked Border Patrol vehicle (a Chevrolet Tahoe). I was wearing a rough duty uniform with a green shirt, green pants, and black boots.

4.     At approximately 2210 hours, I heard Agent Godreau broadcast radio updates about his pursuit of a suspected alien smuggling vehicle. He reported that the

*Declaration of Jason Alba*

1

suspect was headed east toward SR-94, several miles from where I was positioned.

5.      After hearing these reports, I drove to SR-94. I pulled out ahead of the pursuit, thinking that it would make the suspect driver slow or stop. Moments later, the suspect vehicle reached my position from behind, crossed over the middle line on SR-94, and passed by on my left side. Thereafter, I fell in behind Agent Godreau and joined the pursuit with my emergency lights activated.

6.      We followed the suspect vehicle into the Circle K parking lot at the intersection of SR-94 and Buckman Springs Road. That parking lot only has a single entrance and exit. The suspect vehicle drove towards the corner of the parking lot before making a U-turn and driving on a dirt/grassy area of the parking lot back towards the sole exit of the parking lot. The suspect vehicle, however, crashed into a tall curb and was forced to stop. The vehicle then reversed through the dirt/grassy area of the parking lot. The vehicle continued reversing until it was forced to stop again, this time by a USBP truck that blocked it from behind.

7.      At this point, I was out of my vehicle yelling commands at the driver to stop.  The driver, however, did not surrender. Instead, after briefly sitting still, the driver revved the car's engine very high, making the engine roar, and then accelerated forward in the direction of Agent Godreau who, from my vantage point, was standing directly in front of the car, approximately six feet away.

8.      Fearing for Agent Godreau's life, I aimed my handgun and fired one round at the driver. When I fired, I was near the back passenger-side door of the suspect vehicle. I had to use my firearm, as nothing else would have been effective in stopping the suspect from running Agent Godreau over.

9.      I was not expecting the outcome or the situation to develop as it did. The driver's actions were unexpected, dynamic, and chaotic. I later learned that the driver of the suspect vehicle was Silvestre Estrada.

10.      After the event ended, I was able to observe the front of the suspect vehicle. The exhibits attached to my declaration as Exhibits 1 and 2, with the exception of any

1  labeling stickers applied, accurately depict the front of the suspect vehicle, including

2  the holes in the windshield, when I saw the front of the suspect vehicle after the event

3  ended on May 14, 2021.

4      I make this declaration under penalty of perjury under the laws of the United States

5  of America.

6

7      DATED: August 30, 2023

8      JASON ALBA

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MSJ_253





**MSJ_255**

*Jason Alba Decl., Ex. 2*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SILVESTRE ESTRADA, a minor, by and through his proposed guardian ad litem EMILY PRIETO; OLGA TOVAR; FRANCISCO MADARIAGA; AND JAIME MADARIAGA-GONZALEZ<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No.: 22-cv-00373-AJB-BGS<br><br>DECLARATION OF JORDAN A. GERBER |

I, JORDAN A. GERBER, pursuant to 28 U.S.C. § 1746, declare the following under penalty of perjury.

1.    I am a deportation officer with U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations and have been so employed since approximately March 26, 2023. Prior to becoming a deportation officer, I was employed as a United States Border Patrol Agent (BPA) between approximately December 2008 and March 2023.

2.    On May 14, 2021, I was assigned to perform transport duties in the Border Patrol's El Cajon Station area of responsibility. I was driving a marked Border Patrol van equipped with emergency lights, sirens, and full Border

1    Patrol and Department of Homeland Security insignias.

2    3.    At approximately 10:25 p.m., I heard over my service radio that BPA

3    Robert Godreau was attempting to initiate a vehicle stop on State Route 94

4    (SR-94) in an area commonly known to Border Patrol agents as Zuellner's.

5    Then, while driving westbound on SR-94 towards BPA Godreau's location,

6    I heard Agent Godreau say over the radio that the vehicle had failed to yield

7    and was traveling eastbound on SR-94 (i.e., in my direction).

8    4.    Upon hearing this, I quickly considered the roadway and the size and speed

9    of the transport van and concluded that I did not have a place to turn off

10    SR-94 or turn around before the vehicle pursuit would be at my location. I

11    told BPA Godreau over the radio that I would turn on my lights and sirens

12    to try to discourage the driver of the fleeing vehicle from continuing the

13    pursuit.

14    5.    After arriving at a straightaway segment of the SR-94, I stopped my Border

15    Patrol vehicle in the westbound lane. As I did so, I made sure traffic in both

16    directions would have ample time to stop safely to avoid a vehicle accident.

17    The emergency lights and sirens on my vehicle were on. I then waited for

18    the fleeing vehicle to arrive at my location.

19    6.    Soon, I saw the fleeing vehicle traveling towards me in the eastbound SR-

20    94 lane. The fleeing vehicle was traveling at a high rate of speed. When the

21    fleeing vehicle arrived at the straightaway, the driver abruptly turned into

22    the westbound lane, crossing over the center line, and came directly at me

23    and my vehicle. At that point, the fleeing vehicle appeared to be picking up

24    speed. At that moment, based on the driver's abrupt turn into my lane, I

25    believed the driver of the fleeing vehicle intended to collide with my Border

26    Patrol vehicle.

27    7.    When the fleeing vehicle was approximately ten feet from the front of my

28

vehicle, the driver swerved back into the eastbound lane and continued driving east on SR-94 at a high rate of speed. After the fleeing vehicle passed by my location, several Border Patrol vehicles also passed by me in pursuit of the fleeing vehicle.

8.   Several minutes later, on May 14, 2021, I saw a Nissan sedan sitting on a dirt/grassy section of the Circle-K parking lot at Cameron Corners in Campo, California. I learned from other agents that the Nissan sedan sitting in the dirt/grassy section of the lot was the vehicle in the pursuit described above that nearly hit me and my vehicle.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this __8__ day of August, 2023.

JORDAN A. GERBER

ANDREW R. HADEN
Acting United States Attorney
DAVID B. WALLACE (Cal. Bar No. 172193)
ERNEST CORDERO, JR. (Cal. Bar No. 131865)
COLIN MCDONALD (Cal. Bar No. 286561)
Assistant U.S. Attorneys
United States Attorney's Office
880 Front Street, Room 6293
San Diego, California 92101-8893
Tel: (619) 546-7669/7478/9144
Facsimile: (619) 546-7751
E-Mail: Dave.Wallace@usdoj.gov
ernest.cordero@usdoj.gov
colin.mcdonald@usdoj.gov

Attorneys for Defendant
United States of America

Attorney for the United States

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Silvestre ESTRADA, et al. | Case No.: 22-cv-00373-AJB-BGS |
| Plaintiff, | **DECLARATION OF ROBERT GODREAU** |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

I, Robert Godreau, declare and state as follows:

1.     I am a U.S. Border Patrol Agent and have been employed by the USBP since 2003.  I served honorably in the U.S. Marine Corps for four years and seven months years before joining the USBP.

2.     In May of 2021, I was working a Monday through Friday schedule, typically, from 2:00 p.m. until midnight. I was assigned to the El Cajon Border Patrol Station, with an area of responsibility (AOR) that spanned from approximately the Tecate Port of Entry to Campo, California. The main public road in this area is SR-94.

3.     On the night of the incident, May 14, 2021, I was driving a marked USBP

*Declaration of Robert Godreau*

1

1 | patrol unit (a Chevy Tahoe), and was wearing a full USBP field uniform.

2 |     4.    Beginning around 9:43 p.m. on May 14, 2021, I heard an agent from the
3 | Brown Field Border Patrol Station relay information over the radio that a vehicle had
4 | picked up some illegal aliens and was traveling east bound on SR-94 towards the El
5 | Cajon Border Patrol Station AOR. Upon hearing this information, I traveled in my
6 | marked USBP vehicle to the side of SR-94 to see if I could locate the subject vehicle.

7 |     5.    After some time, a silver Nissan sedan passed by my location. The Nissan
8 | was traveling at a low rate of speed (slower than residents or locals would ordinarily
9 | drive at this location), with its windows rolled down. I could see a driver and two
10 | passengers inside the Nissan. These facts raised my suspicions that this was the alien
11 | smuggling vehicle in question. After a license plate check, I learned that the Nissan was
12 | from Los Angeles and only had one local checkpoint crossing. This further increased
13 | my belief that this was the alien smuggling vehicle we were looking for. As I followed
14 | the Nissan, driving eastbound on SR-94, I noticed that the driver would look back at me
15 | in his rearview mirror and veer into the westbound lane.

16 |     6.    I decided to conduct a traffic stop, so I activated my overhead lights.
17 | However, the Nissan did not stop. I then activated my siren. Thereafter, the driver of
18 | the Nissan turned on his hazard lights and—after passing by locations where he could
19 | have stopped—eventually pulled over.

20 |     7.    As I approached the Nissan on foot, it suddenly sped off. I got back into
21 | my USBP vehicle and followed the Nissan. Because of how fast the Nissan was going,
22 | I could not catch up. At times, the Nissan drove up to approximately 100 miles per hour.
23 | On two occasions the driver lost control of the Nissan and almost crashed into an
24 | embankment.

25 |     8.    After fleeing for about four-and-a-half miles, the Nissan eventually drove
26 | into a Circle K parking lot near the intersection of SR-94 and Buckman Springs Road.
27 | There is only one exit/entrance into this parking lot. Once the driver entered the parking
28 | lot, I thought the driver was going to give up as he had nowhere else to go.

*Declaration of Robert Godreau*

9.      However, instead of surrendering, the driver made a U-turn, drove over a curb onto a dirt/grass field, and drove eastbound back towards the parking lot exit (leading back to SR-94). Just before the exit, the Nissan crashed hard into a tall curb. I parked my vehicle in front of the Nissan. I thought the pursuit was over at that point.

10.     However, the driver of the Nissan started reversing the Nissan across the dirt/grass field until he stopped within several feet of a USBP vehicle.

11.     I moved forward on foot towards the Nissan as it reversed to a stop.  It remained stopped for several seconds.  Once again, I thought the driver was going to give up, at which point I planned to take the driver into custody. I was shouting commands at the driver such as "show me your hands" and "stop, put your hands up,"  as were several other agents. Other agents were on foot to my left and right surrounding the stopped Nissan.

12.     Suddenly, I heard the Nissan's engine rev loudly, and then the Nissan accelerated towards me. I was only approximately ten feet from the front of the Nissan when it started moving. Based on the short distance between me and the Nissan, I did not believe I had time to get out of the way. Also, based on the driver's behavior, even if I had tried to move out of the way, I believed that the driver would have just turned towards me. I feared for my life and thought I was going to end up under that car. In response, I quickly aimed my firearm through the front windshield and shot several times at the driver to get him to release the accelerator.

13.     The driver then veered to the north (at which point I immediately stopped shooting) in the direction of other agents on foot. Two additional gunshots were fired about the same time, or shortly after, I fired my last shot. The Nissan then came to a stop.

14.     If I had not fired at the driver, I believe the Nissan would have hit me. Based on the revving of the Nissan, its sudden forward movement towards me, and the actions taken throughout the pursuit by the Nissan's driver, I thought I was going to die.

15.     I was not expecting the outcome or the situation to develop as it did. The driver's actions were unexpected, dynamic, and chaotic. I later learned that the driver of

*Declaration of Robert Godreau*

1    the suspect vehicle was Silvestre Estrada.

2          I make this declaration under penalty of perjury under the laws of the United States

3    of America.

4

5          DATED: August *30*, 2023                    _____

6                                                       ROBERT GODREAU

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ANDREW R. HADEN
Acting United States Attorney
DAVID B. WALLACE (Cal. Bar No. 172193)
ERNEST CORDERO, JR. (Cal. Bar No. 131865)
COLIN MCDONALD (Cal. Bar No. 286561)
Assistant U.S. Attorneys
United States Attorney's Office
880 Front Street, Room 6293
San Diego, California 92101-8893
Tel: (619) 546-7669/7478/9144
Facsimile: (619) 546-7751
E-Mail: Dave.Wallace@usdoj.gov
ernest.cordero@usdoj.gov
colin.mcdonald@usdoj.gov

Attorneys for Defendant
United States of America

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Silvestre ESTRADA, et al. | Case No.: 22-cv-00373-AJB-BGS |
| Plaintiff, | **DECLARATION OF DAVID MATHEWS** |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

I, David Mathews, declare and state as follows:

1. I have been a U.S. Border Patrol Agent since February 3, 2020. I have also served in the Army National Guard since 2014.

2. On the day of the incident, May 14, 2021, I was assigned to the San Diego Sector - El Cajon Border Patrol Station. I started my shift at 2:00 p.m. and was driving a marked, white and green, USBP Jeep Wrangler. I was wearing a green USBP field unform.

3. On Friday, May 14, 2021, I was patrolling the line in Zone 28 when I heard a radio transmission at about 2200 hours that a vehicle, possibly with illegal immigrants inside, was headed in my direction on SR-94. I drove to SR-94 in the event the vehicle

*Declaration of David Mathews*

1

1  passed by my location. Other agents were providing descriptions of the vehicle over the
2  radio.

3      4.      Soon I saw a vehicle matching the descriptions provided drive through my
4  area and continue eastbound on SR-94. At that point I got behind the subject vehicle
5  (later determined to be a Nissan sedan), along with two other Border Patrol vehicles.

6      5.      After some time, the Nissan pulled over on the side of SR-94. I got out of
7  my vehicle, expecting to help assist with an inspection of the Nissan and its occupants.
8  However, after stopping, the Nissan took off at a high rate of speed down SR-94. I got
9  back in my vehicle and followed the Nissan, with my lights and sirens on.

10     6.      The Nissan was driving very fast. I was not able to keep up in my Jeep
11 Wrangler. I lost sight of the Nissan, but I was listening to the radio transmission updates
12 from other agents in the pursuit.

13     7.      After multiple miles, I approached the Circle-K parking lot in Campo, and
14 saw the Nissan inside the parking lot. I parked my vehicle on the shoulder of SR-94 and
15 ran westbound alongside a wire fence separating SR-94 from the Circle-K parking lot.
16 At this point, the Nissan was on a grassy section of the parking lot, facing eastbound.
17 The driver's window was down and I could clearly see the driver's face. I yelled, "get
18 out of your vehicle!" or words to that effect, but the driver did not even look at me—
19 acting as if I wasn't even there—and hit the accelerator to drive eastbound towards the
20 exit of the Circle-K parking lot.

21     8.      I decided to try to use my vehicle to block the Circle-K entrance, but seeing
22 that an agent was already there, I parked my car on the shoulder of SR-94 and exited
23 my vehicle. As I exited my vehicle and came around the back of it, I heard the Nissan's
24 engine loudly rev and then saw the Nissan suddenly start moving forward quickly
25 towards another agent at the front of the Nissan. At nearly this same time, I heard gunfire
26 and saw the Nissan's wheels turn to face me head on. The driver was looking forward
27 and his hands remained on the steering wheel.

28     9.      While there was a wire fence in between me and the car, I did not believe

*Declaration of David Mathews*

**MSJ_264**

22-cv-00373-AJB-BGS

1  it would stop the vehicle from hitting me, as the fence was very thin, rusted, and old. I

2  thought the vehicle was going to run me over.

3       10.    In fear of being hit and killed, I fired one round at the driver. Based on the

4  circumstances, I believed that this was my only option to save my life and the life of

5  my fellow Border Patrol Agent near the front of the Nissan.

6      I make this declaration under penalty of perjury under the laws of the United States

7  of America.

8

9      DATED: August _30_, 2023

10      DAVID MATHEWS

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Declaration of David Mathews*

3

Estrada v. United States Rule 26 Report

I.      QUALIFICATIONS                                    May 12, 2023

My name is Jason Fries. I am CEO of 3D Forensic, Inc., located in San Francisco, California. I have worked in the fields of forensic animation, forensic laser scanning, forensic video analysis, laser-based photogrammetry, and scientific method for 25 years. I am an expert in the fields of forensic animation, 3D laser scanning, audio/video analysis, line of sight, laser-based photogrammetry, scientific method, and trajectory analysis. I have extensive training on Human Factors in use of force cases and testified in both state and federal as an expert in all fields mentioned above.

I have a degree in Biology with a focus on chemistry and physics for San Diego State University.

From 1997 to 2012, I worked in the fields of forensic animation, 3D laser scanning, audio/video analysis, and line of sight analysis at Precision Simulation Inc., located in Grass Valley, California. During those 15 years, I rose through the ranks, beginning my tenure as a forensic animator and ending my tenure as President of the organization.

From 2012 to the present, I have served as CEO of 3D Forensic, Inc., where I continue to be an expert in the areas mentioned above.

I have created over 3000 computer animations for use in trial and have worked on cases in 15 states, as well as outside the country in Japan and Costa Rica. I have spent over twenty years in the pursuit of forensic analysis and the use of forensic video reconstruction to reconstruct events involved in Officer-Involved-Shooting (OIS) incidents.

I have been admitted as an expert in the fields of video reconstruction, video analysis, line of site analysis, forensic laser scanning, forensic animation, Human Factors (Use of force), and Photogrammetry.

I am a member of the Society of Forensic Engineers and Scientists as well as the Forensic Expert Witness Association. I routinely lecture in the fields of forensic analysis at conferences all over the country and also guest lecture at Hastings School of Law.

I have been a trainer for members of MAIT, FBI, CHP as well as been a guest lecturer for Force Science Institute and CAARS as well as lecturer at Human Factors & Ergonomics Society.

My compensation is not dependent on the outcome of this litigation. I am compensated at the rate of $450.00 per hour for consulting services. I am paid at the rate of $775.00 per hour for deposition testimony and $775.00 per hour to testify in court.

I have qualified as an expert in forensic animation, 3D laser scanning, trajectory analysis, audio/video analysis, nighttime video analysis, line of sight analysis, and human factors involved in OIS incidents and laser-based photogrammetry.

MSJ_266

## II. SCOPE OF ENGAGEMENT

**Estrada v. United States**

3D Forensic, Inc. was contacted by Mr. Dave Wallace who asked us to analyze a fatal shooting involving the US Border Patrol.

We were provided the data and files outlined in the attached document "Estrada v. United States Incoming Materials."

**Background:**

On May 14th, 2021, decedent Silvestre Vargas Estrada was driving through Campo, CA when US Border Patrol agents suspected him of transporting undocumented immigrants. After pursuing Estrada, he drove into a Circle-K parking lot where agents surrounded him. After accelerating forward in the proximity of agents, agents then opened fire on Estrada, who was later declared dead. The incident was captured on separate footage from the Circle-K, from a store across the street, and from the cell phone of an employee who worked in a Subway restaurant in the subject parking lot

**Analysis Request:**

We were asked by Mr. Wallace to perform a forensic analysis on the data we received and see if our study could answer the following questions:

1)   Can we recreate the 3D positions of Mr. Estrada's car and the agents during the OIS event?
2)   Can we calculate the time, distance, speed, and acceleration of Mr. Estrada's vehicle seen in the footage?
3)   Can we perform a 3D trajectory analysis on all shots fired by the agents?
4)   Can we evaluate whether Estrada's approaching vehicle was capable of impacting Agent Godreau?
5)   Can we evaluate the approximate landing spot for Agent Godreau's discharged shell casings?

To answer these questions, we created the following action plan:

1)   Analyze and synchronize videos received.
2)   Laser scan incident area and inspect Estrada's vehicle.
3)   Camera-match and adjust footage for distortion.
4)   Track positions of agents and Estrada's vehicle.
5)   Identify distances between the agents and Estrada's vehicle.
6)   Perform a bullet trajectory analysis.
7)   Perform acceleration testing on exemplar vehicle.
8)   Calculate the timing for potential for Estrada's vehicle to impact agents.

The report will now explain the process taken and the results for each of these eight steps.

2

**Analyze and synchronize videos received**

After receiving initial case materials including photos, videos, reports, and depositions, we looked at a few videos that would help us position-match this incident. Several videos showed the incident, two of which were captured through nearby security cameras and one by a witness working at the nearby Subway.

Below are the videos we analyzed and synchronized:

- VID_20210514_221832114 (cell phone video from Subway employee Matthew Delgado)
- Circle K surveillance video
- Cameron Corners surveillance video

By aligning the videos with the audio signatures from the bullets being fired, we were able to synchronize the videos so the timing matched. This step allowed us to view the incident from multiple angles at once.



*Figure 1: Alignment of incident footage based on audio*

**Laser scan incident area and inspect Estrada's vehicle**

On September 1st, 2022, our team travelled to the location of the agent-involved shooting at 31471 State Route 94, Campo, CA 91906. While on site, the team laser scanned the area to capture 3D measurements of the incident environment using a Leica P40 laser scanner. After capturing millions of 3D measurement points through these scans, our team registered and input them into our 3D software, 3DS Max, that would allow us to view the scene digitally, extract exact distances, and input 3D models representing agents and vehicles.

On September 2nd, 2022, our team then travelled to El Cajon where Mr. Estrada's vehicle was impounded. While inspecting the vehicle, the team traced the trajectories of bullets fired from the incident by placing ballistic rods through the holes seen throughout the vehicle. The team then laser scanned the vehicle while rods were lodged inside so that these trajectories could be recorded three-dimensionally. The team also laser scanned the inside and outside without the ballistic rods to efficiently capture 3D measurements of the entire vehicle.

After taking scans and photos of the vehicle, the team brought data back for further analysis.

**Camera-match and adjust footage for distortion.**

### Distortion analysis and removal

Before you can use any photograph or video image to track the movement of a vehicle or person you need to analyze the image for any possible distortion. Most security cameras will have a wide Field of View, which will create "Barrel" distortion.  Looking at the image below from the Circle-K security camera (labeled as Figure 2), you can see that items that are straight in the real world look like they are bent inside the image.  This is the cause of showing a wide field of view of the 3D world onto a 2D monitor.  At 3D Forensic, Inc., we use a combination of two pieces of software (3D Max and Photo modeler) to calculate the precise amount of distortion and then remove the distortion, so items within the video are no longer distorted. Figures 3 and 4 below show the end results of a successful undistort process and how we can then use laser-based photogrammetry to create a 3D scene that exactly mimics the real-world scene.



*Figure 2: Video still raw (distorted).*

MSJ_269

**Laser-based photogrammetry**

Laser-based photogrammetry is the process of using laser scan data to recreate the exact location of the cameras that captured the OIS event within our 3D forensic model.  Once our 3D world is identical to the real world where the OIS event took place we can start to match vehicle and people location and movements so the location and movement of items seen in the security camera videos are matched precisely within our 3D environment. For example, raw video shows the movement we can see the movement of Mr. Estrada's vehicle as it reverses along the grassy section of the Circle-K parking lot, stops, then moves forward.  By overlaying the 2D video over our 3D environment we are able to track this movement every 1/30[th] of a second in three dimensional space.  Every still image that shows Mr. Estrada's vehicle—to include freeze frames of video capturing the event—can be used to place our 3D model of Mr. Estrada's vehicle[1] inside our 3D model of the environment. In other words, our 3D vehicle model overlays precisely over the video image of Mr. Estrada's vehicle. Analyzing frame-by-frame of the raw video, when we see Mr. Estrada's vehicle move, we then move our model until it matches up again precisely. This process is done for every single frame. The end result is we have a 3D model that mimics the exact movement of Mr. Estrada's vehicle as well as the precise movement of each agent that is visible  in the security camera images. This precision gives us movement over time, which allows us to calculate speeds, 3D location, acceleration of a person or vehicle.

For example, if at frame 1 we see Mr. Estrada's vehicle stopped in a certain confirmed location, and at frame 10—1/3 of a second later[2]—Mr. Estrada's vehicle has backed up precisely 3.25 feet, we would have an average speed of 6.65 mph for that third of a second. With speed over time we can calculate acceleration ( $a = (v\_f - v\_i) / \Delta t$ ) and braking to within fractions of a second as well. The two images below illustrate the laser-based photogrammetry process. Image one is a still from the video of the event, and image two is the success match of our 3D world to the real world. You can see that we have matched the location of the buildings, pump stations, parking spaces, etc.

---

[1] We laser scanned the precise dimension of Mr. Estrada's vehicle during our vehicle inspection
[2] The footage from this event was captured by at least one camera at the rate of 30 frames per second.

MSJ_270



Figure 3: Undistorted footage from Circle K security camera



*Figure 4: Camera-matched still from security footage matching 3D laser scan.*

**Track positions of agents and Estrada's vehicle**

With undistorted footage and key 3D measurements, 3D Forensic, Inc., could then build 3D models of the vehicle and agents to match their positions seen on footage. Models for the agents were developed based on height and size measurements outlined in their follow-up statements titled "SAN DIEGO SHERIFF'S DEPARTMENT Follow-up Investigative Report." Each agent's height corresponds with the following:

- Jason Alba: 5'8"

6

MSJ_271

- Robert Godreau: 5'10"
- David Mathews: 6'1"
- Lou Patch: 5'11"
- Chris Baker: 6'4"
- Louis Perez: 6'3"

The team then played incident footage while overlayed on the 3D environment, stopping at intervals to match the 3D models' positions to positions seen on footage. After matching the positions of the vehicles and agents throughout one video, the 3D recreation would accurately reflect their locations and positions throughout the footage. Thanks to the availability of multiple incident recordings, the 3D positions placed after the first camera match could be verified from different angles.



*Figure 5: Circle K security footage with position-matched model of Estrada's vehicle*

After this tracking, the 3D reconstruction of the incident could be viewed objectively from any angle at the same distances. The team could also accurately measure the distances between the vehicle and agents at each stage of the incident. The animation that accompanies this report was created following completion of these steps.

MSJ_272



*Figure 6: Overhead shot of agents in verified locations*

**Identify distances between the agents and Estrada's vehicle**

With a verified 3D reconstruction of the event, the team can isolate the distances between each agent and Estrada's vehicle throughout the incident. The following table reflects our findings on the distances throughout the footage, beginning when Mr. Estrada started accelerating the Nissan forward after reversing to a stop of the grassy section of the Circle-K parking lot.

|  | Robert Godreau | Lou Patch | Jason Alba | Chris Baker | Louis Perez | David Matthews |
|---|---|---|---|---|---|---|
| 0.0 sec (Nissan starts forward movement after reversing to a stop) | 12.4 feet | 16.292 | 2.8 | 13.744 | 12.6 | 44 |
| 0.5 second | 10.18 | 14.68 | 2.875 | 13.3 | 12.68 | 42.58 |
| 1 second | 7.77 | 12.894 | 2.658 | 13.43 | 11.138 | 41.89 |

8

| 1.5 second | 4 | 10.5 | 3 | 12 | 12.5 | 35.5 |
|---|---|---|---|---|---|---|
| 1.67 second (first shot fired) | 3.5 | 10 | 3.5 | 12 | 14 | 34 |
| 1.97 (second shot fired) | 3 | 10 | 4 | 11 | 16 | 31.5 |
| 2.3 (third shot fired) | 3 | 11.5 | 4 | 10.5 | 18 | 29.5 |
| 2.37 (fourth shot fired) | 3 | 11.5 | 4 | 10.5 | 18 | 29.5 |
| 2.77 (fifth/final shot fired) | 4 | 12.5 | 6 | 10 | 19 | 28 |



*Figure 7: Overhead display of the vehicle's and agents' positions leading up to approx. .17 seconds before the first shot was fired*

9

Additionally, with a verified 3D reconstruction of the event, we were able to create an animation of the event in question. That animation is attached to this report.

**Perform a bullet trajectory analysis**

Now that we have verified distances, locations and timing of the shooting incident mapped out, we can perform an analysis on the bullets fired to try to determine when and where each agent who fired their weapon was located.

After scanning Mr. Estrada's vehicle with trajectory rods highlighting bullet paths, we could accurately determine the entry angle of each shot fired at Mr. Estrada's vehicle. With this information, we could perform an analysis to determine which agents could have fired each shot and at which time.

To perform our ballistic trajectory analysis, we placed 3D lines in our 3D model of Mr. Estrada's vehicle representing where each bullet trajectory rod was scanned. With these rods representing the bullets' paths of travel, we placed this updated model of the car in the 3D reconstruction aligned with the positions tracked on camera. As the vehicle and surrounding agents travelled in 3D space throughout the incident, we could check the time intervals to see when trajectories aligned with an agent.

Please note that our analysis takes into consideration a 5 degree plus-or-minus error analysis that has been tested and observed in past analyses performed by our office as well as observed in industry testing. This 5-degree window of error is inherent when using the damaged cause by a bullet as the source of analysis. In performing our analysis, we relied on the damage seen in Mr. Estrada's windshield, damage seen in his rear passenger-side window, damage observed in Mr. Estrada's rear driver-side door, and the coroner report of Mr. Estrada.

In total, based on analysis of available audio-recording of the incident, five shots were fired over a span of about 1.1 seconds.  Based on the agents' depositions and the Firearms Lab Report, we narrowed down the list of agents who fired their handguns during this incident. These agents include:

- Agent Jason Alba, who fired 1 bullet,
- Agent Robert Godreau, who fired 3 bullets,
- Agent David Matthews, who fired 1 bullet.

With this information, we could outline at which time intervals the bullet trajectories aligned with one or more of these agents. Because the video footage doesn't provide clear evidence of when or where each shot was fired, our analysis was  performed by finding the time

10

intervals where the audio of the shots, the Nissan's position, the bullet trajectory, and the respective agent's position aligned at the same time.



*Figure 8: Windshield dame in Mr. Estrada's vehicle*

One important step of this process was isolating the shot that led to Mr. Estrada's death. Only one of the five shots impacted Mr. Estrada. Based on a review of the available evidence, including the coroner's report, this bullet came from behind Mr. Estrada and traveled into his neck. Agent Alba was the only agent of the three behind Mr. Estrada at the time the shots were fired.

An important step was highlighting the shot that the coroner's report attributed most directly to the death of Mr. Estrada. This bullet came from behind Mr. Estrada and travelled through his neck.

The results of our trajectory analysis are contained in the exhibits attached to this report.

**Perform acceleration testing on exemplar vehicle**

To calculate the potential for Estrada's vehicle to impact any of the nearby agents, we needed to test the acceleration potential of his vehicle. On April 3rd, our team secured an exemplar 2020 Nissan Altima with all-wheel drive, matching the same specifications as Estrada's vehicle from the accident. Our team then brought this vehicle to an open lot with the accident reconstructionist, Mr. Casteel, to perform acceleration testing.

MSJ_276



*Figure 9: Exemplar vehicle testing*



*Figure 10: Exemplar vehicle testing*

MSJ_277

After setting up cameras to record the reconstruction and assisting with setup markers for distance, Mr. David Casteel performed the acceleration tests. His findings on the vehicle's acceleration potential are outlined below:

- Straight in low
  - First 5 feet of acceleration: 0.44 Gs
  - First 10 feet of acceleration: 0.45 Gs
  - First 15 feet of acceleration: 0.45 Gs
  - First 20 feet of acceleration: 0.45 Gs
- Left in low
  - First 5 feet of acceleration: 0.34 Gs
  - First 10 feet of acceleration: 0.32 Gs
  - First 11 feet of acceleration: 0.32 Gs
- Right in low
  - First 5 feet of acceleration: 0.28 Gs
  - First 10 feet of acceleration: 0.25 Gs
  - First 11 feet of acceleration: 0.23 Gs

In analyzing the motion of Mr. Estrada's vehicle seen in the security cameras we were able to break down his time, distance, and speed profile. The results of our analysis are seen below.

**Reversing from the curb to a stop:**

When Estrada reversed the Nissan from the curb backwards to a stop in the grassy section of the Circle-K parking lot, his reverse acceleration figures are as follows:

| Frame No. | Frames Elapsed | Time (Sec.) | Distance Traveled in Reverse by Nissan (Ft.) | Acceleration Rate (Avg) |
|-----------|----------------|-------------|----------------------------------------------|-------------------------|
| 50 | 0 | 0 | 0 | n/a |
| 60 | 10 | 0.33 | .79 | 0.44G |
| 75 | 20 | 0.67 | 2.5 | 0.35G |
| 90 | 40 | 1.33 | 12.0 | 0.42G |
| 105 | 50 | 1.67 | 19.7 | 0.44g |
| 120 | 70 | 2.33 | 33.3 | 0.38g |

13

MSJ_278

| 135 | 82 | 2.67 | 37.8 | 0.33g |
| 150 | 100 | 3.33 | 48 | 0.28g |
| 165 | 115 | 3.67 | 52.8 | Na |
| 180 | 130 | 4.33 | 59.8 | NA |
| 195 | 145 | 4.67 | 66.9 | NA |
| 210 | 160 | 5.33 | 71.4 | NA |
| 225 | 170 | 5.67 | 74.3 | NA |
| 240 | 190 | 6.33 | 76.1 | NA |

### Accelerating Forward Just Before Shots Are Fired

After reversing to a stop and sitting briefly still, when Estrada accelerated forward just before shots were fired, his acceleration figures are as follows:

| Frame No. | Frames Elapsed | Time (Sec.) | Distance Traveled by Nissan (Ft.) | Acceleration Rate (Avg) |
|---|---|---|---|---|
| 338 | 0 | 0 | 0 | n/a |
| 345 | 7 | 0.23 | 0.4 | 0.44G |
| 360 | 22 | 0.73 | 1.9 | 0.22G |
| 375 | 37 | 1.23 | 4.1 | 0.17G |

14

| 390 | 52 | 1.73 | 8.0 | 0.17G |
| 405 | 67 | 2.23 | 11.3 | 0.14G |
| 419 | 81 | 2.70 | 12.7 | 0.11G |

As shown in the tables above, this speed data indicates that when Mr. Estrada started reversing he reached the maximum acceleration rate of the Nissan, as shown by the testing performed with Mr. Casteel. Furthermore, when Mr. Estrada accelerating forward just before shots were fired, he reached the maximum acceleration rate of the Nissan of 0.44g, as shown by the testing performed with Mr. Casteel.  This would support the witnesses' claims that they heard the Nissan's  engine rev high before and as Mr. Estrada drove forward, as, based on the testing, this is the maximum acceleration capable of this vehicle. This supports the assertion that Mr. Estrada floored his vehicle when he accelerated.

**Calculate the timing potential for Estrada's vehicle to impact agents.**

With average acceleration (G) values for Estrada's vehicle, the accident reconstructionist (Mr. Casteel) could properly calculate the potential timing required for Mr. Estrada to impact the nearby agents. Two agents specifically were in the most danger of collision once Estrada shifted to driver: Agent Godreau and Agent Patch.

- Agent Godreau would be impacted in 1.26 seconds from acceleration by Mr. Estrada if he drove straight
- Agent Patch would be impacted in 1.28 seconds from acceleration by Mr. Estrada if he drove right

**Further Observation From Analysis**

**Order of shots.**

**1.      Agent Godreau – First Three Shots**

In breaking down the timing of the shots fired by the agents (review previous table), we observe that the first three shots are evenly spaced apart at 0.3 seconds. This would indicate that each of these three shots were fired by the same agent. Numerous studies (Lowinski, 2001) as well as my own observation in recording agents shooting indicate that people pull the trigger of a semi-automatic weapon at a constant rate when taking multiple consecutive shots. The average interval between shots fired in this fashion is about .3 seconds.

Moreover, when reviewing the 3D trajectory analysis of the agents' positions in relation to the vehicle, we observed that Agent Godreau's position during these first three shots align with the trajectory analysis attributed to him and he is the only agent that fired three rounds during this incident. See exhibits attached to this report.

15

**MSJ_280**

### 2.      Agent Alba – Fourth Shot

The video and trajectory analysis indicate that Agent Alba was responsible for the fourth shot heard in the video.  Not only is Agent Alba in the correct position at the time that we hear the fourth shot being fired, but the vehicle also stopped moving shortly after Agent Alba fired a lethal round into Mr. Estrada's neck. Because the vehicle stopped by the time the fifth shot was fired, it would be expected that the latest shot before would have started the process of Mr. Estrada ceasing acceleration of the vehicle.

### 3.      Agent Matthews – Fifth Shot

The fifth and final shot heard on the video happens 1.10 seconds after the first shot was fired.  At this moment, Agent Matthews is in the correct position to fire this shot based on our trajectory alignment analysis. Agent Matthews is not in a position to fire the earlier shots as he was still moving into position when these were fired. While Agent Matthews is in a position to make shot four, the vehicle's minimal movement during the fifth shot indicates that Mr. Estrada had already been affected at the time shot five occurred.

**Perception Reaction Times**

Perception reaction time refers generally to the interval between the time when something is perceived and the time it takes to respond to the thing perceived. In working with Mr. Scott DeFoe we were able to provide the following 3D analysis to demonstrate what agents were perceiving shortly before firing upon Mr. Estrada:

1) Location of all agents in relation to Mr. Estrada's vehicle up to and during the OIS event.
2) The time of each shot fired, and which agent fired those shots.
3) Agent positions 1 to 1.5 seconds before they fired.

In working with Mr. Defoe, he indicated that the perception reaction times of these agents were in the 1.0 to 1.5 seconds window. Mr. DeFoe asked us to provide him with still images from our analysis to assist in his reconstruction.



*Figure 11: 1.5 seconds before shot One*



*Figure 12: 1.5 seconds before shot Two*

MSJ_282



*Figure 13: 1.5 seconds before shot Three*



*Figure 14: 1.5 seconds before shot Four*

MSJ_283



*Figure 15: 1.5 seconds before shot Five*

The exhibits attached to this report contain additional images displaying select moments in time before shots were fired.

**Vehicle Speeds**

Through our analysis of the security camera, and using the methodologies described throughout, including tracking the exact frame-by-frame movement of the Nissan, we were able to track the speed of Mr. Estrada's vehicle as it traveled through the property surrounding the gas station.

    1.     Driving forward on the grass while headed towards the curb near the entrance/exit

After jumping one curb shortly after entering the Circle-K parking lot, Mr. Estrada drove the Nissan forward across the grassy section of the Circle-K parking lot back towards the single entrance/exit of the parking lot. Our analysis revealed that while driving forward across the grass, Mr. Estrada reached a top speed of 24 mph. Mr. Estrada's speed markers are further shown in the animation that accompanies this report.

    2.     Reversing after hitting the curb

Our analysis further revealed that Mr. Estrada reached a top speed of 20.4 feet per second in reverse—approximately 13.9 MPH—while on the grass after hitting the curb near the entrance/exit of the Circle-K parking lot. As mentioned previously, at least at times while reversing, Mr. Estrada reached maximum acceleration based on the testing conducted by Mr. David Casteel.

19

3.      Accelerating Forward Before and As Shots Are Fired

After reversing to a stop, the Nissan sat still briefly before Estrada accelerated the Nissan forward. Our analysis revealed that Mr. Estrada reached a speed of 7.9 feet per second while driving forward before and as shots were fired (approximately 5.38 MPH). This means any agent within approximately  8 feet path of Mr. Estrada could be hit by his vehicle in a single second.

**Shell Casing Discharge**

Using the Sheriff's Department's shell casing ejection pattern test for Agent Godreau's firearm, combined with the laser scan technology and capabilities as described above, we were able to approximate the potential landing spot for the shell casings for Agent Godreau's discharges.



*Figure 18: Agent Godreau's Shell Casing Ejection*

**Conclusion and opinions**

After performing our entire analysis, based on the methodologies described herein, we developed the attached images and animation. Based on my experience and training, and the proper use of the methodologies described here, it is my opinion that the attached images and animation fairly and accurately depict the scene as it occurred.

In addition, beyond the analysis and conclusions reflected throughout this report above, based on a review of the cited materials and performing our entire analysis, the methodologies described herein, and my experience and training, it is my opinion that:

MSJ_285

1) Agent Godreau fired the first three shots into the windshield of Mr. Estrada's vehicle.
2) Agent Alba fired one shot through the rear passenger door window and struck Mr. Estrada in the neck.
3) Agent Matthews shot a round into the windshield of Mr. Estrada's vehicle.
4) Based on our 3D positioning of the vehicle and the agents along with our testing of the turning radius of an exemplar vehicle, Agent Godreau and Agent Patch was within the path of Mr. Estrada's vehicle during this OIS event.
5) Mr. Estrada reached an acceleration rate of 0.44g while reversing through the grass reaching speeds of 20.4 ft/second and forward acceleration right before shots were fired reached 0.44g and speed of 7.9 ft/second.
6) When the first shot was fired, Agent Godreau was approximately 3.5 feet from the front of Mr. Estrada's car.
7) When the first shot was fired, five agents were within 15 feet of Mr. Estrada's car, and a sixth agent was approximately 34 feet away

**IV. Cases I Have Testified on in The Last 8 Years**

1 Coates vs. Massmedia Inc. - San Francisco

2 Lafond vs Lafazia - Folsom County

3 People vs. Fletes - Monterey County

4 Whitmire vs. Caltrans - Contra Costa County

5 Cmiez vs. Caltrans - Eureka County

6 Mitchell vs. Pac Bell - San Francisco

7 Individual lawsuit vs. Vintage Property Management - Monterey County

8 Individual lawsuit vs. East Bay Mud - Alameda County

9 Kendra Staedler v Galu Realty - San Francisco

10 Stoll v CCSF - San Francisco

11 People v Jose Cortez - Ventura County

12 Resnansky v USA - San Francisco

MSJ_286

13 Dunn v CCSF - San Francisco

14 Culp v Western Pacific - San Francisco

15 People v Beamon - Solano County

16 McDermott v McDonalds - Bakersfield

17 People v Wilcox - Sacramento

18 People v Smock - Marin

19 Rodas v Caltrans - Fremont

20 Young Kim v SuperShuttle - San Francisco

21 Romero v Vallejo PD - Sacramento

22 People v Jose Flores - Ventura

23 Loberg v County of Lake - Lake County

24 People v. Xue Li - San Jose

25 People v Renfro - Idaho

26 Palmer v UC Regents - Monterey

27 Garza v Dole Foods - Watsonville

28 Pedro Aleman v. Long Beach Transit - Long Beach

29 Garcia v Green Waste - Santa Clara

30 People v Buchanan - South Lake Tahoe

31 People v Muzaffar - San Francisco

32 People v Jason Van Dyke - Chicago

33 Alcott v Shapiro - San Francisco

34 CCSF v Recology - San Francisco

35 Flowers v City of Richmond - Richmond

36 Gomez v CrisostoMid-Valley Disposal

37 Whitten v Sacramento River Cats - Sacramento

38 Austin v Nevarez - San Jose

MSJ_287

39 Nunez v City of San Jose - San Jose

40 Lewis v C.R. England - Sacramento

41 Sultan vs. State of California - Alameda County

42 Lollar v Hong - Santa Clara

43 People v Johnson - Ventura County

44 Alcott v Shapiro - San Francisco

45 Jones v coca Cola - Contra Costa County

46 Cruz Avilez v. City of Santa Monica - Santa Monica

47 Harris v CCSF - San Francisco

48 James Paradisco v. Yuilam Ho - Alameda County

49 Hennager v Silva - Santa Clara County

50 Hacopian v Kennedy - Redding County

51 People v Jason van Dyke - Cook County

52 State v Billings - Reno County

53 State v Boldi - Reno County

54 Economus v CCSF - San Francisco County

55 Hoang v. County of Santa Cruz - Santa Cruz County

56 State v Parker Billings Reno, Nevada

57 State v Trevor Boldi Reno, Nevada

58 Banks v BART Federal Court, Oakland, CA

59 Moon v City of Carlsbad Carlsbad, CA

60 Banks v BART Federal Court, Oakland, CA

61 US v Kieper Federal Court, San Diego, CA

62 Sommers v County of Santa Clara, Santa Clara, CA

63 Morris v Farvo, Martinez, CA

MSJ_288

_____

MSJ_289



MSJ-290

**Jason Fries Exhibit**



MSJ-291

**Jason Fries Exhibit**



MSJ-292

**Jason Fries Exhibit**



MSJ-293

**Jason Fries Exhibit**



MSJ-294

**Jason Fries Exhibit**



MSJ-295

**Jason Fries Exhibit**



MSJ-296

**Jason Fries Exhibit**



MSJ-297

**Jason Fries Exhibit**



MSJ-298

**Jason Fries Exhibit**



**Jason Fries Exhibit**



MSJ-300



MSJ-301

**Jason Fries Exhibit**



GREEN RING = 5 FEET

1.5 SECONDS BEFORE SHOT # 4

MSJ-302

**Jason Fries Exhibit**



MSJ-303

**Jason Fries Exhibit**

Estrada v. United States Rules 26 Report
Rebuttal to Specific Affirmative Opinions Set Forth in Mr. Stephen L Plourd's Rule 26 Report

I.      QUALIFICATIONS                              Friday, May 26th, 2023

My name is Jason Fries. I am CEO of 3D Forensic, Inc., located in San Francisco, California. I have worked in the fields of forensic animation, forensic laser scanning, forensic video analysis, laser-based photogrammetry, and scientific method for 25 years. I am an expert in the fields of forensic animation, 3D laser scanning, audio/video analysis, line of sight, laser-based photogrammetry, scientific method, and trajectory analysis. I have extensive training on Human Factors in use of force cases and testified in both state and federal as an expert in all fields mentioned above.

I have a degree in Biology with a focus on chemistry and physics for San Diego State University.

From 1997 to 2012, I worked in the fields of forensic animation, 3D laser scanning, audio/video analysis, and line of sight analysis at Precision Simulation Inc., located in Grass Valley, California. During those 15 years, I rose through the ranks, beginning my tenure as a forensic animator and ending my tenure as President of the organization.

From 2012 to the present, I have served as CEO of 3D Forensic, Inc., where I continue to be an expert in the areas mentioned above.

I have created over 3000 computer animations for use in trial and have worked on cases in 15 states, as well as outside the country in Japan and Costa Rica. I have spent over twenty years in the pursuit of forensic analysis and the use of forensic video reconstruction to reconstruct events involved in Officer-Involved-Shooting (OIS) incidents.

I have been admitted as an expert in the fields of video reconstruction, video analysis, line of site analysis, forensic laser scanning, forensic animation, Human Factors (Use of force), and Photogrammetry.

I am a member of the Society of Forensic Engineers and Scientists as well as the Forensic Expert Witness Association. I routinely lecture in the fields of forensic analysis at conferences all over the country and also guest lecture at Hastings School of Law.

I have been a trainer for members of MAIT, FBI, CHP as well as been a guest lecturer for Force Science Institute and CAARS as well as lecturer at Human Factors & Ergonomics Society.

My compensation is not dependent on the outcome of this litigation. I am compensated at the rate of $450.00 per hour for consulting services. I am paid at the rate of $775.00 per hour for deposition testimony and $775.00 per hour to testify in court.

I have qualified as an expert in forensic animation, 3D laser scanning, trajectory analysis, audio/video analysis, nighttime video analysis, line of sight analysis, and human factors involved in OIS incidents and laser-based photogrammetry.

**II. Review of Mr. Stephen Plourd's Report**

MSJ_304

On May 19th I was sent (via email) a copy of Mr. Plourd's report and was asked to review/analyze his results and opinions. This Rebuttal Report addresses Mr. Plourd's reconstruction of the shooting event that led to the death of Mr. Silvestre Estrada as well as assertions of the movement and positioning of the agents involved in the shooting event. Upon review of the plaintiff's expert's report none of my opinions or statements listed in my initial report have changed.  This rebuttal report is only to discuss specific statements made by Mr. Plourd in his report that were not directly addressed in my original report.

**Specifically, on page 5 of his report, Mr. Plourd states:**

**"Mr. Estrada stopped his vehicle and began to move forward turning left toward the fence, when three agents <u>ran in front of and to the side of his vehicle opened fire</u>, shooting a total of 5 times, one hitting Mr. Estrada."**

This factual recitation suggests that agents affirmatively ran in front of Mr. Estrada's vehicle as it was moving forward and then opened fire. Based on my review of the available video footage and laser scan analysis of the scene, including the placement of the agents at all times throughout the event, Mr. Plourd's statement above is incorrect.

In tracking the movement of the agents after Mr. Estrada started moving forward in the Nissan, the agents moved very little. They did not "run" to the front of the Nissan when it started moving forward. The exhibit below, previously provided as part of my initial report, demonstrates the movement of the agents, with Time 0 representing the moment in time Estrada first started accelerating the Nissan forward.



*Figure 1: Agent positions for the 1.5 seconds starting the moment Estrada starts to move the Nissan forward (until approx. .17 seconds before the first shot was fired).*

As this exhibit demonstrates, the agents were largely already in place when Estrada suddenly accelerated forward. In other words, contrary to Mr. Plourd's statement, agents did not "run" to the front and side of the vehicle after Estrada began to move the Nissan forward. .  At the moment Estrada started to move the Nissan forward the agent closest to the front of the vehicle was Agent Godreau, who was only approximately 12.4 feet away.  Over approximately the next 2 seconds, that gap closed to approximately 3 feet of distance, due primarily to Estrada's forward acceleration of the Nissan.

Second, at an even more basic level, considering the minimal movement of the agents during the pertinent time period, and based on a review of the surveillance footage, it cannot be said that they were "running" at all during the subject time period.

Accordingly, Mr. Plourd's statement identified above incorrectly describes the movement of the agents during this time period.

_____

## On-Scene Consulting

May 5, 2023

Mr. David B. Wallace, Esq.
United States Department of Justice
800 Front Street, Fourth Floor
San Diego, California 92101

### Federal Rules of Civil Procedure 26 (a) (2) (B) Report

**SILVESTRE ESTRADA, a minor by and through his proposed guardian ad litem EMILY PRIETO, OLGA TOVAR; FRANCISCO MADARIAGA; and JAIME MADARIAGA-GONZALEZ, Plaintiffs.**
**vs.**
**UNITED STATES OF AMERICA, and DOES 1-10, Defendants.**
**Case No. 22-cv-373-AJB (BGS).**

Dear Mr. Wallace,

Thank you for retaining me to analyze and render opinions regarding the May 14, 2021, shooting of Mr. Silvestre V. Estrada in the Circle-K parking lot located at 31471 State Route 94, Camp, California 91906, by United States Customs and Border Protection (CBP) Border Patrol Agents David Matthews (ID No. E345), Jason Alba (ID No. E161), and Robert Godreau, (ID No. E140). Pursuant to the requirements of Rule 26, I have conducted a site visit, studied reports, San Diego Sheriff's Department documents, United States Customs and Border Protection (CBP) documents, videos, Transcriptions of Depositions, and other material (as listed under Materials Reviewed) provided to me thus far regarding this case. Please be advised that if additional documents related to this matter are provided, it may be necessary to write a supplemental report to refine or express additional opinions.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

MSJ_307

## On-Scene Consulting

**Materials Reviewed:**

|     | DOCUMENTS | BATES # |
|-----|-----------|---------|
| 1.  | SAN DIEGO SHERIFFS DEPT-REPORT<br>SDCSD-Crim/Incident Report -Case No: 21149846 | ESTRADA-USAO-000001-000004 |
| 2.  | SAN DIEGO SHERIFFS DEPT-REPORT<br>SDCSD-Follow-Up Report Case Report | ESTRADA-USAO-000005-000007 |
| 3.  | SAN DIEGO SHERIFFS DEPT-REPORT<br>SDCSD- Follow-Up Investigation- Autopsy Report | ESTRADA-USAO-000008-000014 |
| 4.  | SAN DIEGO SHERIFFS DEPT-REPORT<br>SDCSD- Autopsy Report of Silvestre Vargas Estrada | ESTRADA-USAO-000014-000016 |
| 5.  | SAN DIEGO SHERIFFS DEPT-REPORT<br>SDCSD- Follow Up Report- Briefing and Scene | ESTRADA-USAO-000017-000031 |
| 6.  | SAN DIEGO SHERIFFS DEPT-REPORT<br>SDCSD- Follow-Up Investigative Report- Det. Dias | ESTRADA-USAO-000032-000037 |
| 7.  | SAN DIEGO SHERIFFS DEPT-REPORT<br>SDCSD- Follow-Up Report- Det. Gaines | ESTRADA-USAO-000038-000047 |
| 8.  | SAN DIEGO SHERIFFS DEPT-REPORT<br>SDCSD- Follow-Up Report- Det. Patterson | ESTRADA-USAO-000048-000052 |
| 9.  | SAN DIEGO SHERIFFS DEPT-REPORT<br>SDCSD-Follow-Up Report- Det. Patterson | ESTRADA-USAO-000053-000057 |
| 10. | SAN DIEGO SHERIFFS DEPT-REPORT<br>SDCSD- Follow-Up Report- Det. Powers | ESTRADA-USAO-000058 |
| 11. | SAN DIEGO SHERIFFS DEPT-REPORT<br>SDCSD- Follow-Up Report- Det. Powers | ESTRADA-USAO-000059-000076 |
| 12. | SAN DIEGO SHERIFFS DEPT-REPORT<br>SDCSD- Follow-Up Report- Det. Santiesteban | ESTRADA-USAO-000077-000078 |
| 13. | SAN DIEGO SHERIFFS DEPT-REPORT<br>SDCSD- Follow-Up Report- Det. Simpson | ESTRADA-USAO-000079-000087 |
| 14. | SAN DIEGO SHERIFFS DEPT-REPORT<br>SDCSD- Synopsis Report- Det. Powers | ESTRADA-USAO-0000888 |
| 15. | SAN DIEGO SHERIFFS DEPT-REPORT<br>SDCSD- Follow-Up Report- Vehicle Search/Processing Report – Det. Powers | ESTRADA-USAO-000089-000098 |

2

MSJ_308

On-Scene Consulting

| 16. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- REPORTS SDCSD-Statement of BPA- Alba dated 05-20-21 | ESTRADA-USAO-000099-000102 |
|---|---|---|
| 17. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- REPORTS SDCSD-Statement of BPA- Baker dated 05-15-21 | ESTRADA-USAO-000103-000106 |
| 18. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- REPORTS SDCSD-Statement of BPA- Delgado dated 05-15-21 | ESTRADA-USAO-000107-000112 |
| 19. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- REPORTS SDCSD-Statement of BPA- Gandara 05-15-21 | ESTRADA-USAO-000113-000115 |
| 21. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- REPORTS SDCSD-Statement of BPA- Godreau dated 05-20-21 | ESTRADA-USAO-000116-000122 |
| 22. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- REPORTS SDCSD-Statement of BPA- Heimerdinger dated 05-15-21 | ESTRADA-USAO-000123-000124 |
| 23. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- REPORTS SDCSD-Statement of BPA- Madriaga, Francisco dated 05-15-21 | ESTRADA-USAO-000125-000127 |
| 24. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- REPORTS SDCSD-Statement of BPA- Madriaga, Jaime dated 05-15-21 | ESTRADA-USAO-000128-000130 |
| 25. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- REPORTS SDCSD-Statement of BPA- Matthews dated 05-20-21 | ESTRADA-USAO-000131-000134 |
| 26. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- REPORTS SDCSD-Statement of BPA- Patch dated 05-15-21 | ESTRADA-USAO-000135-000138 |
| 27. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- REPORTS SDCSD-Statement of BPA- Perez dated 05-15-21 | ESTRADA-USAO-000139-000141 |
| 28. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- REPORTS SDCSD-Statement of CalFire Firefighter- Morales dated 06-03-21 | ESTRADA-USAO-000142-000143 |
| 29. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- REPORTS SDCSD-Statement of CalFire Firefighter- Jones dated 06-03-21 | ESTRADA-USAO-000144-000146 |
| 30. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- REPORTS SDCSD-Statement of EMT- Soriano dated 06-03-21 | ESTRADA-USAO-000147-000148 |
| 31. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- REPORTS SDCSD-Statement of Circle K employee- Christian Aguilar dated 05-15-21 | ESTRADA-USAO-000149-000151 |

On-Scene Consulting

| 32. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- REPORTS SDCSD-Statement of Circle K employee- Nicole Leon dated 05-15-21 | ESTRADA-USAO-000152-000153 |
|---|---|---|
| 33. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- REPORTS County of San Diego Medical Examiner's Report dated 05/16/21, including Toxicology | ESTRADA-USAO-000154-000170 |
| 34. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- REPORTS San Diego County Sheriff's Department- Patrol Deputy- DR- Deputy Campagna | ESTRADA-USAO-000171 |
| 35. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- REPORTS San Diego County Sheriff's Department- Patrol Deputy- DR- Deputy Ferris | ESTRADA-USAO-000172 |
| 36. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- REPORTS San Diego County Sheriff's Department- Patrol Deputy- DR- Deputy Gimeno | ESTRADA-USAO-000173 |
| 37. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- REPORTS San Diego County Sheriff's Department- Patrol Deputy- DR- Deputy Katrantzis | ESTRADA-USAO-000174-192 |
| 38. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- REPORTS San Diego County Sheriff's Department- Patrol Deputy- DR- Deputy Kelly | ESTRADA-USAO-000193 |
| 39. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- REPORTS San Diego County Sheriff's Department- Patrol Deputy- DR- Deputy Saelens | ESTRADA-USAO-000194 |
| 40. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- LAB REPORTS San Diego County Sheriff's Department- LAB REPORTS Event 1_Crime Scene Investigation (Chapin) | ESTRADA-USAO-000195-000210 |
| 41. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- LAB REPORTS San Diego County Sheriff's Department- LAB REPORTS Event 2_Crime Scene Investigation- (Sautlukis) | ESTRADA-USAO-000211-000215 |
| 42. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- LAB REPORTS San Diego County Sheriff's Department- LAB REPORTS Event 3_Subject Processing- (Robinson) | ESTRADA-USAO-000216-000243 |
| 43. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- LAB REPORTS San Diego County Sheriff's Department- LAB REPORTS Event 4_Crime Autopsy- (Chapin) | ESTRADA-USAO-000244-000257 |
| 44. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- LAB REPORTS San Diego County Sheriff's Department- LAB REPORTS Event 5_Crime Major Case Prints- (Martinez) | ESTRADA-USAO-000258-000260 |
| 45. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- LAB REPORTS San Diego County Sheriff's Department- LAB REPORTS Event 6_Crime Major Case Prints- (Pulverenti) | ESTRADA-USAO-000261-000262 |
| 46. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- LAB REPORTS San Diego County Sheriff's Department- LAB REPORTS Event 7_Autopsy (Hensley) | ESTRADA-USAO-000263-000264 |

MSJ_310

On-Scene Consulting

| 47. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- LAB REPORTS<br>San Diego County Sheriff's Department- LAB REPORTS<br>Event 8_Vehicle Processing (Chapin) | ESTRADA-USAO-000265-000277 |
|---|---|---|
| 48. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- LAB REPORTS<br>San Diego County Sheriff's Department- LAB REPORTS<br>Event 9_Vehicle Processing/Trajectory Analysis (Sautkulis) | ESTRADA-USAO-000278-000298 |
| 49. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- LAB REPORTS<br>San Diego County Sheriff's Department- LAB REPORTS<br>Weapons Operations/Cartridge & Bullet Exam 07/09/2021 | ESTRADA-USAO-000299-000304 |
| 50. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- LAB REQUESTS<br>San Diego County Sheriff's Department- PE Lab Request-Bullet examination) | ESTRADA-USAO-000305-000306 |
| 51. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- LAB REQUESTS<br>San Diego County Sheriff's Department- PE Lab Request-Cartridge examination) | ESTRADA-USAO-000307 |
| 52. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- LAB REQUESTS<br>San Diego County Sheriff's Department- PE Lab Request-Weapon Operations | ESTRADA-USAO-000308 |
| 53. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- MISC. DOCUMENTS<br>Administrative Documents/Notes/Diagrams/Cal Fire Run Sheets | ESTRADA-USAO-000309-000523 |
| 54. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- SEARCH WARRANT DOCUMENTS<br>San Diego County Sheriff's Department- Search Warrant re: Silver Nissan Altima License Plate #8RM551 | ESTRADA-USAO-000524-000559 |
| 55. | SAN DIEGO SHERIFFS DEPT-HOMICIDE- PHOTOGRAPHS<br>Photos taken or obtained by SD County Sheriff's Dept.<br>Agent Alba<br>Det. Patterson<br>Det. Simpson<br>Event-BPA Agents & Hospital<br>Event-Scene<br>Event- Autopsy<br>Event- Vehicle Processing<br>OIS Photos and Video<br>Scene 2Go | ESTRADA-USAO-000560-002085 |
| 56. | SDCSD- Video Files<br>Videos taken or obtained by SD County Sheriff's Dept.<br>002194-BWC (Patrol)<br>002195-Cameron Corner Store Video<br>002196- Cameron Corner Store<br>002197- Campo Green Store Video<br>002198- Circle K Store Video<br>002199- Dep. Katrantzis | ESTRADA-USAO-002086-002094 |

## On-Scene Consulting

|  | 002200- Dep. Simpson<br>002201 VAU Edited Video<br>002202- Witness Heimerdinger Cell Phone Video |  |
|---|---|---|
| 60. | SDCSD- Witness Phone Photos<br>0022-3- Christian Aguilar<br>002204-Matthew Delgado<br>002205- Kevin Gandara<br>002206- Nicole Leon | ESTRADA-<br>USAO-002095-<br>002098 |

|  | DESCRIPTION | BATES NO. |
|---|---|---|
| 61. | Video Clips of surveillance footage from Cameron Corners store | CH07_5015&<br>CH08_1824 |
| 62. | Video Clips of surveillance footage from Circle K store | CKcam13<br>CKcam13&16<br>CK cam 16<br>CK cam All |
| 63. | Deposition transcripts of Plaintiffs':<br>    a.  Jaime Madariaga dated 12/02/22.<br>    b.  Francisco Madariaga dated 12/01/22. |  |
| 64. | Deposition transcripts of Border Patrol Agents:<br>    a.  Jason Alba dated 01/13/23.<br>    b.  Christopher Baker dated 12/23/22.<br>    c.  Robert Godreau dated 12/20/22.<br>    d.  David Matthews dated 12/21/22.<br>    e.  Lou Patch dated 12/28/22.<br>    f.  Luis Perez dated 12/22/22. |  |
| 65. | Deposition transcripts of Eye Witnesses<br>    a.  Matthew Delgado dated 12/07/22.<br>    b.  Kevin Gandara dated 12/07/22.<br>    c.  Trent Heimerdinger dated 12/05/22.<br>    d.  Brian Moreno dated 12/12/22. |  |
| 66. | CBP Union Representative<br>Deposition transcript of Kristopher Whitworth dated 01/04/23 |  |
| 67. | Deposition transcripts of San Diego Sheriff's Department Investigators:<br>    a.  Deputy, Nikolaus Katrantzis dated 01/04/23.<br>    b.  Deputy, Robert Powers dated 01/03/23.<br>    c.  Deputy, Lauren Sautkulis dated 01/03/23. |  |

| 68. | Photos taken by BPA Jason Alba | ESTRADA-<br>USAO-<br>003084-00391 |
|---|---|---|
| 69. | Photos taken by SBPA Lou Patch | ESTRADA-<br>USAO-<br>003092-003093 |

On-Scene Consulting

| 70. | Photos and video taken by eye-witness Brian Moreno- produced by Plaintiff | |
|-----|-----------------------------------------------------------------------------|--|
| 71. | <u>Video</u> – Cameron Corners | ESTRADA-USAO 003080 |
| 72. | <u>Video</u>- Loading Vehicle- FTY | ESTRADA-USAO-003094 |
| 73. | Plaintiff's Responses to Request for Admissions | |
| 74. | Opinion dated March 31, 2020, <u>re</u>: <u>Monzon vs. City of Murrieta</u>, et al. | |
| 75. | CBP- Use of Force policy -4500-002a | ESTRADA-USAO-004394-004457 |
| 76. | CBP Directive re: Vehicle Pursuits (<u>redacted</u>) | ESTRADA-USAO-005231-005249 |
| 77. | Casteel Accident Reconstruction Report. | |
| 78. | 3D Forensic Report/Recreation & Slides. | |

**<u>Summary</u>**

The following statement summaries represent documents/statements that were used in part during my review but are in no way meant to be exhaustive. The documents listed in the <u>Materials Reviewed Section</u> of this report represent the full library of documents reviewed thus far and used as a basis for my opinions.

**<u>The below information is derived from San Diego Sheriff's Department, Follow-up Investigative Report, Officer-Involved Shooting, Case Number 211120434, Statement of Agent Robert Godreau, (ESTRADA-USAO-000116-000122):</u>**

**<u>Statement of Agent Robert Godreau</u>**

*"Agent Godreau was hired by the U.S. Border Patrol (<u>USBP</u>) on April 6, 2003, and has worked the following assignments:*
- *ATV Unit.*
- *Air-Mobile Unit.*
- *Smuggling Interdiction Group.*
- *K-9 Handler.*
- *D.A. Task Force.*
- *San Diego Sheriff's Department Task Force (<u>BCST</u>).*
- *Special Case Unit.*

7

On-Scene Consulting

- *Strike Team.*

*Agent Godreau does not wear eyeglasses and/or contact lenses.  He does not have any hearing loss and he is right handed.*

*Agent Godreau's Area of Responsibility (<u>AOR</u>) is from the 188 and Highway 94, (<u>Tecate Point of Entry</u>) to Buckman Springs Road and Highway 94.*

*On the day of the incident, May 14, 2021, Agent Godreau's call sign was E140.  He was driving a marked USBP patrol unit, but he did not recall the vehicle number.  Agent Godreau described the vehicle as being Chevy Tahoe with lights and sirens and decals around the vehicle that read "United States Border Patrol."  He was alone in his vehicle at the time of the incident and his vehicle does not have a dash camera.*

*On the night of the incident, May 14, 2021, Agent Godreau was in full USBP uniform, and he did not have a Body Worn Camera.  He was carrying OC spray, a baton and a taser.  He thought about transitioning to his "taser" the night of the incident, but he did not want the driver to step on the gas, get "stuck" in that position and then cause an accident.  He never attempted to use his OC spray.  Agent Godreau did not have a less lethal shotgun, pepper ball launcher, or a rifle.*

*Agent Godreau last qualified with his handgun last quarter, which covers in between January through March.*

*Agent Godreau described his department issued handgun as being Glock 47, (<u>9mm</u>). On the night of the incident, Agent Godreau had (<u>1</u>) round in the chamber and a full magazine.  Agent Goudreau was not carrying a backup or off-duty weapon.  Agent Godreau confirmed his department issued firearm that was seized by the Sheriff's Department personnel was the same firearm he used during the incident.  The ammunition in the firearm was department issued.  From the time Agent Godreau left the scene until the firearm was seized, it was not manipulated, and it was in Agent Godreau's possession the entire time.*

*Agent Godreau confirmed the photographs taken of him in uniform on the night side of the incident were accurate and depicted exactly what he was wearing at the time of the incident.*

MSJ_314

## On-Scene Consulting

*On the night of May 14, 2021, an agent from Brown Field Border Patrol Station relayed information over the radio that a vehicle had picked up some "illegal aliens." Additionally, the vehicle was traveling east bound on Highway 94 towards Agent Godreau's AOR.  Agent Godreau did not recall what time the radio traffic was broadcasted.*

*When Agent Godreau heard the radio transmission, he was at "Twin Towers." This area is known to USBP Agents and is located by two SDGE towers.  Agent Godreau drove to Bell Valley Truck Trail and Highway 94 to see if he could see the suspect's vehicle.  He met with Agent Chris Baker.  Agent Baker and Agent Godreau changed their position and moved to Volmer Lane and Highway 94, facing southbound.  Agent Godreau's saw a pick-up pass his location and he got on the radio and asked if the suspect's vehicle was a pick-up truck or sedan.  He was told it was a sedan.  No further details regarding the vehicle, (i.e., make or model) were provided.*

*A vehicle was traveling eastbound on Highway 94 passed Agent Godreau's location.  The vehicle was traveling at a low rate of speed and the windows were down.  Based on Agent Godreau's familiarity with the area, he knows people traveling through the area usually drive fast.  There is not a lot of law enforcement in the area.  People also usually drive with their windows down, due to the fact that the illegal aliens have bad body odor. Agent Godreau pointed out the fact that immigrants usually hike for days and go without bathing.*

*As the vehicle passed, Agent Godreau said he could see the driver and two passengers. One passenger was in the front passenger seat and one passenger was directly behind the front passenger seat.  Agent Godreau got behind the vehicle and conducted a license plate check, via USBP dispatch.  He also ran the license plate on his "ATAC" phone. The check revealed the vehicle was from Los Angeles and had one (1) crossing at a Border Patrol check point (Campo).  This information was important to Agent Godreau because a lot of locals have numerous check point crossings.  The vehicle having only one (1) checkpoint crossing is common with alien smuggling.*

*As Agent Godreau was following the vehicle, the driver would look at Agent Godreau through the rearview mirror and veer into the lane for oncoming traffic.  The rear passenger would occasionally look back at Godreau.  Based on the driver's actions, the information learned about the vehicle and the radio transmission from Brown Field, Agent Godreau decided to conduct a traffic stop on the vehicle.*

9

MSJ_315

## On-Scene Consulting

*Agent Godreau initiated the traffic stop at an area known to the USBP agents as the "sand piles," which is located near the Mountain Empire Campgrounds off Highway 94. He activated his overheard lights, but the vehicle did not stop. Agent Godreau activated his siren. The driver eventually turned on his hazard lights and proceeded through a series of curves. The vehicle pulled over at an area known to USBP agents as the "horse gate." Agent Godreau pulled behind the vehicle and waited for the driver to put the vehicle in park. Agent Godreau never saw the parking lights come on, so he waited thirty seconds in case he missed them. Agent Godreau put his vehicle in park and opened the door. Agent Baker was approaching Godreau's vehicle and Goudreau told Baker to get inside of his vehicle in case the driver took off. Baker complied and Agent Godreau approached the driver's side of the vehicle. The male driver yelled, "something inside of the vehicle" and the vehicle took off. Agent Godreau yelled to Agent Baker there as an "FTY" (failure to yield). **Agent Godreau notified USBP dispatch of the incident and began pursuing the vehicle eastbound on Highway 94.***

*Agent Godreau was unable to catch up to the vehicle. He mentioned the fact he knows the area very well and has been driving those same roads for eighteen years. **As Agent Godreau got closer to the vehicle, he could see the vehicle driving in lanes for oncoming traffic.** Agent Godreau provided dispatch with updates as to what the vehicle was doing and the speeds. **The speeds varied from forty miles per hour up to one-hundred miles per hour. On two occasions the driver lost control of the vehicle and almost crashed into an embankment.** Agent Godreau eventually got within seven to ten car lengths of the vehicle, as they were passing the "Cable Road" on Highway 94. **The driver stepped on the brakes and began "brake checking," Agent Godreau. This happened for a while. Agent Godreau requested a unit with spike strips to go to "Star Ranch," and spike the vehicle, to end the pursuit.** Agent Godreau believes a unit was heading that way but did not make it in time. As Agent Godreau and the vehicle passed Forrest Gate Road, the vehicle slowed down to about twenty miles per hour. The vehicle passed a USBP vehicle and proceeded eastbound past the Camp Green Store. There were two USBP vehicles that were traveling eastbound at about twenty or thirty miles per hour. The vehicle sped up and passed the USBP vehicles on a blind curve. The road straightened out and Agent Godreau was able to see down the roadway. He passed the USBP vehicles and continued to pursue the vehicle.*

*The driver arrived at Circle K and entered the parking lot. Agent Godreau followed. At this point, Agent Godreau believed the driver was going to "give up" since there was nowhere to go. The vehicle drove towards the gas pumps and then sped up. Agent Godreau followed the vehicle to the west side of the parking lot. The driver arrived at the*

MSJ_316

On-Scene Consulting

*end of the parking lot and slowed down to almost a complete stop.  again, Godreau once again believed the driver was going to give up.  **He pulled behind the vehicle**.  The vehicle drove over a curb next to a propane tank.  Agent Godreau made a U-turn and drove eastbound through the parking lot.  The driver of the vehicle was speeding and traveling eastbound on the dirt between Highway 94 and the gas pumps.  Agent Godreau also mentioned a barbed fence that was near Highway 94.  As the vehicle made it to the driveway of the Circle K, the driver hit a curb "pretty hard."  **Agent Godreau parked the back end of his vehicle in front of the suspect's vehicle.**  He believed the pursuit was over.*

***After the vehicle hit the curb, Agent Godreau exited his vehicle and drew his weapon****.  ****He approached the vehicle and gave several commands for the driver to "put his hands up."*** *As Agent Godreau was giving commands, the vehicle began reversing "pretty fast," towards another agent who was possibly in a truck.  The agent was driving forward and stopped.  The suspect stopped as well.  Agent Godreau continued to approach the vehicle on foot.  There were other agents on foot on the southside of Highway 94, which was the same location where the incident was occurring.  All of the agents were yelling commands such as, "Stop.  Put your hands up." Once again, Agent Godreau believed the driver was now going to give up.  Agent Godreau thought about transitioning to his taser but then realized he did not want to tase someone who was driving.  Additionally, it is against USBP policy.  Agent Godreau was getting ready to holster his weapon and remove the driver from the vehicle.  **Agent Godreau then heard the vehicle revving and it "took off towards" him.  He "quickly started aiming and started shooting." The vehicle veered off to the north.  Agent Godreau believed he fired two rounds.  He fired the rounds because he believed it would make the driver release the accelerator.***

*He requested Paramedics to respond.  Agent Godreau was asked what his thoughts and feelings were at the time of the shooting.  **He immediately responded, "I thought I was gonna die."  He also believed he was going to end up underneath the vehicle.  Agent Godreau also believed the other agents on foot were going to get hit by the vehicle.  The only option for him was to fire.  At this point, the driver had put the passengers in his vehicle in danger and he put everyone else involved in danger.***

*Agent Godreau was asked about the distance between him and the vehicle at the time the vehicle started driving towards him.  He believes he was approximately ten feet away from the vehicle.  Agent Godreau also believes the other agents on foot were also approximately ten feet away.  Agent Godreau mentioned a small tree being in the vicinity.  He went on to say he had seen what a vehicle can do to a small tree, and he did not trust*

11

On-Scene Consulting

it.  As far as Agent Godreau moving in a different direction, he believed the vehicle would have followed him.  **Based on the short distance between him and the vehicle and the speed at which it was approaching, Agent Godreau did not believe he had time to get out of the way.  Agent Godreau believes that firing at the driver caused the driver to steer away from him.  Had Agent Godreau not fired at the driver, he believes the vehicle would have struck him.**

Agent Godreau felt his partners were in danger due to the fact they were all surrounding the vehicle.  There were also agents on the other side of the fence.  He felt the driver could have struck him or any of his partners.

Agent Godreau reiterated the only reason he approached the vehicle was because he believed the driver was going to surrender.  He went to talk about how smugglers usually give up once they know they cannot get away.

As soon as he fired at the vehicle it turned "right away" and Agent Godreau stopped firing.  The two rounds fired by the other agents occurred right after, or at the same time, as Agent Godreau fired his second round.  By the time the last round was fired the vehicle came to a complete stop.

When Agent Godreau fired the rounds, he was directly in front of the vehicle, and he was aiming at the driver.  He was able to see the driver's silhouette because of the lights from the USBP vehicle that was behind the driver."

**The below information is derived from San Diego Sheriff's Department, Follow-up Investigative Report, Officer-Involved Shooting, Case Number 211120434, Statement of Agent David Matthews, (ESTRADA-USAO-000131-000134):**

### Statement of Agent David Matthews

"Agent Matthews said he was the only occupant of a marked BP Jeep Wrangler, (_unknown vehicle number_) which was painted white and green with Border Patrol written on the body, a lightbar and sirens.  At the time of the incident, Agent Matthews said he was wearing BP boots, green cargo pants, a green button-down long-sleeved shirt with BP patches, a ballcap with "Border Patrol" written on it, a green external ballistic vest, and a duty belt.  Affixed to Agent Matthews' ballistic vest was his radio, microphone, binoculars, gloves, a flashlight, and a screwdriver.  Affixed to Agent Matthews duty belt was his Glock 47 9mm issued handgun in a holster, two additional loaded handgun

On-Scene Consulting

*magazines, zip tie clips, a baton, handcuffs, OC spray, a hat clip, and a multi-tool.  Agent Matthews did not have a backup gun, conducted energy device (<u>commonly known as a Taser</u>), pepper ball launcher, shotgun, or a rifle during the incident.  Agent Matthews said he always fully loads his magazines and after inserting a fully loaded magazine into his issued handgun and chambering a round, he adds a round to the inserted magazine, so it is full.*

*The pursuit continued eastbound, and Agent Matthews saw BP units and the suspect vehicle in the Circle K gas station.  Agent Matthews pulled his vehicle onto the south shoulder of State Route CA-94 approximately in line with the gas price sign for the Circle K gas station.  The suspect vehicle was in the grass and dirt area of the Circle K gas station facing east.*
*Agent Matthews exited his vehicle and yelled to the suspect driver, "Get out of your vehicle!"  He recalled that the suspect's driver's window was down, and Agent Matthews clearly saw the suspect driver's face.  When he yelled at the suspect driver to get out of the car, the suspect acted as if no one was there and hit the accelerator driving east in the grass and dirt of Circle K gas station.*

*Agent Matthews returned to his vehicle to "secure" (<u>or block</u>) the Circle K entrance, but another BP vehicle was already in place, so he parked on the south shoulder again.  He immediately exited and ran to the back of his vehicle.  He observed the suspect vehicle facing east with two BP agents on foot approaching the suspect from the east.*

***He heard the engine "rev" loudly and believed the suspect vehicle was going to move forward at a high rate of speed based on sound.  He saw the suspect vehicle start to move forward.  Agent Matthews heard gunfire and saw the suspect vehicle wheels turn facing him.  After the wheels turned towards him, he could still clearly see the driver's head and hands on the wheel.  Between Agent Matthews and the suspect vehicle was a thin, rusted wire fence which Agent Matthews did not believe would stop the suspect vehicle from hitting him.  He was frightened and believed he was going to be severely injured, and that the suspect's vehicle was going to hit him.*** *Agent Matthews believed he fired one round at the driver of the vehicle.*  ***He feared for his life and his partner's lives when he fired one round at the driver.  He believed that his only option to avoid injury or death was to use lethal force.  After firing a round, Agent Matthews observed the suspect driver's head slump down and his chin lower to his chest.*** *He did not see where his round hit; however, he believed it might be on the driver's side back passenger door.*

13

MSJ_319

On-Scene Consulting

**The below information is derived from San Diego Sheriff's Department, Follow-up Investigative Report, Officer-Involved Shooting, Case Number 211120434, Statement of Agent Jason Alba, (ESTRADA-USAO-000099-000102):**

### Statement of Agent Jason Alba

*"Agent Alba was driving a marked Border Patrol vehicle, a Chevrolet Tahoe. The vehicle is equipped with green Border Patrol stickers, emergency lights and sirens. Alba was the sole occupant of the vehicle during the incident. His vehicle is not equipped with a dash camera.*

*Agent Alba wore a dark green uniform with an external green vest. Agent Alba described it as a "rough duty" uniform with a green shirt, green pants, and black boots. His shirt and vest have patches with the Border Patrol insignia on them. Agent Alba is not equipped with a body worn camera.*

*Agent Alba was equipped with a collapsible steel baton and a CED (Conductive Energy Device). Agent Alba was equipped with a rifle, on "hot standby" which is an empty chamber with the charging handle forward and a fully loaded magazine inserted. The last time he qualified with his firearm was approximately "a couple" of months ago. Agent Alba was equipped with a Glock 19 that he used during the incident. His handgun was "topped off," meaning a full magazine with a "round in the chamber." There were 15 cartridges in the magazine and 1 in the chamber. Agent Alba had no other firearms with him during the incident.*

*On Friday, May 14, 2021, at approximately 2210 hours, Agent Alba heard a radio transmission of a "load vehicle" described as a silver sedan. Two possible illegal aliens had reportedly climbed inside a vehicle. A description of the vehicle was provided over the radio and that it was traveling eastbound on SR-94.*

*A couple minutes later, Agent Godreau broadcasted he had the suspect vehicle and was attempting to conduct a traffic stop near Mountain Empire Campground. Shortly after, Agent Godreau broadcasted the suspect had failed to yield and they were in pursuit. Agent Godreau began calling out landmarks during the pursuit as he was eastbound on SR-94.* **Agent Godreau broadcasted the suspect vehicle was swerving and hitting objects***.*

*Agent Alba headed to SR-94 while traveling along Forest Gate Road. He pulled out onto SR-94 ahead of the pursuit and drove eastbound at about 40 miles per hour to pace the suspect. Agent Alba thought since he had pulled in front of the suspect vehicle, it would*

14

On-Scene Consulting

give the driver pause and make him think about pulling over.  **The suspect passed him on the left side of the road.**  Agent Godreau continued as the lead and Agent Alba fell in behind him.  Agent Alba activated his lights and followed the pursuit.

The suspect pulled into the Circle K gas station which is just off SR-94.  The suspect pulled into the southwest corner and stopped for a moment.  **The suspect conducted a U-Turn and went around Agent Alba and Agent Godreau, driving at a high rate of speed in the field area.**  The suspect crashed into a curb and came to a stop.  The suspect backed up his vehicle as Agent Alba parked and exited his vehicle.  The suspect vehicle came to a stop before he could hit Agent Perez who was behind the silver sedan.  Agent Alba approached the vehicle on foot on the passenger side.  Agent Godreau exited his vehicle and ran west through the field, in front of the vehicle.  **Agent Alba gave numerous commands for the driver to stop, the driver continued looking around and making movements inside the vehicle.**

**Agent Alba heard the engine "rev," and the vehicle began accelerating.  The vehicle "lurched a little bit," Agent Alba sidestepped, heard two gunshots from his right side and fired one shot at the driver.**  Agent Alba stooped and assessed; he could no longer hear the "rev" of the engine.  He saw the driver was no longer holding the steering wheel and was slumped in his seat.  He assumed he'd given up and began giving commands to the driver not to move.

Agent Alba removed the front and back passengers from their seats, handing them off to other agents to be detained in Border Patrol vehicles.

Agent Alba entered the vehicle through the front passenger side and proceeded to start searching the driver for weapons.  **He removed a knife from the driver's front right pants pocket and placed it on top of the vehicle.**  Agent Alba checked him for injuries but did not observe any.  He walked around the vehicle and began checking on the driver who was awake and breathing but unresponsive.  Upon returning to the passenger side, Agent Alba noted a "wound" to the driver's back-shoulder area.  Agent Alba was told "EMS" <u>(Emergency Medical Services</u>) was on their way to tend to the driver.

**During the incident, Agent Alba feared for Agent Godreau's life.  The vehicle was about to run over Agent Godreau who was in front of the vehicle when the driver put it in drive and lurched forward.  Agent Alba chose to use his firearm "based on the threat."  He did not consider any other force options as they would not have been effective."**

15

On-Scene Consulting

**Opinions:**

Note:  None of my opinions are intended to usurp the province of the jury and are not stated as ultimate issues.

### Opinion Number 1

It is my opinion based on my review of the facts, testimony, United States Customs and Border Protection (CBP) policies, United States Customs and Border Protection (CBP) Border Patrol Agent Robert Godreau, (ID No. E140), had Reasonable Suspicion based on the totality of the circumstances to conduct an Investigative Vehicle Stop of the four-door 2020 Nissan Altima, California License Plate: 8RAM551, on May 14, 2021, driven by Mr. Silvestre V. Estrada.

Reasonable suspicion is when a law enforcement officer has enough facts and circumstances present to make it reasonable to suspect that criminal activity is occurring, and the person detained is connected to that activity.  Reasonable suspicion may be based on observation, personal training and experience, or other information from eyewitnesses, victims, or other officers, (totality of the circumstances).

Some factors contribute to establishing reasonable suspicion are:
- Actions.
- Driving Behavior.
- Time of Day.
- Location of the Vehicle Stop, (known criminal activity in that area).
- Agent training and experience, (modus operandi, expertise in certain areas such as alien smuggling).

Conducting a vehicle pullover can be one of the most dangerous duties a Law Enforcement Officer can perform.  Violent acts that have taken place during a vehicle pullover are among the leading causes of officer injuries and death.

As a general rule, risk assessment refers to the level of anticipated risk involved with any vehicle pullover based on the Law Enforcement Officer's perception of danger due to a suspect's conduct, or advance knowledge.  This knowledge may come from sources such as, but not limited to:
- The Law Enforcement Officer's personal observations.
- Information from Dispatch.
- Information obtained by running the vehicle's license plate.
- Number of occupants in the vehicle.

16

MSJ_322

On-Scene Consulting

- Availability of assistance/back-up units, or
- Other means the Law Enforcement Officer may reasonably rely upon, e.g., training and experience, other Agent observations, modus operandi, and criminal information bulletins.

**Investigative Pullovers**:
- An expectation that the pullover involves less risk than a "high-risk" pullover, but more than a traffic enforcement pullover.
- Reason to believe that one or more of the vehicle's occupants has engaged, or is about to engage, in criminal activity.
- An expectation that the pullover would involve an investigation that might lead to a custodial arrest for a violation of the Vehicle Code, the Penal Code or other statute.

In addition, I base my opinion on the following facts and testimony:
- According to Mr. Jaime Madariaga-Gonzalez, when the police cars started following our vehicle, he sped up fast, (ESTRADA-USAO-003458).
- According to Border Patrol Agent Robert Godreau, he heard a Border Patrol Agent for the Brown Field Station put out over the El Cajon Station radio frequency that there was a vehicle that loaded (2) possible illegal aliens into a vehicle and the vehicle was heading towards Campo, (Deposition Transcript of Robert Godreau, Pages 21-22).
- According to Border Patrol Agent Robert Godreau, Agent Chris Baker came to back him up and pulled his vehicle behind Agent Robert Godreau's, (Deposition Transcript of Robert Godreau, Page 26).

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I have been involved in thousands of vehicle pursuits and vehicle pullovers (Traffic Enforcement/Investigative/High-Risk Pullovers), as Primary Officer, Secondary Officer, and a Supervisor.  In addition, I have received and provided training on Pursuit Policy, Pursuit Tactics, Post-Pursuit Tactics and Containment.  In addition, I have conducted over (50) Vehicle Pursuit Investigations during my last 14 years as a Supervisor with the Los Angeles Police Department.  In addition, as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon, I responded to hundreds of Vehicle Pursuits throughout all geographical patrol divisions to assist with containment, perimeter tactics and ultimately K9 searches.

17

MSJ_323

On-Scene Consulting

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 2

It is my opinion based on my review of the facts, testimony, United States Customs and Border Protection (<u>CBP</u>) policies, United States Customs and Border Protection (<u>CBP</u>) Border Patrol Agent Robert Godreau, (<u>ID No. E140</u>), made a prudent tactical and reasonably objective decision to <u>initiate</u> a vehicle pursuit of the four-door 2020 Nissan Altima, California License Plate: <u>8RAM551</u>, driven by Mr. Silvestre V. Estrada that contained (<u>2</u>) additional occupants based on Mr. Silvestre V. Estrada's <u>Failure to Yield</u>.

In addition, Border Patrol Agent Chris Baker, (<u>ID No. E169</u>), arrived and was present at the time Border Patrol Agent Robert Godreau made the decision to pursue the four-door 2020 Nissan Altima, California License Plate: <u>8RAM551</u>, driven by Mr. Silvestre V. Estrada.

In addition, Border Patrol Agent Robert Godreau responded as trained and immediately notified United States Border Patrol Dispatch of the incident and began pursuing the four-door 2020 Nissan Altima, California License Plate: <u>8RAM551</u>, driven by Mr. Silvestre V. Estrada eastbound on Highway 94.

In addition, Border Patrol Agent Robert Godreau complied with <u>Department of Homeland Security, U.S. Customs and Border Protection, Directive, Directive No. 4510-26, Effective Date: 1/16/2021, Emergency Driving Including Vehicular Pursuits by U.S. Customs and Border Protection Personnel.</u>

2. <u>POLICY</u>

<u>2.1:</u>  It is CBP policy that CBP Officers/Agents, may engage in and continue emergency driving, including a vehicle pursuit, only when and for as long as the Officer/Agent determines that the law enforcement benefit and need for emergency driving outweighs the immediate danger created by such emergency driving.

<u>5.18:</u>  <u>REASONABLE TIME</u>: Based on the circumstances, the amount of time that would be considered reasonable for a person to yield to the activation of emergency warning lights by an Officer/Agent.

MSJ_324

On-Scene Consulting

7.4: VEHICLE PURSUIT DRIVING PROCEDURES:

A. Procedures:

(1). A vehicle pursuit is authorized where there is reasonable suspicion to believe the occupant(s) of the vehicle failed to stop at an immigration checkpoint, failed to yield to an Officer's/Agent's attempt to stop a vehicle for an underlying violation of law, or committed vehicle incursion into the United States at or between a POE and both the Officer/Agent and the pursuit supervisor have determined that the law enforcement benefit of the vehicle pursuit outweighs the risk to the public and supervisory approval is granted on a continuing basis, subject to the evolving state of conditions of the pursuit.

Officers/Agents may initiate a vehicle pursuit prior to receiving supervisory approval but will communicate to a supervisor they have initiated such pursuit as soon as practical.

7.5: VEHICLE PURSUIT DRIVING REPORTING REQUIREMENTS:

A. Primary Unit Responsibilities: Upon deciding to initiate a vehicle pursuit of a vehicle that has failed to yield, the initiating Officer/Agent will immediately notify the appropriate communication center that he/she has initiated a vehicle pursuit and provide continual updates with the following details as soon as practical:

(1). Identification of the CBP unit initiating the pursuit, (one or two person unit).

(2). Location, speed, and direction of travel.

(3). Vehicle description and license plate number and state, if known.

(4). The reason/justification for the pursuit, (suspected violation).

(5). Number of visible occupants, including the identity or description of any known occupants and/or driver.

(6). Any pertinent information concerning firearms, threat, force, or other adverse hazards, including weather and road conditions.

(7). Involvement of other agencies.

MSJ_325

On-Scene Consulting

(8).  Any actions observed during the pursuit including, but not limited to, items expelled or persons exiting the pursued vehicle.

In addition, I base my opinion on the following facts and testimony:
- According to Mr. Francisco Madariaga-Gonzalez, when the officer was approaching the driver fled, putting us at risk, he fled at high rate of speed, (ESTRADA-USAO 003488).
- According to Mr. Francisco Madariaga-Gonzalez, when the driver saw the Immigration Agent, he sped away trying to escape, (Deposition Transcript of Mr. Francisco Madariaga Gonzalez, Page 61).
- According to Border Patrol Agent Robert Godreau, the road of the pursuit is very windy, (Deposition Transcript of Robert Godreau, Page 26).
- According to Border Patrol Agent Robert Godreau, he agrees the driver of the Nissan put his life and the life of the occupants at risk, (Deposition Transcript of Robert Godreau, Pages 29-30).

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I have been involved in thousands of vehicle pursuits and vehicle pullovers (Traffic Enforcement/Investigative/High-Risk Pullovers), as Primary Officer, Secondary Officer, and a Supervisor.  In addition, I have received and provided training on Pursuit Policy, Pursuit Tactics, Post-Pursuit Tactics and Containment.  In addition, I have conducted over (50) Vehicle Pursuit Investigations during my last 14 years as a Supervisor with the Los Angeles Police Department.  In addition, as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon, I responded to hundreds of Vehicle Pursuits throughout all geographical patrol divisions to assist with containment, perimeter tactics and ultimately K9 searches.

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 3
It is my opinion based on my review of the facts, testimony, United States Customs and Border Protection (CBP) policies, United States Customs and Border Protection (CBP) Border Patrol Agent Robert Godreau, (ID No. E140), made a prudent tactical and reasonably objective decision to continue the vehicle pursuit of the four-door 2020 Nissan Altima, California License Plate, 8RAM551, driven by Mr. Silvestre V. Estrada that contained (2) additional occupants based on Mr. Silvestre V. Estrada's initial Failure

## On-Scene Consulting

to Yield and the numerous traffic violations and felonies that were committed during the pursuit.

It is my opinion based on my review of the facts, testimony Mr. Silvestre V. Estrada violated Title 8, U.S.C. 1324(a)(1)(A)(ii)-Domestic Transporting when he picked up (loaded) Mr. Jaime Madariaga-Gonzalez and Mr. Francisco Madariaga-Gonzalez in his four-door 2020 Nissan Altima, California License Plate: 8RAM551, on May 14, 2021.

Title 8, U.S.C. 1324(a)(1)(A)(ii)-Domestic Transporting: makes it an offense for any person who-knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such an alien within the United States by means of transportation or otherwise, in furtherance of such violation of law.

In addition, it is my opinion Border Patrol Agent Robert Godreau made an appropriate decision by requesting a Border Patrol Agent to respond to respond to Star Ranch with Vehicle Immobilization Device (VID), "Spike Strips," after Mr. Silvestre V. Estrada conducted "**brake checks.**" The violent action of conducting "brake checks" could have caused Border Patrol Agent Robert Godreau and other involved Border Patrol Agents to lose control of their police vehicle(s) and become involved in collision that could have resulted in Great Bodily Injury or death to the involved Border Patrol Agents and or Mr. Jaime Madariaga-Gonzalez and Mr. Francisco Madariaga-Gonzalez.

In addition, it is my opinion based on the aforementioned actions of Mr. Silvestre V. Estrada "brake checking" Border Patrol Agent Robert Godreau, there was Probable Cause to Arrest Mr. Silvestre V. Estrada for 245(a)(1), California Penal Code, Assault with a Deadly Weapon: Any person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm shall be punished by imprisonment in the state prison for two, three, or four years.

In addition, it is my opinion based on my review of the facts and testimony in this matter, there was Probable Cause to Arrest Mr. Silvestre V. Estrada for 1907 Title 8, U.S.C. 1324(a)(1)(A)(ii)-Domestic Transporting, 245(a)(1), Assault with a Deadly Weapon and the below listed violations of law:

I. 2800.2(b), California Vehicle Code, (CVC): For purposes of this section, a willful or wanton disregard for the safety of persons or property includes, but is not limited to, driving while fleeing or attempting to elude a pursuing peace officer during which time

MSJ_327

## On-Scene Consulting

either three of more violations that are assigned a traffic violation point count under Section 12810 occur, or damage to property occurs.

II.  22348 (b), California Vehicle Code, (CVC): A person who drives a vehicle upon a highway at a speed greater than 100 miles per hour is guilty of an infraction.

III.  23103 (a), California Vehicle Code, (CVC): A person who drives a vehicle upon a highway in willful or wanton disregard for the safety of persons or property is guilty of reckless driving.

IV.  22107, California Vehicle Code, (CVC): No person shall turn a vehicle from a direct course or move right or left upon a roadway until such movement can be made with reasonable safety and then only after giving of an appropriate signal in the manner provided in this chapter in the event any other vehicle may be affected by the movement.

V.  22350, California Vehicle Code, (CVC): Prohibits driving a vehicle at a speed that is not reasonable and prudent, (unsafe) for the prevailing conditions, when doing so endangers the safety of people or property.

In addition, it is my opinion based on the high rate of speed and manner Mr. Silvestre V. Estrada was operating the four-door 2020 Nissan Altima, California License Plate, 8RAM551, a reasonable Law Enforcement Officer could believe that he was operating the vehicle under the influence of a controlled substance or alcohol.  The National Highway Traffic Safety Administration estimates that approximately half of all fatal collisions involve the use of alcohol and/or drugs.  Because of the gravity of the problem, enforcing laws against impaired driving is an important responsibility of a Law Enforcement Officer.

A Law Enforcement Officer has the responsibility to stop any driver operating a vehicle in a manner that raises doubt to the driver's sobriety, and ascertain the cause of the erratic driving, or other abnormal conditions.

Once the Law Enforcement Officer has detained the driver, Reasonable Suspicion of driving under the influence may develop into Probable Cause to Arrest as a result of questioning the driver, closer observation and administering Field Sobriety Tests.

MSJ_328

## On-Scene Consulting

Examples of deviations from normal driving that a Law Enforcement Officer may observe include <u>but are not limited to</u>:

I.  <u>Movement</u>:
- Weaving
- Swerving
- Drifting
- Turning with wide radius
- Turning abruptly or illegally
- Striking or almost striking an object or another vehicle
- Driving into opposing or crossing traffic.

II.  <u>Speed</u>:
- Low speed
- Stopping, (<u>without cause</u>) in a traffic lane
- Accelerating and decelerating rapidly
- Stopping inappropriately
- Braking erratically.

III.  <u>Position</u>:
- Straddling center or lane marker
- Driving on other designated roadway, (<u>e.g., shoulder</u>)
- Tires on center lane marker
- Following too closely.

IV.  <u>Driver Action</u>:
- Appearing to be impaired
- Driving with headlights off.
- Slowly responding to traffic signals
- Signaling is inconsistent with driving actions.

<u>In addition, I base my opinion on the following facts and testimony</u>:
- According to Mr. Francisco Madariaga Gonzalez, he felt the driver was driving dangerously during the <u>15-20 minute pursuit</u>, (<u>Deposition Transcript of Mr. Francisco Madariaga Gonzalez, Page 72</u>).

MSJ_329

On-Scene Consulting

- According to Border Patrol Agent Robert Godreau, the driver of the Nissan would "brake check" him during the pursuit, (Deposition Transcript of Robert Godreau, Page 33).
- Toxicology revealed Mr. Silvestre V. Estrada, tested positive for Methamphetamine, (0.72 mg/ml), (ESTRADA-USAO-000154-000170).

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I have been involved in thousands of vehicle pursuits and vehicle pullovers (Traffic Enforcement/Investigative/High-Risk Pullovers), as Primary Officer, Secondary Officer, and a Supervisor.  In addition, I have received and provided training on Pursuit Policy, Pursuit Tactics, Post-Pursuit Tactics and Containment.  In addition, I have conducted over (50) Vehicle Pursuit Investigations during my last 14 years as a Supervisor with the Los Angeles Police Department.  In addition, as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon, I responded to hundreds of Vehicle Pursuits throughout all geographical patrol divisions to assist with containment, perimeter tactics and ultimately K9 searches.  In addition, I base my opinion during my tenure with the Los Angeles Police Department when I was a certified and court qualified Drug Recognition Expert, (DRE).

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

**Opinion Number 4**

It is my opinion based on my review of the facts, testimony, United States Customs and Border Protection (CBP) policies, United States Customs and Border Protection (CBP) Border Patrol Agents David Matthews (ID No. E345), Jason Alba (ID No. E161), Robert Godreau, (ID No. E140), and other involved Border Patrol Agents, demonstrated discipline, outstanding driving skills, proper training, maturity and did not allow human factors, (Physiological & Psychological Factors) to cause them to overreact during the vehicle pursuit of the four-door 2020 Nissan Altima, California License Plate, 8RAM551, driven by Mr. Silvestre V. Estrada.

In addition, it is my opinion United States Customs and Border Protection (CBP) Supervisory Border Patrol Agent Jose "Lou" Patch effectively monitored and responded to the pursuit to provide supervisory oversight.

24

On-Scene Consulting

In addition, it is my opinion, Supervisory Border Patrol Agent Jose "Lou" Patch complied with <u>Department of Homeland Security, U.S. Customs and Border Protection, Directive, Directive No. 4510-26, Effective Date: 1/16/2021, Emergency Driving Including Vehicular Pursuits by U.S. Customs and Border Protection Personnel:</u>

<u>7.5</u>:  <u>VEHICLE PURSUIT DRIVING REPORTING REQUIREMENTS</u>:

B.  <u>Supervisory Approval</u>:

(<u>1</u>).  Officers/Agents shall constantly evaluate and regularly communicate vehicle pursuit conditions, when operationally feasible.

(<u>2</u>).  Officers/Agents will notify a supervisor upon witnessing a suspect vehicle committing any dangerous traffic violations during a vehicle pursuit as soon as safely possible.  Supervisory approval is required to continue the vehicle pursuit after such actions have been witnessed.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I have been involved in thousands of vehicle pursuits and vehicle pullovers (<u>Traffic Enforcement/Investigative/High-Risk Pullovers</u>), as Primary Officer, Secondary Officer, and a Supervisor.  In addition, I have received and provided training on Pursuit Policy, Pursuit Tactics, Post-Pursuit Tactics and Containment.  In addition, I have conducted over (<u>50</u>) Vehicle Pursuit Investigations during my last 14 years as a Supervisor with the Los Angeles Police Department.  In addition, as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon, I responded to hundreds of Vehicle Pursuits throughout all geographical patrol divisions to assist with containment, perimeter tactics and ultimately K9 searches.

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## **Opinion Number 5**

It is my opinion based on my review of the facts, testimony, United States Customs and Border Protection (<u>CBP</u>) policies, United States Customs and Border Protection (<u>CBP</u>) Border Patrol Agents David Matthews (<u>ID No. E345</u>), Jason Alba (<u>ID No. E161</u>), Robert Godreau, (<u>ID No. E140</u>), and other involved Border Patrol Agents, utilized effective tactics to contain the four-door 2020 Nissan Altima, California License Plate, <u>8RAM551</u>,

MSJ_331

On-Scene Consulting

driven by Mr. Silvestre V. Estrada that contained (2) additional occupants, when they entered the Circle-K parking lot located at 31471 State Route 94, Camp, California 91906.

Based on my review of the facts, videos and testimony in this matter, the involved Border Patrol Agents immediately blocked ingress and egress into the location to prevent the four-door 2020 Nissan Altima, California License Plate, 8RAM551, driven by Mr. Silvestre V. Estrada from exiting the lot via the access road and preventing uninvolved individuals from driving their vehicles into the area.

In addition, the involved Border Patrol Agents under the direct supervision of Supervisory Border Patrol Agent Jose "Lou" Patch immediately established a perimeter.

The establishment of a secure perimeter may be essential to safely resolve the crime in progress.  Establishing a perimeter:
- Contains and isolates the crime scene.
- Prevents the suspect(s) from escaping the area.
- Prevents unauthorized entry into the area.
- Can aid in apprehending the suspect(s).

There are two types of perimeters at a crime scene: inner perimeter and outer perimeter.

I.  Inner Perimeter:
- Immediate area around the incident.
- Varying in size depending on the purpose of the perimeter.

II.  Outer Perimeter:
- Area surrounding the inner perimeter.
- Established to further contain and isolate the crime scene.
- May aid in apprehension if a suspect(s) manage to breach the inner perimeter, providing protection and cover for inner perimeter officers, providing traffic control, assisting in public safety.

In addition, it is my opinion based on my review of the facts and testimony in this matter, Border Patrol Agent Jason Alba (ID No. E161), attempted to conduct an Offensive Intervention Tactic by Boxing In the four-door 2020 Nissan Altima, California License Plate, 8RAM551, driven by Mr. Silvestre V. Estrada after Mr. Silvestre V. Estrada conducted a U-Turn and went around Agent Alba and Agent Godreau, driving at a high

26

MSJ_332

On-Scene Consulting

rate of speed in the field area.  The suspect, Mr. Silvestre V. Estrada crashed into a curb and came to a stop. In addition, Mr. Silvestre V. Estrada's evasive and unpredictable vehicle operations prevented the involved Border Patrol Agents from conducting a High-Risk-Vehicle Stop/Pullover or using available cover.

In addition, Border Patrol Agent Jason Alba (ID No. E161), actions complied with Department of Homeland Security, U.S. Customs and Border Protection, Directive, Directive No. 4510-26, Effective Date: 1/16/2021, Emergency Driving Including Vehicular Pursuits by U.S. Customs and Border Protection Personnel:

5.4: BOXING IN: The surrounding of a suspect's moving vehicle with moving pursuit vehicles, which are then slowed to a stop along with the suspect's vehicle.

In addition, it is my opinion, based on my review of the facts and testimony in this matter, the involved Border Patrol Agents worked as a Team in attempt to achieve a psychological advantage over Mr. Silvestre Estrada so he would surrender peacefully.

**Agent's Reactions:**
- Work as a team,
- Maintain communications with dispatch and other involved agents,
- Move slowly and methodically,
- Rely on known tactics and procedures while also remaining flexible enough to adapt or improvise if necessary, and
- Exercise emotional restraint and self-control.

**Safety Precautions:**
- Request sufficient personnel and equipment to perform any necessary actions safely and effectively and achieve a psychological advantage over the vehicle's occupant(s).
- Use marked patrol vehicles to affect the vehicle pullover, if possible, to prevent recognition problems and ensure necessary equipment is available within the vehicle.
- Use available cover and concealment.
- Always maintain a position of advantage.
- Do not rush.
- Guard against being impatient (Time is usually on the officer's side).
- Wait for requested backup/assistance to arrive before acting.

27

MSJ_333

On-Scene Consulting

In addition, it is my opinion, based on my review of the facts and testimony in this matter, that the involved Border Patrol Agents, used proper De-Escalation and Defusing Techniques in an attempt to cause Mr. Silvestre Estrada to surrender peacefully by attempting to create Time Distance, but were unsuccessful based on Mr. Silvestre Estrada's active resistance, assaultive and life-threatening behavior.

In addition, it is my opinion based on the facts and testimony in this matter, the involved Border Patrol Agents complied with CBP Use of Force Policy, Law Enforcement Safety and Compliance Directorate Operations Support, January 2021, (004400), when they issued Mr. Silvestre V. Estrada numerous verbal commands to put his hands up and surrender but were met with negative results.

D. De-Escalation:

1. De-escalation tactics and techniques seek to minimize the likelihood of the need to use force, or minimize force used during an incident, to increase the probability of voluntary compliance.

In addition, based on my review of the facts and testimony in this matter, the windows to the four-door 2020 Nissan Altima, California License Plate, 8RAM551, driven by Mr. Silvestre V. Estrada, were in a down position which would have allowed Mr. Silvestre V. Estrada to hear the verbal commands from the involved Border Patrol Agents advising him to turn off his vehicle and surrender.  Mr. Silvestre V. Estrada refused to comply with the involved Border Patrol Agents commands and surrender.

In addition, I base my opinion on the following facts and testimony:

- According to Mr. Jaime Madariaga-Gonzalez, when the driver went into the gas station, he was jumping sidewalks and everything, (ESTRADA-USAO-003458-3459).
- According to Mr. Jaime Madariaga-Gonzalez, when the police officers closed in on the driver, the driver wanted to go through the area where the fences were, (ESTRADA-USAO-003459-3460).
- According to Mr. Francisco Madariaga-Gonzalez, the officers told the driver to stop between 10-20 times and he didn't stop, (ESTRADA-USAO 003492).
- According to Witness Matthew Delgado, he believes the driver of the Nissan as driving medium to fast, (Deposition Transcript of Matthew Delgado, Page 63).
- According to Witness Matthew Delgado, he believes the driver of the Nissan was driving dangerously and placed the Border Patrol Agents in Danger, (Deposition Transcript of Matthew Delgado, Pages 74-75).

28

On-Scene Consulting

- According to Witness Trent Heimerdinger, the driver of the Nissan was driving fast, erratic and trying to evade the Border Patrol Agents, (Deposition Transcript of Trent Heimerdinger, Page 44).
- According to Witness Brian Moreno, the driver of the Nissan was driving at speeds of approximately 25-30 miles per hour within the Circle K gas station parking lot and that the average driver drives at speeds of less than 5 miles per hour, (Deposition Transcript of Brian Moreno, Page 52).
- According to Witness Brian Moreno, he heard the Border Patrol Agents commands even with the windows rolled up in his truck in the Circle K parking lot, (Deposition Transcript of Brian Moreno, Page 68).
- According to Border Patrol Agent Robert Godreau, after the Nissan hit the curb and came to a stop, Agent Robert Godreau positioned his vehicle in front of the suspect's vehicle so he could perform an arrest, (Deposition Transcript of Robert Godreau, Page 43).
- According to Supervisory Border Patrol Agent Jose "Lou" Patch, he gave commands to the driver to stop his vehicle.  Patch further stated both the passenger and driver's side windows were down, (Deposition Transcript of Jose "Lou" Patch, Page 13).

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I have been involved in thousands of vehicle pursuits and vehicle pullovers (Traffic Enforcement/Investigative/High-Risk Pullovers), as Primary Officer, Secondary Officer, and a Supervisor.  In addition, I have received and provided training on Pursuit Policy, Pursuit Tactics, Post-Pursuit Tactics and Containment.  In addition, I have conducted over (50) Vehicle Pursuit Investigations during my last 14 years as a Supervisor with the Los Angeles Police Department.  In addition, as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon, I responded to hundreds of Vehicle Pursuits throughout all geographical patrol divisions to assist with containment, perimeter tactics and ultimately K9 searches.

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 6

It is my opinion based on my review of the facts, testimony, United States Customs and Border Protection (CBP) policies, United States Customs and Border Protection (CBP) Border Patrol Agent Robert Godreau, (ID No. E140), used appropriate and reasonable

MSJ_335

## On-Scene Consulting

lethal force when he fired 3 rounds from his Glock Model 47, 9mm, Semi-Automatic Pistol, Mr. Silvestre V. Estrada to stop him from striking him and possibly killing him with his vehicle.   In addition, it is my opinion, this was a dynamic and urgent situation where Agent Godreau was faced with an immediate threat of physical harm or death.

Agent Robert Godreau stated prior to the use of lethal force he heard the four-door 2020 Nissan Altima, California License Plate, 8RAM551, driven by Mr. Silvestre V. Estrada, engine revving and the vehicle "took off towards" him.  Agent Robert Godreau quickly aligned the sights of his Glock Model 47, 9mm, Semi-Automatic Pistol and fired 3 rounds.  The four-door 2020 Nissan Altima, California License Plate, 8RAM551, driven by Mr. Silvestre V. Estrada, veered off to the north.

**Circumstances and Considerations to the Use of Deadly Force:**

I.  <u>Threat to Life</u>?  **Yes**, Mr. Silvestre V. Estrada threatened the life of Agent Robert Godreau which necessitated him to use lethal and reasonable force to defend his life and or the life of others.

II.  <u>Imminent Threat/Imminent Danger,</u> (<u>means a significant threat that Law Enforcement Officers reasonably believe will result in death or serious bodily to themselves or to other persons</u>)? **Yes**, Mr. Silvestre V. Estrada threatened the life of Agent Robert Godreau which necessitated him to use lethal and reasonable force to defend his life and or the life of others.

III.  <u>Type of Weapon</u>, (<u>Can it cause serious bodily injury or death</u>)? **Yes**.  The four-door 2020 Nissan Altima, California License Plate, 8RAM551, weighs approximately 3460 pounds not to include the weight of the occupants inside of the vehicle or their belongings/contents.

In addition, it is my opinion, the use of less lethal force in this matter by Agent Robert Godreau would have been ineffective and would have placed him and the other involved Border Patrol Agents in Imminent Danger.

In addition, based on this unplanned event that was rapid, tense, uncertain, and occurred without an advanced warning, Agent Robert Godreau had to immediately respond to an imminent threat.  It was not feasible for Agent Robert Godreau to provide a verbal warning to Mr. Silvestre V. Estrada prior to the use of lethal force in this situation.

MSJ_336

On-Scene Consulting

In addition, it is my opinion, based on my review of the facts and testimony in this matter, Agent Robert Godreau complied with CBP Use of Force Policy, Law Enforcement Safety and Compliance Directorate Operations Support, January 2021, (004403-4404).

**Chapter 2**: **Use of Deadly Force**:

A. General Guidelines and Responsibilities

1.  Deadly force is force like to cause serious bodily injury or death of a person.

2.  Authorized Officers/Agents may use deadly force only when necessary; that is, when the officer/agent has a reasonable belief that the subject of such force poses an imminent danger of serious bodily injury or death to the officer/agent or to another person.

a.  Serious Bodily Injury- Physical injury that involves protracted and obvious disfigurement; protracted loss or impairment of the function of a bodily member, organ, or mental faculty; or a substantial risk of death.

3.  Discharging a firearm at a person shall be done with the intent of stopping that person from continuing the threatening behavior that justifies the use of deadly force.

6.  Deadly force shall not be used solely to prevent the escape of a fleeing subject. However, deadly force is authorized to prevent the escape of a fleeing subject where the officer/agent has a reasonable belief that the subject poses a significant threat of death or serious physical harm to the officer/agent or others and such force is necessary to prevent escape.

7.  Authorized Officers/Agents shall not discharge their firearms at the operator of a moving vehicle, vessel, or aircraft unless deadly force is necessary, that is, when the officer/agent has a reasonable belief that the operator poses an imminent danger of serious bodily injury or death to the officer/agent or to another person.

a.  Such deadly force may include a moving vehicle aimed at officers/agents or others present but would not include a moving vehicle merely fleeing from officers/agents unless the vehicle or the escape of the subject poses an imminent threat of serious bodily injury or death to the officer/agent or to another person.

31

On-Scene Consulting

b.  The hazard of an uncontrolled conveyance shall be taken into consideration prior to the use of deadly force.

8.  Firearms shall not be fired solely to disable motor vehicles, vessels, aircraft, or other conveyances.  The only exception is that Authorized Officers/Agents, when conducting maritime law enforcement operations, may use specifically authorized firearms and ammunition to disable moving vessels or other maritime conveyances.

In addition, it is my opinion, based on my review of the facts and testimony in this matter, that there was a Sufficiency of Fear to justify the use of deadly force by Agent Robert Godreau.

There are three elements needed to establish sufficiency of fear:
- The circumstances must be sufficient to excite the fears of a reasonable person in like circumstances.
- The person must not act under the influence of fear alone.  There has to be some circumstances or overt act apart from the Law Enforcement Officer's fear.
- The decision to use deadly force must be made to save one's self or another from great bodily injury or death.

In addition, it is my opinion, Agent Robert Godreau demonstrated proper situational awareness and controlled fire by evaluating his background and not injuring or killing any of the Border Patrol Agents that were at scene, citizens, or Mr. Jaime Madariaga-Gonzalez and or Mr. Francisco Madariaga-Gonzalez who were occupants inside of the four-door 2020 Nissan Altima, California License Plate, 8RAM551, driven by Mr. Silvestre V. Estrada.

In addition, it is my opinion based on my review of the facts, testimony and of 3D Forensic Report/Recreation & Slides, Agent Robert Godreau was standing almost directly in front of the four-door 2020 Nissan Altima, California License Plate, 8RAM551, driven by Mr. Silvestre V. Estrada 1.0-1.5 seconds prior to firing three rounds from his semi-automatic pistol.  This was clearly an Immediate Defense of Life situation for Agent Robert Godreau.  In addition, this incident occurred at night and Agent Robert Godreau had to contend with the vehicle's illuminated lights that would have negatively impacted his ability to align the front and rear sight apertures on his semi-automatic pistol. In addition, Agent Robert Godreau's shots were 0.03 seconds apart which means he fired all three shots in approximately 1second.

MSJ_338

On-Scene Consulting

In addition, it is my opinion based on my review of the facts, testimony and Casteel Accident Reconstruction Report, the high-pitched whine from the Nissan's engine indicated a high acceleration and at maximum acceleration it could have impacted the Border Patrol Agents within two seconds.

In addition, it is my opinion based on my twenty-six year law enforcement career where I was assigned as a tactics and firearms instructor as well as being involved in three Officer-Involved Shooting incidents, a Law Enforcement Officer is usually not able to see and react to changes in the subject at whom he or she is shooting.  This is not determined by whether that change is an increase or a decrease in the threat presented to the officer by the subject.  The focus of the officer's attention-internal or external, specific, or general, near or far, and left or right-will determine the officer's ability to perceive and react to changes in the threat and also the length of time it takes for the officer to perceive and then react to that change.

The delay in noticing any change in the nature of the threat and having the officer change his or her behavior in response to that threat could theoretically take the average officer 1-1.5 seconds in a dynamic, "real-world," life-threatening encounter if the officer did not expect the threat would cease, which I believe occurred based on Agent Robert Godreau's actions and reasonable response based on the totality of the circumstances.

In addition, I base my opinion on the following facts and testimony:
- According to Mr. Jaime Madariaga-Gonzalez, the driver did not want to stop, and they had to fire on him, (ESTRADA-USAO-003460).
- According to Mr. Jaime Madariaga-Gonzalez, "and just imagine, that there is an area with grass and all, and he jumped the sidewalk, and then afterwards he went this way to this sidewalk like this, he came up on the sidewalk, and he went backwards and then after he wanted to go through the screen/fence and that was it, and that's where they stopped him," (ESTRADA-USAO-003462).
- According to Mr. Jaime Madariaga-Gonzalez, he believes it was possible that he may have hit an agent with the car if one had gotten in front of him, because he was very, very upset, (ESTRADA-USAO-003469).
- According to Mr. Jaime Madariaga-Gonzalez, the car actually might have been moving when the shots were fired, "That's what I don't remember very well," (Deposition Transcript of Mr. Jaime Madariaga Gonzalez, Page 123).
- According to Mr. Francisco Madariaga-Gonzalez, the vehicle's engine was revving for 1-2 seconds, (Deposition Transcript of Mr. Francisco Madariaga Gonzalez, Page 106).

33

On-Scene Consulting

- According to Mr. Francisco Madariaga-Gonzalez, the driver accelerated and then the shots were fired, (Deposition Transcript of Mr. Francisco Madariaga Gonzalez, Page 115).
- According to Witness Matthew Delgado, there were two Border Patrol Agents on foot, in front of the suspect vehicle, located diagonally with respect to the Nissan, (Deposition Transcript of Matthew Delgado, Page 77).
- According to Witness Matthew Delgado, there were two Border Patrol Agents on foot, in front of the suspect vehicle, were approximately 3-6 feet from the Nissan, (Deposition Transcript of Matthew Delgado, Page 85).
- According to Witness Trent Heimerdinger, the Nissan was still rolling forward when he heard the first shot fired, (Deposition Transcript of Trent Heimerdinger, Page 60).
- According to Witness Trent Heimerdinger, the driver of the Nissan appeared to be reckless and posed a threat to the Border Patrol Agents on foot, (Deposition Transcript of Trent Heimerdinger, Page 69).
- According to Witness Brian Moreno, he noticed the RPM's on the engine of the Nissan start to go higher and make a high-pitched whine as the Nissan moved forward, (Deposition Transcript of Brian Moreno, Page 73).
- According to Witness Brian Moreno, the driver of the Nissan was traveling in the direction of the Border Patrol Agents that were on foot before the shots were fired, (Deposition Transcript of Brian Moreno, Page 80).
- According to Border Patrol Agent Jason Alba, he fired his weapon because he believed if the Nissan were allowed to continue forward, it could strike Agent Robert Godreau or some other Border Patrol Agent, (Deposition Transcript of Jason Alba, Page 36).
- According to Border Patrol Agent Jason Alba, he could hear the Nissan's engine revving or accelerating in some fashion, (Deposition Transcript of Jason Alba, Page 37).
- According to Border Patrol Agent Robert Godreau, he believed the suspect could be armed with a weapon and did not want to be arrested, (Deposition Transcript of Robert Godreau, Page 48).
- According to Border Patrol Agent Robert Godreau, Mr. Silvestre V. Estrada refused to comply with commands to "show his hands," (Deposition Transcript of Robert Godreau, Page 26).
- According to Border Patrol Agent Robert Godreau, he was in front of the Nissan Sentra towards the driver's side of the vehicle and he moved back as he fired his gun, (Deposition Transcript of Robert Godreau, Pages 55&57).

34

MSJ_340

On-Scene Consulting

- According to Border Patrol Agent Robert Godreau, when he fired his semi-automatic pistol, the Nissan was coming at him, (<u>Deposition Transcript of Robert Godreau, Page 94</u>).
- According to Supervisory Border Patrol Agent Jose "Lou" Patch, he heard the Nissan's engine "rev" loudly for 2-4 seconds and then the vehicle lunged forward toward Agent Robert Godreau.  Patch feared for Agent Godreau's life.  Patch did not fire because the front passenger of the Nissan would have been in his line of fire, (<u>Deposition Transcript of Jose "Lou" Patch, Pages 15-16</u>).

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## <u>Opinion Number 7</u>

It is my opinion based on my review of the facts, testimony, United States Customs and Border Protection (<u>CBP</u>) policies, United States Customs and Border Protection (<u>CBP</u>) Border Patrol Agent David Matthews (<u>ID No. E345</u>), used appropriate and reasonable lethal force when he fired 1<u>round</u> from his Glock Model 47, 9mm, Semi-Automatic Pistol, Mr. Silvestre V. Estrada to stop him from striking him and possibly killing him with his vehicle.   In addition, it is my opinion, this was a dynamic and urgent situation where Agent Matthews was faced with an immediate threat of physical harm or death.

Agent David Matthews stated prior to the use of lethal force he heard the four-door 2020 Nissan Altima, California License Plate, <u>8RAM551</u>, driven by Mr. Silvestre V. Estrada, engine "rev" loudly and believed the suspect vehicle was going to move forward at a high rate of speed based on sound.  Agent David Matthews saw the suspect vehicle start to move forward.  Agent David Matthews heard gunfire and saw the suspect vehicle wheels turn facing him.  After the wheels turned towards him, Agent David Matthews could still clearly see the driver's head and hands on the wheel.  Between Agent David Matthews and the suspect vehicle was a thin, rusted wire fence which Agent David Matthews did not believe would stop the suspect vehicle from hitting him.  Agent David Matthews was frightened and believed he was going to be severely injured, and that the suspect's vehicle was going to hit him.  Agent David Matthews believed he fired one round at the driver of the vehicle.  Agent David Mathews feared for his life and his partner's lives when he fired one round at the driver.  Agent David Mathews believed that his only option to avoid injury or death was to use lethal force.

35

On-Scene Consulting

**Circumstances and Considerations to the Use of Deadly Force:**

I.  Threat to Life?  **Yes**, Mr. Silvestre V. Estrada threatened the life of Agent David Matthews which necessitated him to use lethal and reasonable force to defend his life and or the life of others.

II.  Imminent Threat/Imminent Danger, (means a significant threat that Law Enforcement Officers reasonably believe will result in death or serious bodily to themselves or to other persons)? **Yes**, Mr. Silvestre V. Estrada threatened the life of Agent David Matthews which necessitated him to use lethal and reasonable force to defend his life and or the life of others.

III.  Type of Weapon, (Can it cause serious bodily injury or death)? **Yes**.  The four-door 2020 Nissan Altima, California License Plate, 8RAM551, weighs approximately 3460 pounds not to include the weight of the occupants inside of the vehicle or their belongings/contents.

In addition, it is my opinion, the use of less lethal force in this matter by Agent David Matthews would have been ineffective and would have placed him and the other involved Border Patrol Agents in Imminent Danger.

In addition, based on this unplanned event that was rapid, tense, uncertain, and occurred without an advanced warning, Agent David Matthews had to immediately respond to an imminent threat.  It was not feasible for Agent David Matthews to provide a verbal warning to Mr. Silvestre V. Estrada prior to the use of lethal force in this situation.

In addition, it is my opinion, based on my review of the facts and testimony in this matter, Agent David Matthews complied with CBP Use of Force Policy, Law Enforcement Safety and Compliance Directorate Operations Support, January 2021, (004403-4404).

**Chapter 2:** **Use of Deadly Force:**

A. General Guidelines and Responsibilities

1.  Deadly force is force like to cause serious bodily injury or death of a person.

**MSJ_342**

On-Scene Consulting

2.  Authorized Officers/Agents may use deadly force only when necessary; that is, when the officer/agent has a reasonable belief that the subject of such force poses an imminent danger of serious bodily injury or death to the officer/agent or to another person.

a.  <u>Serious Bodily Injury</u>- Physical injury that involves protracted and obvious disfigurement; protracted loss or impairment of the function of a bodily member, organ, or mental faculty; or a substantial risk of death.

3.  Discharging a firearm at a person shall be done with the intent of stopping that person from continuing the threatening behavior that justifies the use of deadly force.

6.  Deadly force shall not be used solely to prevent the escape of a fleeing subject. However, deadly force is authorized to prevent the escape of a fleeing subject where the officer/agent has a reasonable belief that the subject poses a significant threat of death or serious physical harm to the officer/agent or others and such force is necessary to prevent escape.

7.  Authorized Officers/Agents shall not discharge their firearms at the operator of a moving vehicle, vessel, or aircraft unless deadly force is necessary, that is, when the officer/agent has a reasonable belief that the operator poses an imminent danger of serious bodily injury or death to the officer/agent or to another person.

a.  Such deadly force may include a moving vehicle aimed at officers/agents or others present but would not include a moving vehicle merely fleeing from officers/agents unless the vehicle or the escape of the subject poses an imminent threat of serious bodily injury or death to the officer/agent or to another person.
b.  The hazard of an uncontrolled conveyance shall be taken into consideration prior to the use of deadly force.

8.  Firearms shall not be fired solely to disable motor vehicles, vessels, aircraft, or other conveyances.  The only exception is that Authorized Officers/Agents, when conducting maritime law enforcement operations, may use specifically authorized firearms and ammunition to disable moving vessels or other maritime conveyances.

In addition, it is my opinion, based on my review of the facts and testimony in this matter, that there was a <u>Sufficiency of Fear</u> to justify the use of deadly force by Agent David Matthews.

MSJ_343

On-Scene Consulting

There are three elements needed to establish sufficiency of fear:

- The circumstances must be sufficient to excite the fears of a reasonable person in like circumstances.
- The person must not act under the influence of fear alone.  There has to be some circumstances or overt act apart from the Law Enforcement Officer's fear.
- The decision to use deadly force must be made to save one's self or another from great bodily injury or death.

In addition, it is my opinion, David Matthews demonstrated proper situational awareness and controlled fire by evaluating his background and not injuring or killing any of the Border Patrol Agents that were at scene, citizens, or Mr. Jaime Madariaga-Gonzalez and or Mr. Francisco Madariaga-Gonzalez who were occupants inside of the four-door 2020 Nissan Altima, California License Plate, 8RAM551, driven by Mr. Silvestre V. Estrada,

In addition, it is my opinion based on my review of the facts, testimony and of 3D Forensic Report/Recreation & Slides, Agent David Matthews was standing almost directly in front of the four-door 2020 Nissan Altima, California License Plate, 8RAM551, driven by Mr. Silvestre V. Estrada prior to firing one round from his semi-automatic pistol.  This was clearly an Immediate Defense of Life situation for Agent David Matthews.  In addition, this incident occurred at night and Agent David Matthews had to contend with the vehicle's illuminated lights that would have negatively impacted his ability to align the front and rear sight apertures on his semi-automatic pistol.

In addition, it is my opinion based on my review of the facts, testimony and Casteel Accident Reconstruction Report, the high-pitched whine from the Nissan's engine indicated a high acceleration and at maximum acceleration it could have impacted the Border Patrol Agents within two seconds.

In addition, it is my opinion based on my twenty-six year law enforcement career where I was assigned as a tactics and firearms instructor as well as being involved in three Officer-Involved Shooting incidents, a Law Enforcement Officer is usually not able to see and react to changes in the subject at whom he or she is shooting.  This is not determined by whether that change is an increase or a decrease in the threat presented to the officer by the subject.  The focus of the officer's attention-internal or external, specific, or general, near or far, and left or right-will determine the officer's ability to perceive and react to changes in the threat and also the length of time it takes for the officer to perceive and then react to that change.

MSJ_344

On-Scene Consulting

The delay in noticing any change in the nature of the threat and having the officer change his or her behavior in response to that threat could theoretically take the average officer 1-1.5 seconds in a dynamic, "real-world," life-threatening encounter if the officer did not expect the threat would cease, which I believe occurred based on Agent David Matthews' actions and reasonable response based on the totality of the circumstances.

In addition, I base my opinion on the following facts and testimony:

- According to Mr. Jaime Madariaga-Gonzalez, the driver did not want to stop, and they had to fire on him, (ESTRADA-USAO-003460).
- According to Mr. Jaime Madariaga-Gonzalez, "and just imagine, that there is an area with grass and all, and he jumped the sidewalk, and then afterwards he went this way to this sidewalk like this, he came up on the sidewalk, and he went backwards and then after he wanted to go through the screen/fence and that was it, and that's where they stopped him, (ESTRADA-USAO-003462).
- According to Mr. Jaime Madariaga-Gonzalez, he believes it was possible that he may have hit an agent with the car if one had gotten in front of him, because he was very, very upset, (ESTRADA-USAO-003469).
- According to Mr. Jaime Madariaga-Gonzalez, the car actually might have been moving when the shots were fired, "That's what I don't remember very well," (Deposition Transcript of Mr. Jaime Madariaga Gonzalez, Page 123).
- According to Mr. Francisco Madariaga-Gonzalez, the vehicle's engine was revving for 1-2 seconds, (Deposition Transcript of Mr. Francisco Madariaga Gonzalez, Page 106).
- According to Mr. Francisco Madariaga-Gonzalez, the driver accelerated and then the shots were fired, (Deposition Transcript of Mr. Francisco Madariaga Gonzalez, Page 115).
- According to Border Patrol Agent Chris Baker, the Nissan was heading towards the barbed wire fence, (Deposition Transcript of Chris Baker, Page 37).
- According to Witness Trent Heimerdinger, the driver of the Nissan appeared to be reckless and posed a threat to the Border Patrol Agents on foot, (Deposition Transcript of Trent Heimerdinger, Page 69).
- According to Witness Brian Moreno, he noticed the RPM's on the engine of the Nissan start to go higher and make a high-pitched whine as the Nissan moved forward, (Deposition Transcript of Brian Moreno, Page 73).
- According to Witness Brian Moreno, the driver of the Nissan was traveling in the direction of the Border Patrol Agents that were on foot before the shots were fired, (Deposition Transcript of Brian Moreno, Page 80).

On-Scene Consulting

- According to Border Patrol Agent David Matthews, he perceived his life was in danger when he fired his semi-automatic pistol, (Deposition Transcript of David Matthews, Page 31).

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## Opinion Number 8

It is my opinion based on my review of the facts, testimony, United States Customs and Border Protection (CBP) policies, United States Customs and Border Protection (CBP) Border Patrol Agent Jason Alba (ID No. E161), used appropriate and reasonable lethal force when he fired 1 round from his Glock Model 19, 9mm, Semi-Automatic Pistol, at Mr. Silvestre V. Estrada to stop him from striking Agent Robert Godreau and possibly killing him with his vehicle.   In addition, it is my opinion, this was a dynamic and urgent situation where Agent Jason Alba was faced with an immediate threat of physical harm or death.

According to Agent Jason Alba, during the incident, he feared for Agent Robert Godreau's life.  According to Agent Jason Alba, the four-door 2020 Nissan Altima, California License Plate, 8RAM551, driven by Mr. Silvestre V. Estrada, vehicle was about to run over Agent Robert Godreau who was in front of the vehicle when Mr. Silvestre V. Estrada put it in drive and lurched forward.  Agent Jason Alba chose to use his firearm based on the lethal threat.  Agent Jason Alba stated he did not consider any other force options as they would not have been effective.

## Circumstances and Considerations to the Use of Deadly Force:

I.  Threat to Life?  **Yes**, Mr. Silvestre V. Estrada threatened the life of Agent Robert Godreau which necessitated Agent Jason Alba to use lethal and reasonable force to defend his life and or the life of others.

II.  Imminent Threat/Imminent Danger, (means a significant threat that Law Enforcement Officers reasonably believe will result in death or serious bodily to themselves or to other persons)?  **Yes**, Mr. Silvestre V. Estrada threatened the life of Agent Robert Godreau which necessitated Agent Jason Alba to use lethal and reasonable force to defend his life and or the life of others.

40

MSJ_346

On-Scene Consulting

III.  Underline{Type of Weapon}, (Underline{Can it cause serious bodily injury or death})? **Underline{Yes}**.  The four-door 2020 Nissan Altima, California License Plate, Underline{8RAM551,} weighs approximately 3460 pounds not to include the weight of the occupants inside of the vehicle or their belongings/contents.

In addition, it is my opinion, the use of less lethal force in this matter by Agent Jason Alba would have been ineffective and would have placed Agent Robert Godreau and the other involved Border Patrol Agents in Imminent Danger.

In addition, based on this unplanned event that was rapid, tense, uncertain, and occurred without an advanced warning, Agent Jason Alba had to immediately respond to an imminent threat.  It was not feasible for Agent Jason Alba to provide a verbal warning to Mr. Silvestre V. Estrada prior to the use of lethal force in this situation.

In addition, it is my opinion, based on my review of the facts and testimony in this matter, Agent Jason Alba complied with Underline{CBP Use of Force Policy, Law} Underline{Enforcement Safety and Compliance Directorate Operations Support, January 2021}, (Underline{004403-4404}).

**Underline{Chapter 2}: Underline{Use of Deadly Force}:**

A. Underline{General Guidelines and Responsibilities}

1.  Deadly force is force like to cause serious bodily injury or death of a person.

2.  Authorized Officers/Agents may use deadly force only when necessary; that is, when the officer/agent has a reasonable belief that the subject of such force poses an imminent danger of serious bodily injury or death to the officer/agent or to another person.

a.  Underline{Serious Bodily Injury}- Physical injury that involves protracted and obvious disfigurement; protracted loss or impairment of the function of a bodily member, organ, or mental faculty; or a substantial risk of death.

3.  Discharging a firearm at a person shall be done with the intent of stopping that person from continuing the threatening behavior that justifies the use of deadly force.

6.  Deadly force shall not be used solely to prevent the escape of a fleeing subject. However, deadly force is authorized to prevent the escape of a fleeing subject where the officer/agent has a reasonable belief that the subject poses a significant threat of death or

MSJ_347

On-Scene Consulting

serious physical harm to the officer/agent or others and such force is necessary to prevent escape.

7.  Authorized Officers/Agents shall not discharge their firearms at the operator of a moving vehicle, vessel, or aircraft unless deadly force is necessary, that is, when the officer/agent has a reasonable belief that the operator poses an imminent danger of serious bodily injury or death to the officer/agent or to another person.

a.  Such deadly force may include a moving vehicle aimed at officers/agents or others present but would not include a moving vehicle merely fleeing from officers/agents unless the vehicle or the escape of the subject poses an imminent threat of serious bodily injury or death to the officer/agent or to another person.

b.  The hazard of an uncontrolled conveyance shall be taken into consideration prior to the use of deadly force.

8.  Firearms shall not be fired solely to disable motor vehicles, vessels, aircraft, or other conveyances.  The only exception is that Authorized Officers/Agents, when conducting maritime law enforcement operations, may use specifically authorized firearms and ammunition to disable moving vessels or other maritime conveyances.

In addition, it is my opinion, based on my review of the facts and testimony in this matter, that there was a Sufficiency of Fear to justify the use of deadly force by Agent Jason Alba.

There are three elements needed to establish sufficiency of fear:
- The circumstances must be sufficient to excite the fears of a reasonable person in like circumstances.
- The person must not act under the influence of fear alone.  There has to be some circumstances or overt act apart from the Law Enforcement Officer's fear.
- The decision to use deadly force must be made to save one's self or another from great bodily injury or death.

In addition, it is my opinion, Agent Jason Alba demonstrated proper situational awareness and controlled fire by evaluating his background and not injuring or killing any of the Border Patrol Agents that were at scene, citizens, or Mr. Jaime Madariaga-Gonzalez and or Mr. Francisco Madariaga-Gonzalez who were occupants inside of the four-door 2020 Nissan Altima, California License Plate, 8RAM551, driven by Mr. Silvestre V. Estrada,

42

## On-Scene Consulting

In addition, it is my opinion based on my review of the facts, testimony and of 3D Forensic Report/Recreation & Slides, Agent Robert Godreau was standing almost directly in front of the four-door 2020 Nissan Altima, California License Plate, 8RAM551, driven by Mr. Silvestre V. Estrada 1.0-1.5 seconds prior to Agent Jason Alba firing one rounds from his semi-automatic pistol.  This was clearly an Immediate Defense of Life situation for Agent Jason Alba to protect Agent Robert Godreau from being killed or gravely injured.

In addition, it is my opinion based on my review of the facts, testimony and Casteel Accident Reconstruction Report, the high-pitched whine from the Nissan's engine indicated a high acceleration and at maximum acceleration it could have impacted the Border Patrol Agents within two seconds.

In addition, it is my opinion based on my twenty-six year law enforcement career where I was assigned a tactics and firearms instructor as well as being involved in three Officer-Involved Shooting incidents, a Law Enforcement Officer is usually not able to see and react to changes in the subject at whom he or she is shooting.  This is not determined by whether that change is an increase or a decrease in the threat presented to the officer by the subject.  The focus of the officer's attention-internal or external, specific, or general, near or far, and left or right-will determine the officer's ability to perceive and react to changes in the threat and also the length of time it takes for the officer to perceive and then react to that change.

The delay in noticing any change in the nature of the threat and having the officer change his or her behavior in response to that threat could theoretically take the average officer 1-1.5 seconds in a dynamic, "real-world," life-threatening encounter if the officer did not expect the threat would cease, which I believe occurred based on Agent Jason Alba's actions and reasonable response based on the totality of the circumstances.

In addition, officers will both start and stop shooting based on a variety of factors, including their visual angle on the incident and their ability to perceive the threat, their attentional and reactive capabilities, and their psychomotor movement times.

43

MSJ_349

On-Scene Consulting

In addition, I base my opinion on the following facts and testimony:

- According to Mr. Jaime Madariaga-Gonzalez, the driver did not want to stop, and they had to fire on him, (ESTRADA-USAO-003460).
- According to Mr. Jaime Madariaga-Gonzalez, "and just imagine, that there is an area with grass and all, and he jumped the sidewalk, and then afterwards he went this way to this sidewalk like this, he came up on the sidewalk, and he went backwards and then after he wanted to go through the screen/fence and that was it, and that's where they stopped him, (ESTRADA-USAO-003462).
- According to Mr. Jaime Madariaga-Gonzalez, he believes it was possible that he may have hit an agent with the car if one had gotten in front of him, because he was very, very upset, (ESTRADA-USAO-003469).
- According to Mr. Jaime Madariaga-Gonzalez, the car actually might have been moving when the shots were fired, "That's what I don't remember very well," (Deposition Transcript of Mr. Jaime Madariaga-Gonzalez, Page 123).
- According to Mr. Francisco Madariaga-Gonzalez, the vehicle's engine was revving for 1-2 seconds, (Deposition Transcript of Mr. Francisco Madariaga-Gonzalez, Page 106).
- According to Mr. Francisco Madariaga-Gonzalez, the driver accelerated and then the shots were fired, (Deposition Transcript of Mr. Francisco Madariaga-Gonzalez, Page 115).
- According to Witness Matthew Delgado, there were two Border Patrol Agents on foot, in front of the suspect vehicle, located diagonally with respect to the Nissan, (Deposition Transcript of Matthew Delgado, Page 77).
- According to Witness Matthew Delgado, there were two Border Patrol Agents on foot, in front of the suspect vehicle, were approximately 3-6 feet from the Nissan, (Deposition Transcript of Matthew Delgado, Page 85).
- According to Witness Trent Heimerdinger, the Nissan was still rolling forward when he heard the first shot fired, (Deposition Transcript of Trent Heimerdinger, Page 60).
- According to Witness Trent Heimerdinger, the driver of the Nissan appeared to be reckless and posed a threat to the Border Patrol Agents on foot, (Deposition Transcript of Trent Heimerdinger, Page 69).
- According to Witness Brian Moreno, he noticed the RPM's on the engine of the Nissan start to go higher and make a high-pitched whine as the Nissan moved forward, (Deposition Transcript of Brian Moreno, Page 73).
- According to Witness Brian Moreno, the driver of the Nissan was traveling in the direction of the Border Patrol Agents that were on foot before the shots were fired, (Deposition Transcript of Brian Moreno, Page 80).

MSJ_350

On-Scene Consulting

- According to Border Patrol Agent Jason Alba, he fired his weapon because he believed if the Nissan were allowed to continue forward, it could strike Agent Robert Godreau or some other Border Patrol Agent, (<u>Deposition Transcript of Jason Alba, Page 36</u>).
- According to Border Patrol Agent Jason Alba, he could hear the Nissan's engine revving or accelerating in some fashion, (<u>Deposition Transcript of Jason Alba, Page 37</u>).

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 9

It is my opinion based on my review of the facts, testimony, United States Customs and Border Protection (<u>CBP</u>) policies, United States Customs and Border Protection (<u>CBP</u>) Supervisory Border Patrol Agent Jose "Lou" Patch effectively managed the rapid, tense, and uncertain tactical incident as it was evolving.  In addition, it is my opinion, Supervisory Border Patrol Agent Jose "Lou" Patch demonstrated proper situational awareness by immediately calling a "cease fire" once Mr. Silvestre Estrada was no longer a lethal threat by evaluating his background and ensuring the Border Patrol Agents that were at scene, citizens, or Mr. Jaime Madariaga-Gonzalez and or Mr. Francisco Madariaga-Gonzalez who were occupants inside of the four-door 2020 Nissan Altima, California License Plate, <u>8RAM551</u>, driven by Mr. Silvestre V. Estrada, were not injured or killed.

In addition, it is my opinion based on my review of the facts and testimony in this matter, Supervisory Border Patrol Agent Jose "Lou" Patch, ensured Mr. Jaime Madariaga-Gonzalez and or Mr. Francisco Madariaga-Gonzalez who were occupants inside of the four-door 2020 Nissan Altima, California License Plate, <u>8RAM551</u>, driven by Mr. Silvestre V. Estrada, were rescued.  In addition, Supervisory Border Patrol Agent Jose "Lou" Patch, ensured Emergency Medical Services (EMS) were responding to the scene to ensure that Mr. Silvestre V. Estrada received prompt medical treatment.

In addition, Supervisory Border Patrol Agent Jose "Lou" Patch, ensured that the inner and outer perimeter was established to ensure the crime scene was preserved for evidence to include the interviewing of witnesses.

MSJ_351

## On-Scene Consulting

The establishment of a secure perimeter may be essential to safely resolve the crime in progress.  Establishing a perimeter:

- Contains and isolates the crime scene.
- Prevents the suspect(s) from escaping the area.
- Prevents unauthorized entry into the area.
- Can aid in apprehending the suspect(s).

There are two types of perimeters at a crime scene: inner perimeter and outer perimeter.

I. Inner Perimeter:
- Immediate area around the incident.
- Varying in size depending on the purpose of the perimeter.

II. Outer Perimeter:
- Area surrounding the inner perimeter.
- Established to further contain and isolate the crime scene.
- May aid in, (apprehension if a suspect(s) manage to breech the inner perimeter, providing protection and cover for inner perimeter officers, providing traffic control, assisting in public safety).

In addition, it is my opinion, Supervisory Border Patrol Agent Jose "Lou" Patch, complied with U.S. Customs and Border Protection, Administrative Manual Section 20.012, INS Firearms Policy, Supervisor's Incident Scene Response, Do & Don't, (ESTRADA-USAO-005230):

Do:
- VERIFY the condition of the involved agent(s) and other parties…
- VERIFY that all necessary Emergency assistance has been requested…
- ENSURE that a scene perimeter has been Established and is SECURED…
- ASSIGN personnel to guard perimeter for unauthorized intrusions…
- ENSURE that the NOTIFICATION has been INITIATED…
- MAINTAIN scene security and LIMIT access…. (i.e., medical personnel) …
- ASSIGN a scribe to document scene access and activity…
- REMOVE the involved agent(s) from the scene…
- ISOLATE suspect(s) and witness(s)…PROTECT SUSPECT/WITNESS INTEGRITY…
- ACTIVATE the Critical Incident Investigation Team…

46

## On-Scene Consulting

- NOTIFY the appropriate local agency…
- TURN SCENE over to the local responding agency or C.I.I.T Investigator…
- BE PREPARED to brief investigators…
- If an agent is assigned to guard subject(s) at medical facilities, DIRECT THEM to NOT allow anyone other than medical personnel to have access until the Investigators have had an opportunity to conduct interviews…

Don't:
- ENTER the scene unless absolutely necessary…
- ALLOW unnecessary access, regardless of rank…
- TOUCH or MOVE anything unless absolutely necessary…
- CONDUCT an independent search of evidence…
- TAKE an agent's firearm as evidence…
- RELEASE any information…
- LEAVE the scene until relieved by a C.I.I.T. Supervisor…
- CONDUCT independent post-scene investigations…
- TAKE OR ALLOW the taking of photographs/video of incident unless authorized by an Investigating Official…the condition of involved agent(s) and other parties…

REMEMBER:
SAFETY of agents and other persons present.
PROTECTION of government property and,
SECURITY of the scene.

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## **Opinion Number 10**

It is my opinion based on my review of the facts, testimony, United States Customs and Border Protection (CBP) policies, United States Customs and Border Protection (CBP) Border Patrol Agents David Matthews (ID No. E345), Jason Alba (ID No. E161), and Robert Godreau, (ID No. E140), were properly trained in the following areas: Shooting at or from Moving Vehicles, Vehicle Pursuits, High-Risk Felony Pullovers, Vehicle Deployment Tactics, Working as a Team, Use of Available Cover and Concealment, Contact and Cover Officers, Verbal Strategies, Defusing and De-Escalation Techniques, Less Lethal Force Options: ASP Baton, Oleoresin Capsicum Spray, Taser Electronic

MSJ_353

On-Scene Consulting

Device, 40mm Less Lethal Launcher (Foam Rubber Baton Rounds), 870 Remington "Super Sock" Less Lethal Shotgun, Tactical Retreat, K9, and Tactical Re-Deployment.

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

**My Qualifications for Reviewing this Case:**

My opinions are based on my education, training, and experience. Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in Criminal Justice, I was hired as Criminal Investigator/Special Agent, GS-1811. Upon completion of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training Center (FLETC), 6-Month academy, I was assigned to the Organized Crime Drug Task Force where I functioned as an agent and undercover operative. The investigations focused on targeting criminal organizations that were involved in large scale drug smuggling and money laundering operations.

I was assigned to the Office of the Special Agent In-Charge, in San Francisco from August 1988 until I joined the Los Angeles Police Department in November of 1989. While in the academy, I was selected by the staff to be my Recruit Class Leader. Upon my graduation from the LAPD Academy, I was assigned to 77th Division. In addition to being assigned to 77th Division, I was assigned to Northeast Division (Patrol), Northeast Division (Special Projects Unit-SPU), Northeast Division C.R.A.S.H (Gang Detail). I was selected to be transferred to Operations Central Bureau C.R.A.S.H., where I was assigned to a plain clothes detail targeting specific gangs throughout Operations Central Bureau.

I was selected to be a Police Officer III at Wilshire Area Vice where I functioned as an undercover operative targeting prostitution, gambling, bookmaking, and other Vice related offenses. While working Wilshire Vice, I was ambushed and received two gunshot wounds. I received the Purple Heart in 2010. Upon return from my injuries, I attended mandated Field Training Officer School and was assigned as a Field Training Officer (FTO) at Wilshire Division. I trained recruits upon their graduation from the Los Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for service, court testimony, emergency procedures, pursuit policy, accident investigations, perimeters, Department policies and procedures, and effective communication skills.

MSJ_354

## On-Scene Consulting

While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of Force incident.

I was promoted to the rank of Detective and attended the LAPD Detective School.  Upon completion of LAPD Detective School, I was assigned to Wilshire Area Narcotics, Field Enforcement Section, where I functioned in an undercover capacity.

I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division.  Prior to my assignment, I attended the mandated LAPD Supervisor School.  In conjunction with LAPD Supervisor School, I was selected to attend the West Point Leadership Academy Supervisor Training.  The training focused on team building, leadership, and decision making.  While assigned to Hollenbeck Division, I conducted roll call training on a daily basis on numerous subject matters to include Use of Force Options (Non-Lethal and Lethal), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal Bulletins, Training Directives, and other Standardized Roll Call Training.  I directly supervised Police Officers and provided supervisory oversight during calls for service, tactical situations, perimeter tactics, containment and control issues and use of force incidents.  I conducted audits, personnel investigations, Standard Based Assessments (Ratings/Evaluations), Use of Force Investigations, Administrative Projects, and prepared commendations for Police Officer's field performance.  While assigned to Hollenbeck Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special Enforcement Group, (SEG).  I directly supervised (14) Police Officers and Detectives assigned to the Unit.  SEG worked in conjunction with Hollenbeck Detectives and specifically targeted career criminals in Hollenbeck Division.  I provided ongoing mandated Department Training as well tactical, firearms, less than lethal force, lethal force and search warrant tactics training to Police Officers and Detectives.  SEG prepared and served numerous search warrants.  I provided search warrant tactical briefing and de-briefing of each warrant at the conclusion of the of the search warrant service.  I completed audits, administrative projects, Use of Force Investigations, personnel complaints, and other administrative duties as deemed necessary by the Area Commanding Officer.

During this time, I was assigned to Internal Affairs Division (IAD), Headquarters Section.  I investigated personnel complaints that exceeded the scope for a geographical Division.  At the conclusion of my assignment to IAD, I was selected to Management Services Division, Special Projects, Office of the Chief of Police.  I completed numerous

MSJ_355

## On-Scene Consulting

in-depth staff projects for review by the Chief of Police.  In addition, I conducted research and edited the 2000 LAPD Department Manual.

Also, during this time, I earned my Master's Degree in Public Administration from California State University, Long Beach.

I was selected as a Sergeant II at 77th Division Vice.  I directly supervised (10) undercover Vice Officers and four uniformed Police Officers.  I provided all facets of training to the Police Officers assigned to Vice to include Use of Force Policy, Legal Updates, Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics Training, Undercover Operations Training, Surveillance Training, and any other training deemed necessary by the Area Commanding Officer.  I conducted audits, personnel investigations, administrative projects, Use of Force Investigations, and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart Corruption Task Force.  I conducted Use of Force audits and Internal Affairs Audits on Specialized Units in Central Bureau and South Bureau.

In 2000, I was selected to Metropolitan Division K9 Platoon as a Sergeant II+1.  I directly supervised (16) K9 Handlers.  Metropolitan Division K9 conducted K9 searches for the entire Department covering all Patrol Divisions and Specialized Units.  I provided all facets of training to the K9 Officers to include K9 Operations, tactics, search warrant services, Mobile Field Force Options, Less than Lethal Force Options, Lethal Force Options, Department Directives, Training Bulletins, and other training dictated by the Officer-in-Charge and Commanding Officer.  In addition, I taught K9 Operations at LAPD In-Service Training, Watch Commander School, Sergeant School, Field Training Officer (FTO) School and Detective School.   While assigned to K9, I investigated and completed K9 contacts (bite investigations), personnel complaints, and Use of Force Investigations.  In addition, I directed and was directly involved in Use of Force incidents.  I received the LAPD Medal of Valor and LAPD Police Star for two lethal use of force incidents while assigned to K9.

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT). I directly supervised (60) SWAT Officers.  I conducted and facilitated all facets of SWAT training to include Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun, Remington 870 Bean Bag Shotgun, .40mm, 37mm, X-26 Taser) on a monthly basis.  In addition, I facilitated and conducted training in the following training Cadres: Breacher

MSJ_356

## On-Scene Consulting

(Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention, Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support Training (Fast Rope, Aerial Platform Shooting).  I directly supervised SWAT missions and High-Risk Search Warrant Services to include all facets (preparation, briefing, deployment, de-briefing).  I was the Supervisor-in-Charge of the Crisis Negotiation Team, (CNT).  I provided on-going Crisis Negotiation Training, mental health training, Tactical de-briefs of SWAT incidents, 40-hour POST Certified CNT School, and suicide prevention training.  I worked in conjunction with the mental health community to provide and facilitate training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science Services Section (BSS), and Didi Hirsch Suicide Prevention Training.  In addition, I assisted the West Point Military Academy with the development of their crisis negotiation curriculum.

During this time, I was selected as the LAPD SWAT representative to respond to Mumbai India with LAPD Counterterrorism and Las Vegas Metropolitan Division Police Department Counterterrorism following the terrorist attack in November 2008.  I taught use of force, tactics, and SWAT deployment to 250 Mumbai Special Tactical Police Officers.  Upon my return, I assisted with the development of Multi-Assault, Counter-Terrorism Action Capabilities, (MACTAC).

In June 2010, I retired from the Los Angeles Police Department with over 20 years of service to pursue an opportunity in the private sector. I held supervisory positions for the last 14 years of my career.  During my tenure with the LAPD, I received over 100 Commendations including: The Medal of Valor, Purple Heart, and the Police Star. From June 2010 through April 2013, I was the Vice President of Security Operations at Caruso Affiliated in Los Angeles, CA.  My responsibilities included identifying and conducting Risk and Vulnerability Assessments for all Caruso Affiliated Developments, projected developments/investments, and residences.  I utilized strategic-level analysis from the intelligence community, law enforcement and the private sector.  I identified and monitored potential or actual incidents among critical infrastructure domains and all personal and professional interests of Caruso Affiliated.  I mitigated expected threats.  I utilized preplanned, coordinated actions in response to infrastructure warnings or incidents.  I responded to hostilities.  I identified and eliminated the cause, or source, of an infrastructure event by the utilization of emergency response measures to include on-site security personnel, local law enforcement, medical and fire rescue, and relevant investigative agencies.  I conducted all facets of security training for the company and employees.  I formulated Business Continuity and CEO Succession Plans for the company

51

On-Scene Consulting

and all affiliated business interests.  I conducted ongoing audits and internal investigations.

From June 2013 to June 2014, I was hired as a Deputy Sheriff at the Riverside Sheriff's Department where I conducted all facets of patrol service to include calls for service, self-initiated field activity, arrests, citations, and court testimony. In addition, during my tenure with the Riverside County Sheriff's Department, I was assigned to Robert Presley Detention Center (RPDC).  I processed and monitored inmate population from initial intake, housing, court, transportation, and release. I conducted searches of inmate population as well as the facility on an ongoing basis. I utilized my experience as a gang officer, Detective and Sergeant with LAPD to conduct interviews and interrogations of prisoners regarding a myriad of investigations. I provided information to Gang Detail. I functioned as a mentor to newly appointed Deputy Sheriffs as well as Supervisors. I attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. I attended on-going training to include Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents and Proper Protocols and Procedures when responding to a medical incident or suicide.

From June 2014 to March 2016, I was the Director of Security at Universal Protection Service where I supervised 84 Security Professionals at the City National Plaza.  I conducted and facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals.  I ensured all Security Professionals were compliant with BSIS security training and licensing.  I conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft.  I conducted ongoing Risk and Vulnerability Assessments of the City National Plaza to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED) and protocols to respond and mitigate threats.  I developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. I coordinated all security efforts to ensure safety at Special Events.  I conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis.

From March 2016 to September 2017, I was the Director of Security at L&R Group of Companies.  I conducted Risk and Vulnerability (RAV) Assessments for all L&R Group of Companies developments and projected developments throughout the United States. I

## On-Scene Consulting

conducted and/or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals. I ensured all Security Professionals were compliant with BSIS security training and licensing. I conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft. I conducted ongoing Risk and Vulnerability Assessments to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. I developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. I coordinated all security efforts to ensure safety at Special Events. I conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis as well as respective law enforcement agencies throughout the United States on security matters.

In 2020, I received my Master of Legal Studies from Pepperdine Caruso School of Law. Attached are my curriculum vitae, listing of testimony and fee schedule.

Scott A. DeFoe

53

## On-Scene Consulting

May 26, 2023

Mr. David B. Wallace, Esq.
United States Department of Justice
800 Front Street, Fourth Floor
San Diego, California 92101


### Federal Rules of Civil Procedure 26 (a) (2) (B) Rebuttal Report

**SILVESTRE ESTRADA, a minor by and through his proposed guardian ad litem
EMILY PRIETO, OLGA TOVAR; FRANCISCO MADARIAGA; and JAIME
MADARIAGA-GONZALEZ, Plaintiffs.**
**vs.**
**UNITED STATES OF AMERICA, and DOES 1-10, Defendants.**
**Case No. 22-cv-373-AJB (BGS).**

Dear Mr. Wallace,

Thank you for retaining me to analyze additional material received after the submission of my Rule 26 Report on May 5, 2023, and if necessary, to render rebuttal opinions.

Please be advised that if additional documents related to this matter are provided, it may be necessary to write a supplemental report in order to refine or express additional opinions.  It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

1

MSJ_360

On-Scene Consulting

**Additional Materials Reviewed:**

1. Report by Mr. Jonathan C. Smith, 5/14/2023.

2. Report by Mr. Stephen L. Plourd Investigations, 5/12/23.

**Rebuttal Opinions to Mr. Jonathan C. Smith's Opinions**

1. <u>Page 9</u>:  Mr. Jonathan C. Smith states, *"It reversed and came to a complete stop, still on the grassy area."*

Mr. Jonathan C. Smith omitted that Mr. Silvestre Estrada stopped his vehicle after Border Patrol Agent Luis Perez positioned his Border Patrol vehicle behind Mr. Silvestre Estrada's vehicle blocking any further reverse travel.

2. <u>Page 11</u>: Mr. Jonathan C. Smith states, *"According to Steve Plourd's investigation, the cell phone video clearly shows the vehicle was moving approximately 4-5 mph when the agents opened fire, and all three agents, including Godreau, had ample time to move."*

It is my rebuttal opinion, based on my review of the facts and testimony in this matter, that the involved Border Patrol Agents, used proper <u>De-Escalation and Defusing</u> Techniques in an attempt to cause Mr. Silvestre Estrada to surrender peacefully by attempting to create <u>Time Distance</u>, but were unsuccessful based on Mr. Silvestre Estrada's <u>active resistance</u>, <u>assaultive and life-threatening behavior</u>.

In addition, it is my rebuttal opinion based on my twenty-six year law enforcement career where I was assigned a tactics and firearms instructor as well as being involved in three Officer-Involved Shooting incidents, a Law Enforcement Officer under circumstances such as what occurred in this case is usually not able to see and react to changes in the subject at whom he or she is shooting.  This is not determined by whether that change is an increase or a decrease in the threat presented to the officer by the subject.  The focus of the officer's attention-internal or external, specific, or general, near or far, and left or right-will determine the officer's ability to perceive and react to changes in the threat and also the length of time it takes for the officer to perceive and then react to that change.  In addition, this incident occurred at night and the involved agents had to contend with the vehicle's illuminated lights that would have negatively impacted their abilities to align their front and rear sight apertures on their semi-automatic pistols.

MSJ_361

On-Scene Consulting

The delay in noticing any change in the nature of the threat and having the officer change his or her behavior in response to that threat could theoretically take the average officer 1-1.5 seconds in a dynamic, "real-world," life-threatening encounter if the officer did not expect the threat would cease, which I believe occurred based on the agents actions and reasonable response based on the totality of the circumstances.

In addition, officers will both start and stop shooting based on a variety of factors, including their visual angle on the incident and their ability to perceive the threat, their attentional and reactive capabilities, and their psychomotor movement times.

3.  Page 17:  Mr. Jonathan C. Smith states, *"Agent Baker testified he was able to safely move out of the way of the Nissan at an earlier point in time in the gas station when it was moving toward him at approximately "15 to 20 mph."*

Agent Christopher Baker stated, "It was accelerating.  It was rapidly accelerating.  I can't give you the exact speed.  I'd say 15 to 20 miles per hour—as it passed me." "It was on this grassy area, so between the fence and the parking lot, and it was heading right towards me, and I had to jump—run out of the way of the vehicle.  It was heading right towards me.  I was pointing my flashlight and I had to kind of do an evasive maneuver to get out of the front of the vehicle." "If I wouldn't have moved, it would have hit me head on, but it was within 10 feet as I ran away," (Deposition Transcript of Christopher Baker, Pages 17-18, 25-26).

4.  Page 17: Mr. Jonathan C. Smith states, *"I would expect the Agents involved to claim that the vehicle was attempting to accelerate."*

Mr. Jonathan C. Smith appears to be making a credibility determination by making this statement which he is prohibited from doing as a police practices expert.

In addition, Mr.  Jonathan C. Smith failed to consider, Plaintiffs' Consolidated Responses and Objections to Defendant's Requests for Admissions, Case No. 22-cv-373-AJB (BGS):

Request for Admission No. 18: Admit that shortly before any shots were fired, Estrada "revved" the engine of the Nissan.

Response by Francisco Madariaga: **Admit**.

3

## On-Scene Consulting

In addition, Brian Moreno, an off-duty San Diego Police Department Police Officer who was filling up his gas tank at the time of the incident stated the following:

According to Witness Brian Moreno, he noticed the RPM's on the engine of the Nissan start to go higher and make a high-pitched whine as the Nissan moved forward, (Deposition Transcript of Brian Moreno, Page 73). According to Witness Brian Moreno, the driver of the Nissan was traveling in the direction of the Border Patrol Agents that were on foot before the shots were fired, (Deposition Transcript of Brian Moreno, Page 80).

5. Pages 18-19: Mr. Jonathan C. Smith states, *"Officers can use non-lethal force options to encourage the driver such as K-9, OC spray, a pepper ball launcher, a baton or taser."*

As a former Los Angeles Police Department (LAPD) Metropolitan Division K9 Supervisor and who wrote the LAPD K9 Manual and who attended the San Diego County Sheriff's Department Advanced K9 School, the idea of deploying a K9 into a moving vehicle is non-sensical and quite honestly laughable. I have personally directed, approved, and facilitated thousands of K9 deployments and there has never been a single K9 deployment inside of a moving vehicle.

As a former Los Angeles Police Department (LAPD) Metropolitan Division Special Weapons and Tactics Supervisor and Defensive Tactics Supervisor/Instructor who has deployed chemical irritants/agents to include Oleoresin Capsicum (OC) spray into a barricaded vehicles on numerous occasions, there has never been a single deployment of chemical agents/irritants inside of a moving vehicle. This situation was never static preceding the shooting but rather rapid, tense, and uncertain. In addition, there would not be an opportunity to utilize an impact weapon such as a Collapsible Straight Baton on Mr. Silvestre Estrada as he was driving as this situation was never static preceding the shooting but rather rapid, tense, and uncertain. In addition, the only area to deploy the Collapsible Straight Baton would be to the head or neck area of Mr. Silvestre Estrada which would violate CBP Use of Force Policy, Law Enforcement Safety and Compliance Directorate Operations Support, 4500-002A, January 2021, 5. Collapsible Straight Baton:

c. The following acts and techniques with the CSB are prohibited when using less-lethal force:

4

On-Scene Consulting

(2).  Intentional strikes with the baton to the **head**, **neck**, the **face**, the groin, the solar plexus, the kidneys, or the spinal column.

As a former Los Angeles Police Department (LAPD) Metropolitan Division Special Weapons and Tactics Supervisor and Long Range Impact Device Supervisor/Instructor who has deployed Long Range Impact Device munitions into barricaded vehicles, it would be ineffective to deploy pepper ball round(s) at the head of Mr. Silvestre Estrada as this situation was never static preceding the shooting but rather rapid, tense, and uncertain.

As a former Los Angeles Police Department (LAPD) Metropolitan Division Special Weapons and Tactics Supervisor and Taser Instructor, there would not be an opportunity to deploy a Taser either in Probe Mode or Drive Stun Mode at the head of Mr. Silvestre Estrada from an effective range of 7-15 feet as this situation was never static preceding the shooting but rather rapid, tense, and uncertain.  In addition, the only area to deploy the Taser would be to the head or neck area of Mr. Silvestre Estrada based on his position in the vehicle which would violate CBP Use of Force Policy, Law Enforcement Safety and Compliance Directorate Operations Support, 4500-002A, January 2021, Electronic Control Weapon, (ECW):

f.  Authorized Officers/Agents shall not intentionally target the **head**, **neck**, groin, or female breast.

C. Sympathetic Fire Played a Role in this Shooting, "I think sympathetic fire could have played a role in this situation in that Agents all reacted to the initial pull of the trigger," (Pages 21-22)

Mr. Jonathan C. Smith again appears to be making a credibility determination by making this statement which he is prohibited from doing as a police practices expert.  In addition, his statement is completely based on speculation and not on a single fact, testimony, or evidence in this case.  Each of the respective CBP Agents (Alba, Matthews, and Godreau) independently articulated the necessity to use lethal force.  In addition, based on this unplanned event that was rapid, tense, uncertain, and occurred without an advanced warning, Agents Godreau, Matthews, and Alba had to immediately respond to an imminent threat.

MSJ_364

On-Scene Consulting

## Rebuttal Opinions to Mr. Stephen L. Plourd's Opinions

Mr. Stephen Plourd omitted the following from Agent Christopher Baker's <u>Deposition Pages 25-26</u>: "I may have jumped.  I know I ran.  I made an evasive maneuver to get out of there and get behind cover.  If I wouldn't have moved, it would have hit me head on, but it was within 10 feet as I ran away."

On <u>Page 4</u>, Mr. Stephen Plourd states, *"USBP agents were now surrounding the Estrada vehicle on the driveway and concrete platforms of the gas station, with no way out, as the driveway was the only entrance/exit to the property."*
- Mr. Silvestre Estrada could have turned left and driven through the barbed wire fence directly towards Agent Matthews, putting the 2020 Nissan Altima, California License Plate: <u>8RAM551,</u> back on the highway, continuing to flee and putting the Border Patrol Agents, Mr. Silvestre Estrada's passengers, and other motorists in danger.

On <u>Page 5</u>, Mr. Stephen Plourd states, *"Mr. Estrada stopped his vehicle and began to move forward turning left toward the fence when the three agents ran in front of and to the side of his vehicle and opened fire."*

- Mr. Stephen Plourd's statement makes it seem as if the Agents ran up and shot a moving vehicle, however, the Agents were in position before the 2020 Nissan Altima, California License Plate: <u>8RAM551,</u> driven by Mr. Silvestre Estrada began to accelerate.

In addition, Mr. Stephen Plourd omitted the following: <u>Plaintiffs' Consolidated Responses and Objections to Defendant's Requests for Admissions,</u> <u>Case No. 22-cv-373-AJB</u> (<u>BGS</u>):

<u>Request for Admission No. 18</u>: Admit that shortly before any shots were fired, Estrada "revved" the engine of the Nissan.

<u>Response by Francisco Madariaga</u>: **Admit**.
In addition, Brian Moreno, an off-duty San Diego Police Department Police Officer who was filling up his gas tank at the time of the incident stated the following:

According to Witness Brian Moreno, he noticed the RPM's on the engine of the Nissan start to go higher and make a high-pitched whine as the Nissan moved forward, (<u>Deposition Transcript of Brian Moreno, Page 73</u>). According to Witness Brian Moreno,

6

## On-Scene Consulting

the driver of the Nissan was traveling in the direction of the Border Patrol Agents that were on foot before the shots were fired, (<u>Deposition Transcript of Brian Moreno, Page 80</u>).

On <u>Page 7</u>, Mr. Stephen Plourd states, *Shots 3 and 4 were made by Agent Godreau firing in succession into the approximate center of the windshield approximately 10-12 feet away from the windshield."*

With respect to Mr. Stephen Plourd's opinion that Agent Godreau fired the <u>3rd and 4th shots</u>, I disagree with that opinion because among other reasons, the <u>3rd and 4th shots</u> were fired at <u>2.30</u> and <u>2.37 seconds</u> respectively-a mere seven-hundredths of a second apart. From a human factors standpoint and based on my training in the use of firearms, it would be impossible for the same shooter to fire consecutive rounds from a 9mm semi-automatic pistol in such a short period of time.  Based on my extensive training and experience in firearms, it takes approximately <u>.30 seconds</u> for a shooter to fire a subsequent round from a 9mm semi-automatic pistol.  It is my expert opinion that the <u>3rd and 4th shots</u> were fired from different Border Patrol Agents.

## <u>My Qualifications for Reviewing this Case:</u>

My opinions are based on my education, training, and experience.  Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in Criminal Justice, I was hired as Criminal Investigator/Special Agent, GS-1811.  Upon completion of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training Center (<u>FLETC</u>), 6-Month academy, I was assigned to the Organized Crime Drug Task Force where I functioned as an agent and undercover operative. The investigations focused on targeting criminal organizations that were involved in large scale drug smuggling and money laundering operations.

I was assigned to the Office of the Special Agent In-Charge, in San Francisco from August 1988 until I joined the Los Angeles Police Department in November of 1989. While in the academy, I was selected by the staff to be my Recruit Class Leader.  Upon my graduation from the LAPD Academy, I was assigned to 77th Division.  In addition to being assigned to 77th Division, I was assigned to Northeast Division (<u>Patrol</u>), Northeast Division (<u>Special Projects Unit-SPU</u>), Northeast Division C.R.A.S.H (<u>Gang Detail</u>).  I was selected to be transferred to Operations Central Bureau C.R.A.S.H., where I was assigned to a plain clothes detail targeting specific gangs throughout Operations Central Bureau.

MSJ_366

## On-Scene Consulting

I was selected to be a Police Officer III at Wilshire Area Vice where I functioned as an undercover operative targeting prostitution, gambling, bookmaking, and other Vice related offenses. While working Wilshire Vice, I was ambushed and received two gunshot wounds.  I received the Purple Heart in 2010.  Upon return from my injuries, I attended mandated Field Training Officer School and was assigned as a Field Training Officer (FTO) at Wilshire Division.  I trained recruits upon their graduation from the Los Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for service, court testimony, emergency procedures, pursuit policy, accident investigations, perimeters, Department policies and procedures, and effective communication skills. While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of Force incident.

I was promoted to the rank of Detective and attended the LAPD Detective School.  Upon completion of LAPD Detective School, I was assigned to Wilshire Area Narcotics, Field Enforcement Section, where I functioned in an undercover capacity.

I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division.  Prior to my assignment, I attended the mandated LAPD Supervisor School.  In conjunction with LAPD Supervisor School, I was selected to attend the West Point Leadership Academy Supervisor Training.  The training focused on team building, leadership, and decision making.  While assigned to Hollenbeck Division, I conducted roll call training on a daily basis on numerous subject matters to include Use of Force Options (Non-Lethal and Lethal), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal Bulletins, Training Directives, and other Standardized Roll Call Training.  I directly supervised Police Officers and provided supervisory oversight during calls for service, tactical situations, perimeter tactics, containment and control issues and use of force incidents.  I conducted audits, personnel investigations, Standard Based Assessments (Ratings/Evaluations), Use of Force Investigations, Administrative Projects, and prepared commendations for Police Officer's field performance.  While assigned to Hollenbeck Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special Enforcement Group, (SEG).  I directly supervised (14) Police Officers and Detectives assigned to the Unit.  SEG worked in conjunction with Hollenbeck Detectives and specifically targeted career criminals in Hollenbeck Division.  I provided ongoing mandated Department Training as well tactical, firearms, less than lethal force, lethal force and search warrant tactics training to Police Officers and Detectives.  SEG prepared and served numerous search warrants.  I provided search warrant tactical briefing and de-briefing of each warrant at the conclusion of the of the search warrant service.  I

8

On-Scene Consulting

completed audits, administrative projects, Use of Force Investigations, personnel complaints, and other administrative duties as deemed necessary by the Area Commanding Officer.

During this time, I was assigned to Internal Affairs Division (IAD), Headquarters Section.  I investigated personnel complaints that exceeded the scope for a geographical Division.  At the conclusion of my assignment to IAD, I was selected to Management Services Division, Special Projects, Office of the Chief of Police.  I completed numerous in-depth staff projects for review by the Chief of Police.  In addition, I conducted research and edited the 2000 LAPD Department Manual.

Also, during this time, I earned my Master's Degree in Public Administration from California State University, Long Beach.

I was selected as a Sergeant II at 77th Division Vice.  I directly supervised (10) undercover Vice Officers and four uniformed Police Officers.  I provided all facets of training to the Police Officers assigned to Vice to include Use of Force Policy, Legal Updates, Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics Training, Undercover Operations Training, Surveillance Training, and any other training deemed necessary by the Area Commanding Officer.  I conducted audits, personnel investigations, administrative projects, Use of Force Investigations, and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart Corruption Task Force.  I conducted Use of Force audits and Internal Affairs Audits on Specialized Units in Central Bureau and South Bureau.

In 2000, I was selected to Metropolitan Division K9 Platoon as a Sergeant II+1.  I directly supervised (16) K9 Handlers.  Metropolitan Division K9 conducted K9 searches for the entire Department covering all Patrol Divisions and Specialized Units.  I provided all facets of training to the K9 Officers to include K9 Operations, tactics, search warrant services, Mobile Field Force Options, Less than Lethal Force Options, Lethal Force Options, Department Directives, Training Bulletins, and other training dictated by the Officer-in-Charge and Commanding Officer.  In addition, I taught K9 Operations at LAPD In-Service Training, Watch Commander School, Sergeant School, Field Training Officer (FTO) School and Detective School.   While assigned to K9, I investigated and completed K9 contacts (bite investigations), personnel complaints, and Use of Force Investigations.  In addition, I directed and was directly involved in Use of Force

9

On-Scene Consulting

incidents.  I received the LAPD Medal of Valor and LAPD Police Star for two lethal use of force incidents while assigned to K9.

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT).  I directly supervised (60) SWAT Officers.  I conducted and facilitated all facets of SWAT training to include Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun, Remington 870 Bean Bag Shotgun, .40mm, 37mm, X-26 Taser) on a monthly basis.  In addition, I facilitated and conducted training in the following training Cadres: Breacher (Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention, Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support Training (Fast Rope, Aerial Platform Shooting).  I directly supervised SWAT missions and High-Risk Search Warrant Services to include all facets (preparation, briefing, deployment, de-briefing).  I was the Supervisor-in-Charge of the Crisis Negotiation Team, (CNT).  I provided on-going Crisis Negotiation Training, mental health training, Tactical de-briefs of SWAT incidents, 40-hour POST Certified CNT School, and suicide prevention training.  I worked in conjunction with the mental health community to provide and facilitate training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science Services Section (BSS), and Didi Hirsch Suicide Prevention Training.  In addition, I assisted the West Point Military Academy with the development of their crisis negotiation curriculum.

During this time, I was selected as the LAPD SWAT representative to respond to Mumbai India with LAPD Counterterrorism and Las Vegas Metropolitan Division Police Department Counterterrorism following the terrorist attack in November 2008.  I taught use of force, tactics, and SWAT deployment to 250 Mumbai Special Tactical Police Officers.  Upon my return, I assisted with the development of Multi-Assault, Counter-Terrorism Action Capabilities, (MACTAC).

In June 2010, I retired from the Los Angeles Police Department with over 20 years of service to pursue an opportunity in the private sector. I held supervisory positions for the last 14 years of my career.  During my tenure with the LAPD, I received over 100 Commendations including: The Medal of Valor, Purple Heart, and the Police Star. From June 2010 through April 2013, I was the Vice President of Security Operations at Caruso Affiliated in Los Angeles, CA.  My responsibilities included identifying and conducting Risk and Vulnerability Assessments for all Caruso Affiliated Developments, projected developments/investments, and residences.  I utilized strategic-level analysis from the intelligence community, law enforcement and the private sector.  I identified and monitored potential or actual incidents among critical infrastructure domains and all

MSJ_369

On-Scene Consulting

personal and professional interests of Caruso Affiliated.  I mitigated expected threats.  I utilized preplanned, coordinated actions in response to infrastructure warnings or incidents.  I responded to hostilities.  I identified and eliminated the cause, or source, of an infrastructure event by the utilization of emergency response measures to include on-site security personnel, local law enforcement, medical and fire rescue, and relevant investigative agencies.  I conducted all facets of security training for the company and employees.  I formulated Business Continuity and CEO Succession Plans for the company and all affiliated business interests.  I conducted ongoing audits and internal investigations.

From June 2013 to June 2014, I was hired as a Deputy Sheriff at the Riverside Sheriff's Department where I conducted all facets of patrol service to include calls for service, self-initiated field activity, arrests, citations, and court testimony. In addition, during my tenure with the Riverside County Sheriff's Department, I was assigned to Robert Presley Detention Center (RPDC).  I processed and monitored inmate population from initial intake, housing, court, transportation, and release. I conducted searches of inmate population as well as the facility on an ongoing basis. I utilized my experience as a gang officer, Detective and Sergeant with LAPD to conduct interviews and interrogations of prisoners regarding a myriad of investigations. I provided information to Gang Detail. I functioned as a mentor to newly appointed Deputy Sheriffs as well as Supervisors. I attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. I attended on-going training to include Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents and Proper Protocols and Procedures when responding to a medical incident or suicide.

From June 2014 to March 2016, I was the Director of Security at Universal Protection Service where I supervised 84 Security Professionals at the City National Plaza.  I conducted and facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals.  I ensured all Security Professionals were compliant with BSIS security training and licensing.  I conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft.  I conducted ongoing Risk and Vulnerability Assessments of the City National Plaza to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED) and protocols to respond and mitigate threats.  I

11

## On-Scene Consulting

developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. I coordinated all security efforts to ensure safety at Special Events. I conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis.

From March 2016 to September 2017, I was the Director of Security at L&R Group of Companies. I conducted Risk and Vulnerability (RAV) Assessments for all L&R Group of Companies developments and projected developments throughout the United States. I conducted and/or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals. I ensured all Security Professionals were compliant with BSIS security training and licensing. I conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft. I conducted ongoing Risk and Vulnerability Assessments to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. I developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. I coordinated all security efforts to ensure safety at Special Events. I conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis as well as respective law enforcement agencies throughout the United States on security matters.

In 2020, I received my Master of Legal Studies from Pepperdine Caruso School of Law. Attached are my curriculum vitae, listing of testimony and fee schedule.

Scott A. DeFoe

12



**CASTEEL  ACCIDENT RECONSTRUCTION**

1920 Cordell Court,  Suite 102,  El Cajon, CA 92020

# <u>*22-074: Estrada v. USA*</u>

## *Expert Report*

Prepared For:

David Wallace

By

Casteel Accident Reconstruction

*Date*

May 12, 2023

MSJ_372

# TABLE OF CONTENTS

*1. Items Reviewed* ........................................................................ *4*

*2. General Description of Events* .................................................... *5*

*3. Synopsis of Statements* ............................................................. *5*

Plaintiff Francisco Madariaga—Statements from Deposition ............................... 5

Plaintiff Jaime Madariaga-Gonzalez—Statements from Deposition ....................... 6

Border Patrol Agent Robert Godreau—Statements from Deposition ...................... 6

Border Patrol Agent Jason Alba—Statements from Deposition ............................. 7

Border Patrol Agent Christopher Baker—Statements from Deposition ................... 7

Border Patrol Agent David Matthews—Statements from Deposition ..................... 8

Border Patrol Agent Jose Patch—Statements from Deposition ............................. 8

Border Patrol Agent Luis Perez—Statements from Deposition ............................. 9

Witness Brian Moreno—Statements from Deposition ........................................... 9

Witness Kevin Gandara—Statements from Deposition ......................................... 10

Witness Matthew Delgado—Statements from Deposition ..................................... 10

Witness Trent Heimerdinger—Statements from Deposition .................................. 10

*4. Roadway Description* ................................................................ *11*

*5. Vehicle Description* ................................................................... *12*

Vehicle 1 ................................................................................................... 12

*6. Vehicle Damage Evaluation* ...................................................... *13*

*7. Analysis* ................................................................................... *15*

Reconstruction of the Nissan Altima's Behavior ................................................ 15

Kinematics and Primary Cause Analysis ............................................................ 16

The Perceived Threat of Danger Created by the Revving of the Nissan's Engine
Immediately Before the Vehicle Accelerated Toward Agent Godreau ................... 17

*8. Conclusions* ............................................................................. *17*

*Appendix A: Nissan Range Analysis & Date Of Loss Movement* ....... *19*

*Appendix B: VBox Test Results in Low & Drive Gear* ...................... *21*

MSJ_373

***Appendix C: Nissan Ability and Range Acceleration Results in Low*** ...............................*23*

***Appendix D: Nissan Ability and Range Acceleration Results in Drive*** ...............................*26*

***Appendix E: Dave Casteel Analysis*** ...............................*29*

***Appendix F: VBox 0.1 Second Increment Test Data*** ...............................*33*

***Appendix G: Nissan Exemplar Testing Aerial Images & Results*** ...............................*35*

***Appendix H: Nissan Acceleration Testing Paths*** ...............................*38*

***Appendix I: Flash Drive Labeled "Estrada v USA"*** ...............................*41*

**MSJ_374**

# 1. ITEMS REVIEWED

1. Faro Scans of the area of loss taken by investigators following the incident on May 21, 2021

2. Approximately 331 color photographs depicting the Nissan taken during a CAR Inc. vehicle inspection on December 12, 2022

3. Approximately 194 color photographs depicting the area of loss, the Nissan, and the Border Patrol vehicles following the incident

4. Approximately 1 color photograph depicting the area of loss taken by Lou Patch

5. Approximately 8 color photographs depicting the area of loss taken by Brian Moreno

6. Approximately 6 color photographs depicting the area of loss taken by Border Patrol Agent Jason Alba

7. Approximately 1 color photograph depicting the area of loss taken by Border Patrol Agent Spencer Whitney

8. Security camera video from Cameron Corners Convenience Store depicting the incident

9.  2 security camera videos from Circle K gas station depicting the incident

10. San Diego Sheriff's Department regional crime lab vehicle processing/trajectory analysis documentation

11. VBox III acceleration data for 19 tests taken during exemplar Nissan acceleration testing

12. Approximately 20 videos of the Nissan acceleration testing taken on an iPhone

13. Approximately 13 videos of the Nissan acceleration testing taken from an overhead drone

14. The deposition transcript of Plaintiff Francisco Madariaga

15. The deposition transcript of Plaintiff Jaime Madariaga-Gonzalez

16. The deposition transcript of Border Patrol Agent Jason Alba

17. The deposition transcript of Border Patrol Agent Christopher Baker

18. The deposition transcript of Border Patrol Agent Robert Godreau

19. The deposition transcript of Border Patrol Agent David Matthews

20. The deposition transcript of Border Patrol Agent Lou Patch

MSJ_375

21. The deposition transcript of Border Patrol Agent Luis Perez

22. The deposition transcript of witness Matthew Delgado

23. The deposition transcript of witness Kevin Gandara

24. The deposition transcript of witness Trent Heimerdinger

25. The deposition transcript of witness & off duty SDPD Brian Moreno

26. Aerial and street view photographs of the area of loss from Google Earth Pro

27. Vehicle specifications for all known vehicles involved

## 2. GENERAL DESCRIPTION OF EVENTS

The subject event involves a Nissan Altima driven by Silvestre Vargas Estrada attempting to evade Border Patrol on multiple occasions before coming to rest within a dirt area of the parking lot of a Sinclair gas station in Campo, California. Upon approaching the vehicle on foot, the Nissan accelerated in the direction of multiple Border Patrol Agents placing their lives at risk.

## 3. SYNOPSIS OF STATEMENTS

### PLAINTIFF FRANCISCO MADARIAGA—STATEMENTS FROM DEPOSITION

He was in the front passenger seat of the Nissan Altima and his cousin was seated behind him. He didn't know the driver. Eventually a police car was behind the Nissan driving normally and turned on the overhead lights. The driver said he was going to stop but the road didn't have a shoulder. He stopped and lowered his window. The agent arrived. The driver saw it was an immigration agent and that's when he sped away. He heard the tires make a noise on the road as the vehicle sped away. Something like the sound of a race car taking off. He describes the driver's driving as high speed. Because of the curves he would leave the roadway. He estimates the speed the Nissan to be 100 to 120 kilometers per hour. On the curves the Nissan driver would go to the wrong side of the road. He felt the driver of the Nissan was driving dangerously. He was scared because if they got into a collision he could die. The three border agents were behind them the entire time. The driver came into the gas station and went up front next to the store. Then he jumped over to the grass on the corner, but there were two patrol cars. Then the Nissan went back to look for the exit, driving on grass. He arrived at the exit but there were two police cars. He couldn't drive through because the curb was too high. The driver drove backwards and stopped to look around and see where he could go. The agents were approaching the car. Several officers were yelling at him to stop. The agents that were standing near the front corners of the vehicle were about 3 meters away. The driver tried to speed away, but the car didn't move, and the agents shot their guns. The car wasn't moving when they shot.

The driver put his foot on the accelerator as though he wanted to start driving, he knows because he could hear it. He heard the engine revving for like 1 to 2 seconds.

## PLAINTIFF JAIME MADARIAGA-GONZALEZ—STATEMENTS FROM DEPOSITION

A car stopped on route 94 to pick them up and they got in. He was in the back seat on the passenger side. They were driving normally for 20 minutes. They passed patrol officers. The cars drove behind them normally for a while then turned on their overhead lights. An agent got out, tapped on the window and said something in English so the driver started to flee. That was the fastest he had ever gone in a car in his life. He thought the car was going to overturn or crash and he might die if they leave the roadway. The driver would cross to the opposite side of traffic going around some of the curves. It was 15-20 minutes from when the driver fled to the gas station. He was very scared. He thought the driver was putting him at risk. There was only one entrance to the gas station. The driver left the concrete of the gas station parking lot and went up onto the grass by going over the curb. The driver came to a stop in the grass and just stayed there. The driver backed up a little bit. When he noticed there was no exit. The Border Patrol were stopped all around and began surrounding the car. The car was stopped for a minute or two and then he heard the shots. There were two agents about 5 meters or less from the vehicle. He claims the driver didn't put the agents in danger. When the shots were fired the car was not moving forward. He didn't hear the car engine make a noise. When the driver was on the grass he was moving slowly.

## BORDER PATROL AGENT ROBERT GODREAU—STATEMENTS FROM DEPOSITION

He pulled out from facing south on Vollmer Lane Road and highway 94 to follow the Nissan as it passed by. He performed a vehicle stop. He thought the vehicle might flee since he hadn't seen the parking brakes turn on. As is approaching the vehicle the driver yells something and takes off at a fast rate. He pursues the vehicle. He believes the Nissan reached speeds of 100 mph. He believes the Nissan was driving recklessly. He thinks the Nissan was brake checking him as he would get close the driver would stop really hard on the brake to slow him down. They entered the gas station, and he was the first car behind the Nissan. The Nissans' speed as it pulled into the parking lot fluctuated, from slow by the gas pumps to speeding up to 25 or 35 mph in some areas. The Nissan went to the southwest corner of the parking lot. He came to a stop along the western side of the parking lot. He was facing west along the 94. At that point he thought the chase had come to an end. But he turned right and went over the curb. Now the Nissan was going eastbound on a grass field. The vehicle was 3-5 feet parallel to the fence. The Nissan continued onto the grassy area along Highway 94 and was speeding up. There's a large curb that the Nissan hit solid and came to a stop. He put his vehicle in front of the Nissan, on the paved area. The Nissan was then put in reverse. As the Nissan backed up it got within a foot of the border patrol vehicle behind it. There was another agent behind the Nissan, so it came to a stop. He exits his vehicle to perform an arrest. He commands the driver to put his hands up. He hears the engine rev up and the vehicle came at a fast rate towards him where he

MSJ_377

opened fire because he thought the vehicle was going to kill him. He was standing at the 10:30 to 11:00 o'clock hour in a position relative to the Nissan. He was standing approximately 10 feet from the vehicle when he opened fire on the Nissan. He was in front of the Nissan because he was taking a direct line towards the Nissan from his vehicle. After he fired his weapon, the vehicle came to a stop. He perceived himself and the agents next to him to be in danger.

## BORDER PATROL AGENT JASON ALBA—STATEMENTS FROM DEPOSITION

He was on patrol and heard a radio transmission from dispatch. He heard they were attempting a vehicle stop. He heard the vehicle had fled and officers were engaging in pursuit. He was on Forest Gate and Highway 94. He was behind Agent Godreau. He fell behind approximately a mile from the gas station. At some point the car entered the parking lot of a Circle K. The vehicle went into the driveway, around the pumps, to the back parking lot. He pursued the vehicle through the back parking lot. The vehicle then went all the way through the grass and tried to get to the driveway and came to a sudden stop. The vehicle hit the curb and impeded its progress. The vehicle backed up. After backing up the vehicle came to a stop. He saw agent Godreau approaching the vehicle. He estimates Agent Godreau was 6 feet from the front of the Nissan. He was standing between 11 and 12 o'clock relative to the Nissan. He heard the engine revving as though the accelerator had been pushed. He fired his weapon because he believes the vehicle might continue forward and injure agent Godreau. Once the shots were fired the vehicle continued to move forward a little.

## BORDER PATROL AGENT CHRISTOPHER BAKER—STATEMENTS FROM DEPOSITION

He met up with Agent Godreau after hearing about a loaded vehicle travelling towards them. Agent Godreau got behind the Nissan and he followed Agent Godreau a couple hundred yards back. Agent Godreau pulled the Nissan over and he also pulled over right behind Agent Godreau. The Nissan took off eastbound. The Nissan was driving at such a high rate of speed he was in and out of visibility. At one point, the Nissan lost control and regained control. Eventually the Nissan pulled into a Circle K gas station. He parked his car just east of a gap in the fence that is 40 to 50 yards west of the gas station entrance. He then got out of his car. He did not believe the Nissan would try to drive through the fence opening since there were too many natural barriers. As he was approaching the grassy area, the Nissan ran over the curb and started driving at him. The vehicle was rapidly accelerating. He puts the speed of the Nissan at 15 to 20 mph as it passed him. The Nissan was heading right for him, and he had to jump out of the way of the front. The Nissan was driving a couple feet away along the fence. He was initially planning on getting back in his car, but he saw the Nissan was getting stuck and he saw agents approaching the vehicle. He didn't see the shots, but he heard them and took cover. He perceived himself to be in imminent harm when the Nissan made a U-turn towards him. If he hadn't moved, he would have been hit. He knows the Nissan was accelerating because he saw the vehicle go forward before he heard the pops. He estimates the Nissans speed between 5 to 10 mph when the gunfire occurred. He heard the Nissan engine revving and there was dust

MSJ_378

going up in the air from the tires. That's what he would assume is pedal to the metal. He saw that the officers were in danger of being killed, they were approaching the vehicle and it went forward. At least one agent would have been pinned or hit by the subject vehicle if they had stayed in front. He was ten yards north and just a little west of the Nissan when he heard the gunshots.

## BORDER PATROL AGENT DAVID MATTHEWS—STATEMENTS FROM DEPOSITION

The subject Nissan already had two agents behind it at the time he first saw the vehicle. He pulled in behind the two agents that were following the Nissan. The Nissan pulled over and stopped. After all three of the agents had gotten out of their vehicles, the Nissan took off. The pursuit continued eastbound. The Nissan eventually pulled into a Circle K gas station. At some point the Nissan stopped within that enclosure. He yelled to stop the car. The moment he did, the vehicle took off eastbound. Driving in the dirt. He lost sight as he ran back to his vehicle. He stayed on the highway side of the fence during the incident because there were already multiple vehicles within the enclosure. The Nissan was moving towards an agent when it was first shot. He heard the engine rev. He fired his weapon when the vehicle faced towards him. He fired his weapon into the vehicle from across the fence. When the engine revved it was very high pitch meaning they put the accelerator pedal all the way down. When he fired his weapon, he believed he was in imminent danger because the vehicle was headed directly towards him. There was a flimsy barbed wire fence in front of them and the Nissan was coming straight for him. He also perceived the other agent that was in front of the vehicle at the time of acceleration to be in imminent danger. The vehicle was 5 to 10 feet from him when he shot once at the Nissan. He did not see the Nissan reverse and back up to the truck.

## BORDER PATROL AGENT JOSE PATCH—STATEMENTS FROM DEPOSITION

He was in the last vehicle in line (4th) that was pursuing the Nissan. He drove into the gas station parking lot and went by the gas pumps. Did a three-point turn and parked his car near the entrance to the lot. He got out of his vehicle when he saw the Nissan trying to jump the curb. The Nissan couldn't make it over the curb. Both the passenger window and rear passenger window were down. He was in the 1:00 o'clock position in front of the Nissan as it stopped in the area, after backing up. He was 10 to 15 feet from the vehicle when it stopped. He heard an engine rev loudly and then the Nissan moved forward, lunged from that position coming towards him and Agent Godreau, and feared for his life. He did not fire his weapon because agent Godreau was in his line of fire. Agent Godreau was 10 feet from him. He believed Agent Godreau was in great physical danger for his life when the Nissan accelerated. He estimates the speed of the Nissan when it lunged forward to be 10 to 15 mph.

## BORDER PATROL AGENT LUIS PEREZ—STATEMENTS FROM DEPOSITION

He was one of the border patrol agents that followed the Nissan into the Circle K gas station. Agent Godreau's vehicle was in front of him as they pursued. He was on the northern side of the pumps with his vehicle to observe what the other agents were doing. The Nissan drove onto a grass section and continued to drive east. Agent Baker had to jump out of the way of the Nissan when it was on the grass jumping the curb. The Nissan passes by his position, travelling east. He then turned his vehicle to get behind the Nissan. He noticed the Nissan was trying to reverse because the driver couldn't get out. He jumped the curb into the grassy area and positioned his vehicle right behind the Nissan. This was done to box in the Nissan. The Nissan stopped 1 to 2 feet from the front of his vehicle. He heard the Nissan's engine revving while remaining stationary. When the Nissan stopped in front of him, he exited his vehicle. He was roughly 5 to 10 feet from the Nissan. Agent Godreau was directly in front of the Nissan. The Nissan driver got the vehicle into drive and started to move forward. He perceived Agent Godreau to be in danger. He heard gunshots. Immediately following the shots, the Nissan came to a stop. He estimates the speed of the Nissan lunging forward to be between 5 to 10 mph.

## WITNESS BRIAN MORENO—STATEMENTS FROM DEPOSITION

He is a police officer with the SDPD (off-duty). He was getting gas at the Circle K. After filling up he couldn't leave because he saw sirens and a car being chased by a bunch of Border Patrol. He was in his vehicle, a 2018 Toyota Tacoma. The vehicle was speeding on the 94. The vehicle being chased pulled into the gas station parking lot. The vehicle went in front of him and drove back to the back area of the parking lot, at which point it became obstructed. When the Nissan was pulling through the Circle K parking lot it was driving fast. It definitely looked like the driver was trying to get out of there. The next time he saw the Nissan it was trying to go back towards the entrance. He estimates the speed of the Nissan as it pulled through the parking lot to be 25 to 30 mph. The Nissan was driving in the dirt as it was heading for the gas station entrance. The Nissan hit a little two-foot curb. He tucked in under the first pump of the gas station with his vehicle. It appeared that the Nissan was trying to evade the Border Patrol as they were trying to stop him. He heard a loud pop when the Nissan hit the curb. Then it backed up, and it seemed like the Nissan didn't know where to go. It did not appear that the Nissan had anywhere to go at that point because there were cars all around it. The Nissan reversed "erratically". Trying to get out of there as fast as he could. After reversing the Nissan came to a stop for a second. There were Border Patrol agents on foot, two of them in front of the Nissan walking towards the front of the car. He could hear the agents yelling to "stop" and "get out of the car" through his own closed windows. The Nissan started pulling forward again. When the Nissan had stopped and was starting to move forward again, he heard the engine, the rpms going higher on the engine like the vehicle was trying to escape. He describes it as a high-pitched whine. He associates that sound with someone trying to rapidly pick up speed. When the shots were fired the Nissan was moving, it looked like it was trying to get back up to Campo Road going in the direction of the Border Patrol. He probably would have hit one of the Border Agents trying to get out of that parking lot. Two of the Border Agents were roughly 10 feet from the Nissan, and one was about 15 feet away. One of the Agents was off in the 1:00 o'clock area and the other was in the 3:00

MSJ_380

o'clock area relative to the Nissan. The Nissan was travelling in the direction of the Border agents when they fired the shots. It looked like the vehicle was starting to turn left after it started accelerating. After the shots were fired and the Nissan came to rest, it remained there.


## WITNESS KEVIN GANDARA—STATEMENTS FROM DEPOSITION

On the date of the incident he was working at the Circle K. He looked outside and saw a bunch of Border Patrol vehicles come inside the parking lot. It seemed like they were following someone. 10 to 15 seconds later he sees the Nissan surrounded in the middle of the gas pump. It seems like the Nissan tried to get out. He saw the Nissan back up a little and then he heard the shots. When the Nissan was surrounded, it was on the concrete. It appeared as though the driver was trying to evade arrest. The driver appeared to be driving erratically. He doesn't know if the vehicle was moving forwards when the shots were fired.

## WITNESS MATTHEW DELGADO—STATEMENTS FROM DEPOSITION

He was working at the subway on the date of loss. He was working the closing shift. He first saw the Nissan go through the parking lot followed by a border patrol agent. He only recalls the vehicle driving along the fence in the grass and dirt. He didn't keep his eyes on the Nissan the entire time until the shots were fired because he had to go get his phone. The Nissan was travelling at a medium to medium-fast speed, noticeably faster for a parking lot. He didn't see the Nissan get up onto the grass. It appeared the Nissan was trying to evade the Border Patrol. The Nissan came to a halt when it reached the curb that was too high. The Nissan was reversing quickly. When the Nissan backed up another Agent in a vehicle came up and blocked it in place. He took a video of what was unfolding in front of him. It appeared that the Nissan was driving dangerously. After backing up the Nissan was stopped for 2 to 3 seconds. After stopping, the Nissan proceeded to drive forward in the direction of the agents. He saw two border patrol agents in front of the Nissan about 3 to 6 feet away. Based on what he saw it appeared the Nissan posed a threat to the Border Patrol agents at that moment in time. He describes the movement forward as a jerk forward quickly. The gunshots occurred when the Nissan was in motion forward. In a matter of moments it was possible that the Nissan could have run into one of the Border Patrol agents.

## WITNESS TRENT HEIMERDINGER—STATEMENTS FROM DEPOSITION

Prior to getting to Buckman Springs Road stop sign he could see in the big meadow of campo sirens off to the right. When he first saw the Nissan it was underneath the gas pumps (at the Sinclair). The Border Patrol pursued the Nissan through the gas station entrance. The Nissan tried to get out of the main entrance and a Border Patrol vehicle stopped him close to the entrance. It looked like the Nissan was trying to go through the grass however he could to get back to the main entrance. The Nissan went in reverse back towards the main building of the parking lot. The Nissan was reversing fast, approximately 10 to 15 mph. After reversing the

MSJ_381

Nissan came to a stop briefly. He saw the Border Patrol Agents get out. They drew their weapons, the Nissan rolled forward and then he heard gunshots. He estimates the speed of the Nissan as it was pulling forward just before the shots rang out to be approximately 8 to 10 mph. When the shots were fired the agents were about 10 to 15 feet away in front of the Nissan. The Nissan was facing right at the agents on foot. If he went straight, he would have gone right at them. The Nissan driver posed a threat to the agents on foot. He describes the Nissan's driving as erratic, trying to evade. A lot of vehicles surrounded that area very quickly. The Nissan driver appeared to be driving recklessly. He did not see the Nissan jump the curb into the dirt and grass area.

## 4. ROADWAY DESCRIPTION

The incident occurred in a Sinclair gas station off State Route 94 at the intersection with Buckman Springs Road in the county of San Diego. The roadway on State Route 94 consists of a single asphaltic concrete travel lane in the eastbound and westbound direction. Opposing traffic is separated by a double yellow painted roadway stripe.  There is a designated left turn pocket for eastbound traffic on State Route 94 to turn onto Buckman Springs Road. The roadway is bordered by a dirt shoulder and barbed wire fence on the south side with scattered trees. There is one driveway that serves as an entrance and exit for the gas station and convenience store. There is a dirt patch between the paved roadway of State Route 94 and the Portland concrete paved area for the Sinclair gas pumps. At the time of loss the roadway was clean and dry and there were no apparent visual obstructions. The incident occurred during nighttime. See figure 1 below for an aerial image of the area.

MSJ_382



*FIGURE 1: GOOGLE AERIAL PHOTOGRAPH DEPICTING AREA OF NISSAN POINT OF REST*

## 5. VEHICLE DESCRIPTION

### VEHICLE 1

- *Year: 2020*

- *Make: Nissan*

- *Model: Altima*

- *Trim level: 2.5 S*

- *Engine Type: L4, 2.5L*

- *Body Type: 4 Door Sedan*

- ***Driveline Type: All Wheel Drive***

- *License: 8RAM551*

- *VIN: 1N4BL4BW3LC251824*

The 2020 Nissan Altima is built with Nissan's "Intelligent All Wheel Drive" system. This system consistently monitors road conditions and rapidly responds to changes. The wheel sensors function to detect traction loss, indicating which wheels require additional power. It distributes power, as needed, to the wheels with the best traction. This feature makes it a great choice if you live in an area with heavy rain or snow, or you plan to take your vehicle for light off-roading. This feature lessens the tires' ability to "spin out". In normal driving conditions, when the Nissan is at speed, power is sent to the Nissan Altima's front wheels to maximize fuel efficiency. The photographs below taken of the subject Nissan indicate that vehicle does indeed have All Wheel Drive.




## 6. VEHICLE DAMAGE EVALUATION












FIGURE 2: PHOTOGRAPHS TAKEN OF NISSAN ALTIMA

1920 Cordell Court, Suite 102 El Cajon, CA 92020-0900          *14/41*

619-937-0502 Fax 619-937-0507

MSJ_385

<u>Synopsis of damaged areas</u>

An analysis of the vehicle damage was conducted during a CAR Inc. vehicle inspection. It is evident the Nissan suffered minor impact damage to the front of the vehicle toward the right side. The focal point appears to be below the right headlamp housing. The right side of the bumper assembly has been displaced from the vehicle and remains attached. This damage most likely occurred when the Nissan impacted the two-foot-tall curb on the east edge of the dirt area. There are multiple bullet holes in the windshield. The right rear window has been shattered. There appears to be sideswipe damage on the trailing edge of the driver's door. Additionally, there is a small outward bulge with paint missing on the rear driver's side door just below the door handle. Overall, the damage indicates a minor impact to the front of the vehicle.

The damage to the Nissan Altima indicates a minor impact; it is evident that the Nissan impacted the curb on the front right portion. This damage supports the claim that the Nissan impacted the curb as it attempted to flee through the gas station entrance.

# 7. ANALYSIS

After reviewing the available evidence, including statements, vehicle damage, VBox test data in drive gear and low gear, and photographs of the area of the incident, I was able to perform a preliminary analysis to determine the details of the collision and the probable cause.

Mr. Estrada's continued desire to evade the Border Patrol Agents in the subject Nissan put his own life, the lives of his passengers, and the lives of the pursuing agents at risk. Mr. Estrada had multiple opportunities to stop the vehicle and surrender to the Border Agents. He could have surrendered when initially pulled over, when he entered the gas station, when the Nissan impacted the curb, and finally, he could have surrendered when he reversed and came to a stop with the Nissan boxed in. At each one of those instances, Border Agents assumed that the chase had run its course, but Mr. Estrada continued to attempt evasion. The Border Agents that exited their vehicles and surrounded the Nissan were now in danger of the Nissan accelerating and impacting them. Witnesses stated there was a high-pitched whine from the Nissan's engine indicating a high acceleration. At maximum acceleration, the Nissan could have impacted the Border Agents within 2 seconds.

## RECONSTRUCTION OF THE NISSAN ALTIMA'S BEHAVIOR

The Nissan Altima had pulled over to the side of the road in response to Border Patrol Agents activating their overhead lights. The driver of the Nissan proceeded to flee when he noticed the Agents next to his vehicle. A chase ensued where the Nissan was driving recklessly, crossing over to the opposite side of the road, travelling at high speeds up to 100 mph, and at least one point, losing control. Agent Godreau testified that the Nissan attempted to brake check him in an attempt to make him lose control. After approximately 15 minutes of pursuit, the Nissan turned from eastbound State Route 94 into the Sinclair gas station. The Nissan travelled westbound

through the parking lot attempting to find an exit in the rear. Upon noticing there was no exit, the Nissan performed a U-turn and hopped the curb, driving onto a grassy dirt area nearly impacting Border Patrol Agent Christopher Baker in the process. The Nissan then travelled eastbound in the dirt area approximately 3 to 5 feet parallel to the barbed wire fence attempting to reach the gas station entrance. The grassy dirt area was bordered by a two-foot-tall Portland concrete curb that the Nissan impacted attempting to reach the exit. The Nissan then reverses approximately 100 feet before being boxed in by Border Patrol Agent Luiz Perez's vehicle. The Nissan remains stationary for 2 to 3 seconds while revving the engine before lunging forward in the direction of the Border Patrol Agents surrounding the vehicle on foot.

## KINEMATICS AND PRIMARY CAUSE ANALYSIS

Based on <u>Low</u> gear acceleration testing with an exemplar Nissan Altima, the Border Patrol Agents on foot within the Nissan's turn range could have been impacted in less than 2 seconds from start of acceleration (See Appendix A). The Nissan had an average acceleration factor of 0.44 g for straight line acceleration in low, 0.31 g for left turn acceleration in low, and 0.24 g for right turn acceleration in low (See Appendix B). The Nissan had the potential to travel forward to Agent Godreau's position in 1.26 seconds, at which point the 3400-pound Nissan would be travelling approximately 11.6 mph (See Appendix C). If the Nissan turned right and accelerated, it could have impacted Border Patrol Agent Jose Patch in 1.28 seconds from start of acceleration, where it would be travelling approximately 10.5 mph.

It should be noted that the Border Patrol Agent and vehicle positions in Appendices A, B, & C are from the analysis of 3D Forensic Inc. The testing turn and acceleration data provided by CAR Inc. was overlayed onto the positions set by 3d Forensic Inc.

Based on <u>Drive</u> gear acceleration testing with an exemplar Nissan Altima, the Border Patrol Agents on foot could have still been impacted in less than 2 seconds. The Nissan had an average acceleration factor of 0.38 g for straight line acceleration in drive, 0.34 g for left turn acceleration in drive, and 0.24 g for right turn acceleration in drive (See Appendix B). The Nissan had the potential to travel forward to Agent Godreau's position in 1.46 seconds travelling approximately 11.79 mph (See Appendix D). If the Nissan turned right and accelerated, it could have impacted Border Patrol Agent Jose Patch in 1.28 seconds from start of acceleration, where it would be travelling approximately 10.61 mph.

It may be concluded that Mr. Estrada's continued evasive actions put his life, the lives of his passengers, and the Border Patrol Agent's lives at risk. When given multiple opportunities to surrender, Mr. Estrada refused and continued to attempt escape. When the Nissan was finally boxed in by Border Patrol vehicles and surrounded by Border Agents on foot, the driver still attempted to escape. Revving the engine in a threatening manner. His vehicle had the potential of a deadly weapon for the Agents within the Nissan's turning range.

MSJ_387

## THE PERCEIVED THREAT OF DANGER CREATED BY THE REVVING OF THE NISSAN'S ENGINE IMMEDIATELY BEFORE THE VEHICLE ACCELERATED TOWARD AGENT GODREAU

Agents Godreau, Alba, Baker, Matthews, and Patch all testified that they heard the Nissan's engine rev loudly immediately before the car accelerated toward Agent Godreau. This was confirmed by other witnesses at the scene, including off-duty SDPD Officer Moreno and plaintiff Francisco Madariaga. According to the agents, due to the degree of revving, they expected the Nissan to accelerate at a high speed toward Godreau. I understand the Plaintiffs dispute the level of revving because, as described by the agents, it was louder than would be expected given the actual speed of the vehicle as it headed toward Godreau. In my opinion, the high level of revving likely occurred when the vehicle was placed in neutral due to one of two plausible reasons. First, Estrada may have intentionally placed the vehicle in neutral and revved the engine to confuse the agents. Alternatively, after reversing in the grassy area of the Circle-K parking lot, Estrada moved the shifter down toward him as he tried to place the transmission in drive mode. But he mistakenly placed the vehicle in neutral, which is the transmission setting between reverse and drive (see photo above on p. 13). Then, when he pressed the accelerator and heard revving, but realized the car was not moving, he shifted down again into drive.



FIGURE 3: PHOTOGRAPH OF THE NISSAN ALTIMA SHIFTER

## 8. CONCLUSIONS

After reviewing all of the evidence available to me thus far, I have come to the following conclusions.

1.  The Nissan Altima driven by Silvestre Vargas Estrada led Border Patrol Agents on a reckless and dangerous pursuit that ended in the Sinclair gas station grassy/dirt area.

2. Mr. Estrada had multiple opportunities to stop and surrender to the Border Patrol Agents but refused, and he continued to attempt evasion. Agent Baker had to do an evasive maneuver to avoid being struck by the Nissan after it ran over the curb onto the grassy area further highlighting Mr. Estrada's potential to inflict harm.

3. Surrounded by Border Patrol vehicles and agents on foot, Mr. Estrada revved his engine and accelerated the Nissan in the direction of the Border Patrol Agents before shots were fired.

4. Based on exemplar testing of the Nissan Altima, the position of the Nissan Altima in the grassy area, and the positioning of Border Patrol Agents, at the moment the Nissan accelerated and starting moving forward, the Nissan could have impacted Agent Godreau in 1.26 seconds from the start of acceleration, reaching a speed of approximately 11.6 mph if the vehicle was in low, and 1.46 seconds travelling 11.79 mph if the vehicle was in drive. Based on the same considerations, if the Nissan had turned to the right, it could have impacted Border Patrol Agent Jose Patch in 1.28 seconds from start of acceleration, reaching a speed of approximately 10.5 mph if the vehicle was in low and 10.61 mph if the vehicle was in drive.

5. Mr. Estrada's consistent evasive and threatening actions while operating the Nissan presented the vehicle as a real time threat with potential deadly force to Border Patrol Agents.

Respectfully submitted,

David A. Casteel

President

Casteel Accident Reconstruction

MSJ_389

## APPENDIX A: NISSAN RANGE ANALYSIS & DATE OF LOSS MOVEMENT





MSJ_391

## APPENDIX B: VBOX TEST RESULTS IN LOW & DRIVE GEAR

### 22-074 VBOX Results - Straight in Low

| | First 5 feet of Acceleration | | | | First 10 feet of Acceleration | | | |
|---|---|---|---|---|---|---|---|---|
| | Time (sec) | Speed (mph) | Distance (ft) | Average Acceleration (g) | Time (sec) | Speed (mph) | Distance (ft) | Average Acceleration (g) |
| Test 1 | 0.92 | 8.60 | 5.0 | 0.44 | 1.26 | 11.60 | 10.0 | 0.45 |
| Test 2 | 0.96 | 8.65 | 5.0 | 0.41 | 1.30 | 11.60 | 10.0 | 0.43 |
| Test 3 | 0.94 | 8.42 | 5.0 | 0.43 | 1.28 | 11.67 | 10.0 | 0.44 |

### 22-074 VBOX Results - Left Turn in Low

| | First 5 feet of Acceleration | | | | First 10 feet of Acceleration | | | |
|---|---|---|---|---|---|---|---|---|
| | Time (sec) | Speed (mph) | Distance (ft) | Average Acceleration (g) | Time (sec) | Speed (mph) | Distance (ft) | Average Acceleration (g) |
| Test 1 | 1.04 | 7.50 | 5.0 | 0.34 | 1.43 | 10.42 | 10.0 | 0.32 |
| Test 2 | 1.13 | 7.56 | 5.0 | 0.31 | 1.51 | 10.83 | 10.0 | 0.30 |
| Test 3 | 1.05 | 7.56 | 5.0 | 0.26 | 1.42 | 10.44 | 10.0 | 0.23 |

### 22-074 VBOX Results - Right Turn in Low

| | First 5 feet of Acceleration | | | | First 10 feet of Acceleration | | | |
|---|---|---|---|---|---|---|---|---|
| | Time (sec) | Speed (mph) | Distance (ft) | Average Acceleration (g) | Time (sec) | Speed (mph) | Distance (ft) | Average Acceleration (g) |
| Test 1 | 0.90 | 7.61 | 5.0 | 0.28 | 1.28 | 10.51 | 10.0 | 0.25 |
| Test 2 | 0.96 | 7.79 | 5.0 | 0.27 | 1.34 | 10.50 | 10.0 | 0.24 |
| Test 3 | 1.09 | 7.53 | 5.0 | 0.24 | 1.47 | 10.46 | 10.0 | 0.22 |

## 22-074 VBOX Results - Straight in Drive

| | First 5 feet of Acceleration | | | | First 10 feet of Acceleration | | | |
|---|---|---|---|---|---|---|---|---|
| | Time (sec) | Speed (mph) | Distance (ft) | Average Acceleration (g) | Time (sec) | Speed (mph) | Distance (ft) | Average Acceleration (g) |
| Test 1 | 1.18 | 8.38 | 5.0 | 0.34 | 1.53 | 11.73 | 10.0 | 0.37 |
| Test 2 | 1.15 | 8.55 | 5.0 | 0.35 | 1.49 | 11.77 | 10.0 | 0.38 |
| Test 3 | 1.13 | 8.48 | 5.0 | 0.37 | 1.46 | 11.79 | 10.0 | 0.39 |
| Test 4 | 1.10 | 8.34 | 5.0 | 0.36 | 1.44 | 11.51 | 10.0 | 0.39 |

## 22-074 VBOX Results - Left Turn in Drive

| | First 5 feet of Acceleration | | | | First 10 feet of Acceleration | | | |
|---|---|---|---|---|---|---|---|---|
| | Time (sec) | Speed (mph) | Distance (ft) | Average Acceleration (g) | Time (sec) | Speed (mph) | Distance (ft) | Average Acceleration (g) |
| Test 1 | 1.02 | 8.11 | 5.0 | 0.36 | 1.37 | 10.93 | 10.0 | 0.34 |
| Test 2 | 0.95 | 7.51 | 5.0 | 0.37 | 1.32 | 10.48 | 10.0 | 0.34 |
| Test 3 | 0.98 | 7.86 | 5.0 | 0.36 | 1.34 | 10.82 | 10.0 | 0.34 |

## 22-074 VBOX Results - Right Turn in Drive

| | First 5 feet of Acceleration | | | | First 10 feet of Acceleration | | | |
|---|---|---|---|---|---|---|---|---|
| | Time (sec) | Speed (mph) | Distance (ft) | Average Acceleration (g) | Time (sec) | Speed (mph) | Distance (ft) | Average Acceleration (g) |
| Test 1 | 1.05 | 7.70 | 5.0 | 0.26 | 1.43 | 10.61 | 10.0 | 0.23 |
| Test 2 | 0.99 | 7.91 | 5.0 | 0.27 | 1.36 | 10.40 | 10.0 | 0.24 |
| Test 3 | 0.91 | 7.76 | 5.0 | 0.29 | 1.28 | 10.61 | 10.0 | 0.25 |

# APPENDIX C: NISSAN ABILITY AND RANGE ACCELERATION RESULTS IN LOW







MSJ_396

## APPENDIX D: NISSAN ABILITY AND RANGE ACCELERATION RESULTS IN DRIVE



MSJ_397



MSJ_398



MSJ_399

## APPENDIX E: DAVE CASTEEL ANALYSIS



MSJ_400

ANALYSIS | 22-074

KINEMATIC ANALYSIS BASED ON AVERAGE ACCELERATION RATES.

## STRAIGHT LINE ACCELERATION

WHEN $\bar{a}_A = 0.455$ (14.4783 ft/sec²)

| TIME (sec) | Sx (ft.) | VE (ft/sec) | (mi/hr) |
|---|---|---|---|
| 0.1 | 0.0724 | 1.448 | 0.9872 |
| 0.2 | 0.2899 | 2.8957 | 1.9745 |
| 0.3 | 0.6515 | 4.3435 | 2.9617 |
| 0.4 | 1.1583 | 5.7913 | 3.9486 |
| 0.5 | 1.8098 | 7.2392 | 4.9356 |
| 0.6 | 2.6061 | 8.6670 | 6.0229 |
| 0.7 | 3.5472 | 10.1348 | 6.9101 |
| 0.8 | 4.6331 | 11.5826 | 7.8973 |
| 0.9 | 5.8637 | 13.0305 | 8.8844 |
| 1.0 | 7.2392 | 14.4783 | 9.8716 |
| 1.1 | 8.7594 | 15.9261 | 10.8587 |
| 1.2 | 10.4244 | 17.3740 | 11.8459 |
| 1.3 | 12.2340 | 18.8218 | 12.8330 |
| 1.4 | 14.1887 | 20.2696 | 13.8202 |
| 1.5 | 16.2881 | 21.7175 | 14.8072 |
| 1.6 | 18.5322 | 23.1653 | 15.7945 |
| 1.7 | 20.9211 | 24.6131 | 16.7817 |
| 1.8 | 23.4548 | 26.0609 | 17.7688 |
| 1.9 | 26.1333 | 27.5089 | 18.7560 |
| 2.0 | 28.9560 | 28.9566 | 19.7431 |

## LT/TURN ACCELERATION

WHEN $\bar{a}_A = 0.8336$ (9.1149 ft/sec²)

| TIME (sec) | Sx (ft) | VE (ft/sec) | (mi/hr) |
|---|---|---|---|
| 0.1 | 0.0456 | 0.9115 | 0.6215 |
| 0.2 | 0.1825 | 1.8230 | 1.2429 |
| 0.3 | 0.4102 | 2.7345 | 1.8644 |
| 0.4 | 0.7292 | 3.6460 | 2.4869 |
| 0.5 | 1.1394 | 4.5574 | 3.1074 |
| 0.6 | 1.6407 | 5.4689 | 3.3288 |
| 0.7 | 2.2331 | 6.3804 | 4.3503 |
| 0.8 | 2.9166 | 7.2919 | 4.9718 |
| 0.9 | 3.6915 | 8.2034 | 5.5932 |
| 1.0 | 4.5574 | 9.1149 | 6.2147 |
| 1.1 | 5.5145 | 10.0264 | 6.8362 |
| 1.2 | 6.5627 | 10.9379 | 7.4576 |
| 1.3 | 7.7021 | 11.8494 | 8.0791 |
| 1.4 | 8.9326 | 12.7609 | 8.7006 |
| 1.5 | 10.2542 | 13.6723 | 9.3221 |
| 1.6 | 11.6671 | 14.5838 | 9.9435 |
| 1.7 | 13.1710 | 15.4953 | 10.5650 |
| 1.8 | 14.7661 | 16.4068 | 11.1865 |
| 1.9 | 16.4524 | 17.3183 | 11.8079 |
| 2.0 | 18.2298 | 18.2298 | 12.4294 |
| 2.1 | 20.0983 | 19.1413 | 13.0509 |
| 2.2 | 22.0580 | 20.0528 | 13.6723 |
| 2.3 | 24.1089 | 20.9643 | 14.2938 |
| 2.4 | 26.2909 | 21.8757 | 14.9153 |
| 2.5 | 28.4640 | 22.7872 | 15.5368 |

ANALYSIS                                    22-074

KINEMATIC ANALYSIS BASE ON AVERAGE ACCELERATION RATES

| TIME (sec) | Sx (ft) | Ve (ft/sec) | (mi/hr) |
|---|---|---|---|
| 0.1 | 0.0361 | 0.7616 | 0.5192 |
| 0.2 | 0.1523 | 1.5231 | 1.0385 |
| 0.3 | 0.3424 | 2.2847 | 1.5577 |
| 0.4 | 0.6092 | 3.0462 | 2.0770 |
| 0.5 | 0.9515 | 3.8078 | 2.5962 |
| 0.6 | 1.3708 | 4.5694 | 3.1155 |
| 0.7 | 1.8658 | 5.3309 | 3.6347 |
| 0.8 | 2.4370 | 6.0925 | 4.1540 |
| 0.9 | 3.0843 | 6.8540 | 4.6732 |
| 1.0 | 3.8078 | 7.6156 | 5.1924 |
| 1.1 | 4.6074 | 8.3771 | 5.7117 |
| 1.2 | 5.4832 | 9.1387 | 6.2309 |
| 1.3 | 6.4352 | 9.9003 | 6.7502 |
| 1.4 | 7.4633 | 10.6618 | 7.2694 |
| 1.5 | 8.5675 | 11.4234 | 7.7887 |
| 1.6 | 9.7479 | 12.1849 | 8.3079 |
| 1.7 | 11.0045 | 12.9465 | 8.8272 |
| 1.8 | 12.3372 | 13.7081 | 9.3464 |
| 1.9 | 13.7461 | 14.4696 | 9.8656 |
| 2.0 | 15.2312 | 15.2312 | 10.3849 |
| 2.1 | 16.7924 | 15.9927 | 10.9041 |
| 2.2 | 18.4297 | 16.7543 | 11.4234 |
| 2.3 | 20.1432 | 17.5158 | 11.9426 |
| 2.4 | 21.9329 | 18.2774 | 12.4619 |
| 2.5 | 23.7987 | 19.0390 | 12.9811 |
| 2.6 | 25.7407 | 19.8005 | 13.5009 |
| 2.7 | 27.7588 | 20.5621 | 14.0196 |
| 2.8 | 29.8531 | 21.3236 | 14.5388 |
| 2.9 | 32.0235 | 22.0852 | 15.0381 |
| 3.0 | 34.2701 | 22.8468 | 15.5773 |

RT/TURN ACCELERATION
WHEN $\mu$ = 0.2367 ?
( $a_A$ = 7.61516 ft/sec² )

1920 Cordell Court, Suite 102 El Cajon, CA 92020-0900

619-937-0502 Fax 619-937-0507

*31*/41

MSJ_402

ANALYSIS                                    22-074

KINEMATIC ANALYS / STRAIGHT LINE TRANSLATION RESULTING IN AN
ADVERAGE ACCELERATION FACTOR OF 0.43g ( 13.8348 ft/sec² )

| TIME (sec) | Sx (ft) | VE (ft/sec) | (mi/hr) |
|---|---|---|---|
| 0.1 | 0.0692 | 1.3835 | 0.9433 |
| 0.2 | 0.2767 | 2.7670 | 1.8866 |
| 0.3 | 0.6226 | 4.1504 | 2.8298 |
| 0.4 | 1.1068 | 5.5339 | 3.7731 |
| 0.5 | 1.7294 | 6.9174 | 4.7164 |
| 0.6 | 2.4903 | 8.3009 | 5.6597 |
| 0.7 | 3.3895 | 9.6844 | 6.6030 |
| 0.8 | 4.4271 | 11.0678 | 7.5463 |
| 0.9 | 5.6031 | 12.4513 | 8.4895 |
| 1.0 | 6.9174 | 13.8348 | 9.4328 |
| 1.1 | 8.3701 | 15.2183 | 10.3761 |
| 1.2 | 9.9611 | 16.6018 | 11.3194 |
| 1.3 | 11.6904 | 17.9852 | 12.2627 |
| 1.4 | 13.5581 | 19.3687 | 13.2059 |
| 1.5 | 15.5642 | 20.7522 | 14.1492 |
| 1.6 | 17.7085 | 22.1357 | 15.0925 |
| 1.7 | 19.9913 | 23.5192 | 16.0358 |
| 1.8 | 22.4124 | 24.9026 | 16.9791 |
| 1.9 | 24.9718 | 26.2861 | 17.9224 |
| 2.0 | 27.6696 | 27.6696 | 18.8656 |

# APPENDIX F: VBOX 0.1 SECOND INCREMENT TEST DATA

**Straight Line in Low Gear**

| Time (sec) | Speed (mph) | Distance (feet) |
|---|---|---|
| 0.00 | 0.00 | 0.00 |
| 0.10 | 0.00 | 0.04 |
| 0.20 | 0.92 | 0.13 |
| 0.30 | 1.69 | 0.33 |
| 0.40 | 2.82 | 0.65 |
| 0.50 | 3.96 | 1.15 |
| 0.60 | 5.19 | 1.82 |
| 0.70 | 6.29 | 2.65 |
| 0.80 | 7.19 | 3.66 |
| 0.90 | 8.32 | 4.78 |
| 1.00 | 9.31 | 6.07 |
| 1.10 | 10.29 | 7.52 |
| 1.20 | 11.02 | 9.08 |
| 1.30 | 12.03 | 10.77 |
| 1.40 | 13.07 | 12.61 |
| 1.50 | 14.02 | 14.59 |
| 1.60 | 14.77 | 16.70 |
| 1.70 | 15.88 | 18.95 |
| 1.80 | 16.73 | 21.34 |
| 1.90 | 17.71 | 23.87 |
| 2.00 | 18.15 | 26.51 |
| 2.10 | 19.28 | 29.28 |
| 2.20 | 20.28 | 32.16 |
| 2.30 | 20.82 | 35.16 |
| 2.40 | 21.74 | 38.27 |
| 2.50 | 22.71 | 41.49 |
| 2.60 | 23.31 | 44.85 |
| 2.70 | 24.07 | 48.31 |

**Left Turn in Low Gear**

| Time (sec) | Speed (mph) | Distance (feet) |
|---|---|---|
| 0.00 | 0.00 | 0.00 |
| 0.10 | 0.42 | 0.04 |
| 0.20 | 0.62 | 0.11 |
| 0.30 | 1.06 | 0.22 |
| 0.40 | 1.94 | 0.44 |
| 0.50 | 2.73 | 0.77 |
| 0.60 | 3.86 | 1.26 |
| 0.70 | 4.79 | 1.91 |
| 0.80 | 5.68 | 2.69 |
| 0.90 | 6.43 | 3.57 |
| 1.00 | 7.13 | 4.55 |
| 1.10 | 7.57 | 5.65 |
| 1.20 | 8.65 | 6.85 |
| 1.30 | 8.94 | 8.12 |
| 1.40 | 10.18 | 9.53 |
| 1.50 | 10.65 | 11.06 |

**Right Turn in Low Gear**

| Time (sec) | Speed (mph) | Distance (feet) |
|---|---|---|
| 0.00 | 0.00 | 0.00 |
| 0.10 | 0.74 | 0.07 |
| 0.20 | 1.44 | 0.23 |
| 0.30 | 2.27 | 0.50 |
| 0.40 | 3.22 | 0.89 |
| 0.50 | 4.14 | 1.42 |
| 0.60 | 5.03 | 2.12 |
| 0.70 | 6.14 | 2.92 |
| 0.80 | 7.15 | 3.90 |
| 0.90 | 7.54 | 4.95 |
| 1.00 | 8.23 | 6.11 |
| 1.10 | 9.15 | 7.42 |
| 1.20 | 9.85 | 8.80 |
| 1.30 | 10.59 | 10.33 |
| 1.40 | 11.22 | 11.92 |

## APPENDIX G: NISSAN EXEMPLAR TESTING AERIAL IMAGES & RESULTS



MSJ_406

**2020 Nissan Altima Exemplar acceleration testing: Left turn, Low**

Start

22-074 left01

Testing Date 4/3/2023

1.43 sec, 10.42 MPH, 10 feet

22-074 left03

1.04 sec, 7.50 MPH, 5 feet

22-074 left02

1.55 sec, 10.63 MPH, 11.5 feet

22-074 left04

MSJ_407



**2020 Nissan Altima Exemplar acceleration testing: Right turn, Low**

Testing Date 4/3/2023

Start

1.28 sec, 10.51 MPH, 10 feet

22-074 right03

22-074 right01

1.47 sec, 11.08 MPH, 12.6 feet

0.90 sec, 7.61 MPH, 5 feet

22-074 right04

22-074 right02

1920 Cordell Court, Suite 102 El Cajon, CA 92020-0900          37/41

619-937-0502 Fax 619-937-0507

MSJ_408

## APPENDIX H: NISSAN ACCELERATION TESTING PATHS



MSJ_409



MSJ_410



MSJ_411

## APPENDIX I: FLASH DRIVE LABELED "ESTRADA V USA"

Flash drive labeled "Estrada v USA" contains the following materials:

- Drone video footage from exemplar Nissan Altima acceleration testing
- iPhone video footage from exemplar Nissan Altima acceleration testing
- VBox III data from exemplar Nissan Altima acceleration testing
- Security footage from the Circle K of the subject incident used in CAR Inc. analysis
- Security footage from Cameron Corners convenience store of the subject incident used in CAR Inc. analysis
- Additional footage of the incident
- CV of David Casteel
- Testimonial History of Dave Casteel
- Fee Schedule of Dave Casteel
- Court Exhibits
- Stills used for analysis
- Thumbnail images of police photos, aerial images, and stills used for analysis

MSJ_412



**CASTEEL  ACCIDENT RECONSTRUCTION**

1920 Cordell Court,  Suite 102,  El Cajon, CA 92020

Estrada v USA                                                                                      5/24/2023

This report responds to certain opinions, claims, and arguments contained in the Expert Reports of Stephen L. Plourd and Jonathan C. Smith, both dated May 12, 2023. The facts and opinions expressed in my report of May 12, 2023 have not changed. I reserve the right to change my opinions as new information becomes available.

**Stephen L. Plourd Report**

- On page 4, Mr. Plourd states "USBP agents were by now surrounding the Estrada vehicle on the driveway and concrete platforms of the gas station, with no way out, as the driveway was the only entrance/exit to the property."
    - Mr. Plourd omits that Estrada could have turned left and driven through the barbed wire fence (pictured below), directly towards Agent Matthews, putting the Nissan back onto the SR-94, and continuing the pursuit. It is my opinion, based on a review of photographs, descriptions of the wire fence in deposition testimony, and knowledge of the weight and acceleration capabilities of the Nissan, that the wire fence would not have stopped the Nissan if the Nissan had impacted the fence. Furthermore, based on the exemplar acceleration testing, from the time the Nissan first started moving forward after reversing to a stop in the grass, the Nissan could have reached Agent Matthews' position (approximately 44 feet) within 2.60 seconds if the vehicle was in low gear and 2.76 seconds if the vehicle was in drive gear.



*Screenshot from drone video showing small wire fence separating Circle-K parking lot from SR-94*

1

MSJ_413

**CASTEEL  ACCIDENT  RECONSTRUCTION**

1920 Cordell Court,  Suite 102,  El Cajon, CA 92020

**Jonathan C. Smith Report**

- On page 12, Mr. Smith states "had the vehicle been revving as stated by several of the agents, there would have been physical evidence of acceleration marks in the grass/dirt area."
  - Mr. Smith omits that non-agent witnesses, including Brian Moreno and one of the Plaintiffs, also heard the Nissan engine revving or accelerating while the Nissan was stationary and surrounded by Border Patrol Agents.
  - Additionally, the All-Wheel Drive system that the subject Nissan is equipped with is designed to maximize traction in various roadway conditions and minimize wheel slipping. For instance, during the exemplar acceleration testing described in my initial report, the Nissan's tires did not leave tire friction marks from any of the 19 acceleration tests performed.
  - Given the AWD features of the subject Nissan and the exemplar testing, it is my opinion that the Nissan would not have left "acceleration" or "skid" marks on the dirt/grass area of the Circle-K parking lot.

Dated: May 24, 2023                                    Respectfully submitted,


David A. Casteel
President
Casteel Accident Reconstruction

2

KEITH H. RUTMAN (CSB #144175)
501 West Broadway, Suite 1650
San Diego, California 92101-3541
Telephone: (619) 237-9072
Facsimile: (760) 454-4372
email: krutman@krutmanlaw.com

JOSH D. GRUENBERG (CSB #163281)
PAMELA VALLERO (CSB #308301)
GRUENBERG LAW
2155 First Avenue
San Diego, CA  92101
Tel: 619.230.1234 / Fax: 619.230.1074
josh@gruenberglaw.com
pam@gruenberglaw.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

(Hon. Anthony J. Battaglia)

| | |
|---|---|
| SILVESTRE ESTRADA, *et al*.; | ) Case No. 22-CV-0373-AJB (BGS) |
| | ) |
| Plaintiffs, | ) |
| | ) **EXPERT REPORT OF JONATHAN** |
| v. | ) **C. SMITH** |
| | ) |
| UNITED STATES OF AMERICA | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |

1

MSJ_415

My name is Jonathan C. Smith, and this report has been written pursuant to F.R.Civ.P. 26(a)(2).

## I.   INTRODUCTION

### A.   Qualifications

I was a peace officer in the City and County of San Diego for 36 years.

I was a sworn SDPD police officer for 26 years and retired in November 2011. My investigative experience included working as a detective in the Homicide Unit, Narcotics Task Force, Narcotics Unit, Gang Unit and Vice Unit. I have over 19 years of experience as an SDPD Detective and 7 as a patrol officer in the Central Division and the Traffic Unit.

I retired as a San Diego Police Department Homicide Detective. As a Homicide Detective I was assigned to Homicide Team IV. I was directly involved in all homicide, suspicious death and officer involved shooting investigations assigned to Team IV from 2003-2011. During this period, I also assisted other SDPD Homicide teams in their investigations. In total, I was involved in over 300 homicide, suspicious death and officer involved shooting investigations.

After retiring from SDPD in November 2011, I was hired as an investigator by the San Diego County District Attorney's Office. As a "DAI," I was assigned to the Superior Court Division and the Special Operations Division. In the Special Operations Division, I worked primarily on Officer Involved Shootings and Police

2

MSJ_416

Misconduct investigations, where I investigated over 70 officer involved shooting incidents during the 7 years of my assignment.

In 2017 I was promoted to a DAI Supervisor and worked in Special Operations, the Family Protection Division and Superior Court Division. I directly supervised investigators in the Crimes Against Police Officer Unit and the Major Violators Unit. I continued to be involved in officer involved shooting cases and was the director supervisor in the Homicide investigation of SDPD Officer JD DeGuzman. I retired in November 2021 after 10 years with the DA's Office and 36 years total as a sworn peace officer.

During the course of my law enforcement career, I assisted in the development of the DA's countywide Crisis Intervention and De-escalation training for police officers. I was directly involved in the DA's 25-year study of officer-involved shootings in San Diego County, and I have presented its findings to over 2,000 law enforcement officers and civilian stakeholders.

I have a Master's of Advance Study from UC Irvine in Criminology, Law, and Society. My Master's capstone project was on the relationship between Officer Involved Shootings and Mental Illness. I have a Bachelor of Science degree in Criminal Justice Administration from San Diego State University.

My experience, training and background are more fully described in my attached resume.

MSJ_417

My areas of expertise in policing include, but are not limited to: officer involved shootings, homicide, crime scene management, police use of force; pursuits; police administration; training; police operations; criminal investigations; interviews.

**B.     Assignment**

I was retained by counsel for the Plaintiffs to both provide background information as well as address several issues related to this lawsuit. Those issues include:

1.  Was it appropriate for US Border Patrol agents to shoot at this particular moving vehicle?

2.  Could de-escalation techniques or less lethal options have effectively been used in this situation?

3.  Did sympathetic fire play a role in the shooting of Mr. Estrada?

4.  Was the shooting scene appropriately secured? Was it appropriate for USBP to move their vehicles from the shooting scene? Was the transfer of the scene from USBP to SDSO Homicide done appropriately?

5.  What significance, or inference, if any, can be drawn from the fact that three shell casings belonging to the officer who claimed to be most directly at risk from the slow-moving vehicle could not be located at the shooting scene despite the efforts of multiple investigators to locate them?

4

6. Should the witnesses to the shooting have been separated prior to any interviews? What about the USBP agents?

7. What significance, or inference, if any, can be drawn from the fact that one attorney for several involved agents assisted in the repositioning of USBP vehicles?

8. Was the delay in interviewing the USBP agents appropriate?

I have reviewed the reports and other materials compiled by the San Diego Sheriff Department's Homicide Unit concerning the circumstances leading to the fatal shooting of Silvestre Estrada Vargas by U.S. Border Patrol Agents Robert Godreau, Jason Alba, and David Mathews, on May 14, 2021. I began my review on August 1, 2022. I visited the scene on three occasions and viewed Estrada's silver Nissan Altima at Sheriff's impounds.

I specifically reviewed the following in making my opinion:

a. All discovery identified in the attached "DOCUMENTS PRODUCED IN DISCOVERY BY USA" (Exhibit 1)

b. Depositions:

Brian Moreno

Christopher Baker

David Matthews

Jaime Madariaga-Gonzalez

5

MSJ_419

Jason Alba

Jose Patch

Kevin Gandara

Kristopher Whitworth

Lauren Sautkulis

Luis Perez

Francisco Madariaga

Matthew Delgado

Nikolaus Kantrantzis

Olga Tovar

Robert Godreau

Robert Powers

Trent Heimerdinger

c. The following discovery responses:

    a. United States Response to Plaintiffs' Requests For Admissions

    b. United States Response to Plaintiffs' Interrogatories

    c. United States Response to Plaintiffs' First and Second Sets of Requests for the Production of Documents

    d. Plaintiffs' Responses to United States' Requests for Production of Documents

MSJ_420

   e. Plaintiffs' Responses to United States' Request for Admissions

  d. The following documents prepared by Plaintiffs' scene reconstruction expert

   Steve Plourd (to whom I have also spoken)

   a. Notes (Exhibit 2)

   b. Additional Notes (Exhibit 3)

   c. Draft angle depiction (Exhibit 4)

   d. SP-5693_diagrams-1-10_12-5-2022  (scene sketches - Exhibit 5)

According to https://www.timeanddate.com/weather/usa/san-diego/historic

the weather conditions on May 14, 2021, at 10:15 pm were as follows:  it was

overcast, ambient air temperature was about 58 degrees, the wind speed was

between 7 and 13 mph, the humidity was 78%, the barometric pressure was 29.93"

hg, visibility was 10 miles, and the moon was 92% dark (waxing crescent).

According to the investigative reports/depositions I reviewed, the terrain was

hard packed and level and not at all slippery, meaning that the CBP agents

assigned footwear would have provided good, stable traction.

At this point in the development of this case, I have not elected to create or

use any demonstrative aids during my testimony. Should I decide to use any such

aids, whether prepared by myself or other members of the Plaintiffs' team, I will

ensure that they are made available for review prior to their use.

MSJ_421

My professional charges for this litigation work is an hourly fee of $350 plus expenses, including all travel time. My fees for deposition and trial testimony are $2,950 per calendar day or any portion thereof, plus travel time and expenses. Thus far, I have been paid the sum of $7,500, and have an invoice outstanding for $14,200.

The opinions that follow are made within a reasonable degree of certainty within the field of police practices based on over 36 years of professional law enforcement experience and scholarship.

## II.    SUMMARY OF INCIDENT

Late one night on May 9, 2021, FRANCISCO MADARIAGA and his cousin JAIME MADARIAGA-GONZALEZ attempted to illegally enter the United States. They were apprehended and deported. On May 12, 2021, they tried again. A foot guide[1] helped them cross and abandoned them by the side of the road where they waited, without food, water, or a charged cell phone.

At approximately 9:43 p.m. on Friday May 14, 2021, they were observed by CBP being picked up at the side of Highway 94 in Campo by a 2020 Nissan Altima driven by SYLVESTRE ESTRADA-VARGAS (Decedent)[2]. At

---

[1]    Who was prosecuted and pled to a time served misdemeanor in 21-cr-1742 and thereafter deported.

[2]    I am aware that the autopsy results revealed that Decedent's blood contained the following controlled substances: Amphetamine 0.05 mg/L and Methamphetamine 0.72 mg/L. I express no opinion on the relevance of these findings.

8

approximately 10:10 p.m., they passed by CBP Agents Godreau and Baker near Volmer Lane and Highway 94. At 10:13 p.m., a traffic stop occurred at 29146 Campo Road (Mountain Empire Campgrounds). As Agent Godreau was walking up to contact the vehicle, Decedent took off, initiating a chase for about 5.1 miles.

Around 10:15, the vehicle entered the Circle K gas station located at the intersection of Highway 94 and Campo Road/Buckman Springs Road, pursued by 6 Border Patrol Vehicles. There is only one way in or out of the gas station. (See Exhibit 6)

The Nissan drove to the back, looking for an exit, but found there was none. It headed back toward the entrance, then completely blocked off by the Border Patrol. (Exhibit 7)[3]  Decedent drove over the grass area and struck an approximate 20-24 inch raised high concrete curb. It reversed and came to a complete stop, still on the grassy area. Attempting to wrest free, the car suffered damage to the front bumper. (Exhibits 8-9)

According to a video of the incident taken on a Subway employee's cell phone camera[4], the vehicle began to move forward at a slow rate of speed, which is when three agents, Agent Mathews, Agent Godreau, and Agent Alba, discharged their firearms at the vehicle, striking Decedent in the upper back. Decedent was

---

[3]    This particular photograph was taken the next day with the CBP vehicles positioned "approximately" where they were at the time of the incident.

[4]    Not included herein.

MSJ_423

transported to the hospital by paramedics and pronounced dead shortly after his arrival.  The two passengers in the vehicle, Francisco Javier Madariaga and Jaime Madariaga Gonzalez, were both uninjured and taken into custody after agents determined they were in the country illegally. They were ultimately deported back to Mexico.

To a man, the CBP agents wrote in their report that Decedent drove recklessly at a "high rate of speed towards USBP agents," endangering their lives. One agent wrote that Decedent was alleged to have driven "forward toward Agent Godreau at a high rate of speed who was trapped between the barbed wire fence and a Border Patrol vehicle."  Agent Godreau claimed he heard the vehicle revving[5] and it "took off" towards him. Agent Matthews claimed to be directly in front of the car on the other side of the fence and "saw the suspects wheels turn towards him."  Agent Alba "feared for Godreau's life who was in front of the vehicle."  Agent Baker stated that after shots were fired, the "driver than began looking around and driving away" This is, of course, not possible.

---

[5]     Witness Heimerdinger, parked at the intersection of Highway 94 & Buckman Springs Road, also claimed to have heard such a high-pitched whine, as did other agents.  There is no independent forensic evidence to establish that the Nissan, which had a standard transmission, was attempting to accelerate at a high rate of speed.  Tire tracks would have revealed such an action, and there were none.

MSJ_424

According to Steve Plourd's investigation, the cell phone video clearly shows the vehicle was moving approximately 4-5 mph when the agents opened fire, and all three agents, including Godreau, had ample time to move6.

Five (5) shots were fired in total: 1 by Agent Alba (the fatal shot), 1 by Agent Matthews and 3 by Agent Godreau7. Only 2 casings were recovered, however. Agent Patch did not shoot because he was rightfully concerned about crossfire. Decedent was struck in the neck by one bullet. The Madariaga cousins were in the direct line of fire and fortunately were uninjured. It cannot be proven who fired first. Agent Alba was sure he did not.

The Sheriff's Department was notified at 10:25 p.m. and responded to the scene at 10:43 p.m. Before the Sheriff's personnel arrived, an ambulance transported Decedent to Sharp Memorial Hospital. The 2 Madariaga cousins, along with all the agents present at the time of the shooting, decamped to the CBP, also before the Sheriff's Department arrived. On May 15, 2021, at about 0020 hours, Decedent was pronounced deceased at a local hospital shortly after arrival.

Back at the CBP substation, most of the agents, who were not known to have been segregated from each other or instructed not to communicate with each other,

---

[6]     Agent Alba later told investigators that during the pursuit in the gas station, Decedent "conducted a U-turn and went around Agent Alba and Agent Godreau."  In other words, he was not trying to run them over.

[7]     As the angles of the projectiles show, no agent as in the direct path of the vehicle when shots were fired.  (See Exhibit 4)

MSJ_425

met with a common union representative. Union provided lawyers also met with the agents before the Sheriff's investigators could question them. Agents Perez, Baker, Godreau, Matthews, and Patch later went back to the scene to conduct walkthroughs with the Sheriff's detectives and reposition their vehicles, but they were not formally interviewed at the time. Subsequent to these walkthroughs, all 6 agents returned to the scene in daylight with Sheriff's Detectives and parked their cars "approximately" where they were positioned the night before and showed the investigators "approximately" where they were standing when shots were fired. (Exhibit 10)

  Crime scene reconstruction expert Stephen Plourd has told me that while the reported statements of the Agents (or civilians) say the car was moving "fast" or "quickly accelerating," the cell phone video, analyzed frame by frame, instead shows that the car was moving at approximately 4-5 mph when the shots were fired. The vehicle's black box did not contain any relevant information. According to Mr. Plourd, had the vehicle been revving as stated by several of the agents, there would have been physical evidence of acceleration[8] marks in the grass/dirt area, a

---

[8] At maximum acceleration, a 2020 Nissan Altima is capable of going from 0 to 60 mph in 8.4 sec, 0 to 100 mph in 22.2 sec, and 0 to 124 mph in 43.8 sec.  Here there is absolutely no independent evidence to support a claim that Decedent "floored it." https://www.automobile-catalog.com/performance/2020/2765735/nissan_altima_2_5_platinum.html

MSJ_426

phenomenon familiar to me in my experience as a detective. None were found or documented by Sheriff's investigators, and no agent reported seeing such evidence.

## III.   SUMMARY OF OPINIONS

### A. Shooting at This Particular Moving Vehicle was an Unreasonable Use of Force

Counsel has provided the following recitation of the applicable law, and I accept it in toto for the purpose of rendering these opinions

"A moving vehicle can of course pose a threat of serious physical harm, but only if someone is at risk of being struck by it." Orn v City of Tacoma, 949 F.3d 1167, 1174 (9th Cir. 2020). Use of deadly force to stop a recklessly speeding vehicle during a car chase may therefore be reasonable under the Fourth Amendment. See, e.g., Mullenix v. Luna, 577 U.S. 7, 15 (2015).

In Villanueva v. California, 986 F.3d 1158, 1170-1172 (9th Cir. 2021), prior to the shooting, Villanueva slowed to below the speed limit and came to a stop before performing a three-point turn. Even under the Officers' view of the facts, "the truck was moving forward at a speed of up to five miles an hour" when they shot at it.)

In holding the officers were not entitled to qualified immunity, the Court stated:

"We have consistently found use of deadly force to stop a slow-moving

13

vehicle unreasonable when the officers could have easily stepped out of the vehicle's path to avoid danger. See Orn, 949 F.3d at 1175 ("Orn's vehicle was moving at just five miles per hour. [The officer] could therefore have avoided any risk of being struck by simply taking a step back."); Acosta v. City & Cnty. of S. F., 83 F.3d 1143, 1146 (9th Cir. 1996), as amended (June 18, 1996), abrogated on other grounds by Saucier v. Katz, 533 U.S. 194 (2001) (finding that a reasonable officer "would have recognized that he could avoid being injured when the car moved slowly, by simply stepping to the side"). In contrast, we have found use of deadly force against a stopped or slow-moving vehicle reasonable only when the driver was trying to evade arrest in an aggressive manner involving attempted or actual acceleration of the vehicle. See Monzon v. City of Murrieta, 978 F.3d 1150, 1161 (9th Cir. 2020) (finding use of deadly force reasonable when "the van's event data recorder, or 'black box,' shows that the van's acceleration pedal was repeatedly pressed down between 80 and 99 percent during the very short 4.5 seconds from start to impact, and the van reached a speed of over 17 mph before hitting [the officer]'s cruiser"); Wilkinson v. Torres, 610 F.3d 546, 551-53 (9th Cir. 2010) (finding deadly force reasonable where the officer "was standing in a slippery yard with a minivan accelerating around him"); see also Plumhoff, 572 U.S. at 776 (deadly force reasonable where "the front bumper of [the driver's] car was flush with that of one of the police cruisers, [the driver] was obviously pushing down on the accelerator because the car's wheels were spinning, and then [the driver] threw the car into reverse 'in an attempt to escape.'").

Acosta thus clearly established that an officer who shoots at a slow-moving car when he can easily step out of the way violates the Fourth Amendment, as we recently reaffirmed in Orn. 949 F.3d 1167. . . . "If [the driver] was traveling at only five miles per hour as he maneuvered past [the officer's] SUV, and if he did not accelerate until after being shot, a reasonable jury could conclude that [the officer] lacked an objectively reasonable basis to fear for his own safety, as he could simply have stepped back to avoid being injured."

Id.

Determining the reasonableness of an officer's actions is a highly fact-intensive task. Avina v. United States, 681 F.3d 1127, 1130 (9th Cir. 2012).

14

MSJ_428

As case law makes clear, the decision to use deadly force is highly dependent on the specific circumstances of the situation, and officers must make split-second decisions in high-stress situations. However, law enforcement officers should also avoid intentionally and unreasonably placing themselves in positions in which they have no alternative to using deadly force, including moving vehicles.

Officers in every agency, state, federal or local, are generally trained to avoid shooting at moving vehicles unless it is absolutely necessary to protect themselves or others from an imminent threat of death or serious bodily harm.

The US Department of Homeland Security Department Policy on Use of Force Section V B(2)(a) specifically states: "US DHS law enforcement officers are prohibited from discharging firearms at the operator of a moving vehicle, vessel, aircraft, or other conveyance unless the use of deadly force against the operator is justified under the standards articulated elsewhere in this policy.

That relevant CBP Use of Force Policy provides, in part, that "Authorized Officers/Agents shall not discharge their firearms at the operator of a moving vehicle, vessel, or aircraft unless deadly force is necessary, that is, when the officer/agent has a reasonable belief that the operator poses an imminent danger of serious bodily injury or death to the officer/agent or to another person."

In its Use of Force Policy, the International Association of Chiefs of Police (IACP) also recommends that officers should not discharge their firearm at a

MSJ_429

moving vehicle unless the occupants of the vehicle are using deadly force, such as firing a weapon, and there are no other available options to prevent imminent harm.

Witness Brian Moreno, an off-duty San Diego Police Officer, also testified in his deposition that SDPD officers are training to not shoot at a moving vehicle absent urgent necessity to protect against imminent danger of serious bodily injury or death.

In my training and experience, the use of deadly force by law enforcement officers against a moving vehicle is generally discouraged because of the high risk of causing harm to the driver, passengers, or innocent bystanders. Shooting at a moving vehicle can also cause the driver to lose control, increasing the risk of a crash, serious injuries and can potentially escalate the situation. Additionally, the bullets may pass through the vehicle and hit unintended targets.

Instead of shooting at a moving vehicle, officers are trained to use other tactics to stop the vehicle, such as cutting off all avenues of escape, using a tire deflation device or pursuing the vehicle until it can be safely stopped. This approach allows officers to maintain control of the situation and reduce the risk of harm to themselves and others. Shooting at a moving vehicle is a tactic that should be used only in the most extreme circumstances when all other options have been exhausted.

MSJ_430

Based upon the facts developed during discovery and the applicable law, it is my opinion that use of deadly force to stop this slow-moving vehicle was unreasonable because the officers could have easily stepped out of the vehicle's path to avoid danger. There was no risk of losing their footing on the grassy area given the ambient conditions. Agent Baker testified he was able to safely move out of the way of the Nissan at an earlier point in time in the gas station when it was moving toward him at approximately "15 to 20" mph. I have seen no objective evidence to support the claim that at the time of the shooting Decedent was trying to evade arrest in an aggressive manner involving attempted or actual acceleration of the vehicle. I would expect the Agents involved to claim that the vehicle was attempting to accelerate. However, no audio or video evidence, nor tire track analysis, can support this assertion. It is entirely possible that Decedent placed the vehicle in neutral when trying to start moving again, but given the lack of black box data, we will never know.

Police officers receive specialized training to help them remain calm during a pursuit and other high stress situations. The training is designed to help officers control their emotions and adrenaline, stay focused and make quick and effective decisions under pressure. Officers learn how to communicate effectively with their

17

fellow officers, dispatchers, and other law enforcement agencies in these types of situations. They are trained to quickly assess the risk and benefits of continuing a pursuit, including evaluating factors such as the severity of the crime, the safety of bystanders, and the likelihood of apprehending the suspect. Officers receive training on how to de-escalate a situation, including techniques for slowing down or ending a pursuit safely, such as using spike strips or other non-lethal tools.

Ultimately, the Court will have to decide whether Decedent was "trying to evade arrest in an aggressive manner involving attempted or actual acceleration of the vehicle" based on all available evidence. However, it is my opinion that the cell phone video is dispositive on this issue.

### B. De-Escalation Techniques and Less Than Lethal Options Could Have Been Used

There are several de-escalation techniques that law enforcement officers can use to get a driver to safely exit a vehicle and avoid the need for deadly force. Officers can use verbal commands to communicate with the driver and instruct them to exit the vehicle. However, multiple officers shouting conflicting commands at a driver can create a chaotic scene and escalate the situation. One officer should give clear commands to the driver while other officers use their vehicles to prevent the suspect from fleeing the scene. Officers can use non-lethal force options to encourage the driver to exit the vehicle, such as a K-9, OC spray, a

18

pepper ball launcher, a baton or a taser. These options can be effective in disabling the driver and removing him from the vehicle.

If the situation allows for it, officers may choose to back off and wait for a better opportunity to remove the driver. This can include slowing down the incident, closing off escape routes and calling for additional resources if necessary. De-escalation techniques are essential for law enforcement officers to safely remove a driver from a vehicle while protecting themselves and the public.

All CBP Agents at the scene described multiple commands by multiple agents being given to the driver.

It is my opinion that multiple agents issuing possibly conflicting commands contributed to confusion and increased the risk of a deadly force situation. This can be especially problematic in high-stress situations where split-second decisions may need to be made.

When multiple officers give conflicting commands, an individual may be unsure which command to follow or may become overwhelmed by the conflicting information. This can lead to a breakdown in communication and potentially increase the likelihood of a use-of-force incident.

19

MSJ_433

To prevent conflicting commands from creating confusion, police departments typically have established protocols for communication and command structures. These protocols may include designating a single officer to be in charge of the situation, using clear and concise language when giving commands, and providing regular updates to all officers involved.

In situations where conflicting commands do occur, it is important for officers to quickly communicate and clarify the situation to avoid any misunderstandings or potential escalation of force. Overall, clear, and effective communication among officers is essential for maintaining safety and preventing the use of deadly force.

Further, Agent Matthews told SDSO Homicide Detectives that he had a baton, OC spray, a Taser, and a pepper ball launcher. He made no attempt to use his less lethal weapons. The pepper ball launcher has been demonstrated to be effective from a distance of up to 150 feet. Matthews was well within this distance when he made the decision to use deadly force.

Agent Godreau told SDSO Homicide Detectives in his interview that he was carrying OC spray, a baton, and a Taser. He never attempted to use his OC spray, baton, or Taser. Godreau said he thought about transitioning to his "Taser," but he did not want the driver to step on the gas, and get "stuck" in that position, and then cause an accident. It seems to me that a bullet would likely cause the same

20

outcome. Additionally, Godreau explained that it is against USBP policy to use a Taser on the driver of a moving vehicle. Just moments later Godreau told investigators he fired (his handgun) because he believed it would make the driver release the accelerator.

Agent Alba told SDSO Homicide Detectives he was equipped with a collapsible steel baton and a Taser. He made no attempt to use these less lethal weapons, instead choosing to use a deadly force option.

Alternatives to deadly force existed and could have been successfully used.

### C. Sympathetic Fire Played a Role in this Shooting

Sympathetic fire refers to the unintentional discharge of a firearm by a police officer or another law enforcement agent because of the startle response triggered by another officer's firing of their weapon. For example, if an officer fires their weapon in a high-pressure situation, it may cause another officer to instinctively pull the trigger as well, even if they did not intend to do so. This type of unintentional shooting can result in injury or death to innocent bystanders or other officers, and it is a significant concern in law enforcement.

Newer officers are often the ones who are affected the most by sympathetic fire, as they may not have the training and experience to handle such situations.

Additionally, if the unintentional discharge of a firearm results in injury or death, it can have a significant emotional and psychological impact on the victim's

MSJ_435

family and community. Therefore, it is essential for law enforcement agencies to take steps to prevent sympathetic fire and to provide adequate training and equipment to their officers to minimize the risk of unintentional shootings.

Proving sympathetic fire can be difficult. It is even more difficult with lost shell casings, vehicles being removed from the scene, or other forensic evidence.

None of the Agents admitted to sympathetic fire, however it is important to note that it is supported by the evidence. Agent Alba was clear he did not fire first. Agent Matthews, who it was determined fired one round, had been a Border Patrol Agent for approximately 15 months. He had only been off training and working alone for a few weeks at the time of the shooting. This was his first traffic stop, and first pursuit. He was thrust into a high stress, rapidly evolving situation that required split second decisions. I think sympathetic fire could have played a role in this situation in that the Agents all reacted to the initial pull of the trigger.

### D. The Scene was not properly Secured.

In his deposition Agent Patch testified that he understood that it was his responsibility as the Watch Commander to control and secure the scene until the sheriff's department arrived9. He also testified in his deposition "Everything was happening so quickly that those of us that were there were not thinking or were not

---

9       See San Diego County Police Chiefs' and Sheriff's Association Memorandum of
        Understanding: Protocol for Investigation and Review of Officer Involved Shootings and
        Other Uses of Force Resulting in Death (Bates 005224-005229)

MSJ_436

engaged in scene preservation Patch testified that his only attempt to secure the scene was to direct a USBP Agent from the Campo station to park in the driveway to make sure no one entered the Circle K parking lot,

Multiple Border Patrol Agents were on scene when the shooting occurred and were responsible for securing the area, establishing a perimeter to preserve evidence, and to prevent unauthorized access to the shooting scene. The Border Patrol also had a responsibility to provide medical assistance to any injured parties and to control the situation to ensure the safety of themselves and others. Agent Patch was the Watch Commander and highest-ranking Agent at the shooting scene.

Once secured, it is important to preserve the integrity of the scene and any evidence present. This involves not moving any objects, including vehicles, shell casings, or other items that may be related to the shooting. Ultimately, the goal of securing the scene is to ensure a thorough and impartial investigation, which can help to establish the facts surrounding the incident and determine any appropriate actions or consequences. Based on the investigation, witness statements, video surveillance cameras of the parking lot, and other facts, the scene was not properly secured by agents after the shooting.

There were three different video camera angles (channels 02, 07, and 08) that faced the parking lot. The time stamp on the video was incorrect based on Homicide reports. I've used the actual times to show a timeline of when USBP

23

units involved in the shooting cleared from the scene and how long the scene remained unsecured.

o   At approximately 2231 hours, 5 minutes after the shooting, the USBP vehicle at the entrance/exit to the parking lot turned off the emergency overhead lights and drove away, leaving the main entrance/exit to the parking lot unsecured.

o   At approximately 2232 hours, 6 minutes after the shooting, a USBP vehicles parked along Highway 94 turned off its emergency overhead lights and drove away. This was 11 minutes prior to the arrival of the first SDSO patrol deputy.

o   At approximately 2239 hours, 13 minutes after the shooting, an unidentified person walked toward the entrance of the Circle K parking lot, and into the shooting scene. This was 4 minutes prior to the arrival of the first SDSO patrol deputy.

o   At approximately 2243 hours, 17 minutes after the shooting, the first SDSO patrol deputy, Deputy Katrantzis, arrived on scene. The deputy noticed a gray Toyota truck leaving the shooting scene. The deputy was concerned about the truck leaving the scene of a shooting and made note of the license plate. It was later determined to be witness and off-duty SDPD Officer Brian Moreno, who left the scene prior to

24

being interviewed. It was later determined that Mr. Moreno, who lived

nearby, had given his contact information to Agent Patch, who did not

disclose this to any responding patrol deputies or investigators.

In general, witnesses should not be allowed to leave the scene of a shooting

until they have been interviewed by law enforcement officers. Witnesses may have

valuable information that can help investigators determine what happened, and

their testimony may be critical in determining the truth. Allowing witnesses to

leave the scene without being interviewed can make it more difficult to gather

evidence and may hinder the investigation.

There may be circumstances where witnesses need to leave the scene for

their own safety or other reasons. In these cases, law enforcement officers may

take steps to ensure that witnesses are available for interviews at a later time. The

decision to allow witnesses to leave the scene depends on the specific

circumstances of the shooting and the judgment of the law enforcement officers on

the scene.

  o  At approximately 2246 to 2251 hours, witness Christian Aguilar saw

     customers drive up to the store, park in the crime scene, enter the

     Circle K and shop. Aguilar believed this was odd because he thought

     the Circle K should be treated as an active crime scene. At

MSJ_439

approximately 2250 hours, 24 minutes after the shooting, an additional USBP vehicle left the scene.

o  At approximately 2302 hours, 36 minutes after the shooting, all USBP agents and their vehicles cleared the scene, except for one vehicle parked at the entrance/exit to the lot.

o  At approximately 2313 hours, 47 minutes after the shooting, SDSO Deputy John Ferris arrived on scene and took a scene security post on the highway, west of the entrance to the parking lot.

o  At approximately 2326 hours, 1 hour after the shooting, Deputy Joseph Saelens took a perimeter post on the northwest corner of the parking lot and set up crime scene tape along State Route 94 in front of the Circle K.

o  At approximately 0003 hours, 1 hour and 37 minutes after the shooting, Deputy Allan Campagna arrived on scene. He took a perimeter position on the northwest corner of the parking lot and began putting up crime scene tape. Agent Patch testified in his deposition that he was responsible for having the agents involved in the shooting move their vehicles and return to the station.

Each vehicle used by USBP in the shooting is a separate item of evidence. The San Diego County Law Enforcement Memorandum of Understanding for

MSJ_440

officer involved shootings states, "Evidence should not be unnecessarily moved or altered." Moving the vehicles from the scene prior to being photographed, measured and without documenting their distances from other items of evidence, creates several problems, compromises the integrity of the investigation, and ultimately leads to questions about the use of deadly force. No matter how carefully the vehicles are moved, it alters the scene and destroys or alters the shooting scene forever.

Moving the USBP vehicles made it more difficult for investigators to reconstruct the scene and determine the trajectory of bullets and other important details. This compromised the investigation and made it more difficult for investigators to reconstruct the events of the shooting accurately, making it harder to determine whether the use of deadly force was justified. For example, moving a vehicle may disturb the position of shell casings or bullet fragments, which can be important in determining the sequence of events during the shooting.

Additionally, moving the vehicles can raise questions about the agency's transparency and accountability. Altering the scene, whether intentionally or not, may be seen as an attempt to cover up or hide evidence that may be damaging to the agency or individual agents involved in the shooting. This can erode public trust in law enforcement and make it harder for the agency to maintain positive relationships with the communities they serve. To ensure a fair and impartial

MSJ_441

investigation, it is important to preserve the crime scene and avoid moving any evidence, including vehicles, until the investigation is complete or released by the investigating agency.

There may be some situations where it is necessary to move the cars involved in an officer-involved shooting for safety reasons, such as if they are blocking a road or posing a hazard to other drivers. In such cases, law enforcement officials should take steps to document the position and condition of the cars before they are moved, and to preserve any evidence that may be present. In this particular case the shooting occurred in a parking lot and the USBP vehicles were not impeding traffic or posing a threat to other motorists.

It is important to handle the cars involved in an officer-involved shooting with care to ensure that evidence is not destroyed or compromised, and that the investigation can proceed in a thorough and accurate manner.

In my opinion, the delayed securing of the scene and the movement of the vehicles has cast a cloud upon the integrity of the investigation that the Sheriff's Department would otherwise have been able to carry out. The delay in securing the scene of an officer-involved shooting and the movement of vehicles can significantly impact the integrity of an investigation and may make it more difficult for investigators to determine what happened. I cannot say that there was a "significant impact" here, but the concern must be recognized and factored in. It is

28

MSJ_442

important for law enforcement agencies, including CBP[10], to follow established protocols and procedures to ensure that scenes are secured quickly and evidence is properly collected and preserved.

### E. CBP did not Follow Proper Procedure in Handing Over the Investigation and Scene to the Sheriff's Department.

When an agency is involved in a shooting, it is essential to follow proper procedures for handing the scene over to the investigating agency. The first step is to secure the scene to ensure that no evidence is lost or tampered with. This includes setting up a perimeter and controlling access to the area. According to the investigation, including statements from deputies and witnesses, the scene was not properly secured for at least an hour and a half after the shooting.

In general, the agency involved in the shooting should notify the investigating agency as soon as possible. The shooting agency should provide assistance to the investigating agency, including a briefing, identifying the location of evidence, position of the shooters, and direction of fire. The investigating agency should have access to all witnesses, involved officers/agents, and any other

---

[10]   I am aware that the San Diego County Police Chiefs' and Sheriff's Association Memorandum of Understanding: Protocol for Investigation and Review of Officer Involved Shootings and Other Uses of Force Resulting in Death (Bates 005224-005229) specifically allows for officers to leave the scene and decamp to their stations. This union negotiated concession runs counter to the well-accepted principle that all witnesses, including police officers, should be treated equally.

29

relevant personnel or information known at the time. All known evidence should be carefully identified and documented to ensure that it is available to the investigating agency. An agency involved in a shooting should ensure a seamless handing off of the scene to the investigating agency. It is the responsibility of a supervisor to provide a briefing and provide the investigating agency with all the information and evidence needed to conduct a thorough and impartial investigation. This requires effective communication, documentation, and cooperation. Agent Patch testified he was unaware of any USBP policy regarding communicating with the investigating agency and informing them that USBP was preserving and clearing the shooting scene and SDSO would at that point take over control of the scene.

In this case, the first responding deputy to the scene was Deputy Katrantzis. Deputy Katrantzis reported that upon arrival there were numerous USBP vehicles and agents at the scene. One witness, Firefighter Tyler Jones, told investigators there were approximately fifteen USBP vehicles on scene when he arrived. Deputy Katrantzis went inside the Circle K to look for witnesses or any additional people needing medical attention. Katrantzis located five witnesses together inside the store. Several minutes later Katrantzis reported all USBP units had cleared the scene. Katrantzis asked the supervisor where all the agents went. As the supervisor drove away from the scene, he advised Katrantzis through his car window that all

MSJ_444

agents and their vehicles were moving to the USBP station on Forrest Gate Road in Campo. In his deposition Katrantzis described being confused and angry with USBP. In his deposition Agent Patch testified, "I turned the scene over and acknowledged a sheriff's deputy at that time who had arrived on scene."

Katrantzis did not know how many agents were involved in the shooting, their identities, how many non-shooting agents witnessed the shooting, the agents locations at the time of the shooting, the direction they fired, the placement of their vehicles, the location of civilian witnesses or the location of shell casings or other evidence.

Again, I cannot say that there was a "significant impact" here as a result of the delayed handoff, but the concern must be recognized and factored in. In my opinion, the delayed handoff of the scene has cast a pall upon the investigation that the Sheriff's Department would otherwise have been able to make. A delay in securing the scene of an officer-involved shooting and the movement of vehicles significantly impacts the integrity of the investigation and made it more difficult for investigators to determine what happened. It is important for law enforcement agencies to follow established protocols and procedures to ensure that scenes are secured quickly and evidence is properly collected and preserved.

It is my opinion that the procedures employed in this case impacted the integrity of the investigation and made it more difficult for investigators to

MSJ_445

determine what happened. Had a proper securing and handoff of the scene been accomplished, evidence would have been preserved and contamination of the scene prevented. Shell cases likely would not have been lost or missing and the location of the agents involved in the shooting could be more accurately determined. The moving of the CBP vehicles from the scene made it more difficult to show the exact location of the shooters, their distance from each other as well as their location and distance from the Decedent.

**F.  The Unrecovered Shell Casings from Agent Godreau's Weapon are a Significant Factor Compromising the Integrity of the Investigation.**

Shell casings are often found at shooting scenes because they are ejected from firearms when a bullet is fired. The shell casing contains the primer, gunpowder, and the bullet, and it is expelled from the firearm after the bullet is discharged. Shell casings can provide critical evidence in determining the type of firearm used, the number of shots fired, and the location of the shooter(s).

An ejection pattern is a term used in forensic investigations to describe the spread or distribution of materials that have been ejected or discharged from a weapon, such as bullet casings or shell fragments. By analyzing the ejection pattern, forensic investigators may be able to determine important details about the weapon, such as its type, caliber, and firing mechanism. Ejection patterns are

MSJ_446

important because they provide clues about the location and position of the shooter and the direction in which the weapon was fired. For example, if shell casings are found in a particular area, investigators may be able to determine the approximate position of the shooter at the time of the shooting. Ejection patterns are an important tool used by forensic investigators to help reconstruct the events of a shooting and gain a better understanding of what happened.

Matching particular projectiles to particular weapons involves examining the physical characteristics of a projectile, such as its size, weight, and shape, to determine important details about the weapon that fired it, such as the caliber and rifling marks on the bullet. In this case, an ejection pattern analysis revealed that three separate handguns were used in the fatal shooting of Mr. Estrada. It was determined that five rounds in total were fired. Three projectiles were determined to have been fired by Agent Godreau's firearm, one round from Agent Matthews firearm and one round from Agent Alba's firearm. The analysis of the projectiles determined the fatal round was fired from Agent Alba's firearm. (See Exhibit 4)

Shell casings can sometimes be lost or overlooked at an officer-involved shooting scene for various reasons. For example, if the scene is not properly secured and guarded, people may trample over the area and disturb the evidence. Alternatively, if the shell casings are not collected and documented by law enforcement officers, they may be lost or misplaced. In addition, if the area is not

33

properly searched or if the shell casings are hidden or obscured, they may be missed entirely.

If shell casings are missing, investigators may need to rely on other forms of evidence, such as witness testimony or ballistics analysis of the bullets themselves. However, these methods may be less reliable or may not provide as much information as shell casings and their locations.

Missing shell casings can also raise questions about the thoroughness and competence of the investigating agency. If it is determined that law enforcement failed to properly collect or document evidence at the scene, it could call into question the credibility of the investigation and any subsequent legal proceedings. The consequences of missing shell casings at a shooting scene can be significant, it is, therefore, crucial for investigators to be diligent in identifying, collecting, and documenting all available evidence at the scene of a shooting. This may involve using specialized equipment, such as those used by SDSO homicide investigators in this case. They utilized metal detectors, line searches and shell casing markers, in an attempt to locate and document the missing shell casings.

Poor scene management and the removal of the USBP vehicles from the scene prior to being processed could have contributed to the three shell casings not being located by homicide detectives or their forensic team.

MSJ_448

Agent Godreau testified that he believed his three shell casings were, consistent with an ejection pattern analysis, to be located in the bushes just to the north of where he was standing. (Exhibit 10) Sheriff's Detective Powers and Sheriff's Forensic Examiner Lauren Sautkulis testified they independently, on multiple occasions, performed thorough searches in the area looking for casings. They were unsuccessful in locating any of the three.

Another possibility is that the 3 casings were picked up in an effort to obscure just where Agent Godreau was standing. There is no concrete evidence to support this decision. However, I am surprised that Detective Powers and Sheriff's Forensic Examiner Lauren Sautkulis could not find at least 1 of the three. I know both of them, and they are thorough and professional.

### G. Witnesses Should Have Been Separated.

Deputy Katrantzis located five witnesses together inside the Circle K approximately 15 minutes after the shooting. The witnesses were not separated by CPBP. Failing to separate witnesses at a crime scene can have significant consequences for the investigation. When witnesses are not separated, they may influence each other's recollection of events, making it difficult for investigators to determine the truth. Witnesses may also be hesitant to provide information if they feel intimidated or pressured by other witnesses or suspects.

MSJ_449

In addition, not separating witnesses can compromise the integrity of the investigation and the credibility of the witnesses. Attorneys may argue that the witnesses colluded or shared information, undermining their statement to police or testimony in court.

Furthermore, not separating witnesses may result in the contamination of evidence or the crime scene. Witnesses may inadvertently disturb evidence or leave fingerprints or DNA that could confuse investigators. This could compromise the integrity of the evidence and make it more difficult to do a thorough investigation.

Separating witnesses is an important part of preserving the integrity of an investigation. It allows investigators to collect accurate and reliable information, maintain the credibility of witnesses, and ensure that evidence is not contaminated or compromised.

**1. The Agents Should Also Have Been Separated and Interviewed Sooner.**

In his deposition, Agent Patch testified that it was his decision to have each USBP Agent at the shooting scene return to the station prior to the arrival of the SDSO Deputies. Patch also said he was unaware of any policy directing agents to be separated after an Agent involved shooting. He also acknowledged that the

MSJ_450

agents met as a group and believes there was a lawyer or union representative present.

Agent Matthews testified in his deposition that he returned to the station and was in a room with all the other agents from the shooting. He described an awkward silence, but the agents were not separated. Agent Alba described being together at the substation with the other agents from the shooting.

Agents involved in a shooting should be transported to a secure location as soon as possible after the incident. Transporting involved agents to a secure location helps to protect them from potential harm or retaliation by the public or others who may be involved in the incident.

Additionally, transporting the agents to a secure location can help to ensure that their statements and reports are accurate and unbiased. Agents may be experiencing high levels of stress and adrenaline after being involved in a shooting, which can impact their ability to provide clear and accurate information.

Transporting involved agents to a secure location also allows for appropriate medical care and support to be provided to them, if necessary.

Beyond simply transporting the agents, keeping them separate from others involved in the shooting is an important step in  protecting the integrity of the investigation. Here, all USBP agents left the scene and went to the USBP station on Forrest Gate Road in Campo. There are no reports or statements throughout the

MSJ_451

investigation that mention keeping the agents separated from each other or not allowing them to discuss the shooting with one another prior to repositioning their vehicles or being interviewed by homicide detectives.

Agents ought to be separated after an agent-involved shooting. It is important to ensure that their accounts of the incident are not influenced by the accounts of other officers involved. Separating agents allows each agent to provide their own account of the incident without the possibility of being influenced by others or colluding to create a story.  All that we know is that they admitted to being together.

Email correspondence produced by the Government also reveals that some of the involved agents were part of an email chain attempting to craft a narrative for a press release.

Separating agents can help to maintain the integrity of the investigation and the credibility of the agents statements. It ensures that each agents' account is based solely on their own observations and experiences and is not influenced by the accounts of others.

Furthermore, separating agents can help to alleviate any concerns or suspicions about the impartiality of the investigation. If agents are not separated, it could be perceived that they are working together to cover up any wrongdoing or to create a story that supports their version of events. Keeping agents separate is an

38

MSJ_452

important step in ensuring that the investigation is conducted in a fair and impartial manner, and that the truth is revealed. Civilian witnesses are immediately segregated. Giving law enforcement special privileges, even if required by a Memorandum of Understanding, fosters the appearance of injustice. As the law makes clear, all witnesses are to be treated equally.

Even if the agents were separated from each other and not allowed to discuss the shooting it appears most of the agents involved in the shooting spoke to the same attorney, National Border Patrol Council Attorney J. Aldrich. There are several problems with one attorney representing multiple agents after an agent-involved shooting.

Each agent's account of the incident may differ, and they may have different perspectives of the shooting. Having one attorney representing multiple officers can create the appearance of collusion or a cover-up, which can erode public trust in law enforcement. To ensure fair and impartial legal representation, each officer should have their own attorney.

In this case, at the request of the homicide team, the CBP agents were asked to return to the shooting scene and position their vehicles in the location they were parked at the time of the shooting. Agents returned and attempted to put their vehicle in the "approximate" location. Attorney J. Aldrich assisted in the placement of each vehicle.

MSJ_453

- On Saturday, May 15, 2021, at 0240 hours, non-shooting witness USBP Agent L. Perez and Attorney Aldrich walked into the scene and positioned Perez's USBP vehicle.

- On Saturday, May 15, 2021 at 0259 hours, non-shooting witness Agent Lou Patch and Attorney Aldrich positioned his vehicle at the scene.

- On Saturday, May 15, 2021, at approximately 0359 hours, non-shooting witness Agent Christopher Baker and Attorney Aldrich positioned his vehicle at the scene.

- On Saturday, May 15, 2021, at approximately 0407 hours, USBP Agent Godreau and Attorney J. Aldrich conducted a walk- through of the scene and positioned Godreau's USBP vehicle.

- On Saturday, May 15, 2021, at approximately 0413 hours, USBP Agent Mathews, and Attorney J. Aldrich conducted a walk- through of the scene and positioned Matthews' USBP vehicle.

With respect to the timing of the interviews, it can depend on a variety of factors, including the medical condition of the shooter(s), the presence of legal counsel, and the needs of the investigation. However, it is generally recommended that investigators wait until the shooter is medically stable and coherent before

40

conducting an interview. This can ensure that the shooter is physically and mentally capable of answering questions and providing the best possible information.

Officers involved in a shooting should generally be interviewed as soon as possible after the incident, preferably within 24 hours. This allows for a more accurate and detailed account of what occurred while the events are still fresh in the officer's memory.

However, it is important to note that officers involved in a shooting may be experiencing a range of emotions, including shock, fear, and trauma, and may not be immediately ready to give a statement. In some cases, it may be necessary to allow the officer time to decompress and seek support before conducting an interview.

The timing of interviews should be based on the individual circumstances of the shooting and the emotional and psychological state of the officers involved. The goal should be to obtain an accurate and detailed account of what happened while also prioritizing the well-being and safety of the officers involved.

- o Agent Matthews was interviewed May 20, 2021, at approximately 1324 hours, five days after the shooting.
- o Agent R. Godreau was interviewed May 20, 2021, at approximately 1203 hours, five days after the shooting.

MSJ_455

o   Agent Alba was interviewed May 20, 2021, at approximately 1202 hours, five days after the shooting.

o   Agent Patch was interviewed May 15, 2021, at approximately 0407 hours, approximately 5.5 hours after the shooting.

o   Agent Perez was interviewed May 15, 2021, at approximately 0528 hours, approximately seven hours after the shooting.

o   Agent Baker was interviewed May 15, 2021, at approximately 2027 hours, approximately four hours after the shooting.

One weakness in waiting five days before interviewing the agents involved in the shooting is that it allowed the agent to receive coaching, preparation, and advice from their colleagues and union representation before being interviewed. Interviews done five days after the shooting tend to be less authentic than interviews done within 24 hours of the incident. The delay allows the agent to forget critical details of the incident or to alter their memory of events. Memories can be influenced by various factors, including post-incident discussions with other agents involved in the shooting, colleagues, and media coverage.

In my opinion it is possible for an agent involved in a shooting to have their memory of the event altered in as little as five days. I also believe the five-day delay before interviewing the agents about the shooting was inappropriate.

Conclusion

MSJ_456

The foregoing represent my opinions on the matters submitted to me based upon my training, experience and the facts as I understand them.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 14, 2023 at San Diego, California.

_JC Smith_

JONATHAN C. SMITH

43

KEITH H. RUTMAN (CSB #144175)
501 West Broadway, Suite 1650
San Diego, California 92101-3541
Telephone: (619) 237-9072
Facsimile: (760) 454-4372
email: krutman@krutmanlaw.com

JOSH D. GRUENBERG (CSB #163281)
PAMELA VALLERO (CSB #308301)
GRUENBERG LAW
2155 First Avenue
San Diego, CA  92101
Tel: 619.230.1234 / Fax: 619.230.1074
josh@gruenberglaw.com
pam@gruenberglaw.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

(Hon. Anthony J. Battaglia)

| | |
|---|---|
| SILVESTRE ESTRADA, *et al*.; | ) Case No. 22-CV-0373-AJB (BGS) |
| | ) |
| Plaintiffs, | ) |
| | ) **REBUTTAL REPORT OF** |
| v. | ) **JONATHAN C. SMITH** |
| | ) |
| UNITED STATES OF AMERICA | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |

1

**MSJ_458**

My name is Jonathan C. Smith, and this report has been written pursuant to F.R.Civ.P. 26(a)(2). Specifically, it is written to address my opinions about the opinions offered by defense expert Scott A. DeFoe. I hereby incorporate by reference all opinions and statements set forth in my own expert report. Any summaries I set forth of Mr. DeFoe's report are just that and should not be substituted for the actual opinions stated.

**Opinion Number 1**

I agree with the opinion that Border Patrol Agent Robert Godreau had reasonable suspicion, based on the totality of the circumstances, to conduct an Investigative Vehicle Stop of the 2020 Nissan Altima driven by Mr. Silvestre V. Estrada.

**Opinion Number 2**

I agree with the opinion that Border Patrol Agent Robert Godreau made a prudent and reasonably objective decision to initiate a vehicle pursuit of the Nissan Altima driven by Mr. Estrada.

**Opinion Number 3**

I agree that Border Patrol Agent Robert Godreau made a prudent and reasonably objective decision to continue the vehicle pursuit of the Nissan Altima, driven by Mr. Estrada based on Mr. Estrada's initial failure to yield.

MSJ_459

I also agree that Border Patrol Agent Robert Godreau made an appropriate decision by requesting a Border Patrol Agent respond to Star Ranch with a Vehicle Immobilization Device (VID), aka "Spike Strips," in an effort to end the pursuit.

**Opinion Number 4**

I agree that Border Patrol Agents Matthews, Alba, Godreau, and other involved Border Patrol Agents, demonstrated outstanding driving skills. I disagree with the conclusion that physiological and psychological factors did not play a role in the pursuit and ultimately, the shooting. Each of the agents told investigators they were in fear for their lives and the lives of their partners. They likely experienced physiological factors related to fear including an increased heart rate, blood pressure and adrenaline levels that can lead to physical symptoms like sweating, shaking and tunnel vision. Psychological factors related to fear include stress, anxiety, and pressure to perform, which can affect decision-making and reaction times.

It is my opinion these human factors contributed to Agent Godreau's decision to run into the path of a moving vehicle as well as the decisions made by Matthews, Alba, and Godreau to fire their weapons in a crossfire situation.

I agree with the opinion that Supervisory Border Patrol Agent Patch effectively monitored and responded to the pursuit and possibly saved lives by

MSJ_460

ordering the cease-fire. I agree that Agent Patch provided effective supervisory oversight as the pursuit came to an end.

However, it is my opinion that Agent Patch should have taken control of the scene, preserved the location of the agents' vehicles and set a more thorough scene perimeter.

**Opinion Number 5**

I disagree that Border Patrol Agents Matthews, Alba and Godreau, and other involved Border Patrol Agents, utilized effective tactics to contain the Nissan Altima driven by Mr. Estrada when it entered the Circle-K parking lot.

While I agree that Border Patrol Agents effectively blocked ingress and egress into the parking lot, making it difficult for Mr. Estrada to exit, I disagree with the tactics used by Agent Godreau and Agent Matthews. Approaching a suspect vehicle from the front, especially if the engine is running or in motion, regardless of the speed, is extremely dangerous for law enforcement officers. I believe it is even more dangerous to do so if the driver has exhibited prior efforts to avoid capture such as the circumstances present in this case.   Agent Godreau left a place of safety, without any cover or concealment, and increased the likelihood of a shooting by intentionally and unreasonably placing himself in a position to be struck by the moving vehicle.

4

Not only did Agent Godreau's actions place him in danger of being struck by a moving vehicle, but it also created a crossfire situation that put him and other agents (as well as the innocent passengers) in danger of being shot. Agent Patch told investigators he was fearful for his agents due to the potential for crossfire and called for a cease-fire. Agent Patch also told investigators that the agents had the suspect vehicle surrounded and were shooting from different directions. Agent Alba and other agents were in a good tactical location to approach Mr. Estrada's vehicle from the rear. Agent Godreau could have taken cover behind his vehicle or taken a deliberate, measured approach well off to the side of Mr. Estrada's vehicle, avoiding actions that could escalate tensions or increase the risk of harm to all involved.

I disagree with the opinion that Supervisory Patrol Agent Patch directed agents to immediately establish a perimeter. Merely parking a Border Patrol vehicle in the driveway of the Circle K parking lot does not secure the scene, protect the integrity of the investigation, or preserve evidence. There is no Border Patrol documentation of who or when personnel entered or left the scene. All Border Patrol agents removed their vehicles and left the scene leaving responsibility to adequately secure the scene to SDSO Deputies upon their arrival.

Additionally, I disagree with the opinion that agents used proper de-escalation techniques to cause Mr. Estrada to surrender peacefully. The facts and

MSJ_462

the testimony are clear that agents were equipped with less lethal weapons but made no attempt to use them. The windows to Mr. Estrada's vehicle were down, creating an ideal situation to use a pepper ball launcher or Taser. The only attempt to de-escalate was a failed attempt by agents to deploy the Vehicle Immobilization Device (VID) or "Spike Strips," in an effort to end the pursuit. The actions of Agent Godreau charging the vehicle actually escalated the situation and increased the likelihood of a deadly force encounter.

**Opinion Number 6**

I disagree with the opinion that Agent Godreau used appropriate and reasonable force when he fired 3 rounds at Mr. Estrada. By running into the path of a moving vehicle, Agent Godreau intentionally and unreasonably placed himself in a position in which he had no alternative to using deadly force. If Agent Godreau had used sound tactics he would have not been in a situation where he believed he was in immediate danger of death or serious bodily harm. Additionally, Agent Alba and Agent Mathews would have no reason to believe this was a deadly force situation.

**Opinion Number 7**

I disagree with the opinion that Agent Matthews used appropriate and reasonable lethal force when he fired 1 round at Mr. Estrada. It is my opinion that Agent's Matthews' actions were not objectionably reasonable under the

6

circumstances. Agent Mathews was equipped with less lethal options, including a pepper ball launcher, and took no steps to de-escalate the situation and avoid using deadly force. Additionally, Agent Mathews was in a position of advantage behind a fence, at the top of a slope overlooking the parking lot. It is unlikely Mr. Estrada's vehicle would be able to climb the slope and drive through the fence without getting stuck. If Agent Matthews believed he was in imminent danger of being struck by Mr. Estrada's vehicle he was at a distance far enough away that he could have simple stepped out of the vehicle's path. Because of these facts it is my opinion that Agent Matthew's fear of death or great bodily harm was unreasonable.

**Opinion Number 8**

I disagree with the opinion that Agent Alba used appropriate and reasonable lethal force when he fired 1 round at Mr. Estrada. I disagree with the opinion that Agent Alba was faced with an immediate threat of physical harm or death. Mr. Estrada's vehicle was moving in a direction away from Agent Alba and Agent Alba was in no danger of being struck by the vehicle.

Agent Alba stated he feared for Agent Godreau's life and believed Mr. Estrada's vehicle was about to run over Agent Godreau. It is my opinion that Agent Alba's fear was unreasonable. The evidence shows Mr. Estrada's tires were turned to the left or away from Agent Godreau. Agent Alba stated he did not

MSJ_464

consider any other force options and he did not attempt to use the less lethal options that were available to him.

Agent Alba told investigators that moments before the shooting, Mr. Estrada "conducted a U-turn and went around Agent Alba and Agent Godreau," indicating Mr. Estrada was not trying to run them over.

## Opinion Number 9

I agree that Supervisory Border Patrol Agent Patch demonstrated proper situational awareness by immediately calling a "cease fire." He recognized the crossfire situation created by Agent Godreau and Agent Matthews.

I disagree with the opinion that Agent Patch ensured that the inner and outer perimeter was established to ensure the crime scene was preserved for evidence to include the interviewing of witnesses. It was Agent Patch's decision to have all agents, whether actual shooters or not, remove their vehicles from the scene and meet at the station. Either Agent Patch did not assign personnel to guard the perimeter for unauthorized intrusions, or the assignment was ignored, because the agents left the scene within minutes of the first responding SDSO deputy. Border Patrol agents were not involved in maintaining scene security and there is no documentation of scene access and activity from a scribe.

## Opinion Number 10

8

I agree that Agents Matthews, Alba, and Godreau, were properly trained in Shooting at or from Moving Vehicles, Vehicle Pursuits, High-Risk Felony Pullovers, Vehicle Deployment Tactics, Working as a Team, Use of Available Cover and Concealment, Contact and Cover Officers, Verbal Strategies, Defusing and De-Escalation Techniques, Less Lethal Force Options: ASP Baton, Oleoresin Capsicum Spray, Taser Electronic Device, 40mm Less Lethal Launcher (Foam Rubber Baton Rounds), 870 Remington "Super Sock" Less Lethal Shotgun, Tactical Retreat, K9, and Tactical Re-Deployment.

## Conclusion

The foregoing represent my opinions on the matters submitted to me based upon my training, experience and the facts as I understand them.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 26, 2013 at Coronado, California.

_____

JONATHAN C. SMITH

MSJ_466



May 12, 2023

Keith H. Rutman, Esq.
Attorney at Law
501 West Broadway, Suite 1650
San Diego, California 92101-3741

      **Re:  Silvestre Estrada, et al. v. United States of America, SDCA Case
      No. 22-cv-273-AJB (BGS)
      Date of Incident/Shooting: May 14, 2021
      Shooting Reconstruction and Dynamics Analysis**

Mr. Rutman,

Per your request, I completed an independent, objective evaluation, investigation,
and reconstruction analysis of the shooting death of Silvestre Estrada.  Specifically,
I was asked to evaluate the facts of the incident and generate a reconstruction of the
scene, and explain the vehicle dynamics with locations, speeds and the positions of
the various agents and the subject vehicle prior to and as the shooting occurred.

My opinions are based upon my education, experience and training in the field of
Investigations and Reconstructions, as outlined in my Curriculum Vitae (Exhibit
1), and more than 40 years of investigating and reconstructing incidents, along
with the review of the following documents and discovery provided. This report
has been written pursuant to F.R.Civ.P. 26(a)(2).

I have reviewed the reports and other materials compiled by the San Diego
Sheriff Department's Homicide Unit concerning the circumstances leading to the
fatal shooting of Silvestre Estrada Vargas by U.S. Border Patrol Agents on May
14, 2021.  As discussed infra, I visited the scene on several occasions and viewed

<u>**Estrada et al. v. United States**</u>
May 12, 2023
Page 2

Estrada's silver Nissan Altima at the Sheriff's impound lot.

I reviewed the following in making my opinion:

a.   All discovery identified in the attached "DOCUMENTS PRODUCED IN DISCOVERY BY USA" (Exhibit 2), including the following videos:

  a.   Clips of surveillance video from the Circle-K;
  b.   2 surveillance videos from the Cameron Corners Gas Station;
  c.   iPhone video of the incident from inside the Subway sandwich shop;

b.   The following depositions:

  a.   Brian Moreno
  b.   Christopher Baker
  c.   David Matthews
  d.   Jaime Madariaga-Gonzalez
  e.   Jason Alba
  f.   Jose Patch
  g.   Kevin Gandara
  h.   Kristopher Whitworth
  i.   Lauren Sautkulis
  j.   Luis Perez
  k.   Francisco Madariaga
  l.   Matthew Delgado
  m.  Nikolaus Kantrantzis
  n.   Olga Tovar
  o.   Robert Godreau
  p.   Robert Powers
  q.   Trent Heimerdinger

c.   The following discovery responses:

  a.   United States Response to Plaintiffs' Requests For Admissions
  b.   United States Response to Plaintiffs' Interrogatories

MSJ_468

**Estrada et al. v. United States**
May 12, 2023
Page 3

     c. United States Response to Plaintiffs' First and Second Sets of
       Requests for the Production of Documents
     d. Plaintiffs' Responses to United States' Requests for Production of
       Documents
     e. Plaintiffs' Responses to United States' Request for Admissions

I have spoken to retired SDPD Homicide Detective/DAI J.C. Smith on numerous
Occasions.

On September 2, 2022, I inspected, documented, measured, photographed and
scanned the subject 2020 Nissan Altima at the San Diego County Sheriff
impound facility.

On September 17, 2021, I traveled to the shooting scene and met with
investigators JC Smith, P. Barranco, and witness SDPD Officer Brian Moreno.
At that time, I also completed preliminary scene documentation with
measurements and photographs.

On September 20, 2021, I completed scene documentation with a total station,
documenting, measuring and photographing the area, reconstructing the physical
evidence and the vehicle's positions of rest. I subsequently completed a number
of scaled vehicle dynamics scene diagrams.  (Exhibit 3)

On January 19, 2023, I re-inspected the subject 2020 Nissan Altima at the San
Diego County Sheriff impound facility, downloaded the Electronic Data
Recorder (EDR, or "black box") with no results and completed a documentation
of the bullet trajectory and shooter's positions (Exhibit 4).

On January 20, 2023, I traveled to the shooting scene, with Investigators R. Kelly
and P. Barranco to verify measurements at the scene.

I obtained numerous "Aerial and Street View" photographs of the shooting scene
from "Google Earth Pro".

I was able to insert time/codes in the surveillance videos and the iPhone video
and work with them frame by frame to obtain more precise timing.

**Estrada et al. v. United States**
May 12, 2023
Page 4


I researched and reviewed specific vehicle data information for the 2020 Nissan Altima.

I researched and reviewed the weather conditions from official sources.

My professional charges for this litigation work is an hourly fee of $375 plus expenses, including all travel time. My fees for deposition and trial testimony are $500 per calendar day or any portion thereof, plus travel time and expenses. Thus far, I have been paid the sum of $12,067 and have no outstanding invoices.

The opinions that follow are made within a reasonable degree of certainty within the field of accident reconstruction based on over 40 years of experience and scholarship.

**Summary of Reconstruction Analysis and Opinions**

This incident/shooting occurred on Friday, May 14, 2021 at approximately 10:15 p.m., at the Circle-K Gas Station located at SR-94 and Campo Road/Buckman Springs Road in Campo, California. At the time it was dark, the weather was clear, the roadways were dry with no unusual or adverse roadway conditions. According to the investigative reports/depositions/photographs I reviewed, the terrain was hard packed and level and not at all slippery, meaning that the CBP agents assigned footwear would have provided good, stable traction.  There were streetlights and lighting from businesses in the area.  There are no speed limits posted at the Circle-K gas station parking and adjoining lot.

The incident began as Mr. Estrada was driving a 2020 Nissan Altima, with two passengers, and being pursued by at least 6 US Border Patrol Agents.  Mr. Estrada turned into the driveway of the Circle-K followed by USBP vehicles.  Mr. Estrada drove around the front area of the gas station on a grassy area parallel with SR-94, which is separated by a fence.  Mr. Estrada continued and made an attempt to exit the gas station area, however he was unable to and he collided with a raised concrete curb. USBP agents were by now surrounding the Estrada vehicle on the driveway and concrete platforms of the gas station, with no way out, as the driveway was the only entrance/exit to the property.  (Exhibit 5)

**Estrada et al. v. United States**
May 12, 2023
Page 5

Mr. Estrada began to back up, apparently, looking for another alternate route; however, he was blocked by an agent in a USBP vehicle with lights flashing. Mr. Estrada stopped his vehicle and began to move forward turning left toward the fence, when three agents ran in front of and to the side of his vehicle opened fire, shooting a total of 5 times, one hitting Mr. Estrada. The vehicle came to a stop.

A short time later, the agents left the scene and went to their sector office, without properly securing the scene. This issue has been addressed by retired detective J. C. Smith, who briefed me on his conclusions, which I accept as true for the purposes of this report.

## Summary of Conclusions

Although Mr. Smith concludes the evidence may have been compromised due to the agents leaving the unsecured scene, not documenting the vehicles at their exact positions of rest when the shooting occurred and the critical loss of 3 expended cartridges fired from Agent Godreau's weapon, I was able to reconstruct the evidence and vehicle movements as best as possible to determine speeds and shooters' positions based on surveillance video and scene photographs.

Based my review of the available evidence, specifically the surveillance videos (see attached Exhibits 6-7), it is my opinion that this was an unjustified shooting. Based on the facts and the evidence, the vehicle was moving forward and turning left away from agents at such a slow speed the agents were not in immediate harm or danger. See sections of the USBP Use of Force policy Handbook 4500-002A. The Border Patrol agents also moved directly into the path of the moving vehicle, in violation of Border Patrol policy. (Exhibit 8)

It is my opinion the officers had the vehicle cornered and that all reasonable means of escape for Mr. Estrada were exhausted.

In a chronological order, this is what I determined had occurred:

- As Mr. Estrada was traveling east on the grass toward the exit, his vehicle struck a raised concrete curb, which brought his vehicle to a stop. At this

**Estrada et al. v. United States**

May 12, 2023

Page 6

time, no agents are in his path and not in any danger.

- As Mr. Estrada was traveling east on the grass toward the exit, his vehicle struck a raised concrete curb, which brought his vehicle to a stop.  At this time, no agents are in his path and not in any danger.

- As Mr. Estrada begins to back up his vehicle, he brings his vehicle to a stop due to the agent in the Ford pick-up who has stopped and blocked his path to an exit.

- Mr. Estrada backed his vehicle approximately 68 feet in about 5 seconds for an average speed of six to seven 7 miles per hour.

- Mr. Estrada now stopped for approximately 4 seconds as agents are converging in on the area, in their vehicles and on foot, with no way of escape.

- Agent Alba (with his weapon drawn) is moving east along the right side of the car, positioning himself at the right rear area of the passenger door/window.

- Agent Godreau (with his weapon drawn) is moving west toward the right front corner of the car.

- Agent Matthews, who parked his Jeep on the north side of the fence, on the south shoulder of SR-94 and to the north and east of the stopped Estrada vehicle, is now walking around the rear of his Jeep with his weapon drawn.

- Mr. Estrada turns his wheels to the left and starts to move forward.

- As the vehicle is first starting to accelerate, moving forward and turning left, the vehicle moves about five to six feet, traveling 4-5 miles per hour, when the first shot is heard.

- Based on an analysis of the rendering of the iPhone video-shot timing, the

**Estrada et al. v. United States**
May 12, 2023
Page 7

first shots occur at 1.6 seconds, the second shot is at 1.9 seconds, the third shot at 2.23 seconds, the fourth shot at 2.26 seconds and the last shot, fifth at 2.7 seconds. (Exhibit 7)

- These shots all occur in rapid fire for a total duration of 1.1 seconds.

- The most probable first shot is by Agent Godreau firing into the approximate center of the windshield standing near the right front approximately 8-12 feet away.

- The second shot appears to have been made by Agent Alba into the passenger side window.  Agent Alba was standing to the right of the vehicle approximately 5-8 feet away.

- Shots 3 and 4 were made by Agent Godreau firing in secession into the approximate center of the windshield approximately 10-12 feet away from the windshield.

- The last shot was determined to be made by Agent Matthews into the upper middle section of the windshield. Agent Matthews was standing about 25 feet away on the south shoulder of SR-94 just to the rear of his stopped Jeep, firing behind a banner on the fence at a vehicle that was nearly stopped.

- The evidence or lack thereof indicates that the Nissan was not accelerating quickly.  The video shows a slow accelerating/moving vehicle with no evidence of rapid acceleration such as tires spinning or evidence of acceleration marks on the ground.

It is my opinion, supported by the evidence and outlined in the USBP Use of Force Police Handbook 4500-002A, that the agents actually moved into the area where Mr. Estrada's vehicle was stopped before he starts to move, and he starts to slowly move the vehicle turning left out of their path.  In my opinion, the Agents had ample time to move out of the way of the slow-moving car.

This analysis is based on the above-indicated information.  I may have additional analysis and opinions, depending on inquiry and other reports as they become

**Estrada et al. v. United States**
May 12, 2023
Page 8

available.  Should additional information become available, the above opinions and conclusions may be subjected to change or revision.

Should you have any questions regarding my findings in this report, please feel free to call my office.

I declare under perjury that the foregoing is true and correct.  Executed May 12, 2023 at San Diego, California.

Stephen L. Plourd
Accident Reconstructionist
ACTAR Accredited Accident Reconstructionist #212



**Stephen L. Plourd**
**Investigations**

**INC.**

Accident Reconstruction Consultant • ACTAR #212
Licensed Private Investigator • PI #15460
Civil and Criminal Expertise

May 26, 2023

Keith H. Rutman, Esq.
Attorney at Law
501 West Broadway, Suite 1650
San Diego, California 92101-3741

> **Re: Silvestre Estrada, et al. v. United States of America, SDCA Case**
> **No. 22-cv-273-AJB (BGS)**
> **Date of Incident/Shooting: May 14, 2021**
> **Shooting Reconstruction and Dynamics Analysis**
> **Rebuttal Report**

Mr. Rutman,

Per your request, I completed an evaluation and analysis of the reports with files and exhibits of defense experts David Casteel of Casteel Accident Reconstruction and Jason Fries of 3D Forensics regarding the shooting death of Silvestre Estrada.

Herein, I set forth my opinions about the conclusions and opinions offered by these two defense experts. I hereby incorporate by reference all opinions and statements set forth in my own expert report. Any summaries I set forth of their reports are just that and should not be substituted for the actual opinions stated.



<u>**Estrada et al. v. United States**</u>
May 26, 2023
Page 2

1. The conclusions derived from the exemplar vehicle testing do not stand up to scientific validation as it relates to this matter:

   - Both Mr. Casteel and Mr. Fries reference the acceleration testing of an exemplar Nissan that Mr. Casteel performed on April 3, 2023 at an asphalt parking lot and rely on this data to support their analysis and opinions.

   - The testing was performed at a location not substantially similar to the location of the incident in question.

     o The incident in question occurred on a grassy/dirt lot that had a mix of hard pack and loose surface level dirt, gravel, grass and weeds.

     o The testing was performed on what appeared to be an asphalt parking lot in good condition.

   - By conducting this test on an asphalt surface as opposed to the grassy/dirt surface found at the incident site, Mr. Casteel has derived figures that are skewed towards higher speeds and greater potential acceleration rates.

   - Based on research, an asphalt surface in relatively good condition has a typical coefficient value of 0.80 g's where the typical grassy/dirt surface such as the incident scene has a coefficient value of 0.40 − 0.50 g's. This grassy/dirt surface translates to about 60 percent of the asphalt.  This means

**Estrada et al. v. United States**
May 26, 2023
Page 3

that a car will accelerate quicker and reach higher speeds faster on the asphalt surface when compared to the grassy/dirt surface. (Exhibit A)

- The 2020 Nissan Maxima used for this testing looks to be in excellent condition, most likely sourced from a service such as TURO, which requires vehicles to be in excellent condition.

  o Mr. Casteel did not have an opportunity to verify the mechanical soundness of the Nissan driven by Mr. Estrada. At the time of inspection the Nissan driven by Mr. Estrada had already been "torn apart" by agents after being released from the SDSO crime lab.

  o Mr. Casteel has no basis as to whether or not the Estrada Nissan had the same capabilities as the test vehicle at the time of the incident.

2    Mr. Fries is citing incorrect data for his acceleration analysis.

- On Page 14 of Mr. Fries' report he cites that at FRAME 345 the Nissan reaches a 0.44 g's acceleration rate, in line with Mr. Casteel's maximum acceleration test for a straight acceleration test (noted on page 15).

  o Casteel's maximum acceleration test for a left turning Nissan, as was the case here, never gets above 0.37 g's over the course

MSJ_477

**Estrada et al. v. United States**
May 26, 2023
Page 4

of 6 different runs. And as noted already, these numbers were derived from testing on asphalt and not a grassy/dirt surface.

3      Mr. Fries prepared a chart noting times, distances and acceleration rates in g's (page 14 and 15 of his report, see Exhibit B).  When I calculated out these numbers, the Nissan was traveling approximately 7.48 mph, which is a greater speed than I calculated and explained in my own report.

4      Mr. Fries stated in his vehicle speed analysis, page 20 of his report, #3 "Accelerating Forward Before and As Shots Are Fired," "Our analysis revealed that Mr. Estrada reached a speed of 7.9 feet per second while driving forward before shots were fired (approximately 5.38 MPH)".  This speed analysis is consistent with my own analysis as to time and speed when the first shot was fired.

5      In Mr. Fries' chart (page 14 and 15 of his report) it has the Nissan first starting to accelerate at 0.44 g's then lowering its deceleration rate to 0.17 g's and continuing to turn left when the first shot is fired.  The speeds are then calculated as follows:

Frame #338 to frame #345, in the first 0.4 feet (4.8") the Nissan is accelerating at 0.44 g's and is going 3.37 fps or 2.29 mph.

**Estrada et al. v. United States**
May 26, 2023
Page 5

Frame #345 to frame #360, the Nissan travels an additional 1.5 feet in 0.73 seconds at 0.22 g's and is going 5.705 fps or 3.89 mph.

Frame #360 to frame #375, the Nissan moves an additional 2.3 feet at 0.17 g's and is now traveling 7.53 fps or 5.13 mph.

Frame #375 to frame #390, the approximate time of the first shot, the Nissan moves an additional 3.9 feet at 0.17 g's attaining a speed of 9.97 fps or 6.80 mph.

The Nissan continues to accelerate at 0.14 g's from frame #390 to frame #405 moving an additional 3.3 feet attaining a speed of 11.36 fps or 7.75 mph.

In the last sequence from frame #405 to frame #419 the Nissan moves an additional 1.4 feet @ 0.11 g's and is now traveling at 11.79 fps or 8.04 mph.

This means that the Nissan's acceleration rate is "*decreasing*" and "*turning away*" from the agents before the first shot is fired.

6.   Mr. Casteel, as discussed earlier, using an inappropriate acceleration test on asphalt to come to the conclusions that there was a "potential risk of harm" to Agent Godreau had the Nissan continued straight, which is

MSJ_479

**Estrada et al. v. United States**
May 26, 2023
Page 6

inconsistent with the evidence as described by Mr. Fries, that the Nissan was turning left when it first started to move forward, which would have been out of the path of any agent.

7.   A more appropriate acceleration rate, which I believe matches the physical evidence and the video analysis, is a continuous acceleration rate of approximately 0.17 g's, This has the Nissan accelerating to a speed of approximately 5.9 miles per hour in approximately 7 feet. (Exhibit C)

8.   Mr. Casteel opines that had Mr. Estrada accelerated the Nissan at the maximum rate of 0.44 g's based on the exemplar vehicle testing, the agents would have been impacted in various times at various speeds.  Based on the research noted previously the maximum acceleration rate for the grassy/dirt surface would be 0.25 g's to 0.30 g's and the speeds and time would be adjusted lower accordingly.

This analysis is based on the above-indicated information.  I may have additional analysis and opinions, depending on inquiry and other reports as they become available.  Should additional information become available, the above opinions and conclusions may be subjected to change or revision.

Should you have any questions regarding my findings in this report, please

<u>**Estrada et al. v. United States**</u>
May 26, 2023
Page 7

feel free to call Plaintiff's counsel.

      I declare under perjury that the foregoing is true and correct.  Executed May

26, 2023 at San Diego, California.

_____
Stephen L. Plourd
Accident Reconstructionist
ACTAR Accredited Accident Reconstructionist #212

1  KEITH H. RUTMAN (CSB #144175)
   501 West Broadway, Suite 1650
2  San Diego, California 92101-3541
   Telephone: (619) 237-9072
3  Facsimile: (760) 454-4372
   email: krutman@krutmanlaw.com

4
   JOSHUA D. GRUENBERG (CSB #163281)
5  PAMELA VALLERO (CSB #308301)
   Gruenberg Law
6  2155 1st Ave
   San Diego, California 92101
7  Telephone: (619) 230-1234
   Facsimile: (619) 230-1074
8  email: josh@gruenberglaw.com
   email: pam@gruenberglaw.com

9
10 Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

11
SOUTHERN DISTRICT OF CALIFORNIA
12 (Hon. Anthony J. Battaglia)

13 SILVESTRE ESTRADA, a minor, by and      )    Case No. 22-cv-373-AJB (BGS)
   through his proposed guardian ad litem   )
14 EMILY PRIETO; OLGA TOVAR;                )    PLAINTIFFS' CONSOLIDATED
   FRANCISCO MADARIAGA; and                 )    RESPONSES AND OBJECTIONS
15 JAIME MADARIAGA-GONZALEZ,                )    TO DEFENDANT's REQUESTS
                                            )    FOR ADMISSIONS
16                    Plaintiffs,           )
                                            )
17 v.                                       )
                                            )
18 UNITED STATES OF AMERICA and             )
   DOES 1-10                                )
19                                          )
                     Defendants.            )
20 _____      )

21      **TO DEFENDANT, BY AND THROUGH ITS ATTORNEYS OF RECORD:**

22      Pursuant to F.R.C.P. 36, Plaintiffs hereby respond as follows to Defendant's

23 First Set of Interrogatories.

24                        **PRELIMINARY STATEMENT**

25      These responses are made solely for the purposes of and in relation to this action.

26 Each answer is given subject to the general objections set forth below and all

27 appropriate objections (including but not limited to objections concerning competency,

28 relevancy, materiality, propriety and admissibility) which will require the exclusion of

1  the answer.  All such objections and grounds therefor are reserved and may be

2  interposed at the time of trial.  Plaintiffs have not fully completed their investigation of

3  facts relating to this case, have not fully completed their discovery in this action, and

4  have not completed their preparation for the trial.

5       All responses contained herein are based only upon such information and

6  documents which are presently available to and specifically known to Plaintiffs.

7  Plaintiffs recognize they may not "refuse to admit or deny a request for admission

8  based upon a lack of personal knowledge if the information relevant to the request is

9  reasonably available to him." Asea, Inc. v. S. Pac. Transp. Co., 669 F.2d 1242, 1245,

10  1247 (9th Cir. 1981)("We hold, therefore, that a response which fails to admit or deny

11  a proper request for admission does not comply with the requirements of Rule 36(a) if

12  the answering party has not, in fact, made "reasonable inquiry," or if information

13  "readily obtainable" is sufficient to enable him to admit or deny the matter."); Wynne

14  v. Town of E. Hartford, No. 3:21CV1834(JCH), 2022 WL 17985963, at *5 (D. Conn.

15  Dec. 29, 2022) ("Further, given the amount of information that has been exchanged in

16  this case, it is unclear to the Court that the defendant has done a sufficient inquiry to

17  claim a lack of knowledge or information to respond to the requests for admission by

18  admitting or denying them. Between the medical records and the reports of the officers

19  involved in the incident, the Court believes that defendant has sufficient information to

20  admit or deny the requests for admission.").

21       It is anticipated that further discovery, independent investigation, legal research,

22  and analysis will lead to additional information and add meaning to existing

23  information, all of which may lead to substantial additions to, changes in, and

24  variations from responses herein set forth herein. The following responses are given

25  without prejudice to Plaintiffs' right to produce answers based upon information which

26  he might later discover or locate or to amend and augment said responses based upon

27  any subsequently discovered information.

28       Plaintiffs provide these responses in a good faith effort to supply as much factual

MSJ_483

information and as much specification of legal contentions as is presently known, but nevertheless reserve the right to modify any and all responses herein as additional information is ascertained, analysis is made, legal research is completed and documents discovered.

## GENERAL OBJECTIONS

1.      Plaintiffs object to each and every Request to the extent that it seeks documents or information protected by the attorney-client privilege, the attorney work-product doctrine or any other applicable privilege, doctrine or immunity.  Nothing contained in these responses (including, but not limited to any inadvertent response or production subject to such privileges, protections, or doctrines) is intended as a waiver of any such doctrine, privilege, protection or immunity; and nothing shall constitute any such waiver.

2.      Plaintiffs object to each and every Request to the extent that it is repetitive or cumulative, in whole or in part, of another Request.

3.      Plaintiffs object to each and every Request to the extent that it is irrelevant, overly broad, vague, ambiguous, unduly burdensome, unintelligible, oppressive, vexatious, fails to specify the information sought with reasonable particularity, and to the extent that it seeks information or documents that are not reasonably calculated to lead to the discovery of admissible evidence, or otherwise outside the scope of permissible discovery.

4.      Plaintiffs object to each and every Request to the extent that it seeks a legal conclusion, legal analysis or calls for an expert opinion.

5.      Plaintiffs object to each and every Request to the extent that it calls for the provision of information and records which are, by their very nature, proprietary and confidential.

6.      Plaintiffs' objections shall be construed to preserve all of Plaintiffs' rights to enter similar objections as to future or supplemental responses to the Requests (as well as additional discovery requests, if any, from Defendant).  Moreover, a failure to

3

MSJ_484

further object herein shall not constitute a waiver of Plaintiffs' right to object to these or any future or supplemental Requests.

7. Plaintiffs' objections to a particular Request shall be construed to apply to any other Interrogatory seeking the same or similar information or documents.

8. Plaintiffs' failure to object to a Request on a particular ground or grounds shall not be construed as any type of waiver of Plaintiff's right to object on any additional ground.

9. Plaintiffs object to each and every Request to the extent that it seeks information or documents in the possession, custody or control of Defendant, or that seeks information or documents in the possession custody or control of third parties that can be easily obtained by Defendant (or that can be obtained by Defendant as easily as it can be obtained by Plaintiff).

10. Plaintiffs object to each and every Request to the extent that it utilizes instructions and definitions which are improper.

11. Plaintiffs object to each and every Request to the extent it purports to impose obligations in addition to or different from those set forth in the Federal Rules of Civil Procedure.

**REQUESTS**

**Request for Admission No. 1**

Admit that Estrada had methamphetamine in his system at the time of the incident alleged in this case.

**Response**

SILVESTRE ESTRADA, a minor, by and through his guardian ad litem EMILY PRIETO

I lack personal knowledge about this subject but am informed and believe and therefore allege that the autopsy report reveals this to be the case, so on that basis I admit.

OLGA TOVAR

MSJ_485

1    I lack personal knowledge about this subject but am informed and believe and

2    therefore allege that the autopsy report reveals this to be the case, so on that basis I

3    admit.

4    FRANCISCO MADARIAGA

5    I lack personal knowledge about this subject but am informed and believe and

6    therefore allege that the autopsy report reveals this to be the case, so on that basis I

7    admit.

8    JAIME MADARIAGA-GONZALEZ

9    I lack personal knowledge about this subject but am informed and believe and

10   therefore allege that the autopsy report reveals this to be the case, so on that basis I

11   admit.

12   **Request for Admission No. 2**

13   Admit that Estrada was on parole at the time of the incident alleged in this case.

14   **Response**

15   SILVESTRE ESTRADA, a minor, by and through his guardian ad litem EMILY

16   PRIETO

17   Admit.

18   OLGA TOVAR

19   Admit.

20   FRANCISCO MADARIAGA

21   I lack personal knowledge about this subject but am informed and believe and

22   therefore allege that the discovery provided to date reveals this to be the case, so on

23   that basis I admit.

24   JAIME MADARIAGA-GONZALEZ

25   I lack personal knowledge about this subject but am informed and believe and

26   therefore allege that the discovery provided to date reveals this to be the case, so on

27   that basis I admit.

28   **Request for Admission No. 3**

5

1       Admit that Estrada did not yield to Border Patrol agents when agents attempted

2   to conduct a vehicle stop on SR-94.

3   **Response**

4   SILVESTRE ESTRADA, a minor, by and through his guardian ad litem EMILY

5   PRIETO

6       I lack personal knowledge about this subject but am informed and believe and

7   therefore allege that the discovery provided to date reveals he initially did pull over,

8   but then drove away without permission from the agents, so on that basis I admit in

9   part and deny in part.

10   OLGA TOVAR

11       I lack personal knowledge about this subject but am informed and believe and

12   therefore allege that the discovery provided to date reveals he initially did pull over,

13   but then drove away without permission from the agents, so on that basis I admit in

14   part and deny in part.

15   FRANCISCO MADARIAGA

16       He initially did pull over, but then drove away without permission from the

17   agents, so on that basis I admit in part and deny in part.

18   JAIME MADARIAGA-GONZALEZ

19       He initially did pull over, but then drove away without permission from the

20   agents, so on that basis I admit in part and deny in part.

21   **Request for Admission No. 4**

22       Admit that while being pursued by Border Patrol agents on the SR-94, Estrada at

23   times drove the Nissan at speeds greater than 80 miles per hour.

24   **Response**

25   SILVESTRE ESTRADA, a minor, by and through his guardian ad litem EMILY

26   PRIETO

27       I lack personal knowledge about this subject but am informed and believe and

28   therefore allege that the discovery provided to date reveals that the agents in pursuit so

6

1    stated.  Lacking any information to rebut their claims, I admit.

2    OLGA TOVAR

3         I lack personal knowledge about this subject but am informed and believe and

4    therefore allege that the discovery provided to date reveals that the agents in pursuit so

5    stated.  Lacking any information to rebut their claims, I admit.

6    FRANCISCO MADARIAGA

7         I admit he was driving very fast, but do not personally know the speed.  I am

8    informed and believe and therefore allege that the discovery provided to date reveals

9    that the agents in pursuit so stated, so on that basis I admit.

10   JAIME MADARIAGA-GONZALEZ

11        Admit.

12   **Request for Admission No. 5**

13        Admit that while being pursued by Border Patrol agents on the SR-94, Estrada at

14   least once crossed the Nissan over into the opposing lane of traffic.

15   **Response**

16   SILVESTRE ESTRADA, a minor, by and through his guardian ad litem EMILY

17   PRIETO

18        I lack personal knowledge about this subject but am informed and believe and

19   therefore allege that the discovery provided to date reveals that the agents in pursuit so

20   stated.  Lacking any information to rebut their claims, I admit.

21   OLGA TOVAR

22        I lack personal knowledge about this subject but am informed and believe and

23   therefore allege that the discovery provided to date reveals that the agents in pursuit so

24   stated.  Lacking any information to rebut their claims, I admit.

25   FRANCISCO MADARIAGA

26        Admit.

27   JAIME MADARIAGA-GONZALEZ

28        Admit.

MSJ_488

**Request for Admission No. 6**

Admit that Estrada drove recklessly while being pursued by Border Patrol agents on the SR-94.

**Response**

SILVESTRE ESTRADA, a minor, by and through his guardian ad litem EMILY PRIETO

I lack personal knowledge about this subject but am informed and believe and therefore allege that the discovery provided to date reveals that the agents in pursuit so stated.  Lacking any information to rebut their claims, I admit.

OLGA TOVAR

I lack personal knowledge about this subject but am informed and believe and therefore allege that the discovery provided to date reveals that the agents in pursuit so stated.  Lacking any information to rebut their claims, I admit.

FRANCISCO MADARIAGA

Admit.

JAIME MADARIAGA-GONZALEZ

Admit.

**Request for Admission No. 7**

Admit that while being pursued by Border Patrol agents on the SR-94, Estrada nearly struck the vehicle of Border Patrol Agent Jordan Gerber.

**Response**

SILVESTRE ESTRADA, a minor, by and through his guardian ad litem EMILY PRIETO

I lack personal knowledge about this subject but am informed and believe and therefore allege that the agents in pursuit so stated.  However, I am also informed and believe and therefore allege that the two men in the car, FRANCISCO MADARIAGA and JAIME MADARIAGA-GONZALEZ say that they did not see that happen.  As such, I can neither admit nor deny the request.

8

1    OLGA TOVAR

2        I lack personal knowledge about this subject but am informed and believe and

3    therefore allege that the agents in pursuit so stated.  However, I am also informed and

4    believe and therefore allege that the two men in the car, FRANCISCO MADARIAGA

5    and JAIME MADARIAGA-GONZALEZ say that they did not see that happen.  As

6    such, I can neither admit nor deny the request.

7    FRANCISCO MADARIAGA

8        I did not see that happen so I lack personal knowledge about this subject but am

9    informed and believe and therefore allege that the agents in pursuit so stated.  As such,

10   I can neither admit nor deny the request.

11   JAIME MADARIAGA-GONZALEZ

12       I did not see that happen so I lack personal knowledge about this subject but am

13   informed and believe and therefore allege that the agents in pursuit so stated.  As such,

14   I can neither admit nor deny the request.

15   **Request for Admission No. 8**

16       Admit that plaintiffs Jaime Madariaga and Francisco Madariaga were unlawfully

17   present in the United States when they entered the vehicle driven by Estrada on the

18   SR-94.

19   **Response**

20   SILVESTRE ESTRADA, a minor, by and through his guardian ad litem EMILY

21   PRIETO

22       I lack personal knowledge about this subject but am informed and believe and

23   therefore allege that the discovery provided to date reveals that FRANCISCO

24   MADARIAGA and JAIME MADARIAGA-GONZALEZ admitted that this was the

25   case, so on that basis I admit.

26   OLGA TOVAR

27       I lack personal knowledge about this subject but am informed and believe and

28   therefore allege that the discovery provided to date reveals that FRANCISCO

9

1  MADARIAGA and JAIME MADARIAGA-GONZALEZ admitted that this was the

2  case, so on that basis I admit.

3  FRANCISCO MADARIAGA

4      Admit.

5  JAIME MADARIAGA-GONZALEZ

6      Admit.

7  **Request for Admission No. 9**

8      Admit that Estrada's driving while being pursued by Border Patrol agents on the

9  SR-94 placed plaintiffs Jaime Madariaga and Francisco Madariaga in danger of being

10  involved in an accident.

11  **Response**

12  SILVESTRE ESTRADA, a minor, by and through his guardian ad litem EMILY

13  PRIETO

14      I lack personal knowledge about this subject but am informed and believe and

15  therefore allege that FRANCISCO MADARIAGA and JAIME

16  MADARIAGA-GONZALEZ admitted that this was the case, so on that basis I admit.

17  OLGA TOVAR

18      I lack personal knowledge about this subject but am informed and believe and

19  therefore allege that FRANCISCO MADARIAGA and JAIME

20  MADARIAGA-GONZALEZ admitted that this was the case, so on that basis I admit.

21  FRANCISCO MADARIAGA

22      Admit.

23  JAIME MADARIAGA-GONZALEZ

24      Admit.

25  **Request for Admission No. 10**

26      Admit that Estrada drove the Nissan over a curb onto a non-paved portion of the

27  Circle-K parking lot.

28  **Response**

MSJ_491

1  SILVESTRE ESTRADA, a minor, by and through his guardian ad litem EMILY
2  PRIETO
3       I lack personal knowledge about this subject but am informed and believe and
4  therefore allege that the video discovery provided to date reveals this is the case.  On
5  that basis, I admit.
6  OLGA TOVAR
7       I lack personal knowledge about this subject but am informed and believe and
8  therefore allege that the video discovery provided to date reveals this is the case.  On
9  that basis, I admit. .
10  FRANCISCO MADARIAGA
11       Admit.
12  JAIME MADARIAGA-GONZALEZ
13       Admit.
14  **Request for Admission No. 11**
15       Admit that Estrada nearly struck Border Patrol Agent Christopher Baker, who
16  was on foot, with the Nissan inside the non-paved portion of the Circle-K parking lot.
17  **Response**
18  SILVESTRE ESTRADA, a minor, by and through his guardian ad litem EMILY
19  PRIETO
20       I lack personal knowledge about this subject but am informed and believe and
21  therefore allege that Agent Baker so testified.  However, I am also informed and
22  believe and therefore allege that the two men in the car, FRANCISCO MADARIAGA
23  and JAIME MADARIAGA-GONZALEZ say that they did not see that happen.  As
24  such, I can neither admit nor deny the request.
25  OLGA TOVAR
26       I lack personal knowledge about this subject but am informed and believe and
27  therefore allege that Agent Baker so testified.  However, I am also informed and
28  believe and therefore allege that the two men in the car, FRANCISCO MADARIAGA

11

MSJ_492

1 | and JAIME MADARIAGA-GONZALEZ say that they did not see that happen.  As

2 | such, I can neither admit nor deny the request.

3 | FRANCISCO MADARIAGA

4 |     I did not see that happen so I lack personal knowledge about this subject but am

5 | informed and believe and therefore allege that Agent BAKER so testified.  As such, I

6 | can neither admit nor deny the request.

7 | JAIME MADARIAGA-GONZALEZ

8 |     I did not see that happen so I lack personal knowledge about this subject but am

9 | informed and believe and therefore allege that Agent BAKER so testified.  As such, I

10 | can neither admit nor deny the request.

11 | **Request for Admission No. 12**

12 |     Admit that Estrada struck a curb with the Nissan inside the Circle-K parking lot.

13 | **Response**

14 | SILVESTRE ESTRADA, a minor, by and through his guardian ad litem EMILY

15 | PRIETO

16 |     I lack personal knowledge about this subject but am informed and believe and

17 | therefore allege that the video and forensic evidence reveals this to be the case.

18 | Further, the two men in the car, FRANCISCO MADARIAGA and JAIME

19 | MADARIAGA-GONZALEZ, as well as the agents in pursuit, so stated.  Lacking any

20 | information to rebut their claims, I admit.

21 | OLGA TOVAR

22 |     I lack personal knowledge about this subject but am informed and believe and

23 | therefore allege that the video and forensic evidence reveals this to be the case.

24 | Further, the two men in the car, FRANCISCO MADARIAGA and JAIME

25 | MADARIAGA-GONZALEZ, as well as the agents in pursuit, so stated.  Lacking any

26 | information to rebut their claims, I admit.

27 | FRANCISCO MADARIAGA

28 |     Admit.

MSJ_493

1    JAIME MADARIAGA-GONZALEZ

2        Admit.

3    **Request for Admission No. 13**

4        Admit that after striking a curb with the Nissan inside the Circle-K parking lot,

5    Estrada reversed the Nissan.

6    **Response**

7    SILVESTRE ESTRADA, a minor, by and through his guardian ad litem EMILY

8    PRIETO

9        I lack personal knowledge about this subject but am informed and believe and

10   therefore allege that the video evidence reveals this to be the case.  Further, the two

11   men in the car, FRANCISCO MADARIAGA and JAIME

12   MADARIAGA-GONZALEZ, as well as the agents in pursuit, so stated.  Lacking any

13   information to rebut their claims, I admit.

14   OLGA TOVAR

15       I lack personal knowledge about this subject but am informed and believe and

16   therefore allege that the video evidence reveals this to be the case.  Further, the two

17   men in the car, FRANCISCO MADARIAGA and JAIME

18   MADARIAGA-GONZALEZ, as well as the agents in pursuit, so stated.  Lacking any

19   information to rebut their claims, I admit.

20   FRANCISCO MADARIAGA

21       Admit.

22   JAIME MADARIAGA-GONZALEZ

23       Admit.

24   **Request for Admission No. 14**

25       Admit that as Estrada reversed the Nissan to a stop inside the Circle-K parking

26   lot, a Border Patrol agent positioned a vehicle behind the Nissan which prevented

27   Estrada from reversing the Nissan off the non-paved portion of the Circle-K parking

28   lot.

1　**Response**

2　SILVESTRE ESTRADA, a minor, by and through his guardian ad litem EMILY

3　PRIETO

4　　　I lack personal knowledge about this subject but am informed and believe and

5　therefore allege that the video evidence reveals this to be the case.  Further, the two

6　men in the car, FRANCISCO MADARIAGA and JAIME

7　MADARIAGA-GONZALEZ, as well as the agents in pursuit, so stated.  Lacking any

8　information to rebut their claims, I admit.

9　OLGA TOVAR

10　　　I lack personal knowledge about this subject but am informed and believe and

11　therefore allege that the video evidence reveals this to be the case.  Further, the two

12　men in the car, FRANCISCO MADARIAGA and JAIME

13　MADARIAGA-GONZALEZ, as well as the agents in pursuit, so stated.  Lacking any

14　information to rebut their claims, I admit.

15　FRANCISCO MADARIAGA

16　　　Admit.

17　JAIME MADARIAGA-GONZALEZ

18　　　Admit.

19　**Request for Admission No. 15**

20　　　Admit that as Estrada reversed the Nissan to a stop in the Circle-K parking lot,

21　Border Patrol personnel shouted commands to Estrada to stop.

22　**Response**

23　SILVESTRE ESTRADA, a minor, by and through his guardian ad litem EMILY

24　PRIETO

25　　　I lack personal knowledge about this subject but am informed and believe and

26　therefore allege that the two men in the car, FRANCISCO MADARIAGA and JAIME

27　MADARIAGA-GONZALEZ, as well as the agents in pursuit, so stated. .  Lacking any

28　information to rebut their claims, I admit.

14

1  OLGA TOVAR

2      I lack personal knowledge about this subject but am informed and believe and

3  therefore allege that the two men in the car, FRANCISCO MADARIAGA and JAIME

4  MADARIAGA-GONZALEZ, as well as the agents in pursuit, so stated. .  Lacking any

5  information to rebut their claims, I admit.

6  FRANCISCO MADARIAGA

7      Admit.

8  JAIME MADARIAGA-GONZALEZ

9      Admit.

10  **Request for Admission No. 16**

11      Admit that after Estrada reversed the Nissan to a stop inside the Circle-K parking

12  lot, Francisco Madariaga observed a Border Patrol agent ("Agent 1") on foot

13  approximately three meters forward of the Nissan at the 11:00 o'clock position.

14  **Response**

15  SILVESTRE ESTRADA, a minor, by and through his guardian ad litem EMILY

16  PRIETO

17      I lack personal knowledge about this subject but am informed and believe and

18  therefore allege that the testimony of FRANCISCO MADARIAGA so states.  On that

19  basis, I admit.

20  OLGA TOVAR

21      I lack personal knowledge about this subject but am informed and believe and

22  therefore allege that the testimony of FRANCISCO MADARIAGA so states.  On that

23  basis, I admit.

24  FRANCISCO MADARIAGA

25      Admit.

26  JAIME MADARIAGA-GONZALEZ

27      I did not see this and thus lack personal knowledge about this subject but am

28  informed and believe and therefore allege that the testimony of FRANCISCO

15

1  MADARIAGA so states.  On that basis, I admit.

2  **Request for Admission No. 17**

3      Admit that after Estrada reversed the Nissan to a stop inside the Circle-K parking

4  lot, Francisco Madariaga observed another Border Patrol agent ("Agent 2") on foot

5  approximately four meters forward of the Nissan at the 1:00 o'clock position.

6  Response

7  SILVESTRE ESTRADA, a minor, by and through his guardian ad litem EMILY

8  PRIETO

9      I lack personal knowledge about this subject but am informed and believe and

10  therefore allege that the testimony of FRANCISCO MADARIAGA so states.  On that

11  basis, I admit.

12  OLGA TOVAR

13      I lack personal knowledge about this subject but am informed and believe and

14  therefore allege that the testimony of FRANCISCO MADARIAGA so states.  On that

15  basis, I admit.

16  FRANCISCO MADARIAGA

17      Admit.

18  JAIME MADARIAGA-GONZALEZ

19      I did not see this and thus lack personal knowledge about this subject but am

20  informed and believe and therefore allege that the testimony of FRANCISCO

21  MADARIAGA so states.  On that basis, I admit.

22  **Request for Admission No. 18**

23      Admit that shortly before any shots were fired, Estrada revved the engine of the

24  Nissan.

25  **Response**

26  SILVESTRE ESTRADA, a minor, by and through his guardian ad litem EMILY

27  PRIETO

28      I lack personal knowledge about this subject but am informed and believe and

16

1  therefore allege that the testimony of FRANCISCO MADARIAGA so states.  On that

2  basis, I admit.

3  OLGA TOVAR

4      I lack personal knowledge about this subject but am informed and believe and

5  therefore allege that the testimony of FRANCISCO MADARIAGA so states.  On that

6  basis, I admit.

7  FRANCISCO MADARIAGA

8      ~~Deny.~~  Admit.

9  **JAIME MADARIAGA-GONZALEZ**

10     I did not hear this and thus lack personal knowledge about this subject but am

11 informed and believe and therefore allege that the testimony of FRANCISCO

12 MADARIAGA so states.  On that basis, I admit.

13 **Request for Admission No. 19**

14     Admit that witness Brian Moreno, from approximately 50 feet away, heard

15 sounds of engine acceleration (i.e., revving or RPMs) from the Nissan shortly before

16 shots were fired.

17 **Response**

18 SILVESTRE ESTRADA, a minor, by and through his guardian ad litem EMILY

19 PRIETO

20     I lack personal knowledge about this subject but am informed and believe and

21 therefore allege that the testimony of Brian Moreno asserts this is the case.  On that

22 basis, I admit.

23 OLGA TOVAR

24     I lack personal knowledge about this subject but am informed and believe and

25 therefore allege that the testimony of Brian Moreno asserts this is the case.  On that

26 basis, I admit.

27 FRANCISCO MADARIAGA

28     I lack personal knowledge about this subject but am informed and believe and

17

1  therefore allege that the testimony of Brian Moreno asserts this is the case.  On that

2  basis, I admit.

3  JAIME MADARIAGA-GONZALEZ

4      I lack personal knowledge about this subject but am informed and believe and

5  therefore allege that the testimony of Brian Moreno asserts this is the case.  On that

6  basis, I admit.

7  **Request for Admission No. 20**

8      Admit that plaintiff Francisco Madariaga heard an acceleration sound from the

9  Nissan before shots were fired.

10  **Response**

11  SILVESTRE ESTRADA, a minor, by and through his guardian ad litem EMILY

12  PRIETO

13      Objection.  Duplicate of No 18.  I lack personal knowledge about this subject but

14  am informed and believe and therefore allege that the testimony of Francisco

15  Madariaga so states.  On that basis, I admit.

16  OLGA TOVAR

17      I lack personal knowledge about this subject but am informed and believe and

18  therefore allege that the testimony of Francisco Madariaga so states.  On that basis, I

19  admit.

20  FRANCISCO MADARIAGA

21      Objection.  Duplicate of No 18.  I admit.

22  **JAIME MADARIAGA-GONZALEZ**

23      I did not hear this and thus lack personal knowledge about this subject but am

24  informed and believe and therefore allege that the testimony of FRANCISCO

25  MADARIAGA so states.  On that basis, I admit.

26  **Request for Admission No. 21**

27      Admit the Nissan was moving forward at the time shots were fired.

28  **Response**

SILVESTRE ESTRADA, a minor, by and through his guardian ad litem EMILY PRIETO

I lack personal knowledge about this subject but am informed and believe and therefore allege that the video evidence reveals that this is the case.  On that basis, I admit.

OLGA TOVAR

I lack personal knowledge about this subject but am informed and believe and therefore allege that the video evidence reveals that this is the case.  On that basis, I admit.

FRANCISCO MADARIAGA

Admit.

JAIME MADARIAGA-GONZALEZ

Admit.

**Request for Admission No. 22**

Admit that rounds fired by Agent Godreau struck the front windshield of the Nissan.

**Response**

SILVESTRE ESTRADA, a minor, by and through his guardian ad litem EMILY PRIETO

I lack personal knowledge about this subject but am informed and believe and therefore allege that the forensic evidence reveals that this is the case.  On that basis, I admit.

OLGA TOVAR

I lack personal knowledge about this subject but am informed and believe and therefore allege that the forensic evidence reveals that this is the case.  On that basis, I admit.

FRANCISCO MADARIAGA

I did not see where any particular shot hit so lack personal knowledge about this

19

1  subject but am informed and believe and therefore allege that the forensic evidence

2  reveals that this is the case.  On that basis, I admit.

3  JAIME MADARIAGA-GONZALEZ

4      I did not see where any particular shot hit so lack personal knowledge about this

5  subject but am informed and believe and therefore allege that the forensic evidence

6  reveals that this is the case.  On that basis, I admit.

7  **Request for Admission No. 23**

8      Admit that a round fired by Agent Mathews struck the front windshield of the

9  Nissan.

10  **Response**

11  SILVESTRE ESTRADA, a minor, by and through his guardian ad litem EMILY

12  PRIETO

13      I lack personal knowledge about this subject but am informed and believe and

14  therefore allege that the forensic evidence reveals that this is the case.  On that basis, I

15  admit.

16  OLGA TOVAR

17      I lack personal knowledge about this subject but am informed and believe and

18  therefore allege that the forensic evidence reveals that this is the case.  On that basis, I

19  admit.

20  FRANCISCO MADARIAGA

21      I did not see where any particular shot hit so lack personal knowledge about this

22  subject but am informed and believe and therefore allege that the forensic evidence

23  reveals that this is the case.  On that basis, I admit.

24  JAIME MADARIAGA-GONZALEZ

25      I did not see where any particular shot hit so lack personal knowledge about this

26  subject but am informed and believe and therefore allege that the forensic evidence

27  reveals that this is the case.  On that basis, I admit.

28  **Request for Admission No. 24**

MSJ_501

1      Admit that Estrada drove recklessly in the Circle-K parking lot.

2 **Response**

3 SILVESTRE ESTRADA, a minor, by and through his guardian ad litem EMILY

4 PRIETO

5      Objection, calls for a legal conclusion.  I lack personal knowledge about this

6 subject but am informed and believe and therefore allege that the video evidence

7 reveals that this is the case **prior** to the time that the vehicle came to a full stop, several

8 seconds before shots were fired. When shots were fired, video evidence shows that the

9 vehicle was not being driven recklessly nor faster than 5-7 mph.   Thus, I admit in part

10 and deny in part.

11 OLGA TOVAR

12      Objection, calls for a legal conclusion.  I lack personal knowledge about this

13 subject but am informed and believe and therefore allege that the video evidence

14 reveals that this is the case **prior** to the time that the vehicle came to a full stop, several

15 seconds before shots were fired. When shots were fired, video evidence shows that the

16 vehicle was not being driven recklessly nor faster than 5-7 mph.   Thus, I admit in part

17 and deny in part.

18 FRANCISCO MADARIAGA

19      Objection, calls for a legal conclusion.  This is the case **prior** to the time that the

20 vehicle came to a full stop, several seconds before shots were fired. When shots were

21 fired, video evidence shows that the vehicle was not being driven recklessly nor faster

22 than 5-7 mph.   Thus, I admit in part and deny in part.

23 JAIME MADARIAGA-GONZALEZ

24      Objection, calls for a legal conclusion.  This is the case **prior** to the time that the

25 vehicle came to a full stop, several seconds before shots were fired. When shots were

26 fired, video evidence shows that the vehicle was not being driven recklessly nor faster

27 than 5-7 mph.   Thus, I admit in part and deny in part.

28 **Request for Admission No. 25**

MSJ_502

1    Admit that Border Patrol agents in the Circle-K parking lot were faced with a

2  rapidly developing, uncertain, situation created by Estrada.

3  **Response**

4  SILVESTRE ESTRADA, a minor, by and through his guardian ad litem EMILY

5  PRIETO

6    Objection, calls for a legal conclusion and misstates Plaintiffs' burden.   I lack

7  personal knowledge about this subject but am informed and believe and therefore

8  allege that the agents in pursuit so testified.  Lacking any information to rebut their

9  claims, I admit.

10  OLGA TOVAR

11    Objection, calls for a legal conclusion and misstates Plaintiffs' burden.   I lack

12  personal knowledge about this subject but am informed and believe and therefore

13  allege that the agents in pursuit so testified.  Lacking any information to rebut their

14  claims, I admit.

15  FRANCISCO MADARIAGA

16    Objection, calls for a legal conclusion and misstates Plaintiffs' burden.  I am

17  informed and believe and therefore allege that the agents in pursuit so testified.  On

18  that basis, I admit.

19  JAIME MADARIAGA-GONZALEZ

20    Objection, calls for a legal conclusion and misstates Plaintiffs' burden.  I am

21  informed and believe and therefore allege that the agents in pursuit so testified.  On

22  that basis, I admit.

23    Respectfully Submitted,

24  Dated: February 22, 2023

25  KEITH H. RUTMAN
    Attorney for Plaintiffs
26  Email:  krutman@krutmanlaw.com

27

28

22

**VERIFICATIONS**

1
2     I, EMILY PRIETO, as guardian ad litem for SILVESTRE ESTRADA, a minor,
3 hereby declare under penalty of perjury under the laws of the United States that I am
4 the Plaintiff in the instant action. I have read the foregoing Responses and Objections
5 to Defendants' First Set of Requests for Admissions.
6     That I have made "reasonable inquiry" and consulted information "readily
7 obtainable" which might be sufficient to enable me to admit or deny the matter.
8     The responses and answers set forth therein are true and correct to the best of my
9 knowledge, except as to these matters alleged upon information and belief, and I do
10 believe those to be true.
11     Executed this 7 day of February 2023 at _____ San Diego, CA.



12
13 _____
      EMILY PRIETO
14
15     I, OLGA TOVAR, hereby declare under penalty of perjury under the laws of the
16 United States that I am the Plaintiff in the instant action. I have read the foregoing
17 Responses and Objections to Defendants' First Set of Requests for Admissions.
18     That I have made "reasonable inquiry" and consulted information "readily
19 obtainable" which might be sufficient to enable me to admit or deny the matter.
20     The responses and answers set forth therein are true and correct to the best of my
21 knowledge, except as to these matters alleged upon information and belief, and I do
22 believe those to be true.
23     These requests and responses were translated into the Spanish language before I
24 signed this verification.
25     Executed this ____ day of _____, 2023 at _____.
26
27 _____
      OLGA TOVAR
28     I, FRANCISCO MADARIAGA, hereby declare under penalty of perjury under

23

MSJ_504

**VERIFICATIONS**

I, EMILY PRIETO, as guardian ad litem for SILVESTRE ESTRADA, a minor, hereby declare under penalty of perjury under the laws of the United States that I am the Plaintiff in the instant action. I have read the foregoing Responses and Objections to Defendants' First Set of Requests for Admissions.

That I have made "reasonable inquiry" and consulted information "readily obtainable" which might be sufficient to enable me to admit or deny the matter.

The responses and answers set forth therein are true and correct to the best of my knowledge, except as to these matters alleged upon information and belief, and I do believe those to be true.

Executed this ____ day of _____, 2023 at _____.


_____
EMILY PRIETO

I, OLGA TOVAR, hereby declare under penalty of perjury under the laws of the United States that I am the Plaintiff in the instant action. I have read the foregoing Responses and Objections to Defendants' First Set of Requests for Admissions.

That I have made "reasonable inquiry" and consulted information "readily obtainable" which might be sufficient to enable me to admit or deny the matter.

The responses and answers set forth therein are true and correct to the best of my knowledge, except as to these matters alleged upon information and belief, and I do believe those to be true.

These requests and responses were translated into the Spanish language before I signed this verification.

Executed this _8_ day of _Feb_, 2023 at _San Diego C.A._

_____
OLGA TOVAR

I, FRANCISCO MADARIAGA, hereby declare under penalty of perjury under

23

MSJ_505

1 | the laws of the United States that I am the Plaintiff in the instant action. I have read the

2 | foregoing Responses and Objections to Defendants' First Set of Requests for

3 | Admissions.

4 |     That I have made "reasonable inquiry" and consulted information "readily

5 | obtainable" which might be sufficient to enable me to admit or deny the matter.

6 |     The responses and answers set forth therein are true and correct to the best of my

7 | knowledge, except as to these matters alleged upon information and belief, and I do

8 | believe those to be true.

9 |     These requests and responses were translated into the Spanish language before I

10 | signed this verification.

11 |     Executed this _22_ day of _Feb_, 2023 at _____ Ahuatzingo, Mexico

12 |

13 | _[signature]_

    FRANCISCO MADARIAGA

14 |     I, JAIME MADARIAGA-GONZALEZ, hereby declare under penalty of perjury

15 | under the laws of the United States that I am the Plaintiff in the instant action. I have

16 | read the foregoing Responses and Objections to Defendants' First Set of Requests for

17 | Admissions.

18 |     That I have made "reasonable inquiry" and consulted information "readily

19 | obtainable" which might be sufficient to enable me to admit or deny the matter.

20 |     The responses and answers set forth therein are true and correct to the best of m[m]

21 | knowledge, except as to these matters alleged upon information and belief, and I do

22 | believe those to be true.

23 |

24 |     These requests and responses were translated into the Spanish language before

25 | signed this verification.

26 |     Executed this _22_ day of _Feb_, 2023 at _____ Ahuatzingo, Mexico

27 |

28 | _[signature]_ JAIME MADARIAGA-GONZALEZ

24

**PROOF OF SERVICE**

I, the undersigned, declare under penalty of perjury that I am over the age of eighteen years and not a party to this action.  That my business address is 501 West Broadway Suite 1650 San Diego, California 92101.  That on February 22, 2023 I served a copy of **PLAINTIFFS RESPONSES AND OBJECTIONS TO DEFENDANT's FIRST SET OF REQUESTS FOR ADMISSIONS** by delivering a copy to each of the names and addresses listed below via email, with the consent of opposing counsel.

Person(s) served:

AUSA David Wallace: Dave.wallace@usdoj.gov
AUSA Collin McDonald: Colin.mcdonald@usdoj.gov
AUSA Ernest Cordero, Jr.: Ernest.cordero@usdoj.gov

Executed under penalty of perjury under the laws of the United States on February 22, 2023 at San Diego, California.

KEITH H. RUTMAN

25

MSJ_507



<u>ESTRADA vs. UNITED STATES-22cv0373</u>

# MSJ-509

(Thumb-drive containing Video file lodged and served concurrently herewith.)

<u>ESTRADA vs. UNITED STATES-22cv0373</u>

# MSJ-510

(Thumb-drive containing Video file lodged and served concurrently herewith.)

ESTRADA vs. UNITED STATES-22cv0373

# MSJ-511

(Thumb-drive containing Video file lodged and served concurrently herewith.)

ESTRADA vs. UNITED STATES-22cv0373

# MSJ-512

(Thumb-drive containing Video file lodged and served concurrently herewith.)

ESTRADA vs. UNITED STATES-22cv0373

# MSJ-513

(Thumb-drive containing Video file lodged and served concurrently herewith.)

ESTRADA vs. UNITED STATES-22cv0373

# MSJ-514

(Thumb-drive containing Video file lodged and served concurrently herewith.)

ESTRADA vs. UNITED STATES-22cv0373

# MSJ-515

(Thumb-drive containing Video file lodged and served concurrently herewith.)

MSJ515

KEITH H. RUTMAN (CSB #144175)
501 West Broadway, Suite 1650
San Diego, California 92101-3541
Telephone: (619) 237-9072
Facsimile: (760) 454-4372
email: krutman@krutmanlaw.com

JOSHUA D. GRUENBERG (CSB 163281)
PAMELA VALLERO (CSB #308301)
Gruenberg Law
2155 1st Ave
San Diego, California 92101
Telephone: (619) 230-1234
Facsimile: (619) 230-1074
email: josh@gruenberglaw.com
email: pam@gruenberglaw.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

(Hon. Anthony J. Battaglia)

| | |
|---|---|
| SILVESTRE ESTRADA, *et al.*, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | ) Case No. 22-cv-373-AJB (BGS) <br> ) <br> ) **PLAINTIFFS' FIRST** <br> ) **DESIGNATION OF EXPERT** <br> ) **WITNESSES** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

TO DEFENDANT UNITED STATES OF AMERICA and ITS ATTORNEYS OF RECORD:

Pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure, Plaintiffs, by and through their attorneys, hereby designate the expert witnesses who may testify at trial on their behalf.

MSJ516

1    Plaintiffs reserve the right to call additional expert witnesses at the time of trial

2    and notice of the name or names of said experts will be given when they are known,

3    should their testimony become necessary.

4    Plaintiffs further reserve the right to call in rebuttal any expert witness on any

5    issue which has not been disclosed by discovery to date.

6    Plaintiffs also reserve the right to call each and every expert designated by the

7    Defendant in this action and incorporates by reference said designations.

8    The name and address of each person whose expert opinions Plaintiffs may

9    offer at trial is as follows.  The subject matter of the expected expert testimony and a

10   summary of the facts and opinions follows each identification.

11   In accordance with the provisions of F.R.Civ.P. 26(a)(1)(B), a written report

12   "prepared and signed . . .contain(ing) a complete statement of all the opinions to be

13   expressed and the basis and reasons therefore; the data or other information

14   considered by the witness in forming the opinions (and) any exhibits to be used as a

15   summary of or support for the opinions" will be provided on or before the date

16   ordered by the Court.

17   **1. Jonathan "J.C." Smith**

18   Jonathan "J.C." Smith, 1522 Ynez Pl., Coronado, California, 92118, (619) 818-

19   1329; jcsmithmlb@gmail.com.  His C.V., setting forth his qualifications to offer such

20   expert witness testimony, is enclosed.  He charges a flat rate of $350 per hour for all

21   work performed, plus expenses.  There is no daily minimum.

22   Mr. Smith is an expert in the field of police practices, policies, procedures and

23   use of force.   Mr. Smith is expected to testify regarding the crime scene preservation

24   efforts undertaken by the United States Border Patrol prior to "handing the scene

25   over" to the San Diego Sheriff's Department for investigation.  Mr. Smith's testimony

26   will also relate to all relevant standards for law enforcement policies, procedures,

27   tactics and use of force, particularly those the United States Border Patrol Diego.

28

MSJ517

He will also testify about the proper tactics to be used in incidents of the type at issue in this case, his analysis of the particular incident giving rise to this case and the unreasonableness of tactics and policies employed therein, and other subjects within the scope of his knowledge, training, and experience.   He will also address and/or rebut any opinions offered by the defense designated experts.

Mr. Smith has agreed to testify at trial in this matter and will be sufficiently familiar with the pending action to submit to a meaningful oral deposition concerning his specific testimony, including any opinion and its basis, that he is expected to give at trial.  Such opinion testimony will apply to all aspects of Plaintiff's claims (liability, causation and damages) and Defendants' defenses, including the reasonableness and lawfulness of Defendants' actions.  Mr. Smith's specific opinions in this matter will be included in his report.

**2.  Stephen L. Plourd**

Stephen L. Plourd, Stephen L. Plourd Investigations Inc. 4658 Clairemont Drive San Diego, California 92117, (858) 274-9500, Fax (858) 274-9598, slpispy@gmail.com,  www.slpispy.com. His C.V., setting forth his qualifications to offer such expert witness testimony, is enclosed.  His rate sheet is enclosed.

Mr. Plourd is an expert in the field of accident reconstruction and forensic science (i.e., collecting, preserving, and analyzing scientific evidence during the course of investigations). Mr. Plourd has approximately 40+ years of experience. Mr. Plourd's testimony and opinions in this case regard forensic science, including, inter alia, shooting reconstruction (i.e., examining physical evidence recovered or documented at a shooting scene to gain an understanding of what happened during a shooting incident), and other subjects within the scope of his knowledge, training, and experience.

Mr. Plourd is expected to create forensic simulations and/or animations that demonstrate his reconstruction of the shooting incident in this case based on available evidence and scientific principles. Additionally, Mr. Plourd is expected to testify

MSJ518

1  regarding the vehicle dynamics involved in the shooting incident, including the

2  elements of time, motion, and reaction time, number of shots fired, bullet trajectory

3  analysis, speed and distance factors, shooter and witness perspective, correlation of

4  gunshot impact/wounds to scene evidence, and event timing analysis, including the

5  speed of the vehicle in which the Decedent and surviving Plaintiffs were travelling at

6  the time of the firing of gunshots.  He will also address and/or rebut any opinions

7  offered by the defense designated experts.

8       Mr. Plourd has agreed to testify at trial in this matter and will be sufficiently

9  familiar with the pending action to submit to a meaningful oral deposition concerning

10  his specific testimony, including any opinion and its basis, that he is expected to give

11  at trial.  Hi opinion testimony will apply to all aspects of Plaintiff's claims (liability,

12  causation and damages) and Defendants' defenses.  Mr. Plourd's specific opinions in

13  this matter will be included in his report.

14                                        Respectfully Submitted,

15

16  Dated: March 16, 2023

17                                        KEITH H. RUTMAN
                                          Attorney for Plaintiffs
18                                        Email:  krutman@krutmanlaw.com

19

20

21

22

23

24

25

26

27

28

MSJ519

MSJ520

# Jonathan "JC" Smith

1522 Ynez Pl, Coronado, California, 92118, US  •  1 (619) 818-1329  •  jcsmithmlb@gmail.com

## PROFESSIONAL SUMMARY

Retired Law Enforcement professional with over 36 years of experience, 28 years in investigations, primarily homicide, officer involved shooting cases and crimes of violence.

## SKILLS

Experienced crime scene investigator

Law Enforcement Instructor in Officer Involved Shootings, Homicide

Investigations & Deescalation

Accomplished interview & interrogation skills

Extensive professional network

Coaching and mentoring

## EDUCATION

**Criminology, Law & Society - Master of Science** - 2016
**University of California Irvine** - Irvine, CA

**Criminal Justice - Bachelor of Science** - 1991
**San Diego State University** - San Diego, CA

## WORK HISTORY

**Supervising District Attorney Investigator** - November, 2011 to November, 2021
**San Diego County District Attorney** - San Diego, California

- Worked as part of a team that reviewed and acted as the primary advisor to the San Diego County District Attorney on all cases police use of deadly force, including officer involved shootings.
- Worked on-call for officer involved shootings and supervised investigations involving incidents of serious violence against police officers.
- Responded to over 100 officer involved shooting scenes in San Diego County and particapated in the review of over 100 officer involved shooting investigations.
- Lead a team of investigators in Superior Court and Central Pretrial/Case Disposition Division, responsible for some of the most challenging cases in the District Attorney's Office, including murder, assaults, burglaries, robberies, and felony DUIs. This division was responsible for more than 25 percent of all felony cases tried by the District Attorney's Office. In addition, the Superior Court Division handled pre and post-conviction mental health cases for those defendants alleged to be incompetent to stand trial and those found to be a danger to the community as a result of mental illness.
- Directed investigators in The Major Violator Unit which prosecuted criminals with extensive felony backgrounds such as serial robbers and other defendants charged with numerous serious felonies facing extraordinarily long prison sentences.
- Supervised investigators in the DUI Homicide Unit which handled all of the homicides that occur in the county where someone was driving while under the influence of alcohol or drugs.
- Lead investigators in the Crimes Against Police Officers Unit. Routinely responded to felony cases in which defendants committed crimes against police officers. Crimes included murder of police officers, violent resistance to officers, officers who were assaulted with firearms and other weapons, and other crimes against officers who were trying to perform their daily duties.

MSJ521

**Detective** - March, 1986 to November, 2011

**San Diego Police Department -** San Diego, California

- Investigated officer-involved shooting and use of force cases, homicides, suspicious deaths, in-custody deaths, infant deaths, SIDS, and suspicious suicides.
- Trained new detectives and supervisors in crime scene investigation and interview & interrogation
- Provided expert testimony in San Diego Superior Court in crime scene investigation, blood spatter interpretation, narcotics use, transportation and sales.
- Experienced in Vice, Street Gangs, Narcotics, patrol and traffic investigations.

**Resident Security Agent/Authenticator** - February, 2004 to Present

**Major League Baseball (Private Contractor)** - San Diego, CA

## ACCOMPLISHMENTS

- Recipient of the 2019 Major League Baseball Most Valuable Resident Security Agent Award
- Recipient of 2012 Special Congressional Recognition Award
- Recipient of the 2011 Crime Stopper Investigator of the Year Award
- Recipient of the Uptown Irish Police of the Year Award 2008
- Recipient 1997 US Drug Enforcement Administration Certificate of Appreciation Award
- Recipient of the 1989 San Diego Police Department's Meritorious Service Award
- California Peace Officer Standards & Training (POST Certificates), Supervisory POST, Advanced POST, Intermediate POST, Basic POST
- Approximately 12 San Diego Police Department Commanding Officer Citations

## ADDITIONAL INFORMATION

**TELEVISED CASE DOCUMENTARIES**

**48 Hours Mystery: Daddy's Girl: The Murder of Timothy McNeal, 2017**

**48 Hour Mystery: Shattered Dreams: The Murder of Karina Ditto, 2013**

MSJ522

MSJ523



**Stephen L. Plourd Investigations INC.**

Accident Reconstruction Consultant • ACTAR #212
Licensed Private Investigator • PI #15460
Civil and Criminal Expertise

## *Curriculum Vitae - Stephen L. Plourd*

### Professional Experience

**S.L.P.I. Inc.; Stephen L. Plourd Investigations;** *November 1991 – Present; San Diego, CA Traffic Accident Reconstruction Consultant, Forensic Analysis & Investigations; Civil and Criminal litigation; TrafficRelated Cases; Automotive,Commercial Vehicles (big-rig trucks), Motorcycles, Pedestrians, Bicycles ,Off-Road Vehicles, Buggies, Motorcycles & ATV's.*

**Error Analysis, Inc.;** *Traffic Collision Consultant; July 1993 - December 1999; Accident Reconstruction Specialist; La Mesa, CA*

**Impact General, Inc.;** *Traffic Collision Consultant; December 1991 – December 1994; Traffic Accident Reconstruction Specialist; Orange, CA*

**Jungers Investigation Services;** *October 1990 - October 1991; Traffic Collision Consultant; Traffic Accident Reconstruction & Investigations; El Centro, CA*

**California Highway Patrol;** *March 1979 - October 1990; State Traffic Officer; Accident Reconstruction/Investigations for CHP, District Attorney, Area Law Enforcement Agencies; Multi-Disciplinary Accident Investigation Team (testing & training); Traffic and DUI Enforcement & Related Criminal Investigations; Investigated and assisted in the investigation of approximately 3000 Traffic Accidents; Accident Investigations Review Officer; Field Training Officer; Officer-in-Charge; Protective Services and Dignitary Assistance Officer; El Centro Area, Imperial, CA*

### Licenses and Certifications

**Traffic Accident Reconstructionist "Full Accreditation" ACTAR #212; April 1993; Accreditation Commission for Traffic Accident Reconstruction**

**Licensed Private Investigator, State of California; P.I. #15460; March 1993**

**Emergency Medical Technician; EMT, CHP Public Safety; June 1981 - October 1990**

**Licensed Private Pilot, Single-Engine land; April 1970**

### Educational Background

**Western State University College of Law;** *San Diego, CA 1981-1983; Course Studies: Civil Liability, Civil Procedure and Practice, Evidence, Criminal Law, Property Law, Contracts*

**University of San Diego;** *San Diego, CA January 1976 – May 1978; B.B.A., Business Administration*

**Arizona State University;** *Tempe, AZ; August 1974 - December 1975*

**Imperial Valley College;** *El Centro, CA; 1973 - 1974*

### Specialized Continuing Education and Training

**Toyota TSS, Visibility, night photograph and Video Analysis;** *- 2/2022; SATAI Conference, Glendale, AZ*

**Advanced Accident Reconstruction with CDR Applications; C. Gregory Russell;** *5/2021; Accident Analysis & Reconstruction, Inc. Oklahoma City Police Department and NAPARS, Oklahoma City, OK*

**Advanced Analysis of Driver's Responses and Human Factors Research for Accident Reconstruction; Perception/Response Evaluations and Day and Nighttime Visibility Analysis involving Human Factors Research and Studies, IDRR; Jeffrey W. Muttart, Ph.D.;** *11/2018; University of North Florida, Institute of Police Technology and Management,, Jacksonville, FL*



4658 Clairemont Drive • San Diego, California 92117 • Phone (858) 274-9500 • Fax (858) 274-9598
slpispy@gmail.com • www.slpispy.com

MSJ524

*Specialized Continuing Education and Training (continuation)*

**ARC-CSI Crash Conference-Training;** *9/2017; Pedestrians / Human Factors, Traffic Accident Reconstruction Conference, Las Vegas, NV*

**Forensic Reconstruction, Collision Investigation, Scientific Investigations - Meeting/Seminar** *- 2/2016; American Academy of Forensic Sciences, Las Vegas, NV*

**Human Factors Research for Accident Reconstruction; Perception/Response Evaluations and Day and Nighttime Visibility Analysis involving Human Factors Research and Studies; Jeffrey W. Muttart, Ph.D.;** *10/2014; University of Massachusetts & Northwestern University Course, Las Vegas Police Department, Las Vegas, NV*

**ARC-CSI Crash Conference-Training;** *6/2014; Traffic Accident Reconstruction Conference, Las Vegas*

**Human Factors for Accident Reconstruction; Nighttime Visibility Analysis involving Pedestrian; Visibility, Conspicuity and Lighting;** *- 4/2014; S.A.T.A.I. Conference, Laughlin, NV*

**CSI-ARC CDR Training;** *1/2013; Crash Data Retrieval Users Conference, Houston, Texas*

**ARC-CSI Crash Conference-Training; 6/**2012; *Conference Accident Reconstruction, Las Vegas, NV*

**ARC-CSI Crash Conference-Training; 5/**2011; *Accident Reconstruction Conference, Las Vegas, NV*

**ARC-CSI Crash Testing & Training; 5/**2011; *Facilitate, Conduct and Presented; Staged Crash Testing, Las Vegas, NV*

**ARC-CSI Crash Conference-Training; 5/**2010; *Accident Reconstruction Conference, Las Vegas, NV*

**Collision Safety Institute;** *1/2010; Bosch CDR Technician Certification Course, Las Vegas, NV*

**ARC-CSI Crash Conference-Training;** *6/2009; Accident Reconstruction Conference, Las Vegas, NV*

**ARC-CSI Crash Conference-Training;** *6/2008; Traffic Accident Reconstruction Conference, Las Vegas, NV*

**CSI-ARC CDR Training;** *1/2008; Crash Data Retrieval Users Conference, Houston, Texas*

**ARC-CSI Crash Conference-Training;** *6/2007; Accident Reconstruction Conference, Las Vegas, NV*

**ARC-CSI Crash Conference-Training;** *6/2006; Accident Reconstruction Conference, Las Vegas, NV*

**HVE-2D Training;** *- 3/2006; Engineering Dynamics Corp., Joseph Cordova; Beaverton, OR*

**ARC-CSI Crash Conference-Training;** *6/2005; Accident Reconstruction Conference, Las Vegas, NV*

**Bicycle/Pedestrian Accident Reconstruction;** *03/2005; S.A.T.A.I. Conference, Laughlin, NV*

**CAD Training - Map Scenes Pro;** *- 8/2004; Micro Survey Software Inc., Santa Ana Police Department; Santa Ana, CA*

**ARC-CSI Crash Conference-Training;** *6/2004; Accident Reconstruction Conference, Las Vegas, NV*

**Injury Analysis, Low Speed Impact Studies;** *6/2004; IgotHit.com; ARC-CSI; Las Vegas, NV*

**Cross Examination; Expert Witness Summit, 2004; Cross Examination** *- 3/2004; SEAK, Inc., Newport Beach, CA*

**Lighting & Visibility; Nighttime Visibility** *- 11/2003; S.A.T.A.I. Conference, San Diego, CA*

**Forensic Mapping; Evidence Recorder Pro Instruments & Map Scene Pro** *- 9/2003; Mick Capman; KARA Co., Chicago, IL*

**ARC-CSI Crash Conference-Training;** *6/2003; Accident Reconstruction Conference, Las Vegas*

**Vericom Accelerometer Training;** *- 6/2002; Vericom Computers, Inc., Palms Springs Police Department; Palms Springs, CA*

**Automotive Dynamics & Stability Conference;** *- 5/2002; Society of Automotive Engineers, Detroit, MI*

**Passenger Vehicle Roll-Over; TOPTEC** *- 4/2002; Society of Automotive Engineers, Scottsdale, AZ*

**Vehicle Data Retrieval; Delta-V Analysis** *- 11/2001; S.A.T.A.I. Conference, San Diego, CA*

**Biomechanics of Impact Trauma; Seminar** *- 8/1998; Association for the Advancement for Automotive Medicine, Captiva, FL*

**Car Crashes and Occupant Injuries; Seminar** *- 4/1998; Association for the Advancement for Automotive Medicine, Tempe, AZ*

MSJ525

Case 3:22-cv-00373-AJB-BGS   Document 45-3   Filed 09/01/23   PageID.725   Page 526 of 529

*Specialized Continuing Education and Training (continuation)*

**High Speed Rear Impact Collision; TOPTEC** - 10/1997; Society of Automotive Engineers, Tempe, AZ

**Traffic Signal Analysis; Head Lamp Analysis; Motorcycle Reconstruction** - 3/1997; S.A.T.A.I. Conference, Las Vegas, Nevada

**Tire Forensic Analysis; Multi-Vehicle Braking Analysis; WinSLAM Prediction Reconstruction** - 11/1996; S.A.T.A.I. Conference, San Diego, CA

**Forensic Mapping Training Seminar; SOKKIA Instruments** - 8/1996; Michael Capman; KARA Co., Chicago, IL

**Biomechanics of Injury from Automobile Accidents** - 5/96; National Institute of Forensic Studies, Orange, CA

**Forensic Reconstruction, Collision Investigation, Scientific Investigations -** *Meeting/Seminar/Presentation*- 2/96; AmericanAcademy of Forensic Sciences, Seminar, Nashville, TN

**Investigating Staged Traffic Accident** - 5/95; Correspondence Course, California Investigative Academy, Fountain Valley, CA

**Heavy Vehicle Crash Accident Reconstruction** - 2/95; Traffic Institute - Northwestern University, Sunnyvale, CA

**Low Speed Rear Impact Collision; TOPTEC** - 8/94; Society of Automotive Engineers, Irvine, CA

**Forensic Reconstruction, Collision Investigation, Scientific Investigations - Meeting/Seminar**- 2/94; AmericanAcademy of Forensic Sciences, San Antonio, TX

**Head and Neck Injury Symposium** - 12/93; Society of Automotive Engineers, Denver, CO

**Accidental Injury: Biomechanics & Prevention** - 11/91; University of California, School of Medicine, San Diego, CA

**Advanced Accident Reconstruction with Micro-Computers** - 5/91; Institute of Police Technology and Management, University of Northern Florida, Jacksonville, FL

**Investigation of Seat Belt and Child Restraint Injuries** - 7/90; Institute of Police Technology and Management, Phoenix, AZ

**Traffic Accident Reconstruction - Course II** - 11/89; Traffic Institute - Northwestern University, Evanston, IL

**Traffic Accident Reconstruction** - 7/89; MAIT Training, California Highway Patrol Academy, Sacramento, CA

**Investigation of Motorcycle Accidents** - 5/89; Institute of Police Technology and Management, Phoenix, AZ

**Traffic Accident Reconstruction** - 5/88; Institute of Police Technology and Management, University of Northern Florida, Jacksonville, FL

**Speed from Skid-mark Training and Analysis** - 1/87; CaliforniaHighwayPatrolAcademy, Sacramento, CA

**Advanced Accident Investigations** - 1/87; CaliforniaHighwayPatrolAcademy, Sacramento, CA

**Techniques of Accident Investigations** - 10/86; CaliforniaHighwayPatrolAcademy, Sacramento, CA

**Accident Causation Analysis Seminar** - 9/84; James L. Gallion, Rosarito Beach, Mexico

**Emergency Medical Technician Training; Public Safety** - 6/81; California Highway Patrol Academy, Sacramento, CA

**California Highway Patrol, "POST" Training, Accident Investigation Training, DUI, Traffic Enforcement & Vehicle and Penal Codes** - August/1979; California Highway Patrol Academy, Sacramento, CA

MSJ526

*Professional Affiliations*
*Society of Automotive Engineers, S.A.E., Member # 4900595996A*
*National Association of Professional Accident Reconstruction Specialists, N.A.P.A.R.S.*
*Forensic Expert Witness Association, F.E.W.A., Member*
*Accident Reconstruction Network, A.R.C., Member*
*American College of Forensic Examiners, ACFE, Member*
*Southwestern Association of Technical Accident Investigators, S.A.T.A.I.*

*Publications/Lectures/Testing*
* Lecture, Training; Fire Department and Marine Corp Military Police; Bridgeport, CA. December 2017
* Lecture/Presentation;National Association of Legal Investigators, January, 2017; San Diego, CA
* Motorcycle Visibility and Conspicuity; Research, Testing and Analysis, Regarding Motorcycle Visibility and Conspicuity Analysis (with Dr. Alison Vredenburgh MS, Ph.D. and Dr. Harvey Cohen, Ph.D., CPE).
* Publication; Collision Causation; "Time attention is directed away from the traffic in front of vehicle while preparing for a lane change". "Congress of the International Ergonomics Association", Ottawa, Canada, August 1994, (with Dr. Alison Vredenburgh MS. Ph.D. and Dr. Harvey Cohen, Ph.D., CPE).
* Guest Commentator; COURT TV; People of the State of Texas v. Chante Jawan Mallard, June, 2003; National
* Lateral Coefficient of Friction Differentials/Tire Testing; with Gerald Rosenbluth; Automotive Consulting Services; 3/2002
* Testing; Inertial Release Seat Belt Testing; with Gerald Rosenbluth; Automotive Consulting Services; February, 2002
* Testing; Side Impact Crash Testing, RX7-LTD; with Dr. Nicholas Carpenter; May, 1996
* Presentation; AmericanAcademy of Forensic Sciences; Case Study: "Lane Change Analysis" February, 1996; Nashville, TN
* Lectures, Presentations and Speaking Engagements; Attorneys, InsuranceAdjusters, Law Enforcement Officers in Accident Reconstruction, Accident Investigations; Criminal and Civil Litigations; Matters for Plaintiff and Defense
* Presentation; Association of Plaintiff Interstate Trucking Lawyers of America, September, 2011; St. Louis, MO
* Lectures, Presentations and Speaking Engagements; Attorneys, Insurance Adjusters, Law Enforcement Officers in Accident Reconstruction, Accident Investigations; Criminal and Civil Litigations; Matters for Plaintiff and Defense

MSJ527



**Stephen L. Plourd Investigations**
**INC.**

Accident Reconstruction Consultant • ACTAR #212
Licensed Private Investigator • PI #15460
Civil and Criminal Expertise

## SLPI Inc. Fee Schedule                                                **Per Hour**

**Accident Reconstruction (Stephen L. Plourd)**
  Consultation, Analysis, Field Work, Reports, Investigations,
  Diagramming, Exhibit Preparation .................................................................. $375.00
**Technician/Computer Services**
  Simulations, Animation, Scans, Image Analysis, Digital Video Transfers ... $250.00
**Digital Videographer & Photography**
  Evidence Photography, Videography, Enlargements ..........……............… $250.00
**Private Investigations (Investigator, other than Mr. Plourd)**
  Investigations, Interviews, Computer Research. $225.00
**Assistant/Support Staff**
  Scene and vehicle inspections, traffic control, other ...............................… $110.00
**Secretarial/Administrative** ................................................................................... $90.00
**Testimony - Trial/Arbitration/Deposition (Stephen L. Plourd)**
  Per hour or portion thereof (*Video Taped Deposition)............................ $500.00/ *$600

## Related Expenses -- Incidental to case
  Vehicle Expense (per mile) ...............................................……………..... $ 0.75
  Photographs (digital, each) ....................................………................... $ 1.00
  Faro Scanner Service "when available" (* per scan; *per event) ..............… $ 750.00
  Bosch / * Hyundai/KIA/Tesla (down-load, each) ................................…… $ 250.00 / * $450
  Computer Research / Search ........................................ $50 minimum

\*    Travel, subsistence, reproductions, supplies and other non-wage cost directly related to case
     are billed at cost, plus 10% administrative cost.

- **A retainer of $3000 - $5000, of which $1000 is non-refundable, with letter of retention is
  required before start of work. The entire amount is considered a credit against billings.**
- **Mr. Plourd is not considered retained until the retainer and letter of retention is received.**
- **A $1000 Expert Designation Fee is required when Mr. Plourd is designated on any case as
  an expert, regardless of work.**
- **A minimum $1000 Fee is required when reviewing or consulting on ANY Case**

\*    Periodic statements will be submitted for work in progress or upon completion of work.
     Invoices are due and payable upon receipt, delinquent after 30 days. Any invoice unpaid
     after 30 days shall have a service charge added at the rate of 1.0 % per month (12 % per
     year) on the unpaid balance.  Compensation for services performed will not be contingent
     upon case outcome or necessity of client to receive payment from other parties.

04/01/2022



MSJ528

**PROOF OF SERVICE**

I, the undersigned, declare under penalty of perjury that I am over the age of eighteen years and not a party to this action.  That my business address is 501 West Broadway Suite 1650 San Diego, California 92101.  That on March 16, 2023 I served a copy of **PLAINTIFFS' FIRST DESIGNATION OF EXPERT WITNESSES** by delivering a copy to each of the names and addresses listed below via email, with the consent of opposing counsel.

Person(s) served:

AUSA David Wallace: Dave.wallace@usdoj.gov

AUSA Collin McDonald: Colin.mcdonald@usdoj.gov

AUSA Ernest Cordero, Jr.: Ernest.cordero@usdoj.gov

Executed under penalty of perjury under the laws of the United States on March 16, 2023 at San Diego, California.

_Keith H Rut_
KEITH H. RUTMAN

MSJ529