UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SILVESTRE ESTRADA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | Case No.: 22-cv-00373-AJB-BJW <br><br> **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

## I.

## THE ACTION

This is an Action under the Federal Tort Claims Act ("FTCA") arising from the shooting death of Silvestre Estrada Vargas ("Estrada" or the "Decedent") on May 14, 2021.

At approximately 10:13 p.m. that evening, Estrada picked up two undocumented migrants and led United States Border Patrol Agents ("Agents") on a high-speed pursuit on State Route 94 ("SR 94"). The pursuit ended at a Circle K gas station in Campo, California, where three Agents fired five rounds into Estrada's vehicle. Estrada was struck and killed by one of the bullets.

The Plaintiffs in this Action are the Estate of Estrada—which brings suit by Silvestre Estrada, the Decedent's minor son, who is represented by Emily Prieto, Silvestre Estrada's Court-appointed Guardian *ad Litem* and mother; Francisco Madariaga; and Jaime

1

Madariaga-Gonzalez. Francisco Madariaga and Jaime Madariaga-Gonzalez (collectively, the "Madariagas") were the two undocumented migrants who the Decedent picked up.

Plaintiffs allege that the Agents unreasonably used deadly force to stop Estrada's vehicle, causing (1) the wrongful death of Estrada; (2) assault/battery of Estrada; (3) assault of the Madariagas; and (4) the negligent use of force.

The United States is the Defendant in this Action. The United States denies Plaintiffs' allegations and contends that the Agents' use of force was reasonable under the totality of the circumstances.

## II.

## JURISDICTION AND VENUE

The Court has jurisdiction over this matter under 28 U.S.C. § 1346(b)(1). Venue is proper in the Southern District of California because all conduct giving rise to the claims alleged in the Complaint occurred in San Diego County.

## III.

## THE PROCEEDINGS

The case was tried solely before the Court in a trial held from April 2, 2026, through April 14, 2026.

The issues tried and the elements of each claim are set out in the Court's Pretrial Order. (Doc. No. 82.)

Following the trial, and upon review of the testimony and documentary evidence, the agreed facts, the arguments of counsel, and the relevant legal authorities, the Court now makes the following findings based on the credible evidence and the reasonable inferences to be drawn therefrom. These findings were based upon a preponderance of the credible evidence.

The Court's analysis of Plaintiffs' claims distills down to whether the Agents' use of force was reasonable.

22-cv-00373-AJB-BJW

> The United States shall be liable . . in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.
>
> If, however, in any case wherein death was caused, the law of the place where the act or omission complained of occurred provides, or has been construed to provide, for damages only punitive in nature, the United States shall be liable for actual or compensatory damages, measured by the pecuniary injuries resulting from such death to the persons respectively, for whose benefit the action was brought, in lieu thereof.

28 U.S.C. § 2674.

California law applies because the underlying acts occurred in California. Under California law, the Fourth Amendment's excessive force standard applies to claims for wrongful death and assault and battery by law enforcement officers. *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527 (2009). Courts must "consider[] the totality of the circumstances surrounding any use of deadly force" for a negligence claim. *Hayes v. County of San Diego*, 57 Cal. 4th 622, 639 (2013). This is "broader than federal Fourth Amendment law, which tends to focus more narrowly on the moment when deadly force is used." *Id.*

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . [T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Martinez v. County of Los Angeles*, 47 Cal. App. 4th 334, 343 (1996) (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)). Triers of fact "must recognize that peace officers are often forced to make split-second judgments, in tense circumstances, concerning the amount of force required." *Brown*, 171 Cal. App. 4th at 527–28.

Delving into each of Plaintiffs' claims, Claim One alleges that the United States, acting through the Agents, caused the death of Silvestre Estrada Vargas through the wrongful use of deadly force. (Doc. Nos. 8 ¶¶ 12–17; 82 at 4.) "Claims that police officers

used excessive force in the course of a[] . . . 'seizure' . . . are analyzed under the reasonableness standard of the Fourth Amendment to the United States Constitution." *Brown*, 171 Cal. App. 4th at 527 (quoting *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1102 (2004)). "The question is whether a peace officer's actions were objectively reasonable based on the facts and circumstances confronting the peace officer." *Id.* (citing *Munoz*, 120 Cal. App. 4th at 1102). "Where [an] officer has probable cause to believe that [a] suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Put another way, "where a suspect threatens an officer with a weapon . . . , the officer is justified in using deadly force." *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005).

Claims Two and Three allege that the United States, acting through the Agents, assaulted and battered the Decedent and assaulted the Madariagas. (Doc. Nos. 8 ¶¶ 18–25; 82 at 8, 10–11.) "A state law battery claim is a counterpart to a federal claim of excessive use of force. In both, a plaintiff must prove that the peace officer's use of force was unreasonable." *Brown*, 171 Cal. App. 4th at 527 (quoting *Munoz*, 120 Cal. App. 4th at 1102 n.6). Similarly, "the underlying basis of the officers' alleged liability [for assault] is the assertion that the[] officers unreasonably used . . . force." *Koussaya v. City of Stockton*, 54 Cal. App. 5th 909, 932 (2020).

Lastly, Claim Four alleges that the United States, acting through the Agents, acted negligently in using force to seize the Decedent and the Madariagas. (Doc. Nos. 8 ¶¶ 26–29; 82 at 14–15.) Like the assault and battery claims, "the underlying basis of the officers' alleged liability, whether for intentional tort *or negligence*, is the assertion that the[] officers unreasonably used . . . force." *Koussaya*, 54 Cal. App. 5th at 932 (emphasis added).

Thus, the Court must analyze whether the Agents' use of force was reasonable or not to address the Plaintiffs' four claims.

## IV.

## FINDINGS OF FACT

Any finding of fact which is more appropriately a conclusion of law is to be deemed as such.

The following facts were admitted by the parties (Doc. No. 101) and are adopted by the Court:[1]

1. On May 14, 2021, at approximately 10:13 p.m., Agents engaged in the pursuit of a vehicle driven by Estrada.

2. The vehicle driven by Estrada was a silver 2020 Nissan 4DR, Silver, License Plate No. CA8RAM551.

3. The pursuit began in an area known as Zuellner's on SR 94 and ended in the area adjacent to the Circle K gas station on SR 94 in Campo, California.

4. Estrada's vehicle had two passengers—Plaintiff Francisco Madariaga and Plaintiff Jaime Madariaga-Gonzalez.

5. Other Agents, using surveillance technology, observed Estrada pick up Plaintiff Francisco Madariaga and Plaintiff Jaime Madariaga-Gonzalez on the shoulder of SR 94 immediately before the pursuit began.

6. The Madariagas were both undocumented migrants with Mexican citizenship who had crossed the border days before.

7. Estrada was a U.S. citizen.

8. The primary pursuit vehicle was a fully marked Border Patrol 2020 Chevrolet Tahoe (SUV), License Plate No. M07747, with no passengers.

9. The secondary pursuit vehicle was a fully marked Border Patrol 2020 Chevrolet Silverado (Truck), License Plate No. K05818, with no passengers.

---

[1] The Court has made minor, stylistic edits to these stipulated facts. These edits are not intended to change the substance or meaning of the parties' stipulations.

22-cv-00373-AJB-BJW

10. The drivers of the pursuit vehicles were, respectively, Agent Robert Godreau ("Agent Godreau") and Agent Christoper Baker ("Agent Baker").

11. During the pursuit, the Border Patrol pursuit vehicles activated their service vehicle lights and sirens.

12. During the pursuit, Estrada's vehicle at times swerved in and out of the eastbound and westbound lanes of SR 94, and at times was driving over 80 miles per hour ("MPH").

13. At one point during the pursuit, Estrada's vehicle yielded near an area known as "Zuellner's" on SR 94 eastbound. When Agents Godreau and Baker approached the vehicle, it sped off.

14. The length of pursuit was approximately four miles and lasted approximately six minutes.

15. During the pursuit, the Madariagas were frightened and believed they might get into an accident.

16. Ultimately, Estrada's vehicle entered an area known as Zuellner's on SR 94 that contains a Circle K gas station. Estrada's vehicle pulled into the Circle K gas station.

17. In addition to the pursuit vehicles, also arriving on-scene around the time Estrada entered the Circle K gas station were the following fully marked Border Patrol vehicles: 1) a 2016 Jeep Wrangler (SUV), License Plate No. M62677, with no passengers; 2) a 2018 Chevrolet Tahoe (SUV), License Plate No. M87627, with no passengers; and 3) a 2020 Jeep Wrangler (SUV), License Plate No. M08716, with no passengers.

18. While in the Circle K parking lot area, Estrada continued driving and hit a curb, causing damage to his vehicle.

19. At approximately 10:19 p.m. the vehicle came to a stop in the Circle K parking lot area.

22-cv-00373-AJB-BJW

20. Various Agents exited their vehicles, and approached Estrada's car, with their firearms drawn while yelling various commands.

21. After Estrada's vehicle had come to a stop, the vehicle began to move forward.

22. Agents Godreau and Alba and Agent David Mathews ("Agent Mathews") discharged their firearms.

23. Agent Godreau fired three shots.

24. Agent Alba fired one shot, which struck and killed Estrada.

25. Agent Mathews fired one shot.

26. Agent Luis Perez ("Agent Perez"), Agent Baker, and Watch Commander Lou Patch ("WC Patch") were also on scene when Agents Godreau, Alba, and Mathews discharged their firearms.

27. Estrada died after being struck by a bullet shot by Agent Alba.

28. Silvestre Estrada, a minor, through his guardian *ad litem*, Emily Prieto, is the natural born son of the Decedent and therefore has standing to bring a wrongful death claim pursuant to California Code of Civil Procedure 377.60.

29. Silvestre Estrada, a minor, through his guardian *ad litem*, Emily Prieto, is the natural born son of the Decedent and therefore has standing to bring survival claims on behalf of the decedent Silvestre Estrada Vargas pursuant to California Code of Civil Procedure § 377.32.

The parties, by and through their respective attorneys, stipulated as follows:

30. Greg B. Pizzaro, M.D., was not deposed in this case. If Dr. Pizarro were called as a witness at trial, he would testify to the following:

   a. Dr. Pizarro is a Medical Examiner with the San Diego County Medical Examiner's Department. He performed the autopsy of Silvestre Vargas Estrada on May 16, 2021.

   b. The decedent was Silvestre Vargas Estrada, a 26-year-old Hispanic male born on June 30, 1994. He was formally identified by fingerprint

comparison conducted by the U.S. Customs and Border Protection on May 16, 2021. He was pronounced dead at 12:20 a.m. on May 15, 2021.

    c.    Dr. Pizarro would testify consistently with his signed Medical Examiner's Autopsy Report for Silvestre Vargas Estrada, M.E. Case No. 2021-01605, marked as Exhibit 7 and located at ESTRADA-USAO-000158-000170.

31. The San Diego County Medical Examiner's Office conducted a toxicology analysis using its ABFT-accredited laboratory, which yielded the following results:

    a.    Methamphetamine: 0.72 mg/L (positive) in antemortem blood.

    b.    Amphetamine: 0.05 mg/L (methamphetamine metabolite) in antemortem blood.

    c.    Alcohol (Ethanol): Not detected.

    d.    All other drugs of abuse screened (benzodiazepines, cannabinoids, cocaine metabolites, fentanyl, methadone, opiates, oxycodone, phencyclidine, zolpidem, buprenorphine, carisoprodol): Not detected.

32. Michelle Robison was not deposed in this case. If Ms. Robison were called a witness at trial, she would testify to the following:

    a.    Ms. Robison is a Forensic Evidence Technician (ID #6300) with the San Diego County Sheriff's Department Regional Crime Laboratory.

    b.    On May 14, 2021, at 2339 hours, Ms. Robison was contacted by the Sheriff's Communications Center and asked to respond to 31474 State Highway 94, in Campo, for a briefing in connection with an officer-involved shooting.

    c.    On May 15, 2021, at 0109 hours, Ms. Robison arrived at 31474 State Highway 94. She met with Forensic Evidence Technician Sharilyn Chapin, Criminalist Lauren Sautkulis, Detective Robert Powers ("Detective Powers"), and other Sheriff's personnel, Border Patrol

personnel, and FBI personnel. Following a briefing, Detective Powers requested Ms. Robinson respond to the Border Patrol Station in Campo to assist with processing subjects. She departed at 0203 hours.

d.  Ms. Robison would testify consistently with her signed Laboratory Services Report, SDSD Case No. 21120434, marked as Exhibit 204, and located at ESTRADA-USAO-000216-000243.

33.  Sharilyn Chapin was not deposed in this case. If Ms. Chapin were called as a witness at trial, she would testify to the following:

a.  She is a Forensic Evidence Technician (ID #5189) with the San Diego County Sheriff's Department Regional Crime Laboratory.

b.  On May 14, 2021 at 2310 hours, Ms. Chapin was contacted by the Sheriff's Communications Center and asked to respond to 31474 State Highway 94, in Campo, for a briefing in connection with an officer-involved shooting.

c.  Ms. Chapin would testify consistently with her 2 signed Laboratory Service Reports, SDSD Case No. 21120434, marked as Exhibit 202 and located at ESTRADA-USAO-000195-000210, and Exhibit 203 and located at ESTRADA -USAO-000265-000277.

34.  Scott Hoopes was not deposed in this case. If Mr. Hoopes were called as a witness, he would testify to the following:

a.  Mr. Hoopes is a Criminalist III (#6686) with the San Diego County Sheriff's Department Regional Crime Laboratory.

b.  He was asked by Detective R. Powers to perform the following services: weapon operability, cartridge case examination, and bullet examination.

c.  Mr. Hoopes would testify consistently with his signed Laboratory Services Report, SDSD Case No. 21120434, marked as exhibit 11 and located at ESTRADA-USAO-000299-304.

9

35. If Matthew Delgado were called as a witness at trial, he would testify to the following:

a. He was employed at the Subway restaurant located at 31471 SR-94 in Campo—a building within the Circle K parking lot.

b. He was working at the time of the incident in issue in this trial.

c. While working he captured video footage on his cell phone of the incident, which footage is marked as Exhibit 14 and located at ESTRADA-USAO-002096-vid_20210514_221832114.mp4.

d. The video in Exhibit 14 fairly and accurately depicts part of what Mr. Delgado saw that evening.

36. If Agent Jordan Gerber ("Agent Gerber"), United States Customs and Border Protection, were called to testify:

a. Agent Gerber would testify consistently with the declaration he provided to this Court under ECF No. 45-3, and Bates No. MSJ_256 (hereinafter, "Gerber declaration"). The parties stipulate that the contents of the Gerber declaration can be admitted as substantive evidence and may be read into the record. The parties waive all objections to the Gerber declaration's admission and consideration by the Court as substantive evidence during the trial in the instant case.

During the trial, the parties also agreed on the following facts:

37. According to JDPower, the 2020 Nissan Altima is a sedan measuring approximately 16 feet (192.9 inches) in length, 6 feet (72.9 inches) in width (without mirrors), and 4.725–4.79 feet (56.7 to 57.5 inches) in height. (Doc. No. 108.)

38. The Court took Judicial Notice, at the joint request of the parties, that the vehicle speed of five MPH converts to 7.33333 feet per second, and that the vehicle speed of four MPH converts to 5.86667 feet per second. This is based on a calculation of 1.466 feet per second per MPH. (Doc. No. 110.)

The Court further finds, based on a preponderance of the credible evidence, the following:

39. After hitting the curb at Circle K (*supra* ¶ 18) in the area where Agent Godreau's vehicle was parked, Estrada reversed until he was blocked by a Border Patrol vehicle driven by Agent Perez. Estrada stopped (*supra* ¶ 20). Estrada's vehicle was surrounded by Agents and their vehicles at this point.

40. Estrada's vehicle suffered significant passenger-side, front-end damage from the collision with the curb, although it was still drivable.

41. The Agents, including Agent Godreau; witness Brian Moreno; and the Madariagas all believed the chase was over.

42. Pursuant to their training, the Agents approached the vehicle (*supra* ¶ 20) and maintained a perimeter ("boxing in") around the suspects to avoid a "bail out," where the vehicle occupants could escape on foot. Bail outs were something Agents experience in their regular duties.

43. Agent Perez was generally behind the stopped vehicle, Agent Alba and WC Patch were on the vehicle's passenger side, and Agent Godreau approached from the curb in front of the vehicle on his way to arrest the driver on the driver's side. Agent Mathews was on the driver's side of the vehicle on the other side of a barbed wire fence.

44. Estrada's vehicle remained stopped in front of Agent Perez's vehicle for four seconds as the Agents approached while yelling commands to Estrada, whose driver's side window was open. The four-second interval is based on Stephen Plourd's reconstruction using videos of the event.

45. After being stopped for the four seconds, Estrada revved the 3400 pound, six-foot-wide vehicle's engine, making a loud pitched "whine" described as "pedal to the metal," and then accelerated forward at four to five MPH for 1.6 seconds, before Agent Godreau opened fire. Agent Alba fired .03 seconds later, and all shots, including Agents Mathews', ceased within 1.1 seconds

22-cv-00373-AJB-BJW

after the first. Neither Agent Perez nor WC Patch fired as they had no clear shot. Agent Perez believed Agent Godreau was going to be hit by Estrada's vehicle.

46. The vehicle traveled between 5.86 and 11.7 feet at a speed between four to five MPH in the 1.6 seconds that the vehicle moved toward Agent Godreau. According to Stephen Plourd, Agent Godreau was 8 to 12 feet in front of the vehicle.

47. Under the totality of the circumstances, Agent Godreau felt in imminent danger of great bodily harm or death as the vehicle suddenly accelerated and approached him. This officer's actions were "objectively reasonable" in light of the facts and circumstances confronting him.

48. As Agent Godreau fired, he backed away from the vehicle, and the vehicle turned left in the direction of Agent Mathews. Agent Godreau's three shots struck the windshield but did not hit any of the vehicle's occupants.

49. Agent Alba believed Agent Godreau was in imminent danger as the vehicle headed forward and fired the shot that struck and killed Estrada. Like Agent Godreau's actions, Agent Alba's actions were objectively reasonable under the totality of the circumstances.

50. The witnesses' accounts of the less-than-seven critical seconds (four seconds stopped, 1.6 seconds moving toward Agent Godreau, and 1.1 seconds while shots were fired) vary regarding Agent Godreau's precise location. However, the undisputed trajectories of Agent Godreau's bullets place him in front and toward the passenger side of the vehicle.

51. Agent Godreau's post-incident estimate of his firing location *vis-à-vis* the vehicle was inaccurate. The unaccounted-for shell casings do not impact the Court's ultimate findings of Godreau's position, nor did the post-incident movement of the vehicles by the Agents. Stephen Plourd's reconstruction was arrived at with confidence in his opinion, although his reconstruction was

impeached by an improper orientation of Estrada's vehicle before it started to move.

52. As Estrada's vehicle turned towards its left and travelled toward the fence, Agent Mathews fired, fearing he was in danger. Agent Mathews was 25 feet away, but the vehicle was headed toward him and he believed the vehicle could breach the fence and endanger him. This was an objectively reasonable conclusion under the totality of the circumstances.

53. That the vehicle may not have been able to breach the wire fence was not clearly established. It could be inferred that Estrada may have believed he could breach the fence. In any event, Agent Alba shot Estrada within 1.9 seconds of Estrada accelerating, and no evidence establishes that Agent Mathews knew that Estrada was incapacitated before Agent Mathews fired.

54. The applicable use of force and safety policies, often recited in the case, were set forth in Exhibit 1. The relevant language found on page 6 reads in full:

> Except where otherwise required by inspections or other operations, Authorized Officers/Agents should avoid standing directly in front of or behind a subject vehicle. Officers/agents should not place themselves in the path of a moving vehicle or use their body to block a vehicle's path.

And

> Authorized Officers/Agents should avoid intentionally and unreasonably placing themselves in positions in which they have no alternative to using deadly force.

The parties agreed that "should" is a permissive term that provides Agents discretion under the circumstances of a given situation.

55. Neither less-than-lethal force or de-escalation methods could have been employed. There was no time to utilize a baton and any impact from a baton to Estrada would have been to his head and/or neck and would thus be lethal. Agents are trained not to use tasers on a moving vehicle, and there was no

time to deploy a dog or a helicopter (Agent Baker had called for a helicopter during the chase on SR 94). Finally, firing a pepper ball with a launcher into the vehicle would also have been lethal.

## V.

## CONCLUSIONS OF LAW

Tragically, Mr. Estrada was shot and killed on May 14, 2021. This case ultimately comes down to events that occurred within just seven seconds. After the high-speed chase on SR 94, the vehicle entered the Circle K property. Estrada sped through the property apparently looking for an exit. Estrada left the paved area onto a grassy/dirt area adjacent to a fence separating the property from SR94. Estrada attempted to reach the property's entrance/exit, but was blocked by a high curb that Estrada crashed his vehicle into. The right front end of the vehicle sustained significant damage. Unable to proceed further, Estrada backed up to a point where he was blocked in by Agent Perez's vehicle.

Estrada stopped the vehicle for four seconds. While the vehicle was stopped, the Agents approached the vehicle because almost everyone—including the Madariagas—believed the vehicle chase was over. During this time, Agent Alba approached the vehicle from the passenger side, Agent Perez approached from the rear, and WC Patch was in front of and to the passenger side of the vehicle. Agent Godreau was approximately eight to twelve feet in front of the vehicle.

Although everyone else believed the vehicle chase was over, Estrada apparently thought otherwise. Estrada revved the vehicle and then accelerated forward. The acceleration occurred as Agent Godreau approached the vehicle. The vehicle accelerated to four to five miles per hour. Within 1.6 seconds of the acceleration, Agent Godreau fired the first shot. Four shots followed over the next 1.1 seconds.

Under the totality of the circumstances, it was not unreasonable for Agent Godreau and the other Agents to believe that Estrada's attempts to flee had ended during the four-second stop. It was not unreasonable for the Agents to approach the vehicle to arrest the occupants. When the vehicle accelerated forward in Agent Godreau's direction and got

within mere feet from him in 1.6 seconds, Agent Godreau assessed the imminent danger of serious injury or death to himself and fired. This was a reasonable use of force. The Plaintiffs failed to offer credible evidence or analysis that Agent Godreau could have jumped out of the way or that Agent Godreau would have been aware the vehicle would have missed him. One cannot expect Agent Godreau to have gambled with his own life by speculating on Estrada's intent or planned trajectory and hopefully jumping away. Clearly, Estrada gambled with his own life.

Agent Godreau also did not violate Customs and Border Protection policy. He followed his training in approaching the vehicle to apprehend suspects after Estrada crashed into the curb and stopped in front of Agent Perez's vehicle. Agent Godreau had little choice or option once Estrada revved up and then accelerated the vehicle in his direction. The Madariagas and the Agents, including Agents Godreau and Alba, all noted that the acceleration was a surprise.

All the same can be said of Agent Alba, who shot as the vehicle accelerated toward Agent Godreau. Agent Alba shared the belief that the chase was over as Estrada's vehicle sat surrounded by Agents and their vehicles, all after traversing the parking lot and crashing into the curb separating the unpaved area from the entrance/exit to the property. In the split seconds (1.9) before he shot, Agent Alba's assessment that the use of deadly force was justified to save Agent Godreau from a serious risk of injury or death was, all in all, reasonable.

Furthermore, Agent Mathews' fear that he was in danger and his decision to fire were reasonable under the totality of the circumstances. This is especially so considering Estrada's actions during the chase, driving around the Circle K lot, and the acceleration towards Agent Godreau. The use of deadly force by Agent Mathews was thus justified.

Plaintiffs' notion that the Agents should have de-escalated the situation by letting Estrada go and spike stripping the vehicle further down SR 94—at night and on a winding, unlit country road—is untenable. The Agents had already pursued Estrada over a six-mile chase, during which Estrada drove at excessive speeds, made evasive maneuvers and

exhibited poor control of his vehicle—all on a dark and winding two-lane country road with areas unprotected by safety railings. Subjecting the Madariagas, Estrada, and the Agents—along with other possible roadway travelers—to an operation like that would not have been reasonable.

Plaintiffs also proposed that other means to de-escalate or other methods to address the situation with non-lethal force were available. Specifically, Plaintiffs suggested the Agents could have deployed a dog or helicopter in the parking lot or used batons, pepper ball launchers, or tasers to de-escalate or stop Estrada. None of these alternatives would have been reasonable. First, no evidence was offered as to how the deployment of a helicopter or a dog would have produced a different outcome, although the Court notes Agent Baker called for a helicopter during the chase on SR 94. Second, the use of a baton would have been ineffective at the distances involved and because Estrada was in a vehicle. Even if one of the Agents could have struck Estrada with a baton through the open driver's window, likely striking him in the head or neck, such a strike would have constituted the use of lethal force. Third, firing a pepper ball into the vehicle would also have constituted the use of lethal force. Finally, using a taser against the moving vehicle would have been ineffective. If the taser somehow hit Estrada, Estrada likely would have lost control of the vehicle and potentially injured the Agents and the Madariagas.

## VI.

## CONCLUSION

Based on the foregoing, the Court **FINDS** for Defendant United States of America, and against Plaintiffs, all and each of them. The Clerk of Court is **DIRECTED** to enter judgment for the Defendant and against Plaintiffs on all claims and causes of action.

**IT IS SO ORDERED.**

Dated:  April 23, 2026

Hon. Anthony J. Battaglia
United States District Judge

22-cv-00373-AJB-BJW